## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA
U.S. Department of Justice, Antitrust Division
450 5th Street NW, Suite 4100
Washington, DC 20530

STATE OF CALIFORNIA
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102

STATE OF FLORIDA
PL-01, The Capitol
Tallahassee, FL 32399-1050

STATE OF HAWAII
425 Queen Street
Honolulu, HI 96813

STATE OF MISSISSIPPI
P.O. Box 22947
Jackson, MS 39225

and

STATE OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188

                    *Plaintiffs,*

v.

CVS HEALTH CORPORATION
1 CVS Drive
Woonsocket, RI 02895

and

AETNA INC.
151 Farmington Avenue
Hartford, CT 06156

                    *Defendants*.

**COMPLAINT**

The United States of America, acting under the direction of the Attorney General of the United States, and the States of California, Florida, Hawaii, Mississippi, and Washington ("Plaintiff States"), bring this civil antitrust action to prevent CVS Health Corporation from acquiring Aetna Inc.

## I.      Introduction

1.      CVS's proposed $69 billion acquisition of Aetna would combine two of the country's leading sellers of individual prescription drug plans, also known as individual PDPs. More than 20 million individual beneficiaries—primarily seniors and persons with disabilities—rely on these government-sponsored plans for prescription drug insurance coverage. Competition between CVS and Aetna to sell individual PDPs has resulted in lower premiums, better service, and more innovative products. The proposed acquisition would eliminate this valuable competition, harming beneficiaries, taxpayers, and the federal government, which pays for a large portion of beneficiaries' prescription drug coverage.

2.      While CVS and Aetna compete throughout the United States, they are particularly strong in 16 geographic regions established by the Centers for Medicare & Medicaid Services ("CMS"). In these 16 regions, over 9.3 million people are enrolled in individual PDPs. Competition between CVS and Aetna is particularly important in these regions because they compete for similar customers by lowering prices and improving products. Moreover, they are two of the largest and fastest-growing competitors. Individuals in these 16 regions will experience harm, including price increases and quality reductions, from the loss of competition between CVS and Aetna.

3.     Because the transaction likely would substantially lessen competition between CVS and Aetna for individual PDPs in these 16 regions, the proposed acquisition violates Section 7 of the Clayton Act, 15 U.S.C. § 18, and should be enjoined.

## II.     Background

### A.     Medicare Drug Coverage

4.     Medicare is a federal program that provides health insurance to qualified beneficiaries. Medicare offers coverage for outpatient prescription drugs under the Medicare Part D program, which harnesses competition between private insurance companies in order to lower prescription drug costs for Medicare beneficiaries and taxpayers, enhance plan designs, and improve quality of coverage.

5.     Medicare beneficiaries obtain individual drug coverage in two main ways, depending on the type of medical insurance they have. Beneficiaries enrolled in Original Medicare, a fee-for-service program offered directly through the federal government, can enroll in a standalone individual PDP. Beneficiaries enrolled in Medicare Advantage, a type of private insurance offered by companies that contract with the federal government, can enroll in a plan that includes drug coverage.

6.     No matter how beneficiaries obtain Medicare drug coverage, the federal government subsidizes the cost of that coverage. As explained in greater detail below, the federal government also provides additional subsidies to low-income beneficiaries under the low-income subsidy ("LIS") program.

**B.     Individual PDPs**

7.      Individual PDPs provide beneficiaries with insurance coverage for a set of prescription drugs (the "formulary"), a network of pharmacies where beneficiaries may fill prescriptions, and a set schedule of defined premiums and cost-sharing rates.

8.      To offer individual PDPs, insurers must be approved by CMS. CMS has divided the 50 states and the District of Columbia into 34 Part D regions. To offer an individual PDP in a Part D region, the insurer must offer the plan at the same price to all individuals in the region and have a pharmacy network that is adequate to serve individuals throughout the region. No Part D region is smaller than a state, and some Part D regions encompass multiple contiguous states. Beneficiaries can enroll only in individual PDPs offered in the Part D region where they reside. The following map shows the Part D regions:



Part D Regions

Note: Each territory is its own PDP Region.

