UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>CVS HEALTH CORPORATION<br><br>and<br><br>AETNA INC.,<br><br>*Defendants.* | Case No. 1:18-cv-02340-RJL |

**STATUS REPORT ON MERGER INTEGRATION**

At the hearing on November 29, 2018, the Court asked to be kept informed about the status of actions contemplated by the settlement in this case and for the parties to consider maintaining Aetna's assets separately from CVS during the pendency of the Tunney Act process. The United States submits this status report to address these issues and update the Court on the settlement process.

As explained below, the Tunney Act gives this Court an important role: to determine whether a proposed antitrust settlement reasonably addresses the harms alleged in the government's complaint and is therefore in the public interest. In light of this role and the need to protect the divestiture assets while the Tunney Act process is pending, the parties in this case agreed to—and asked the Court to sign—an Asset Preservation Stipulation and Order that (1) requires CVS and Aetna "to abide by and comply with the provisions of the proposed Final Judgment, pending the Judgment's entry by the Court"; (2) prevented CVS and Aetna from

consummating their transaction until the Order was signed; and (3) required them to keep the divestiture assets separate until the sale to WellCare, the divestiture buyer, was complete. ECF #2-1, at 4–5, 7. Once the Court signed that Order, the proposed Final Judgment required CVS and Aetna to consummate their merger and divest Aetna's individual PDP business to WellCare expeditiously. ECF #2-2, at 4. Allowing companies to consummate a proposed merger before a settlement has received final approval is common in consent decrees with the United States and the Federal Trade Commission, and in this instance was particularly critical: as explained below, insurers have already begun planning their bids for the 2020 plan year, so transferring the assets to WellCare as soon as possible was necessary to ensure that it could step into Aetna's shoes and preserve the competition that would otherwise be lost as a result of the merger.

This process has proceeded in accordance with the Court's order and the proposed Final Judgment. On October 25, 2018, the Court signed the Asset Preservation Stipulation and Order. ECF #15. As a result, CVS and Aetna were permitted to consummate their merger, which they did on November 28, 2018, two days after receiving approval from the last remaining state department of insurance. The United States hereby informs the Court that two days later, on November 30, 2018, CVS reported to the United States that it had completed the divestiture to WellCare, as required by the proposed Final Judgment. As explained below, the timely completion of this divestiture protects consumers and preserves competition while the Tunney Act process is pending by ensuring that the competing businesses that are the subject of the Complaint are not in the hands of one company. Furthermore, because the only part of Aetna's business that raised competitive issues is now owned by WellCare, it is not necessary to require CVS to keep the remainder of Aetna's business separate.

I.      **The role of district courts in Tunney Act proceedings**

The Tunney Act empowers a court to independently determine whether the proposed Final Judgment is "in the public interest." 15 U.S.C. § 16(e)(1). This inquiry is necessarily a limited one, as the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995).

Given that the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Microsoft*, 56 F.3d at 1459–60. Nor in making its assessment "is the court tasked with deciding whether the merger as a whole runs afoul of the antitrust laws." *United States v. U.S. Airways Group, Inc.*, 38 F. Supp. 3d 69, 75 (D.D.C. 2014) (internal quotation marks omitted).

This prosecutorial discretion extends to the timing of when a proposed merger may close. The Tunney Act empowers the district court to determine whether the specific settlement before it is in the public interest. The Tunney Act does not, however, prohibit companies from consummating their merger (and integrating operations) while the Tunney Act process is pending, as courts have consistently recognized. In 2014, for example, critics of a merger between US Airways and American Airlines argued that the companies violated the Tunney Act by closing their merger before the court had approved the settlement. Judge Kollar-Kotelly disagreed, noting that the Tunney Act does not require the parties to wait until the district court has ruled: "[B]y choosing to close their merger prior to entry of the Final Judgment, Defendants have accepted the risk of undoing the merger should it prove necessary." 38 F. Supp. 3d at 83–

84. *See also In re AMR Corp.*, 502 B.R. 23, 42 (Bankr. S.D.N.Y. 2013) ("Plaintiffs' argument is based upon the faulty assumption that the Tunney [Act] bars consummation of the merger . . . ."). Similarly, in a private case alleging violations of the Tunney Act, a court rejected the "assum[ption] that once the government files a lawsuit challenging a merger or acquisition, the subject companies may not complete such transaction until the district court enters final judgment," because "[n]othing in the Tunney Act so requires." *Edstrom v. Anheuser-Busch InBev SA/NV*, No. 13-1309, 2013 WL 5124149, at *7 (N.D. Cal. Sept. 13, 2013).

