**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

UNITED STATES OF AMERICA *et al.*,

                          *Plaintiffs*,

v.

CVS HEALTH CORPORATION

and

AETNA INC.,

                          *Defendants*.

Case No. 1:18-cv-02340-RJL

---

**THE UNITED STATES' RESPONSE TO ORDER TO SHOW CAUSE**

On December 3, 2018, the Court ordered the parties to explain why CVS should not be required to hold Aetna separate given that the Court has not evaluated (1) whether the proposed Final Judgment remedies the harm alleged in the Complaint, or (2) whether the Complaint is in the public interest or is drafted so narrowly as to "make a mockery of judicial power." ECF #27. This Order presents a question about a district court's authority under the Tunney Act: whether a court may look beyond the scope of the government's complaint in determining whether the settlement is in the public interest and, as a result, order injunctive relief that no party has asked for, nor wants. This Court should not do so for three main reasons.

First, as the court of appeals recognized in *United States v. Microsoft Corp.*, 56 F.3d 1448, 1459 (D.C. Cir. 1995), a district court may not evaluate the scope of the government's complaint during a Tunney Act review, even if the court believes that additional claims would have been justified. While *Microsoft* noted that a court is not obliged to accept a consent decree

that "makes a mockery of judicial power," *id.* at 1462, that standard applies to the consent decree—not the complaint—and subsequent cases suggesting otherwise are inconsistent with *Microsoft*. To inquire about claims that are not in a complaint would violate the separation of powers and aggravate the "constitutional difficulties that inhere in this statute." *See id.* at 1459.

Second, whether the judicial-mockery standard applies to the complaint or the consent decree, those documents do not implicate that standard in this case. After a thorough investigation, the government challenged the merger in the only markets where it concluded that the merger would result in likely harm, and the divestiture goes beyond those markets to include Aetna's entire individual PDP business nationwide. The fact that the divested business represents a small fraction of Aetna's total value is irrelevant because the decree must be evaluated only in light of the harm alleged in the Complaint.

Third, regardless of the Court's views on the merits of the proposed settlement, the Court should not order CVS to hold Aetna separate during the pendency of the Tunney Act proceeding for both practical and legal reasons. As a practical matter, a hold-separate order is unnecessary because the only part of Aetna's business that threatened competitive harm is already separate (in the hands of WellCare, the divestiture buyer). Even if the Court thought it necessary to divest other parts of Aetna's business, however, the Court would not have a legal basis for ordering that business to remain separate because (1) the Tunney Act allows a court to reject a proposed settlement, not to enjoin the merger; (2) other sources of authority do not provide a basis for injunctive relief; and (3) the hold-separate order would fail the traditional criteria for a preliminary injunction, create uncertainty in the market, and interfere with the United States' ability to negotiate settlements designed to protect competition.

I.      **Under the Tunney Act, a court may not evaluate the scope of the government's complaint, even under the judicial-mockery standard.**

Under the Tunney Act, a district court must determine whether a proposed antitrust settlement reasonably addresses the harms alleged in the government's complaint and is therefore in "the public interest." When making this determination, a court's review is defined by the factors in 15 U.S.C. § 16(e)(1). This provision directs courts to evaluate the proposed settlement in light of the "alleged violations," *id.* § 16(e)(1)(A), and "the violations set forth in the complaint," *id.* § 16(e)(1)(B). The provision does not, however, allow a court to consider potential violations beyond those alleged in the complaint.

The court of appeals confirmed this important limitation in *Microsoft*. Recognizing that the decision about which antitrust claims to bring lies solely within the government's prosecutorial discretion, the court of appeals was unequivocal: during the Tunney Act process, district courts are "barred from reaching beyond the complaint to examine practices the government did not challenge." *See* 56 F.3d at 1460; *see also United States v. Fokker Servs.*, 818 F.3d 733, 738 (D.C. Cir. 2016) (recognizing the "long-settled understandings about the independence of the Executive with regard to charging decisions"). The district court is "only authorized to review the decree itself"—not to construct its "own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459–60. Thus, the D.C. Circuit "flatly" rejected the district court's efforts to "reach beyond the complaint to evaluate claims that the government did *not* make and to inquire as to why they were not made." *Id.* at 1459 (emphasis in original).

