**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

UNITED STATES OF AMERICA, *et al.*,

               Plaintiffs,

   v.

CVS HEALTH CORPORATION; and
AETNA INC.,

               Defendants.

Civil Action No. 1:18-cv-02340-RJL

**Hon. Richard J. Leon**

---

**CVS HEALTH CORPORATION'S MEMORANDUM IN RESPONSE TO THE
COURT'S DECEMBER 3, 2018 ORDER TO SHOW CAUSE**

Michael G. Cowie
    D.C. Bar No. 432338
Rani A. Habash
    D.C. Bar No. 981388
Michael H. McGinley
    D.C. Bar No. 1006943
DECHERT LLP
1900 K Street, NW
Washington, DC 20006
Tel.:  (202) 261-3300
Fax:  (202) 261-3333
Email: mike.cowie@dechert.com

Enu A. Mainigi
    D.C. Bar No. 454012
Craig D. Singer
    D.C. Bar No. 445362
Jonathan B. Pitt
    D.C. Bar No. 479765
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC  20005
Tel.:  (202) 434-5000
Fax:  (202) 434-5029
Email: emainigi@wc.com

*Counsel for CVS Health Corporation*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................. i

INTRODUCTION .......................................................................................................... 1

ARGUMENT ................................................................................................................. 3

I.      The Proposed Final Judgment Is the Result of Extensive Regulatory Scrutiny. ............... 3

        A.      The CVS/Aetna Merger Received Extensive Scrutiny from State and
                Federal Regulators Across the Country. ............................................................ 4

        B.      After Thorough Investigation, the United States and Plaintiff States
                Determined that the Proposed Final Judgment Remedies the Only
                Identified Antitrust Concern. ........................................................................... 6

        C.      The United States and Plaintiff States Carefully Considered—and
                Rejected—the Possibility of Untoward Vertical Effects. ..................................... 7

        D.      In Accordance with the Plans that DOJ Evaluated, CVS and Aetna Have
                Integrated Certain Functions to Achieve the Procompetitive Benefits of
                the Merger. .................................................................................................... 8

II.     The Merger Brings Procompetitive Benefits to Consumers. ............................................ 9

        A.      The Merger Benefits Customers, Patients, and the Healthcare System. ................ 10

        B.      Competitor Complaints Lack Credibility. ......................................................... 13

III.    CVS Is Taking Steps with Regard to Aetna that Make a Hold-Separate Order
        Unnecessary. ............................................................................................................. 15

IV.     The Circumstances Do Not Warrant Broader Equitable Relief Pending Tunney
        Act Review. ............................................................................................................... 17

        A.      A Broader Hold-Separate Order Is Not Necessary to the Court's Review. ............ 17

        B.      A Broader Order Is Not Appropriate Under the Four-Part Test for
                Injunctive Relief. ........................................................................................... 17

                1.      The Proposed Final Judgment Is in the Public Interest and Likely
                        To Succeed. ........................................................................................ 18

                2.      A Broader Hold-Separate Order Would Cause More Irreparable
                        Harm to Patients, Customers, and CVS than It Would Prevent. ................. 18

                3.      The Public Interest Does Not Support a Broad Hold-Separate
                        Order. ................................................................................................. 19

                4.      The Balance of the Equities Strongly Disfavors a Broad Hold-
                        Separate Order. ................................................................................... 19

        C.      A Broader Hold-Separate Order Is Not Consistent with Statutory and
                Constitutional Requirements. ........................................................................... 19

CONCLUSION ............................................................................................................. 21

# TABLE OF AUTHORITIES

**CASES**

*Edstrom v. Anheuser-Busch InBev SA/NV,*
    No. 13-1309, 2013 WL 5124149 (N.D. Cal. Sept. 13, 2013) ................................................. 17

*League of Women Voters of United States v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ............................................................................................. 17, 19

*United States v. AT&T Inc.,*
    310 F. Supp. 3d 161 ......................................................................................... *passim*

*United States v. Microsoft Corp.,*
    56 F.3d 1448 (D.C. Cir. 1995) ....................................................................................... 17, 20

*United States v. SBC Comm'ns., Inc.,*
    489 F. Supp. 2d 1 (D.D.C. 2007) ......................................................................................... 19

*United States v. US Airways Group, Inc.,*
    38 F. Supp. 3d 69 (D.D.C. 2014) ......................................................................................... 19

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ................................................................................................................. 19

## INTRODUCTION

The merger between CVS Health Corporation ("CVS") and Aetna, Inc. ("Aetna") is the logical culmination of a long-term strategic alliance between those companies through which CVS has provided pharmacy benefit management services for Aetna under an agreement entered into between the companies more than seven years ago.  Through the merger, the parties will deepen their relationship by combining CVS's healthcare services expertise and local presence with Aetna's medical expertise and predictive analytics, which will lead to better access to healthcare and lower costs for patients.

The Court's Order directed the parties to address whether and to what extent an order should be entered holding CVS's business separate from its acquired Aetna business pending the Court's Tunney Act review.  The Court also directed the parties to address the steps they are taking at this time to ensure the separateness of the assets or to preserve the status quo.