9.      Within each Part D region, an insurer may generally offer up to three individual PDPs. An insurer must offer one "basic" individual PDP that is actuarially equivalent to the minimum coverage required by statute but may vary in terms of premiums, deductibles, formularies, and pharmacy networks. Insurers may also offer up to two "enhanced" individual PDPs that provide additional coverage compared to the insurer's basic individual PDP.

10.     Individual PDPs vary in terms of premiums, cost sharing, drug formularies, pharmacy networks, and other characteristics. Insurers can use these different plan designs to target different types of Medicare beneficiaries based on their health, income, price sensitivity, and other factors.

11.     Each fall, Medicare has an annual open-enrollment period in which beneficiaries may change their individual PDP. When comparing plans, beneficiaries consider a number of factors, including premiums, cost sharing, whether their drugs are on the formulary, and whether their preferred pharmacies are in network.

C.      **The Low-Income Subsidy Program**

12.     Most low-income beneficiaries do not have to pay a premium for their individual PDP because Medicare pays their premium up to a certain threshold called the "LIS benchmark." Under CMS rules, beneficiaries eligible for the low-income subsidy who do not affirmatively select an individual PDP or a Medicare Advantage plan ("auto-enrollees") are automatically enrolled in a basic individual PDP, but only one that has premiums set below the regional LIS benchmark. These auto-enrollees are assigned in proportion to the number of basic plans below the LIS benchmark. For example, if three basic individual PDPs are below the LIS benchmark in a Part D region, then each plan receives a third of new auto-enrollees in that region.

13.     The LIS benchmark has important consequences for insurers. As long as an insurer's individual PDP remains below the LIS benchmark each year, the plan keeps its existing auto-enrollees and is eligible to receive a portion of new auto-enrollees. If an insurer's basic individual PDP is priced over the LIS benchmark, however, then it generally loses all of its auto-enrollees and is not eligible to receive any new auto-enrollees that year. The one exception is when an insurer's monthly premium is within a *de minimis* amount, currently $2, above the LIS benchmark, in which case the insurer can keep its auto-enrollees if it waives the premium amount above the LIS benchmark, but the insurer is not eligible to receive any new auto-enrollees. If an insurer loses its auto-enrollees, its beneficiaries are reassigned to an individual PDP below the LIS benchmark in the same manner that new auto-enrollees are assigned.

14.     As with the Part D program generally, the LIS program is designed to promote competition between insurers to lower costs for beneficiaries and taxpayers.

### III.     The Defendants and the Merger

15.     CVS, based in Woonsocket, Rhode Island, is one of the largest companies in the United States. It operates the nation's largest retail pharmacy chain; owns a large pharmacy benefit manager called Caremark; and is the nation's second-largest provider of individual PDPs, with over 4.8 million members. CVS offers individual PDPs under the brand name SilverScript in all 50 states and the District of Columbia. In 2017, CVS earned revenues of approximately $185 billion.

16.     Aetna, based in Hartford, Connecticut, is the nation's third-largest health-insurance company and fourth-largest individual PDP insurer, with over 2 million individual PDP members. Like CVS, Aetna offers individual PDPs in all 50 states and the District of Columbia. In 2017, the company earned revenues of $60 billion.

17.     On December 3, 2017, CVS agreed to acquire Aetna for approximately $69 billion.

**IV.     Jurisdiction and Venue**

18.     The United States brings this action, and this Court has subject-matter jurisdiction over this action, under Section 15 of the Clayton Act, 15 U.S.C. § 25, to prevent and restrain the defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

19.     The Plaintiff States bring this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain the defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18. The Plaintiff States, by and through their respective Attorneys General, bring this action as parens patriae on behalf of and to protect the health and welfare of their citizens and the general economy of each of their states.