These courts rooted their views in the plain text of the Tunney Act. In some situations, Congress has chosen to create a waiting period during which parties may not close their transactions. *See* 15 U.S.C. § 18a (providing, in certain circumstances, that "no person shall acquire, directly or indirectly, any voting securities or assets of any other person" until certain notifications have been filed and "the waiting period described in subsection (b)(1) has expired"). Congress did not, however, create a waiting period in the Tunney Act.

These cases are also consistent with the separation of powers under the Constitution, which entrusts the executive branch, and not the courts, with discretion over how to pursue its cases. The Constitution grants the executive branch the power to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. Thus, were another branch to "subvert[] the President's ability to ensure that the laws are faithfully executed," that act would be "incompatible with the Constitution's separation of powers." *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 498 (2010).

The D.C. Circuit recognizes this constitutional principle as a basis for the court's limited authority under the Tunney Act. *See Mass. Sch. of Law at Andover, Inc. v. United States*, 118 F.3d 776, 783 (D.C. Cir. 1997) ("In part because of the constitutional questions that would be raised if

courts were to subject the government's exercise of its prosecutorial discretion to non-deferential review, we have construed the public interest inquiry narrowly." (citation omitted)); *United States v. Fokker Servs.*, 818 F.3d 733, 742–43 (D.C. Cir. 2016) (explaining that the limited scope of the public-interest inquiry under the Tunney Act was influenced by constitutional concerns, citing *Mass Sch. of Law*, 118 F.3d at 783). Thus, "the upshot," as the D.C. Circuit held in *Fokker*, "is that the 'public interest' language in the Tunney Act . . . confers no new power in the courts to scrutinize and countermand the prosecution's exercise of its traditional authority over charging and enforcement decisions." 818 F.3d at 743. Consistent with these principles, it would infringe on the United States' constitutionally protected prosecutorial discretion for a court, in performing a Tunney Act review, to grant relief *sua sponte* (including interim relief such as ordering parties' assets to be held separate) when the government has not asked for such relief.

Similarly, it follows that the United States' prosecutorial discretion extends to all aspects of a proposed settlement, including what assets need to be divested, the identity of the buyer of the divestiture assets, the timing of when a proposed merger may close, and how and when the divesture must occur. The United States considers all these factors in its prosecutorial discretion when deciding whether to settle or litigate.

**II.    In exercising its prosecutorial discretion to settle this case, the United States did not (and does not) seek to have CVS keep the remaining Aetna assets separate while the Tunney Act process is pending.**

In light of the Court's important but limited role in reviewing antitrust settlements, the United States now turns to the Court's suggestion in the November 29 hearing that the United States seek to have CVS and Aetna keep their businesses separate during the pendency of the Tunney Act proceeding and to the United States' exercise of its prosecutorial discretion in this regard.

In accepting the settlement in this case, the United States and Plaintiff States gave considerable thought to the timing of the proposed divestiture and the Defendants' hold-separate obligations to ensure that competition would be preserved during the pendency of the Tunney Act process and beyond. As a result, the Asset Preservation Stipulation and Order—agreed to by the parties and entered by the Court—required CVS and Aetna to hold the divestiture assets separate and to take all steps necessary to ensure that they remained competitive until the divestiture to WellCare was complete. ECF #15, at 8.

Apart from these obligations, however, Plaintiffs did not seek to stop CVS from integrating the remainder of Aetna's business. Once the divestiture was complete, the only part of Aetna's business that had threatened the competitive harm alleged in the Complaint—the individual PDP business—would be in the hands of WellCare, the divestiture buyer. This divestiture is significant in its scope: CVS is required to divest not only Aetna's assets in the 16 geographic markets alleged in the Complaint, but Aetna's entire individual PDP business nationwide. Since Plaintiffs did not allege that combining any other parts of Aetna's business with CVS would raise competitive concerns, allowing the integration of those parts of Aetna's business with CVS does not compromise the outcome of the Tunney Act proceeding. Requiring CVS to hold the Aetna assets separate would also delay any efficiencies that the merger might produce and, under the circumstances of this case, create unnecessary uncertainty for consumers, employees, and shareholders.

In light of the Court's comments at the November 29 hearing, the United States has again considered whether CVS and Aetna should be required to keep their businesses separate. As the Court noted, in *United States v. AT&T, Inc.*, Case No. 1:17-cv-02511 (RJL), the United States sought to hold the Turner business separate from AT&T while appealing the Court's decision.