The D.C. Circuit grounded its holding in both the text of the Tunney Act—which anchors the public-interest review in the allegations of the complaint, as discussed above—as well as the "constitutional difficulties that inhere in this statute" that would be aggravated by allowing a

court to take on a role constitutionally assigned to the executive branch. *Id.* Indeed, the decision about which claims to bring "has long been regarded as the special province of the Executive Branch." *Heckler v. Chaney*, 470 U.S. 821, 832 (1985) (quoting U.S. Const. art. II, § 3); *see Fokker*, 818 F.3d at 742. Reading the Tunney Act in a way that allows courts to second guess the government's exercise of prosecutorial discretion would violate that principle and contravene the guidance that courts should "not construe [a] statute in a manner that renders it vulnerable to constitutional challenge." *Rothe Dev., Inc. v. United States Dep't of Def.*, 836 F.3d 57, 68 (D.C. Cir. 2016). It would also raise the difficult question of whether a court could formulate judicially manageable standards for such an inquiry. *Cf. Maryland v. United States*, 460 U.S. 1001, 1003–06 (1983) (Rehnquist, J., dissenting from summary affirmance).

In addition to clarifying how these principles limit the scope of a court's review under the Tunney Act, the *Microsoft* court separately articulated what is sometimes called the judicial-mockery standard: At the end of the opinion, the court noted that a "district judge is not obliged to accept [a consent decree] that, on its face and even after government explanation, appears to make a mockery of judicial power." 56 F.3d at 1462. The court did not elaborate on when a consent decree would qualify for this exception, but elsewhere left open the possibility that it would apply where there was "a credible showing of bad faith." *Id.* at 1459. "Short of that eventuality," the court said, "the Tunney Act cannot be interpreted as an authorization for a district judge to assume the role of Attorney General." *Id.* at 1462.

In mentioning the judicial-mockery standard, the *Microsoft* court was addressing how courts should review a "decree"—not a complaint—but some cases have since interpreted the judicial-mockery standard as allowing courts to look beyond the scope of the complaint itself. In *United States v. SBC Communications, Inc.*, 489 F. Supp. 2d 1, 14 (D.D.C. 2007), for example,

the court said that if the complaint "is drafted so narrowly as to make a mockery of judicial power," then the district court could reject the consent decree "due to matters outside the scope of the underlying complaint." The United States itself has cited this language in its competitive impact statements, *see*, *e.g.*, ECF #3, as have other courts. *See*, *e.g.*, *United States v. US Airways Grp., Inc.*, 38 F. Supp. 3d 69, 85 (D.D.C. 2014) (declining to consider comments beyond the scope of the complaint because it was not so narrowly drafted as to become a mockery of judicial power); *United States v. Apple, Inc.*, 889 F. Supp. 2d 623, 631–32 (S.D.N.Y. 2012) (same).

Upon further examination, however, the United States concludes that the language in *SBC Communications* goes too far and is inconsistent with the *Microsoft* decision. Considering the D.C. Circuit's unequivocal language prohibiting courts from looking beyond the scope of the complaint, *Microsoft* can only be read as clarifying the standard that courts apply when determining whether a settlement is in the public interest, not as a license to "effectively redraft the complaint." 56 F.3d at 1459. The court in *SBC Communications* suggested that a complaint would mock judicial power if it was so narrow as to be "absurd." 489 F. Supp. 2d at 13. *Microsoft* states, however, that even if the government has "by narrow drafting, artificially limit[ed] the court's review," the district court still may not look outside the complaint. 56 F.3d at 1459–61. To hold otherwise and examine why the government did not bring additional claims would violate the separation of powers and disrupt the "long-settled understandings about the independence" of the executive branch relating to charging decisions. *Fokker*, 818 F.3d at 738.[1]

---

[1] The 2004 amendments to the Tunney Act do not alter *Microsoft*'s holding that district courts should not look outside the complaint. In making those amendments, Congress explicitly recognized *Microsoft*'s holding that courts should limit their analysis to the violations alleged in the complaint and strengthened that holding by requiring, rather than merely permitting, the court to consider those factors in its public-interest analysis. *See* Antitrust Criminal Penalty Enhancement and Reform Act of 2004, Pub. L. No. 108-237, § 221(b)(2)(A)(i), 118 Stat. 661, 668 (2004) (changing "may" to "shall").

As the D.C. Circuit explained, "those determinations are for the Executive—not the courts—to make." *Id.*

In the hearing on December 3, the Court said that it expects to receive "well-informed and thoughtful public commentary" raising concerns about the proposed settlement, Tr. 12/3/18 at 7:7–11, but public comments would not alter the analysis above. As the Supreme Court explained, allowing individuals to turn to federal courts to dictate how the executive branch enforces federal law would violate the Constitution because it would "enable the courts . . . to become 'virtually continuing monitors of the wisdom and soundness of Executive action.'" *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 577 (1992) (citations omitted); *see also Caldwell v. Kagan*, 865 F. Supp. 2d 35, 44 (D.D.C. 2012) ("[A]ny agency with limited resources and an investigative mission has the power, absent an express statute to the contrary, to assess a complaint to determine whether its resources are best spent on the violation, whether the agency is likely to succeed, whether the enforcement requested fits the organization's overall policies, and whether the agency has enough resources to undertake the action."). Thus, if public comments criticize the Complaint for not including additional claims, that criticism cannot be a basis for concluding that the case makes a mockery of the judicial process, nor for ordering interim relief.