CVS is committed to facilitating the Court's Tunney Act review, which it is confident will confirm that the Proposed Final Judgment is in the public interest.  As discussed in more detail below, CVS has undertaken, and has committed to undertake, steps to maintain the separateness of certain aspects of Aetna's business.  These actions extend beyond the hold-separate agreement negotiated with the government to facilitate full divestiture of Aetna's Medicare Part D business.  They also parallel the actions undertaken by AT&T during the pendency of the government's appeal in that case.  These steps include the following:

1. Aetna's health insurance business is being operated as a separate and distinct unit from CVS retail pharmacy and pharmacy benefit manager CVS Caremark within the CVS Health enterprise.  Karen Lynch, formerly Aetna's President and currently an Executive Vice President of CVS Health, is leading this business and reports directly to the CEO.

2.       Aetna will maintain its historical control over the pricing and product offerings brought to market.

3.       Aetna personnel will retain their current compensation and benefits.

4.       CVS Health has and will maintain a firewall to prevent the exchange of competitively sensitive information between CVS Health and Aetna.

These measures make unnecessary any order holding separate the acquired Aetna business pending the Court's Tunney Act review. In addition, responding to the concerns expressed in the Order, CVS believes that the Proposed Final Judgment is in the public interest and that it completely addresses the sole component of the merger that federal and state authorities identified as potentially having an anticompetitive effect.

Part I of this brief summarizes the review process by which the United States and Plaintiff States examined the proposed merger and ultimately approved it subject to divestiture of Aetna's individual Medicare Part D plan business. As this history demonstrates, the Proposed Final Judgment is far from a "mockery" of the judicial approval process—it is the product of prosecutorial discretion exercised through an extensive year-long review process.

Part II summarizes the many procompetitive benefits of the CVS/Aetna merger. The merger will transform the consumer health experience and build healthier communities through a healthcare model that is local, easier to use, and less expensive, and which puts consumers at the center of their care.

Part III discusses the steps CVS has implemented and is implementing to maintain the separateness of aspects of Aetna's business. These measures are sufficient to preserve the Court's Tunney Act jurisdiction; any more burdensome measures would be unnecessary, would deprive

patients of the many procompetitive benefits created by the merger, and would not be of assistance in the event the Court ultimately does not approve the Proposed Final Judgment.

Part IV summarizes the pertinent law and explains why, particularly in light of the steps CVS is already undertaking, no further interim relief is necessary or warranted.  In particular, a broad hold-separate order would not be in the public interest because it would deprive consumers of the substantial procompetitive effects of the integrated business, and would substantially disrupt the operations of the merged entity, without any corresponding public benefit.

## ARGUMENT

### I.     The Proposed Final Judgment Is the Result of Extensive Regulatory Scrutiny.

By any standard, the regulatory scrutiny the CVS/Aetna merger received was more than robust.  For nearly a full year prior to these settlement proceedings, the merger and its competition and public-interest impacts were extensively reviewed not only by the Department of Justice but also by 19 state attorneys general.  These agencies extensively reviewed the vertical and horizontal effects of the merger.  Congress also held a public hearing on the competitive impact of the merger. The resulting settlement reflected a thorough and informed process that considered the views of supporters and opponents (composed almost entirely of CVS's competitors) as well as consumer groups, physician groups, healthcare providers, and both firms' customers.  DOJ approved the merger knowing that the companies planned to integrate their operations immediately upon consummation, allowing them to bring to consumers the substantial benefits of this transaction and to ensure continuity in patient care.  In short, the Court should be assured that, far from making a mockery of the process or of judicial power, this settlement, and the path taken to get there, illustrate just how the antitrust review process is supposed to work.

A.     **The CVS/Aetna Merger Received Extensive Scrutiny from State and Federal Regulators Across the Country.**

No stone was left unturned in analyzing the transaction and constructing an appropriate settlement with the United States and the state attorneys general.   Regulators, in addition to conducting their own economic modeling, evaluated multiple white papers and economic analyses from CVS and Aetna on a range of issues, such as vertical foreclosure theories, information exchange issues, Medicare Part D competition, merger efficiencies, and the consumer benefits generated by prior vertical integrations in the industry.   More than 20 staff attorneys and 8 economists from the Justice Department participated in the investigation.

The United States' "Second Request" pre-merger investigations are notoriously broad, but this investigation went far beyond even those norms.   The Second Request probed 10 different product markets—almost all of which involved no competitive overlap between the merging companies.   CVS and Aetna collectively produced more than 25 million pages of documents; more than 10 terabytes of data; and more than 300 pages of interrogatory responses supported by hundreds of accompanying exhibits.   Document requests dated back 3¼ years—significantly longer than called for in DOJ's "model" Second Request.[1]   Custodial files were collected from over 130 employees, more than three times the standard limit on custodians (20 per company).[2]   DOJ took 17 depositions, or about 50% more than the current standard.[3]   More than 350 CVS and Aetna employees contributed to Second Request compliance efforts.

---

[1]      U.S. Dep't of Justice, Antitrust Div., *Model Second Request*, https://bit.ly/2Qw4aCT.