20.     Defendants are engaged in, and their activities substantially affect, interstate commerce. CVS and Aetna sell individual PDPs, as well as other products and services, to numerous customers located throughout the United States and that insurance covers beneficiaries when they travel across state lines.

21.     This Court has personal jurisdiction over each defendant under Section 12 of the Clayton Act, 15 U.S.C. § 22. CVS and Aetna both transact business in this District.

22.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391. Defendants have also consented to venue and personal jurisdiction in the District of Columbia.

V.      **The Relevant Markets**

A.      **The sale of individual PDPs is a relevant market.**

23.      The sale of individual PDPs is a relevant market and line of commerce under Section 7 of the Clayton Act.

24.      For the vast majority of beneficiaries enrolled in individual PDPs, the main alternative for prescription drug coverage—Medicare Advantage plans that include drug coverage—is not a close substitute. Beneficiaries who have enrolled in an individual PDP have, by definition, chosen Original Medicare over Medicare Advantage. These beneficiaries rarely switch between the two programs, and they are even less likely to switch to obtain alternative prescription drug coverage. Indeed, only about two percent of individual PDP members convert to Medicare Advantage plans each year during open enrollment, and an even smaller percentage of individuals convert from Medicare Advantage plans to individual PDPs.

25.      Because Medicare Advantage is not a close substitute for beneficiaries enrolled in individual PDPs, CVS, Aetna, and other industry participants treat individual PDPs as distinct from other products. For example, CVS offers individual PDPs but does not offer Medicare Advantage plans. Insurers that offer Medicare Advantage plans and individual PDPs, including Aetna, separately monitor and report their individual PDP enrollment, premiums, benefits, market share, and financial performance, both internally and to investors.

26.      For these reasons, individual PDPs satisfy the well-accepted "hypothetical monopolist" test set forth in the U.S. Department of Justice and Federal Trade Commission's *2010 Horizontal Merger Guidelines*. A hypothetical monopolist selling all individual PDPs would likely impose a small but significant and non-transitory price increase because an

insufficient number of beneficiaries would switch to alternatives to make that price increase unprofitable.

**B.    The relevant geographic markets are 16 Part D regions.**

27.    As noted, a Medicare beneficiary may enroll only in the individual PDPs that CMS has approved in the Part D region where the beneficiary resides. Therefore, competition in each Part D region is limited to the insurers that CMS has approved to operate in that region.

28.    For the same reason, a hypothetical monopolist selling individual PDPs in a specific Part D region could profitably impose a small but significant and non-transitory price increase because an insufficient number of beneficiaries would or could switch to alternatives outside the Part D region to make that price increase unprofitable.

29.    As explained below, the proposed acquisition would likely harm competition in 16 of the 34 Part D regions: Arkansas, California, Florida, Georgia, Hawaii, Kansas, Louisiana, Mississippi, Missouri, New Mexico, North Carolina, Ohio, Oklahoma, South Carolina, Wisconsin, and the multistate region of Iowa, Minnesota, Montana, Nebraska, North Dakota, South Dakota, and Wyoming. Each of these Part D regions is a relevant geographic market for the sale of individual PDPs.

**VI.    CVS's acquisition of Aetna will substantially lessen competition in the sale of individual PDPs in 16 Part D regions.**

30.    Consumers will be harmed by the transaction in 16 Part D regions covering 22 states. Over 9.3 million people are enrolled in individual PDPs in the 16 regions, 3.5 million of whom have coverage from CVS or Aetna.

31.    The proposed acquisition would substantially lessen competition and harm consumers by eliminating significant head-to-head competition between CVS and Aetna. Indeed, throughout the country, CVS and Aetna have been close competitors. For example, in 2016 and

2018, CVS found that individuals leaving its individual PDPs went to Aetna more often than to any other competitor. CVS's and Aetna's individual PDPs are also among the fastest growing individual PDPs, with new-to-Medicare enrollees choosing CVS and Aetna plans at rates higher than their current market shares.