That situation, however, was materially different from this case: whereas AT&T had not divested the business causing the competitive harm, here, CVS has already sold the divestiture assets to WellCare, eliminating the competitive concerns. For this reason, and because the other reasons discussed above still apply, the United States believes that requiring CVS and Aetna to keep their businesses separate remains unnecessary.

**III.    As required by the proposed Final Judgment, CVS has completed the divestiture to WellCare, preserving competition and protecting consumers.**

Finally, as noted above and in keeping with the Court's request to be updated on significant developments relating to this merger, the United States informs the Court that, as required by the proposed Final Judgment, Defendants completed their divestiture to WellCare on Friday, November 30, 2018.

This process has proceeded in accordance with the Court's Order and the proposed Final Judgment. Under Section IV.C of the Court's Order, "Defendants may not consummate the transaction sought to be enjoined by the Complaint before the Court has signed [the Order]," which occurred on October 25, 2018. ECF #15, at 4. Approximately a month later, on Monday, November 26, CVS informed the United States that Defendants received approval from the last outstanding state department of insurance, clearing their way to close.

Defendants then closed on the merger two days later, on Wednesday, November 28. That closing triggered the final step of the novation process through which Aetna's contracts with the Centers for Medicare and Medicaid Services were transferred to WellCare—a process that the United States learned on Thursday mid-afternoon, November 29, had occurred that Thursday morning. CVS then completed its transaction with WellCare the following day, on Friday, November 30. Under the proposed Final Judgment, this sale triggers a critical 60-day period during which WellCare may interview and hire Aetna's current employees with expertise relating

to the individual PDP business and begin to obtain additional information necessary to prepare for the 2020 bid.[1]

The United States, in exercising its prosecutorial discretion, believes that the timing of this divestiture is the best outcome for consumers. Given the nature of the bidding process for individual PDPs, the ability of WellCare (or any other buyer) to compete effectively with the divestiture assets would have been compromised unless the assets were divested as soon as possible. Indeed, divesting the assets now—rather than waiting for the end of the Tunney Act process—is the only way to ensure that the assets remain competitive. Insurers have already begun preparing their 2020 bids, which are due in less than seven months (on June 3, 2019). With the divestiture assets, WellCare can immediately begin planning its bids for the 2020 plan year and better serve millions of seniors throughout the United States. If the divestiture assets had remained under CVS's control, WellCare would have lacked the data and employees necessary to prepare for the 2020 plan year. This delay would have interfered with WellCare's ability to maintain the competitiveness of the divested business and risked permanently compromising the divestiture's success. The current arrangement is thus essential for preserving competition in the sale of individual prescription drug plans to seniors throughout the country.

**IV.    Conclusion**

The United States is mindful of the Court's responsibility to independently determine whether the proposed settlement is in the public interest. In light of the principles discussed in this memorandum, the United States looks forward to discussing how that settlement—and the

---

[1] Given the importance of this 60-day period, which has now begun, the United States asks the Court to appoint Julie Myers Wood as a monitoring trustee to oversee the divestiture process and to monitor Defendants' compliance with the proposed Final Judgment. ECF #20-1.

– 9 –

steps that have been taken while it is under review—are the best outcome for competition and consumers.

Dated: December 2, 2018

                                             Respectfully submitted,

                                             _____/s/_____

Jay D. Owen
Peter J. Mucchetti
Scott I. Fitzgerald
U.S. Department of Justice
Antitrust Division
450 Fifth Street NW, Suite 4100
Washington, D.C. 20530
Tel.: (202) 598-2987
Fax: (202) 616-2441
E-mail: Jay.Owen@usdoj.gov

## CERTIFICATE OF SERVICE

    I, Jay D. Owen, hereby certify that on December 2, 2018, I caused a copy of the foregoing document to be served upon Plaintiffs State of California, State of Florida, State of Hawaii, State of Washington, and Defendants CVS Health Corporation and Aetna Inc., via the Court's CM/ECF system, and to be served upon Plaintiff State of Mississippi by mailing the documents electronically to its duly authorized legal representative:

**Counsel for State of Mississippi:**
Crystal Utley Secoy
Consumer Protection Division
Mississippi Attorney General's Office
P.O. Box 22947
Jackson, Mississippi 39225
Phone: (601) 359-4213
cutle@ago.state.ms.us

/s/
Jay D. Owen
U.S. Department of Justice
Antitrust Division
450 Fifth Street NW, Suite 4100
Washington, D.C. 20530
Tel.: (202) 598-2987
Fax: (202) 616-2441
E-mail: Jay.Owen@usdoj.gov