Moreover, the Tunney Act itself may be unconstitutional. In *Maryland v. United States*, the district court attempted to define when a proposed decree was in the public interest for purposes of the Tunney Act. Justice Rehnquist (writing for Chief Justice Burger and Justice White) opined that it was not clear "that this standard, or any other standard the District Court could have devised admits of resolution by a court" because, among other things, "[t]he question assigned to the district courts by the Act is a classic example of a question committed to the

Executive." *Maryland*, 460 U.S. at 1004–05 (Rehnquist, J., dissenting from summary affirmance).

## II.     This case does not implicate the judicial-mockery standard.

Whatever the judicial-mockery standard means, it is clear that the standard is extraordinarily high. No case has ever found that a government antitrust complaint or consent decree makes a mockery of judicial power, let alone rejected a consent decree on that basis. This case should be no different.

Here, the United States conducted a thorough, 11-month investigation and challenged the proposed merger in the only markets where it concluded that the merger would result in likely harm. The Complaint is significant in scope: it challenges anticompetitive harm in 16 broad regions, encompassing 22 states, affecting millions of seniors. The proposed Final Judgment goes even further, addressing the anticompetitive harm with the nationwide divestiture of Aetna's entire individual PDP business.

Additional factors confirm that the Complaint and proposed Final Judgment do not mock the judicial process. As required, the United States filed a competitive impact statement explaining in detail the nature of the allegations in the Complaint and how the proposed Final Judgment resolves the alleged harm. ECF #3. The United States posted additional information about the settlement on its website, including information about its decision not to challenge other aspects of the merger. *See* https://www.justice.gov/opa/press-release/file/1099806/ download (last visited Dec. 14, 2018). As required by 15 U.S.C. § 16(g), CVS and Aetna filed a description of all communications between the companies' officers and the United States relating to the settlement, ECF #13, 14; those communications do not raise any concerns.

In the hearing on December 3, the Court asked whether the government's allegations may be so narrow as to mock the judicial process simply because the divestiture represents a small fraction of the underlying $69 billion deal. Tr. 12/3/18 at 7:2–6. The size of the divestiture relative to the size of the transaction is irrelevant, however, to determining whether a settlement is in the public interest, and courts have routinely found proposed judgments to be in the public interest when the United States' challenged only a small part of a large transaction.[2] In fact, settlements are often ideal in these situations because they allow parties to proceed with transactions that could otherwise benefit consumers. Because Aetna was the nation's third-largest health insurance company, it is not surprising that its individual PDP business, while substantial, represents a small percentage of the company's total value.

### III. The United States does not seek to have CVS keep the remaining Aetna business separate, and the Court should not require CVS to do so.

In light of the principles discussed above, the United States turns to the question of whether the Court should order CVS to hold Aetna separate and insulate the management of the two companies during the pendency of the Tunney Act process. As explained previously, the United States did not seek this outcome as part of its settlement. *See* ECF #25, at 6. Nor should the Court do so on its own for two main reasons.

First, as practical matter, there is no need to keep the remaining portion of Aetna's business separate. Now that the divestiture is complete, the only part of Aetna's business that

---

[2] *See United States v. Parker-Hannifin Corp. and CLARCOR Inc.,* 1:17-cv-01354 (D. Del. Sept. 26, 2017) (complaint alleging harm in only two product markets, which resulted in a divestiture of a business with annual revenues of approximately $60 million, in challenge to $4.3 billion transaction); *United States v. United Technologies Corp. and Goodrich Corp.*, 1:12-cv-01230 (D.D.C. July 26, 2012) (complaint alleging harm in only two product markets, resulting in a divestiture of businesses expected to generate approximately $395 million in annual revenues, in challenge to $18.4 billion transaction); *United States v. InBev N.V./S.A. et al.*, 1:08-cv-01965 (D.D.C. Nov. 14, 2008) (complaint alleging harm in only three regions of upstate New York in challenge to InBev's proposed acquisition of Anheuser-Busch for approximately $52 billion).

threatened the competitive harm alleged in the Complaint—the individual PDP business—is in the hands of WellCare, the divestiture buyer. To the extent that the Court wishes to preserve a remedy for hypothetical violations not alleged in the Complaint, such violations are beyond the scope of the Court's review under the Tunney Act, as discussed above, so they cannot justify additional injunctive relief. The Court need not preserve a remedy for "a vastly expanded complaint" challenging "activities which the government does not believe are illegal." *See Microsoft*, 56 F.3d at 1456.