[2]      Makan Delrahim, Assistant Attorney General, U.S. Dep't of Justice, Antitrust Div., Remarks at the 2018 Global Antitrust Enforcement Symposium: *It Takes Two: Modernizing the Merger Review Process* (Sept. 25, 2018), https://bit.ly/2DvO0Dw.

[3]      *Id.*

The 19 state attorneys general who investigated this merger did so to safeguard the interests of the residents of their respective states, and to determine whether consumers in their states would suffer adverse consequences as a result of the merger.[4]  Having reviewed this transaction, each of those attorneys general—including the attorneys general of the 5 Plaintiff States, as well as the 14 attorneys general who opted not to bring a legal challenge—concluded that the merger, as modified by the settlement reflected in the Proposed Final Judgment, should be allowed to proceed.

As part of their investigations, the United States and state attorneys general committed substantial resources and time to analyzing the merger benefits.  They carefully reviewed a range of efficiencies-related subjects including the creation of new clinical programs, the value of integrating pharmacy and medical data, the achievements of prior vertical integrations, the elimination of double marginalization, and the significant cost savings generated by the combination.  CVS's internal documents produced during the course of the investigation confirmed CVS's procompetitive motivations for the merger:  to transform the healthcare system, especially as it affects lower-income patients, and to build healthier communities through a new integrated model that is local, easier to use, and less expensive.  At the conclusion of the investigation, the Assistant Attorney General for the Antitrust Division concluded that the "integrated pharmacy and health benefits company . . . has the potential to generate benefits by

---

[4]     *See, e.g.*, California Office of the Attorney General, *Antitrust Enforcement in California: How You Can Help*, https://bit.ly/2S5Yf4o ("The [California] Attorney General vigorously enforces the antitrust laws and acts upon any information indicating antitrust violations that affect the California public."); Florida Office of the Attorney General, Antitrust Division, https://bit.ly/2Et9z7j ("The [Florida] Antitrust Division . . . Preserves competition by reviewing proposed mergers and acquisitions.  A merger review is triggered when activity may result in reduced competition resulting in adverse [effects] to Floridians.").

improving the quality and lowering the costs of the healthcare services that American consumers can obtain."[5]

B.   **After Thorough Investigation, the United States and Plaintiff States Determined that the Proposed Final Judgment Remedies the Only Identified Antitrust Concern.**

At the conclusion of their investigations, the United States and Plaintiff States filed a Complaint alleging harm from the companies' overlap in the individual Medicare Part D market. Although CVS and Aetna were both large companies, their businesses were highly complementary with minimal overlap. Aetna is primarily a health insurer; CVS's expertise is in pharmacy, pharmacy benefit management, home infusion services, retail clinics, and other healthcare services that help keep patients healthy. The merger therefore is transformative, combining Aetna's medical expertise and CVS's healthcare services expertise to help fix a broken healthcare system by improving patient engagement, improving health outcomes, and lowering total healthcare costs.

Although small relative to the size of the merger, the sale of Aetna's individual Part D plan business addresses the one market in which CVS and Aetna did compete with each other. It is not uncommon for a transaction of considerable size to be held up by an identified problem in a market that constitutes but a small fraction of the overall assets of the merged companies. In such situations, relief focused on the market in which the problem has been identified is sufficient— even though it may be remedied by divesting assets that are small in relation to the value of the deal overall.

Because the United States and the Plaintiff States found competition was likely to be affected in the individual Part D plan market, that is where the Complaint alleged harm—in 16 of

---

[5]   Press Release, U.S. Dep't of Justice, *Justice Department Requires CVS and Aetna to Divest Aetna's Medicare Individual Part D Prescription Drug Plan Business to Proceed with Merger* (Oct. 10, 2018), https://bit.ly/2pM0RaN.

the 34 Part D regions established by the Centers for Medicare and Medicaid Services ("CMS"). To resolve these allegations, the settlement required CVS to divest Aetna's entire individual Part D plan business—not only in those 16 regions, but across the United States. That business served over 2 million seniors.

The Proposed Final Judgment fully remedies those harms identified in the investigations performed by the United States and Plaintiff States and alleged in their Complaint. The merger, as modified by the divestiture of Aetna's individual Part D business, does not increase concentration because it does not change CVS's share of Part D enrollment. There thus is nothing more for CVS to do to resolve the Complaint's allegations.

### C.   The United States and Plaintiff States Carefully Considered—and Rejected—the Possibility of Untoward Vertical Effects.

That the Department of Justice's and Plaintiff States' Complaint did not allege anticompetitive harm resulting from the vertical aspects of the merger (including, among others, the effects of combining a health insurer with its long-standing pharmacy benefits manager) does not reflect a failure on the part of the relevant antitrust authorities to consider the possibility of such harm. To the contrary, the bulk of the reviews by the United States and state attorneys general concerned potential vertical concerns. Among other things, the Second Request required documents and data spanning 10 different product markets—only one of which was the market for individual Medicare Part D plans—which reflects the overwhelmingly vertical focus of these investigations.