32.      CVS and Aetna have sought to win individual PDP customers in various ways. For example, CVS and Aetna routinely consider each other's prices and formularies when setting prices and coverage amounts for their plans. This price competition between CVS and Aetna drives them to lower premiums, copayments, coinsurance, and deductibles.

33.      CVS and Aetna have also sought to win individual PDP customers from each other by improving the quality of their services and coverage. This competition has led the companies to improve drug formularies, offer more attractive pharmacy networks, and create enhanced benefits for individuals. For example, in recent years, Aetna has made several changes to improve the coverage of its formulary and pharmacy networks to win business from CVS. That competition gave beneficiaries access to certain drugs at more affordable prices.

34.      In 12 Part D regions—Arkansas, California, Florida, Georgia, Hawaii, Kansas, Louisiana, Mississippi, Missouri, New Mexico, Ohio, and South Carolina—CVS and Aetna will account for at least 35 percent of individual PDP enrollment in highly concentrated markets, making the merger presumptively anticompetitive. *See United States v. Anthem, Inc.*, 855 F.3d 345, 349 (D.C. Cir. 2017) (holding that market concentration can establish a presumption of anticompetitive effects).

35.      In five of these Part D regions (Arkansas, Georgia, Kansas, Mississippi, Missouri), as well as four additional regions (North Carolina, Oklahoma, Wisconsin, and the multistate region of Iowa, Minnesota, Montana, Nebraska, North Dakota, South Dakota, and

Wyoming), the merged company will account for 35 percent or more of LIS-eligible beneficiaries. When combined with other market factors, this share of low-income subsidiary beneficiaries will likely result in an additional loss of competition. Competition between CVS and Aetna in these regions has led them to lower premiums to be below the regional LIS benchmarks and *de minimis* thresholds and thus qualify for LIS auto-enrollees. These lower premiums have in turn led to lower regional LIS benchmarks because the LIS benchmarks are based on the premiums that CVS, Aetna, and other companies receive for providing Medicare drug coverage. Lower LIS benchmarks reduce taxpayer costs and costs to non-LIS beneficiaries who choose to enroll in these plans.

36.     If CVS acquires Aetna, these valuable forms of competition will be lost, resulting in higher premiums for consumers and lower-quality services. In addition, because the LIS benchmark is calculated as an LIS-enrollment-weighted-average for each individual PDP region, in Part D regions where CVS and Aetna have a high percentage of LIS enrollees, the merged company would have a greater ability to influence the LIS benchmark and will be incentivized to increase its prices for individual PDPs. Higher prices increase the amount that non-LIS beneficiaries pay as well as the subsidies that the federal government pays for LIS enrollees. As a result, the merger will likely increase costs to beneficiaries, the federal government, and, ultimately, to taxpayers.

**VII.    Countervailing factors do not offset the anticompetitive effects of the transaction.**

37.     Entry of new insurers or expansion of existing insurers into the sale of individual PDPs in any Part D region is unlikely to prevent or remedy the proposed merger's anticompetitive effects. Effective entry into the sale of individual PDPs requires years of planning, millions of dollars, access to qualified personnel, and competitive contracts with

11

pharmacies and pharmaceutical manufacturers. Because of these barriers to entry, entry or expansion into the sale of individual PDPs is unlikely to be timely or sufficient to remedy the anticompetitive effects from this merger.

38.     The proposed merger is also unlikely to generate verifiable, merger-specific efficiencies sufficient to outweigh the anticompetitive effects that are likely to occur in the sale of individual PDPs in the relevant Part D regions.

## VIII.   Violation Alleged

39.     The effect of the proposed merger, if consummated, likely would be to lessen competition substantially in the sale of individual PDPs in each of the relevant Part D regions, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

40.     In the sale of individual PDPs in each of the relevant Part D regions, the merger likely would:

(a)     eliminate significant present and future head-to-head competition between CVS and Aetna;

(b)     reduce competition generally;

(c)     raise prices to Medicare beneficiaries and taxpayers;

(d)     reduce quality; and

(e)     lessen innovation.