Second, the Court does not have a legal basis for ordering CVS to hold the Aetna assets separate. Although a provision in the Tunney Act allows a court to take procedural actions "as the court may deem appropriate" when determining whether a proposed final judgment is in the public interest, 15 U.S.C. § 16(f)(5), this provision does not enlarge the scope of a court's review or its authority under the Act: if the Court rejects the proposed Final Judgment, it remains within the United States and Plaintiff States' discretion whether to then seek to block the merger. Thus, since the Court may not *sua sponte* order CVS to keep Aetna's business separate at the conclusion of the Tunney Act process, it follows that the Court may not do so on its own before that process is complete. *Cf. Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 326–27 (1999) (explaining a "preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally," but is not appropriate if it deals "with a matter lying wholly outside the issues in the suit" (quoting *De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212, 220 (1945)). To hold otherwise would infringe on the United States' prosecutorial discretion and violate the separation of powers discussed above. *See Microsoft*, 56 F.3d at 1459–60.

The Court also does not have a legal basis for ordering interim injunctive relief under other sources of authority. The All Writs Act allows courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions," 28 U.S.C. § 1651(a), but does not allow courts to circumvent statutory provisions, like the Tunney Act, that directly address the subject matter. *See Clinton v. Goldsmith*, 526 U.S. 529, 534–35 (1999); *see also Pa. Bureau of Corr. v. U.S. Marshals Serv.*, 474 U.S. 34, 43 (1985) ("The All Writs Act is a residual source of authority to issue writs that are not otherwise covered by statute. Where a statute specifically addresses the particular issue at hand, it is that authority, and not the All Writs Act, that is controlling."). Furthermore, because the Court can make its public-interest determination regardless of whether CVS integrates with Aetna, "resort to the All Writs Act would . . . be out of bounds, being unjustifiable either as 'necessary' or as 'appropriate' in light of alternative remedies." *See Clinton*, 526 U.S. at 537.

Most importantly, even if the Court had authority to prevent CVS from acquiring Aetna under certain circumstances, doing so here would be inequitable. A hold-separate order "is in form and effect a preliminary restraint," *FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1084 (D.C. Cir. 1981), and thus must satisfy the traditional criteria for preliminary injunctions, *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1101 n.13 (11th Cir. 2004). *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (holding that to obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest").

Here, those criteria are not satisfied. First, because the only question before the Court is whether to approve the proposed Final Judgment and the United States is not seeking additional

divestitures, the merits likely will be resolved without additional divestitures, eliminating the justification for a hold-separate order. Second, because the only part of Aetna's business that threatened competition has been divested, allowing CVS and Aetna to integrate would not result in "irreparable harm." Third, requiring CVS to hold its assets separate is not in the "public interest" nor equitable: it would delay any efficiencies that might result from the transaction; create uncertainty for customers, employers, and shareholders; and, as with a refusal to accept the decree itself, would have "enormous practical consequences for the government's ability to negotiate future settlements," *Microsoft*, 56 F.3d at 1456.

## IV.    Conclusion

The United States remains mindful of the Court's responsibility to independently determine whether the proposed settlement is in the public interest and looks forward to discussing why the settlement meets that standard. In the meantime, the United States asks the Court not to order CVS to hold the Aetna business separate.

Dated: December 14, 2018

Respectfully submitted,

_____/s/_____
Jay D. Owen
Peter J. Mucchetti
Scott I. Fitzgerald
U.S. Department of Justice
Antitrust Division
450 Fifth Street NW, Suite 4100
Washington, D.C. 20530
Tel.: (202) 598-2987
Fax: (202) 616-2441
E-mail: Jay.Owen@usdoj.gov

## CERTIFICATE OF SERVICE

I, Jay D. Owen, hereby certify that on December 14, 2018, I caused a copy of the

foregoing document to be served upon Plaintiffs State of California, State of Florida, State of

Hawaii, State of Washington, and Defendants CVS Health Corporation and Aetna Inc., via the

Court's CM/ECF system, and to be served upon Plaintiff State of Mississippi by mailing the

documents electronically to its duly authorized legal representative:

**Counsel for State of Mississippi:**
Crystal Utley Secoy
Consumer Protection Division
Mississippi Attorney General's Office
P.O. Box 22947
Jackson, Mississippi 39225
Phone: (601) 359-4213
cutle@ago.state.ms.us

_____/s/_____
Jay D. Owen
U.S. Department of Justice
Antitrust Division
450 Fifth Street NW, Suite 4100
Washington, D.C. 20530
Tel.: (202) 598-2987
Fax: (202) 616-2441
E-mail: Jay.Owen@usdoj.gov