The Complaint did not allege harm of a vertical nature because the evidence adduced during the investigations demonstrated decisively that such concerns were unfounded. CVS's submissions to antitrust authorities during the investigations replicated this Court's thoughtful vertical merger analysis in *United States v. AT&T* to show that benefits from the elimination of

double marginalization—totaling more than $1 billion annually—overwhelmingly exceeded the amount of any theoretical harm that could be substantiated, even using conservative assumptions.[6] The analysis further showed that attempted or hypothetical CVS price increases would be unprofitable and that the transaction would in fact create incentives for CVS to lower prices.[7] Even one of the American Medical Association's hired experts, Professor Richard Scheffler, conceded that any allegations of vertical harm likely would fail: "If they [the United States and state attorneys general] attempt to go after this vertical deal they will lose. . . . It will be difficult to stop this deal based on law. . . ."[8]

> **D.    In Accordance with the Plans that DOJ Evaluated, CVS and Aetna Have Integrated Certain Functions to Achieve the Procompetitive Benefits of the Merger.**

From the announcement to the closing of their transaction, CVS and Aetna developed comprehensive plans to integrate their businesses to enable the launch of innovative healthcare programs (described in detail below), and to bring to consumers the benefits of the merger's efficiencies.  The companies then took substantial steps to integrate as soon as the merger was consummated, in order to achieve the critical consumer benefits and the cost savings uniquely attainable through this merger.  The efficiencies and integration plans were evaluated by the United States and the Plaintiff States well in advance.  The integration efforts by CVS and Aetna reflected the two companies' dedication to building a new healthcare platform that will provide better and

---

[6]      CVS Health submission to U.S. Dep't of Justice, *Eliminating Double Marginalization, Cutting Prices, and Reducing Costs of Care* (June 29, 2018), at 3–4 (confidential and available for filing under seal upon request).

[7]      *Id.*; s*ee* Press Release, U.S. Dep't of Justice, *United States v. CVS and Aetna: Questions and Answers for the General Public* (Oct. 10, 2018), at 5, https://bit.ly/2A0lGF5.

[8]      *See* Diane Alter, *Aetna/CVS Merger Reviews Advancing with State AGs a Question Mark*, CTFN (Aug. 30, 2018), https://bit.ly/2SAEi5i.

less-expensive care to patients.  Because of the degree of integration already achieved on Day One of the merger, and the steps CVS has undertaken to maintain the separateness of certain aspects of Aetna's business, a broad hold-separate order will not aid the Court's Tunney Act review.

The new executive team, which had been publicly announced in June 2018,[9] led an orderly transition while other executives from each company departed.  Approximately 140 projects developed during the integration period were executed on Day One.  Moving quickly on Day One enabled the combined company to avoid any material disruption to its business and, more importantly, to its customers and patients.  Among many other things, CVS and Aetna needed to ensure that medical provider claims were promptly and accurately processed, that the companies' information systems were integrated without compromising data security or patient confidentiality, that suppliers were paid and billed accurately and on time, that employees received their paychecks, and that patients continued to receive care.  The new finance team immediately began working together and has been preparing consolidated financials for mandatory filings with the Securities and Exchange Commission and reporting to state insurance commissions.  The legal team worked to ensure that hundreds of required filings and notices were provided to regulatory agencies.

The result of these efforts is that CVS's and Aetna's customers, and the healthcare system, have already begun to realize the benefits of this vertical integration.

## II.    The Merger Brings Procompetitive Benefits to Consumers.

The CVS/Aetna merger aims to address the failures of a healthcare system that have left patients with expensive and often inaccessible care.  The merged companies will combine CVS's

---

[9]    Press Release, CVS Health, *CVS Health Announces Management Team for Combined Company Following Close of Aetna Acquisition Transaction* (June 6, 2018), https://bit.ly/2JnAyjx.

healthcare services expertise and local presence with Aetna's medical expertise and predictive analytics. The result will be better patient outcomes, lower medical costs, and a more competitive healthcare marketplace.

### A.    The Merger Benefits Customers, Patients, and the Healthcare System.

CVS/Aetna's vertical integration generates significant, well-recognized benefits. As this Court has noted, there is broad agreement "among academics, courts, and antitrust enforcement authorities alike that 'many vertical mergers create vertical integration efficiencies between purchasers and sellers'" in that they may "'cut sales and distribution costs, facilitate the flow of information between levels of the industry . . . create economies of scale in management, and so on.'" *United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 193 & n.19 (D.D.C. 2018) (quoting Michael H. Riordan & Steven C. Salop, *Evaluating Vertical Mergers: A Post-Chicago Approach*, 63 Antitrust L.J. 513, 519 (1995), and Robert H. Bork, *The Antitrust Paradox* 227 (2d ed. 1993)). The CVS/Aetna merger is a case in point.