## IX.   Request for relief

41.     Plaintiffs request that the Court:

(a)     adjudge CVS's proposed acquisition of Aetna to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

(b)     permanently enjoin and restrain the Defendants from carrying out the

planned acquisition or any other transaction that would combine the two

companies;

(c)     award Plaintiffs the costs of this action; and

(d)     award Plaintiffs other relief that the Court deems just and proper.

Dated: October 10, 2018

Respectfully submitted,

**FOR PLAINTIFF UNITED STATES OF AMERICA:**

Makan Delrahim
Assistant Attorney General for Antitrust

Bernard A. Nigro, Jr.
(D.C. Bar #412357)
Deputy Assistant Attorney General

Patricia A. Brink
Director of Civil Enforcement

Peter J. Mucchetti
Chief
Healthcare and Consumer Products Section

Scott I. Fitzgerald
Assistant Chief
Healthcare and Consumer Products Section

Jay D. Owen

Jesús M. Alvarado-Rivera
Don Amlin (D.C. Bar #978349)
Barry L. Creech (D.C. Bar #421070)
Justin M. Dempsey (D.C. Bar #425976)
Emma Dick
Matthew C. Hammond
John A. Holler
Barry Joyce
Kathleen S. Kiernan (D.C. Bar #1003748)
Daphne Lin
Cerin M. Lindgrensavage
Michael T. Nash
Andrew J. Robinson (D.C. Bar #1008003)
Rebecca Valentine (D.C. Bar #989607)
Bashiri Wilson (D.C. Bar #998075)

Attorneys for the United States

U.S. Department of Justice
Antitrust Division
450 Fifth Street NW, Suite 4100
Washington, D.C. 20530
Tel.: (202) 598-2987
Fax: (202) 616-2441
E-mail: Jay.Owen@usdoj.gov

14

**FOR PLAINTIFF STATE OF CALIFORNIA:**

XAVIER BECERRA
Attorney General

EMILIO VARANINI
Deputy Attorney General
Office of the Attorney General of California
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
Phone: (415) 510-3541
Fax: (415) 703-5480
E-mail: Emilio.Varanini@doj.ca.gov

**FOR PLAINTIFF STATE OF FLORIDA:**

PAMELA JO BONDI
Attorney General

_____

PATRICIA A. CONNERS
Deputy Attorney General
LIZABETH A. BRADY
Chief, Multistate Enforcement
CHRISTOPHER R. HUNT
Assistant Attorney General
RACHEL MICHELLE STEINMAN
Assistant Attorney General
Office of the Attorney General of Florida
PL-01, The Capitol
Tallahassee, FL 32399-1050
Phone: (850) 414-3851
Fax: (850) 488-9134
liz.brady@myfloridalegal.com

**FOR PLAINTIFF STATE OF HAWAII:**

RUSSELL A. SUZUKI
Attorney General

RODNEY I. KIMURA
Deputy Attorney General
Department of the Attorney General
425 Queen Street
Honolulu, HI 96813
Phone: (808) 586-1180
Fax: (808) 586-1205
rodney.i.kimura@hawaii.gov

**FOR PLAINTIFF STATE OF MISSISSIPPI:**

JIM HOOD, ATTORNEY GENERAL
STATE OF MISSISSIPPI

CRYSTAL UTLEY SECOY
Consumer Protection Division
Mississippi Attorney General's Office
P.O. Box 22947
Jackson, Mississippi 39225
Phone: (601) 359-4213
cutle@ago.state.ms.us

**FOR PLAINTIFF STATE OF WASHINGTON:**

ROBERT W. FERGUSON
ATTORNEY GENERAL

LUMINITA NODIT
Assistant Attorney General
Attorney General's Office
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Phone: (206) 254-0568
Fax: (206) 464-6338
Email: luminitan@atg.wa.gov