One significant benefit of vertical integration is the elimination of double marginalization ("EDM"), which occurs where "two different firms in the same industry, but at different levels in the supply chain, each apply their own markups (reflecting their own margins) in pricing their products." *AT&T*, 310 F. Supp. 3d at 197. Through integration, "the merged company is able to shrink that total margin so there's one instead of two, leading to lower prices for consumers." *Id.* (quotation marks and citation omitted). EDM is a "standard benefit associated with vertical mergers." *Id*. (quotation marks and citation omitted). Given the vertical relationship between CVS and Aetna in the healthcare industry, this merger creates significant EDM benefits. Economic analyses conducted during the investigations identified more than $1 billion in annual recurring cost savings resulting from EDM, which in turn creates downward pricing pressure to

the benefit of patients and employers.[10]

Another benefit from this integration is the significant additional cost savings to customers. In valuing the transaction, CVS measured more than $750 million in near-term, annually recurring cost savings.[11]   As part of the investigations, CVS documented the benefits of administrative streamlining, negotiated discounts from drug manufacturers, and improved care management that will reduce emergency room admissions, hospital readmissions, and lab and infusion charges.  By reducing the cost of care through this combination and expanding access to healthcare services, CVS is making insurance more affordable for employers and patients, helping more patients obtain the care they need.

In addition to the expected efficiencies of vertical integration, the CVS/Aetna merger has enabled the company to launch new clinical programs to provide direct patient benefits.  These programs will improve patient medication adherence, reduce hospital readmissions, provide more convenient home-care services, avoid unnecessary emergency room utilization, increase immunization rates, and make healthcare services more accessible.  They will be available not only to Aetna members but to patients across the country, regardless of their insurer.  For example:

---

[10]    CVS Health submission to U.S. Dep't of Justice, *supra* n.6, at 3–4.  These savings are substantially larger than those in some other large vertical mergers.  For example, in *AT&T*, there was $352 million in annual EDM savings in a deal valued at $85.4 billion.  *See AT&T*, 310 F. Supp. 3d at 198.  CVS expects EDM savings substantially larger than AT&T in dollar terms and as a percentage of deal value.

[11]    *See* CVS Health, *Transforming the Consumer Health Care Experience* (Nov. 28, 2018), at 14, https://bit.ly/2RYYzBC.  These savings do not include additional longer-term medical costs savings and growth synergies which CVS Health also expects to be able to generate as result of the merger.  *See id.*  In the companies' joint proxy statement, Aetna identified $2.4 billion per year in opportunities to increase the combined company's operating efficiency by the fifth full year following completion of the merger.  CVS/Aetna Joint Proxy Statement (Feb. 9, 2018), at 102, https://aet.na/2rEaSrH.

**Readmission Prevention Services.**  Nationally, 14% of patients are readmitted to hospitals within 30 days of an inpatient visit.  By combining Aetna's medical expertise and predictive analytics with CVS's local presence in communities, the merged companies can identify and support patients recently discharged from hospitals who are at risk of being readmitted.  This will keep thousands of people out of the hospital.  As well as saving patients and their families the burden of being readmitted to the hospital, it will save patients and the health care system money.  CVS's internal analysis found that each avoided readmission can save the healthcare system $12,500 to $23,500 in medical costs.  CVS/Aetna's readmission prevention program was launched in December following the closing.

**Improved Medication Adherence.**  Adherence to prescriptions is a key driver of patient health outcomes.[12]  Research has shown that pharmacist counseling is two-to-three times as effective at improving medication adherence as other interventions, and that such counseling results in a cost savings of $6 for every $1 invested.[13]  Aetna can identify members with adherence difficulties who are at risk of an adverse health event—typically patients suffering from chronic conditions (*e.g.*, high cholesterol, hypertension, or diabetes).  CVS can better reach these patients, who typically have far more interactions with pharmacists through prescription refills and regular pharmacy visits than with physicians.  This will help patients avoid medical complications and lead healthier lives.  CVS launched this patient-outreach program earlier this month following the closing.

---

[12]    *See Competition in the Pharmaceutical Supply Chain: the Proposed Merger of CVS Health and Aetna*, Hearing Before the Subcomm. on Regulatory Reform, Commercial and Antitrust Law of H. Comm. on the Judiciary, 115th Cong. (Feb. 27, 2018) (testimony of Thomas M. Moriarty, Executive Vice President, Chief Policy and External Affairs Officer, and General Counsel, CVS Health), at 2 & n.6, https://bit.ly/2Fbztwp.

[13]    *See id.* at 5.

**Emergency Room Avoidance.**  Avoidable emergency room ("ER") visits contribute to higher healthcare costs and worse outcomes for patients and consumers.  About one-third of ER visits involve non-emergent conditions that are better treated in a primary care setting.  Using Aetna's analytical tools, CVS can identify members at high risk of avoidable ER visits and educate them about the availability and resources of retail clinics, urgent care centers, and other less-expensive sites of care where appropriate.  Following the closing, CVS/Aetna implemented steps to identify and educate these patients.

**Increased Vaccination and Immunization Rates.**  Immunizations and vaccinations protect vulnerable populations from the sometimes devastating effects of illnesses such as the flu, shingles, and other conditions.  Using Aetna's medical expertise and predictive analytics to identify at-risk and unvaccinated members, CVS pharmacists can educate these patients through in-person interactions to help ensure that vulnerable populations are vaccinated, and thus protected.  CVS/Aetna is preparing to launch this program in January.

The merged companies will take the learnings of these programs and accelerate them to the market more broadly through the more than 400 health plan relationships that CVS has across the country.

### B.    Competitor Complaints Lack Credibility.

The antitrust laws protect customers, not competitors.  Opponents complain not about prices charged to them as consumers but rather the threat of losing business as competitors.

The American Medical Association ("AMA") is opposed to the merger, and presumably will submit formal comments during the Tunney Act process.  But the AMA is one voice among

many. Others in the healthcare community—and, in particular, groups that advocate on behalf of the most disadvantaged patients—have supported the merger.[14]

It bears noting that the AMA's membership represents fewer than 25% of U.S. physicians and includes many providers who may view the CVS/Aetna merger as a competitive force contrary to their economic interests.[15] After all, CVS has substantially expanded its retail clinic and telemedicine services in recent years to offer patients lower-cost alternatives to traditional doctor's office and hospital services.[16] In connection with the merger, CVS has also announced plans to further expand these services to increase patient access to healthcare.[17] CVS's MinuteClinics offer

---

[14] *See, e.g.*, Letter from Kimberly Neurath, Principal, NeuResource LLC to Katharine L. Wade, Insurance Commissioner, Connecticut Insurance Dep't (Sept., 2018), *available at* https://bit.ly/2ryCjTG; Letter from Oscar Medina, Chief Executive Officer, Optima Medical Management Group to Dave Jones, Commissioner, California Dep't of Insurance (June 19, 2018), https://bit.ly/2PBzXNn; Letter from Christopher W. Hansen, President, American Cancer Society Cancer Action Network to Katherine L. Wade, Insurance Commissioner, Connecticut Insurance Dep't (Aug. 21, 2018), *available at* https://bit.ly/2ryCjTG; *Public Hearing Regarding the Proposed Merger of Aetna, Inc. into CVS Health Corporation*, California Dep't of Insurance (June 19, 2018) (Tr. at 33:12–18) (support from local government officials the Hispanic Chamber of Commerce, and many healthcare organizations), https://bit.ly/2QO1tfs; Letter from Patrick Charmel, Chairman, The Value Care Alliance to Katherine L. Wade, Insurance Commissioner, Connecticut Insurance Dep't (Sept. 10, 2018) (hospitals and affiliated physicians) *available at* https://bit.ly/2ryCjTG.

[15] *See, e.g.*, Judith Graham, *Doctors No Longer Feel the Nation's Largest Doctors Group Represents Their Interests*, Business Insider (Dec. 22, 2016), https://read.bi/2ULM2Ue (The AMA "counts fewer than 25 percent of practicing physicians as members, down from 75 percent in the 1950s"). The AMA was the nation's third-largest spender on lobbying activities from 1998–2018. *See* Top Spenders, Open Secrets.org, https://bit.ly/2SJkJIb.

[16] *See* Beth Jones Sanborn, *CVS Continues March into Primary Care with Expansion of MinuteClinic Network, Chronic Disease Program*, HealthcareFinance (Aug. 11, 2017), https://bit.ly/2SKOQ1Z; Press Release, CVS Health, *CVS Health's MinuteClinic Introduces Virtual Care Offering* (Aug. 8, 2018), https://bit.ly/2BlJjHW.

[17] Carl O'Donnell et al., *CVS Eyes Major Expansion of Health Clinics with Aetna Deal*, Reuters (Dec. 1, 2017), https://reut.rs/2PDozAz; Press Release, CVS Health, *CVS Health Completes Acquisition of Aetna* (Nov. 28, 2018), https://bit.ly/2Rm8916 (announcing MinuteClinic's plans for "expanded services and hours" and "expanded chronic care management services" as a result of the merger).

many medical services at greater convenience (*e.g.*, during evening and weekend hours) and a lower cost than doctors' offices. CVS's home healthcare offerings improve patients' access to trained nurses and infusion services. CVS's specialty pharmacies dispense specialty drugs in competition with doctors who profit from dispensing their own prescriptions at a higher cost. Although the merger provides procompetitive benefits to patients, it also poses direct competitive challenges to certain AMA members.[18]

As the Court has recognized, competitor opposition to procompetitive mergers should be viewed with skepticism because "there is a threat that such testimony reflects self-interest rather than genuine concerns about harm to competition." *AT&T*, 310 F. Supp. 3d at 211; *see also id.* ("Not surprisingly, most of the third-party competitor witnesses testified that they oppose the challenged merger for a number of reasons."). As economists caution, "a 'rival doesn't want to see a transaction that makes its competitor more efficient,' even though such a result may be 'good for consumers.'" *Id.* at 211 (quoting Testimony of Prof. Carlton).

## III.   CVS Is Taking Steps with Regard to Aetna that Make a Hold-Separate Order Unnecessary.

CVS has heard the Court's concerns in the last two hearings and as expressed in the Order.[19] CVS is taking the following actions concerning Aetna's business:

1.   Aetna's health insurance business is being operated as a separate and distinct unit from CVS retail pharmacy and pharmacy benefit manager CVS Caremark within

---

[18]   As the AMA acknowledged in an official report last year: "Conditions for which patients typically visit retail clinics also constitute a large portion of reasons patients visit primary care providers. Therefore, there is a concern that retail clinics pose a financial threat to primary care providers by treating the latter's most profitable patients." American Medical Association, Report 7 of the Council on Medical Service: Retail Health Clinics (2017), at 4, https://bit.ly/2SKS0CM.

[19]   Pursuant to the Court's Asset Preservation Stipulation and Order, ECF No. 15, CVS previously held separate the Part D assets at issue in the Complaint until they were divested to WellCare on November 30, 2018.

the CVS Health enterprise.  Karen Lynch, formerly Aetna's President and currently an Executive Vice President of CVS Health, is leading this business and reports directly to the CEO.

2.      Aetna will maintain its historical control over the pricing and product offerings brought to market.

3.      Aetna personnel will retain their current compensation and benefits.

4.      CVS Health has and will maintain a firewall to prevent the exchange of competitively sensitive information between CVS Health and Aetna.

These measures are analogous to the steps AT&T took during the pendency of its appeal.[20] CVS believes these actions address the concerns the Court has raised.  As a practical matter, broad hold-separate actions would not advance the interests of the Court's Tunney Act review and would cause harm to the merged company and the public.  The integration of other activities (*e.g.*, combining the companies' shared services such as finance, IT, procurement, and human resources) occurred upon the closing of the merger, before CVS was aware of the Court's views.  Further steps to hold the companies separate, other than those set forth above, would severely impede CVS's ability to meet its legal requirements (such as filings required by the SEC and other regulatory agencies), and CVS's and Aetna's ability to satisfy contractual and other commitments and to continue offering new products and services that will improve patients' health and lower healthcare costs for consumers.

---

[20]      *See* Letter from Counsel for AT&T to United States, *United States v. AT&T, Inc., et al.*, No. 17-cv-2511, ECF No. 148 (June 14, 2018).

IV.     **The Circumstances Do Not Warrant Broader Equitable Relief Pending Tunney Act Review.**

       A.     **A Broader Hold-Separate Order Is Not Necessary to the Court's Review.**

The measures CVS is implementing are sufficient to preserve the status quo for this Court's Tunney Act review.  The Complaint in this action alleges a single area of antitrust concern:  that if left unchecked, the CVS/Aetna merger will cause anticompetitive effects in the individual Medicare Part D plan market in certain geographic areas.  *See, e.g.*, Compl. (ECF No. 1) ¶¶ 30–40.  After a thorough investigation, the United States and Plaintiff States have not requested any broader relief, whether permanent or interim.  In particular, as discussed above, the antitrust authorities reasonably concluded that the merger poses no vertical concerns that warrant additional enforcement action.  Accordingly, there is no substantial likelihood that the Court will conclude that the complaint and Proposed Final Judgment make a "mockery of judicial power."  *United States v. Microsoft Corp.*, 56 F.3d 1448, 1462 (D.C. Cir. 1995).  In short, therefore, CVS's existing and additional steps to maintain the separateness of certain aspects of Aetna's business and this Court's appointment of a monitoring trustee to oversee CVS's compliance with its divestiture obligations will sufficiently preserve the integrity of these Tunney Act review proceedings.

       B.     **A Broader Order Is Not Appropriate Under the Four-Part Test for Injunctive Relief.**

For similar reasons, the "traditional requirements" for equitable relief counsel against any broader hold-separate order.  *See, e.g.*, *Edstrom v. Anheuser-Busch InBev SA/NV*, No. 13-1309, 2013 WL 5124149, at *8 (N.D. Cal. Sept. 13, 2013) (party seeking hold-separate order pending Tunney Act proceedings was required to meet preliminary injunction standard).  Injunctive relief is subject to a four-factor test:  "likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities . . . , and accord with the public interest."  *League of Women Voters of United States v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (quoting *Pursuing*

*Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 505 (D.C. Cir. 2016)).  Each of these factors weighs against equitable relief here.

> ### 1.    The Proposed Final Judgment Is in the Public Interest and Likely To Succeed.

For the reasons described above, and in the United States' Competitive Impact Statement (ECF No. 3), the Court's Tunney Act review is likely to result in approval of the Proposed Final Judgment.  The Court should conclude that the Proposed Final Judgment is in the public interest in light of, among other factors:  the thorough regulatory review process; the many benefits this deal will deliver to consumers and the healthcare system; the lack of any unique circumstances as compared to other Tunney Act approvals; and the divestiture of Aetna's entire Part D plan business to WellCare to resolve the harm alleged in the Complaint.

> ### 2.    A Broader Hold-Separate Order Would Cause More Irreparable Harm to Patients, Customers, and CVS than It Would Prevent.

A hold-separate order halting or delaying merger integration would cause significant, irreparable harm to patients, customers, the healthcare system, and CVS that would far outweigh any speculative harm prevented by issuing the order.  As described in more detail above, those benefits include:  EDM and other cost savings, totaling more than $1 billion annually, which will create downward pressures on pricing, thereby benefiting employers and patients; and new clinical programs to improve patients' health, including readmission prevention services, improved medication adherence programs, emergency room avoidance programs, expansion of home infusion services, and increased vaccination and immunization rate programs, which will lower overall healthcare costs and keep countless patients healthier and out of hospitals.

If this Court delays or halts integration, patients, customers, the healthcare system, and CVS would be deprived of these benefits with no remedy available to recoup the losses.

Although it would certainly *cause* irreparable harm, a hold-separate order is unlikely to *prevent* any irreparable and imminent harm. Equitable relief is justified only when irreparable harm likely would occur in its absence. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *see also League of Women Voters*, 838 F.3d at 8–9 (same). Given the extent of integration accomplished upon consummation of the merger, the divestiture of Aetna's Part D business, and the measures that CVS is taking, there is no prospect—and no evidence—that any irreparable harms will occur or would be prevented by an injunction requiring broad hold-separate measures.

### 3. The Public Interest Does Not Support a Broad Hold-Separate Order.

Any broader hold-separate order would have negative consequences for pending and future transactions as well as for consumers. As described above, such an injunction would deprive consumers of the benefits of procompetitive and cost-saving measures. In contrast, there will be no harm to the public interest if this Court does not issue the hold-separate order.

### 4. The Balance of the Equities Strongly Disfavors a Broad Hold-Separate Order.

For the reasons discussed above, there is no equitable basis for issuing a broader hold-separate order and there are substantial reasons for *not* issuing such an order. Balancing all of the equities, the Court should not require hold-separate measures pending Tunney Act review beyond the steps that CVS has already taken.

### C. A Broader Hold-Separate Order Is Not Consistent with Statutory and Constitutional Requirements.

In light of the equitable considerations discussed above, the Court need not decide whether a broader hold-separate order would be appropriate as a statutory or constitutional matter. To the extent the Court reaches the question, however, CVS believes the Court should not enter a broad hold-separate order for these reasons as well. *See United States v. US Airways Group, Inc.*, 38 F. Supp. 3d 69, 75 (D.D.C. 2014) (under the Tunney Act, "the court's inquiry is limited"); *United*

19

*States v. SBC Comm'ns., Inc.*, 489 F. Supp. 2d 1, 10–11 (D.D.C. 2007) (similar).  The Court's

Tunney Act review generally is directed to the issues raised in the complaint, though some courts

have recognized an exception where a consent decree makes a "mockery of judicial power."  *See*

*Microsoft*, 56 F.3d at 1462.  For the reasons discussed above, any "mockery" exception is not met

here.  The Complaint identifies the full scope of the potential anticompetitive harms related to

Aetna's Part D business, and the divestiture required by the Proposed Final Judgment fully

remediates those concerns.  The settlement was the result of a thorough and informed process.

Under these circumstances, there is no basis in the Tunney Act to overrule the United States' and

the Plaintiff States' exercise of prosecutorial discretion or reach issues beyond the complaint, and

doing so would be inconsistent with constitutional separation of powers and Article III.

Undersigned counsel are unaware of any court that has invoked the "judicial mockery" exception

to reject a consent decree, even in circumstances that involved far less regulatory scrutiny.  As a

statutory matter, the Tunney Act does not contemplate enjoining a merger; even at the end of the

process, the Court's ultimate role is to approve or decline to approve a consent order, and

accordingly "hold-separate" orders in Tunney Act proceedings typically speak to the assets to be

divested.  None of these considerations need factor into the Court's analysis, however, because a

broad injunction is unwarranted under traditional equitable standards and the measures CVS has

already undertaken.

## CONCLUSION

For these reasons, this Court should not issue a hold-separate order pending these proceedings under the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)–(h).

Dated:  December 14, 2018

Respectfully submitted,

*/s/ Michael G. Cowie*

Michael G. Cowie
     D.C. Bar No. 432338
Rani A. Habash
     D.C. Bar No. 981388
Michael H. McGinley
     D.C. Bar No. 1006943
DECHERT LLP
1900 K Street, NW
Washington, DC 20006
Tel.:  (202) 261-3300
Fax:  (202) 261-3333
Email: mike.cowie@dechert.com

Enu A. Mainigi
     D.C. Bar No. 454012
Craig D. Singer
     D.C. Bar No. 445362
Jonathan B. Pitt
     D.C. Bar No. 479765
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC  20005
Tel.:  (202) 434-5000
Fax:  (202) 434-5029
Email: emainigi@wc.com

*Counsel for CVS Health Corporation*

## CERTIFICATE OF SERVICE

I, Michael G. Cowie, hereby certify that on December 14, 2018, I caused a copy of the foregoing document to be served upon all parties via the Court's CM/ECF system, with the exception of Plaintiff State of Mississippi. I caused a copy of the foregoing document to be served upon Plaintiff State of Mississippi by mailing the documents electronically to its duly authorized legal representative:

**Counsel for State of Mississippi:**
Crystal Utley Secoy
Consumer Protection Division
Mississippi Attorney General's Office
P.O. Box 22947
Jackson, Mississippi 39225
Phone: (601) 359-4213
cutle@ago.state.ms.us

*/s/ Michael G. Cowie*
Michael G. Cowie
     D.C. Bar No. 432338
DECHERT LLP
1900 K Street, NW
Washington, DC 20006
Tel.: (202) 261-3300
Fax: (202) 261-3333
Email: mike.cowie@dechert.com