December 17, 2018

Peter Mucchetti
Chief, Healthcare and Consumer Products Section
Antitrust Division
Department of Justice
450 Fifth Street NW, Suite 4100
Washington, DC 20530

Re: Comments from Consumer Action and U.S. PIRG Concerning the Proposed Final Judgment in *United States v. CVS Health Corporation and Aetna, Inc.,* No. 1:18-cv-02340 (RJL)

Dear Mr. Mucchetti,

The undersigned stakeholders representing consumer organizations are concerned about the high cost of prescription drugs, escalating healthcare costs, and lack of patient choice. Pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act (the "Tunney Act"), 15 U.S.C. § 16(b), we respectfully submit the following comments on the proposed Final Judgment ("PFJ") in the captioned matter. These comments are being submitted to assist the U.S. Department of Justice ("DOJ") and the district court in its review of whether the PFJ is sufficiently complete to remedy the competitive problems identified in the DOJ's complaint as well as the wide range of anticompetitive concerns presented by the merger of CVS Health Corporation ("CVS") and Aetna Inc. ("Aetna").

## I. Introduction

As this court confirmed in *SBC Communications*, courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." *United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1, 15 (D.D.C. 2007). Here, the DOJ has simply required a divestiture of Aetna's standalone individual Medicare Part D prescription drug plans ("individual PDPs") to WellCare Health Plans, Inc. ("WellCare") in an effort to resolve competition concerns related to a horizontal overlap posed by the merger. The DOJ's Complaint does not identify any other horizontal or vertical foreclosure concerns. In general, the PFJ is insufficient to protect consumers and patients. First, the PFJ raises numerous questions and concerns that the proposed divestiture will not restore competition in the individual PDP markets. Second, the DOJ narrowly drafted the Complaint and completely failed to identify the extensive competitive concerns raised by the merger.

## II. Merger Remedies Increasingly Fail to Restore Competition

The PFJ is unlikely to resolve the competitive concerns raised in the DOJ's Complaint. Merger remedies including both structural and behavioral components are increasingly criticized for

failing to restore competition.[1] The current administration has indicated that it has a strong preference for structural remedies over behavioral ones.[2] The rationale for this position is that the DOJ is a law enforcement agency and is not in the business of regulating industries. While there is some merit to the current administration's position, there are mergers that raise vertical foreclosure concerns where behavioral remedies may be appropriate. Indeed, there are circumstances where structural, behavioral, or a combination of both types of remedies would be the most appropriate resolution. In some cases, as is here, the DOJ should have simply challenged the merger.

Structural remedies such as divestitures are inherently risky and flawed. While the DOJ does its best to construct effective divestiture remedies, the government can never be certain how the divestiture buyer will perform with the divested assets in the future. Not surprisingly, the existing, albeit limited empirical evidence suggests that structural remedies have often failed to prevent competitive harm.[3] Indeed, divestiture remedies have repeatedly failed to protect consumers because in many cases no set of divestiture assets are sufficient to replace the lost competition. In many cases, to guarantee the same level of competition that existed prior to the merger, a divestiture of the acquiring or acquired firm in its entirety would be necessary.

To be sure, consumers are paying higher prices in a number of industries because of failed merger remedies in the airline,[4] grocery store,[5] dollar store,[6] and rental car industries.[7] Some of these failures were monumental, predictable, and unbelievably fast. And for health insurance it is the same story. For example, in 2012, the DOJ conditioned Humana's acquisition of Arcadian on divestitures of Medicare Advantage plans in 51 counties. Within a couple of years, WellCare and Cigna, two of three purchasers of divested assets, went out of business.[8] While Humana shareholders benefitted, consumers and patients did not. Meanwhile, just two years ago, a district court held that Molina Healthcare's ("Molina") acquisition of divested assets related to

---

[1] John Kwoka, Mergers, Merger Control, and Remedies: A Retrospective Analysis of U.S. Policy MIT Press 2015.
[2] Keynote Address by Assistant Attorney General Makan Delrahim at American Bar Association's Antitrust Fall Forum, November 16, 2017. https://www.justice.gov/opa/speech/assistant-attorney-general-makan-delrahim-delivers-keynote-address-american-bar
[3] John Kwoka Mergers, Merger Control, and Remedies: A Retrospective Analysis of U.S. Policy MIT Press 2015.
[4] Catherine A. Peterman, The Future of Airline Mergers after the US Airways and American Airlines Merger, 79 J. Air L. & Com. 781 (2014) https://scholar.smu.edu/jalc/vol79/iss4/3
[5] In 2015, the FTC approved Safeway's acquisition of Albertson's, a large grocery merger, on the condition that the merged company divest itself of 146 stores to Haggens, a small chain of 18 stores. Within months, that small chain filed for bankruptcy and the merged company wound up buying back about 36 stores. Ana Marum, *Failed divestiture: Albertsons is bidding on 36 Haggen stores, including some it used to own,* The Oregonian, November 10, 2015. https://www.oregonlive.com/window-shop/index.ssf/2015/11/albertsons_bids_on_36_haggen_s.html
[6] In 2015, the FTC conditioned Dollar Tree's acquisition of Family Dollar, a merger of dollar stores, on a divestiture of stores to Sycamore, a private equity firm. The private equity buyer sold the assets to the other large national dollar store player, Dollar General, within 21 months. FTC Press Release, "*FTC Approves Sycamore Partners II, L.P. Application to Sell 323 Family Dollar Stores to Dollar General*", April 27, 2017. https://www.ftc.gov/news-events/press-releases/2017/04/ftc-approves-sycamore-partners-ii-lp-application-sell-323-family
[7] In 2012, the FTC conditioned Hertz's acquisition of Dollar Thrifty on a divestiture of Advantage and other assets to a small rental car company, FSNA, backed by a private equity fund and Advantage buyer filed for bankruptcy within a year only to have some of the assets auctioned back to Hertz. Bret Kendall, *How the FTC's Hertz Antitrust Fix Went Flat,* Wall Street Journal, December 8, 2013. https://www.wsj.com/articles/how-the-ftc8217s-hertz-antitrust-fix-went-flat-1386547951?ns=prod/accounts-wsj
[8], Topher Spiro, Maura Calsyn, and Meghan O'Toole, *Divestitures Will Not Maintain Competition in Medicare Advantage*, Center for American Progress, March 8, 2016 (Center for American Progress Humana/Arcadian Analysis).

Aetna's merger with Humana was insufficient to restore competition in Medicare Advantage markets.

### A. Humana/Arcadian Failed Divestiture Remedy Suggests that DOJ's PFJ Is Unlikely to Restore Competition

The DOJ's divestiture remedy in Humana/Arcadian failed to restore competition in Medicare Advantage markets.[9] This failure suggests that it is difficult to restore or maintain competition with divestitures in the health insurance industry. First, the Humana/Arcadian remedy package included a divestiture of only 12,700 lives in 51 rural counties.[10] If a divestiture of only 12,700 lives can fail, how can the DOJ guarantee a successful divestiture of over 2 million lives? Second, WellCare, which was one of the divestiture buyers in Humana/Arcadian, exited the business within two years of making the acquisition.[11] WellCare purchased Arcadian's Medicare Advantage business, which covered about 4,000 members in two counties in Arizona at the beginning of 2013.[12] By all accounts, the DOJ believed WellCare to be a strong buyer because it was already offering Medicare Advantage plans in 12 states. WellCare's membership in both counties quickly declined and WellCare exited both counties by January 2015.[13] In turn, Humana's Medicare Advantage membership increased in the two counties by about 35 percent, and the number of Medicare Advantage plan choices for consumers decreased.[14] WellCare's history with the DOJ as a divestiture buyer indicates that it will make the best economic decision for its executives and shareholders and will not necessarily step up to the task of restoring competition. Third, it is important to understand that the DOJ's remedy in Humana/Arcadian, like here, only called for the divestiture of contracts with subscribers. Once the next open season starts, there is no reason why the merged firm cannot just steal those subscribers back. This is exactly what happened as Humana benefitted from Cigna's and WellCare's exits. Significantly, health insurer relationships with subscribers are fragile assets on which to base a merger remedy. Fourth, it is difficult to find divestiture buyers, especially ones like Cigna and WellCare that have sufficient scope and expertise to meet the obligation under the law to fully restore competition. Given WellCare's checkered past, it is not all clear that the company can meet this threshold. Moreover, the fact that Cigna, one of the nation's most powerful health insurers was one of the failed buyers demonstrates how difficult it is for the DOJ to design a successful divestiture remedy in health insurance markets.

### B. District Court Held That Aetna's Divestiture to Molina Was Insufficient to Preserve Competition

In 2016, the DOJ sued to block Aetna's acquisition of Humana alleging in part that the transaction would substantially lessen competition in Medicare Advantage markets in 364 counties and that the parties' proposed divestitures to Molina to resolve those concerns were unlikely to preserve competition. Aetna and Humana each entered into an Asset Purchase Agreement ("APA") and Administrative Services Agreement ("ASA") with Molina in an attempt

---

[9] Center for American Progress Humana/Arcadian Analysis.
[10] *Justice Department Requires Divestitures in Humana Inc.'s Acquisition of Arcadian Management Services Inc.* DOJ Press Release, March 27, 2012.
[11] Center for American Progress Humana/Arcadian Analysis.
[12] Center for American Progress Humana/Arcadian Analysis at 3.
[13] *Id.*
[14] *Id.*

to resolve competition concerns in numerous Medicare Advantage markets throughout the country.[15] Under the agreements, the defendants were to transfer to Molina certain Medicare Advantage plans that included approximately 290,000 members in as many as 437 counties in 21 states.[16] The proposed divesture covered all of the areas identified as competitive concerns in the DOJ's complaint to block Aetna's acquisition of Humana. Under the ASA, Aetna and Humana were to continue to operate the divested plans for the remainder of the calendar year in which the merger closed. If it closed in 2017, then Molina would have the option to extend the ASA for up to two 6 month periods.[17] During that time, all plan administration services, such as IT, claims processing, and broker services, were to be managed by Aetna and Humana.[18] Their contracts with providers would still be in place, and subscribers were to continue to see their own providers so there was a promise of no disruption to patients.[19]

Though the proposed divestiture purportedly resolved all of the antitrust concerns related to the Medicare Advantage markets, Judge Bates held that the divestiture was insufficient to preserve competition. He was concerned that Molina was not an adequate divestiture buyer. Judge Bates made that decision based on a number of factors. First, contemporaneously prepared business documents from Molina's Board and executives undermined that argument that Molina could successfully compete with the divestiture assets.[20] Second, Judge Bates was very concerned that the low purchase price that Molina paid for the Medicare Advantage contracts raised concerns about whether Molina could be a successful competitor or preserve competition in all of the problem markets.[21] He was concerned that because Molina was getting such a great deal it could make money and be profitable even if it abandoned many of the plans, counties, and members that it was to acquire.[22] Indeed, some evidence from Molina suggested that it might actually withdraw from some counties that didn't make economic sense for its business. Third, Judge Bates was concerned about Molina's history demonstrating that it was unsuccessful in entering the Medicare Advantage space.[23] In summary, Judge Bates concluded that Molina's past history suggested that the company was an inappropriate divestiture buyer.

Given Judge Bates's apprehension of approving Molina as a divestiture buyer because of the company's past history, the DOJ and this Court should have similar concerns related to WellCare's past in the immediate matter.

### C. PFJ Is Unlikely To Preserve Competition In the Medicare PDP Market

The DOJ explains that "[C]ompetition between [CVS and Aetna's PDPs] has led not only to lower premiums and out-of-pocket expenses but also improved drug formularies, more attractive pharmacy networks, enhanced benefits, and innovative product features."[24] Here, the PFJ is unlikely to preserve competition in the Medicare individual PDP markets for a number of reasons. Indeed, part of Aetna's PDP success and its ability to intensively compete with CVS

---

[15] *United States v. Aetna, Inc*., Memorandum and Opinion Filed January 23, 2017 at p. 16 and 93.
[16] Id. at 93.
[17] Id. at 93.
[18] Id. at 94.
[19] Id. at 94.
[20] Id. at 105-106.
[21] Id. at 110-111.
[22] Id. at 110-111.
[23] Id. at 111-112.
[24] Competitive Impact Statement at 5.

relates to Aetna's status as one of the nation's largest health insurers. While the DOJ requires the complete divestiture of Aetna's Medicare PDP contracts and allows WellCare to attempt to hire Aetna's employees, WellCare is not purchasing an existing business entity nor is it guaranteed of hiring Aetna's best employees. Under the PFJ, WellCare has a very small window of time to attempt to hire Aetna employees. This is the problem with a divestiture of assets that is not a standalone business. There is a lot of uncertainty on whether WellCare will be able to hire the correct personnel to help it be successful. WellCare is much smaller than Aetna; as of December 31st, 2017 Aetna's total membership was 22.2 million and it had assets of $55.137 billion,[25] and WellCare had 4,371 million members and assets of $8.364 billion. And WellCare's membership of individual PDPs has declined; from 1,392,000 in 2014 to 1,152,000 in 2017.[26]

As the DOJ's Merger Remedies Guide suggests in some cases, the purchase of an existing business entity might be more likely to effectively preserve the competition that would have been lost through the merger.[27] An existing business entity would have the "personnel, customer lists, information systems, intangible assets, and management infrastructure" necessary to compete.[28] A divestiture of an existing business is generally preferred by the DOJ and is more successful than a divestiture of some lesser set of assets because an existing business has already proved that it can compete within the marketplace.[29] Indeed, the DOJ's Merger Remedies Guides states that in some cases, the DOJ may require more than a divestiture of an existing business to effectively preserve competition.[30]

Because the DOJ did not require a divestiture of an existing business, it requires CVS and Aetna to provide additional assistance to WellCare. We are skeptical of a divestiture that relies on a continuing relationship between CVS/Aetna and WellCare because that leaves WellCare susceptible to CVS's conduct and actions which are not aligned with ensuring that WellCare will be an effective competitor in the future. Administrative services contracts or assistance with the transition from Aetna to WellCare simply raises a host of questions.

Under the PFJ, CVS and Aetna are required to divest to WellCare Aetna's individual PDP contracts that includes approximately 2.2 million members in as many as 50 states. It does not impact Aetna's group or individual Medicare Advantage plans so Aetna will still be selling those products to seniors under the Aetna brand. The parties did not announce the financial terms of the deal publicly but the DOJ told Judge Leon in court that the sale of the assets was a "mere 50 to 100 million", which seems to be a very cheap price. In fact, at most, WellCare is paying $45 per covered life. This information is important because the DOJ and the district court should be extremely cautious about divestiture buyers that are getting a great deal.[31] The better a deal that a divestiture buyer has, the less incentive there is to continue to manage underperforming contracts. A low purchase price raises serious concerns as to whether WellCare will manage the assets in a way that preserves competition going forward. The Merger Remedies Guide

---

[25] Aetna Reports Fourth-Quarter and Full Year 2017 Results, January 30, 2018. https://news.aetna.com/news-releases/aetna-reports-fourth-quarter-and-full-year-2017-results/
[26] WellCare Health Plans, Inc. 2017 Annual Report (Form 10-K). U.S. Securities and Exchange Commission, February 2018. https://www.sec.gov/Archives/edgar/data/1279363/000127936318000011/wcg-2017123110k.htm
[27] DOJ Antitrust Division Policy Guide to Merger Remedies, June 2011, at 8-10. ("Merger Remedies Guide").
[28] Merger Remedies Guide, at 9.
[29] Merger Remedies Guide, at 8-9.
[30] Merger Remedies Guide, at 10.
[31] Merger Remedies Guide at 9.

acknowledges this possibility.[32] An extremely low purchase price shows the conflicting interest between the divestiture buyer and the DOJ's goal of restoring competition. If the divestiture buyer does not have much skin in the game, the inexpensive acquisition could still "produce something of value to the purchaser" even if it does not become a significant competitor in all aspects of the divestiture and therefore, the divestiture would not "cure the competitive concerns."[33]

Here, per the terms of the agreements, Aetna will, at the option of WellCare, provide administrative services to, and assume the financial risk of, the Aetna Part D plans through the end of plan year 2019.[34] Again, this seems like a deal that is too good to be true. The PFJ indicates that Aetna, at WellCare's option, will provide plan administration services, such as pharmacy network management and contracting; prescription drug claims processing; utilization review and quality management; data collection, reporting and submission; rebate management; formulary administration; as well as billing and invoicing. This raises more questions because WellCare will be relying on the merged firm for support. This suggests that the divestiture in the PFJ is unlikely to restore competition lost by the merger.

In addition, past failed remedies demonstrate that when a divestiture buyer such as WellCare, acquires more than it can handle, divestiture buyers have had trouble managing the increased growth. Here, WellCare will be tripling its size in the Medicare PDP business from 1.1 million lives to approximately 3.3 million lives. This type of rapid growth has resulted in small divestiture buyers going out of business within months of acquiring divested assets and consumers lose.[35]

The DOJ makes clear that neither entry nor expansion is likely to solve the competitive problems created by the merger. It notes that recent entrants into individual PDP markets have been largely unsuccessful, with many subsequently exiting the market or shrinking their geographic footprint. Effective entry into the sale of individual PDPs requires years of planning, millions of dollars, access to qualified personnel, and competitive contracts with retail pharmacies and pharmaceutical manufacturers and companies must establish sufficient scale quickly to keep their plans' costs down.[36] This raises a lot of questions on whether WellCare is up to the task.

Under the PFJ, CVS and Aetna are required to provide WellCare with the Aetna brands for the Medicare PDPs for at least one year. The merged firm, however, will continue to use the Aetna brand for its other products. This type of brand splitting or allowing the merged firm to retain access to the brand can present a significant competitive risk because it will make it more difficult for WellCare to differentiate its products from Aetna's going forward.[37] One year is a short time frame, but whenever the period stops, Aetna will be free to compete with its brand in the future. This essentially means that WellCare could end up being not as competitive because it will not have the incentive to market its Aetna Medicare PDPs because to do so would be

---

[32] Merger Remedies Guide at 9.
[33] Merger Remedies Guide at 9.
[34] Press Release, *WellCare Completes Acquisition of Standalone Medicare Part D Prescription Drug Plan Business from Aetna*, December 4, 2018.
[35] Ana Marum, *Failed divestiture: Albertsons is bidding on 36 Haggen stores, including some it used to own,* The Oregonian, November 10, 2015.
[36] Competitive Impact Statement, at 6.
[37] Merger Remedies Guide at 11-12.

advertising Aetna's other insurance plans against its own brands. These limitations will undoubtedly make it more difficult to preserve competition.

In any case, the question remains whether WellCare will be able to retain many of the 2.2 million subscribers that it is acquiring through the divestiture, let alone fully restore competition as is required under the law. One thing is for sure, CVS will compete for those subscribers when its obligations are over.

### D. Inadequate Remedy in the PFJ Will Harm Seniors

The divestitures in the PFJ may also result in additional cost to consumers such as disrupted and inferior service, higher premiums, and increased uncertainty. Careful scrutiny is required with the CVS/Aetna PFJ because it involves the most vulnerable consumers – elderly and disabled Medicare beneficiaries. There is a real danger that they will suffer the greatest harm from this inadequate divestiture requirement in the PFJ. Seniors should not be forced to bear the costs of a risky settlement especially when the merger will only benefit CVS and Aetna shareholders and executives.

## III. DOJ's Complaint and PFJ Fails to Restore Competition in Physician and Pharmacy Markets

The CVS/Aetna transaction raises significant vertical antitrust concerns that are not raised in the DOJ's Complaint, Competitive Impact Statement, or PFJ. The DOJ simply ignored all of the concerns raised by providers, physicians, pharmacists, and consumer groups. The DOJ must be willing to craft alternative remedies in addition to the divestiture of a competitive overlap to ensure consumers are fully protected. As industries consolidate further and become more and more concentrated, the DOJ must not only consider structural and behavioral remedies, but also consider outright rejections when necessary.

The PFJ does not address harm to patients resulting from vertical consolidation that will occur between a merger of the nation's largest retail pharmacy chain, one of the two largest PBMs, on the one hand, and the nation's third largest health insurer, on the other.

### A. PBM Market Is Concentrated and Uncompetitive

The PBM market lacks the essential elements for a competitive market due to the lack of choice, numerous conflicts of interests, and lack of transparency and regulation.[38] Currently, there is a lack of choice because three PBMs (CVS, Express Scripts, and UnitedHealth's OptumRx) control 85% of the PBM market.[39] The three major PBMs clearly face conflicts because they own mail order operations, specialty pharmacies, and, in the case of CVS, the largest retail and

---

[38] Testimony of David Balto, Before House Judiciary Committee, October 8, 2009. http://www.dcantitrustlaw.com/assets/content/documents/CAP/protecting%20consumers.pdf

[39] Reforming Biopharmaceutical Pricing at Home and Abroad, The Council of Economic Advisors, White Paper, February 2018. The White House Council of Economic Advisers found that the three large PBMs control more than 85% of the market, "which allows them to exercise undue market power against manufacturers and against health plans and beneficiaries they are supposed to be representing, thus generating outsized profits for themselves." https://www.whitehouse.gov/wp-content/uploads/2017/11/CEA-Rx-White-Paper-Final2.pdf

specialty pharmacy chain and the dominant long-term care pharmacy.[40] Health plans and employers contract with PBMs, which negotiate drug prices with pharmaceutical manufacturers and reimbursement rates with pharmacies.[41] The PBMs control the formularies so they determine what drugs patients can purchase, how many times patients can fill the prescription, and the amount of patient co-pays.

A PBM such as CVS can design the benefit in such a way that patients will pay higher co-pays at rival retail pharmacies. When the PBM is commonly owned with the entity it is supposed to bargain with, or has its own mail order operations, there is an inherent conflict of interest, which can lead to deception, anticompetitive conduct, higher prices, and less choice for the patient. Because of a lack of transparency, the prescription drug rebates negotiated by PBMs from pharmaceutical manufacturers are not fully passed on to employers or consumers and the dispensing fees reimbursed to retail pharmacies are far less than what the insurance plan is actually paying for the drug. The PBMs can make money off the spread between what they pay retail pharmacies and what they charge the insurance plan. Indeed, the PBMs are in many cases making more money per prescription than the retail pharmacy that is buying and dispensing the drug. PBMs take advantage of a lack of transparency, misaligned incentives, and conflicts of interest to make larger profits than any other players involved in the drug supply chain (distributors, insurers, or pharmacies).[42] In one example, CVS billed $198.22 for a generic antipsychosis drug, but reimbursed the drug dispenser only $5.73.[43] The current structure and characteristics of the PBM market has led to higher drug costs.[44]

### B. Health Insurance Market is Concentrated

Aetna is the third largest health insurer in the United States and is considered part of the "Big 5" along with its rivals United Healthcare, Anthem, Cigna, and Humana.[45] The DOJ successfully challenged two health insurer mergers between four of the Big 5 in 2017.

### C. Past Vertical Healthcare Mergers Have Harmed Consumers

There is little evidence that past vertical acquisitions by CVS have resulted in significant benefits to consumers. Indeed, past vertical mergers have resulted in anticompetitive conduct that has harmed independent pharmacies and consumer choice. If CVS and Aetna are allowed to join forces, the results will be predictably harmful to competition as well as consumers.

In 2007, CVS acquired Caremark. After acquiring the PBM arm, it used its new power to exclude competition, reduce patient access to vital healthcare services from their pharmacists of choice, and drive up prices. After closing on the acquisition, the vertically integrated firm

---

[40] Testimony of David Balto, Before the California Senate Committee on Business Practices and Economic Development, March 20, 2017. https://sbp.senate.ca.gov/sites/sbp.senate.ca.gov/files/David%20Balto%20Testimony.pdf

[41] *See* Robert Langreth, David Ingold, and Jackie Gu, *The Secret Drug Pricing System Middlemen Use to Rake in Millions*, Bloomberg (Sept. 11, 2018), https://www.bloomberg.com/graphics/2018-drug-spread-pricing/.

[42] Charlie Grant, *Hidden Profits in the Prescription Drug Supply Chain*, Wall Street Journal, February 24, 2018. https://www.wsj.com/articles/hidden-profits-in-the-prescription-drug-supply-chain-1519484401

[43] *See* Robert Langreth, David Ingold, and Jackie Gu, *The Secret Drug Pricing System Middlemen Use to Rake in Millions*, Bloomberg (Sept. 11, 2018), https://www.bloomberg.com/graphics/2018-drug-spread-pricing/.

[44] *Id.*

[45] United States v. Aetna Inc., 250 F. Supp. 3d 1, 11 (D. D.C. 2017).

formed exclusive pharmacy networks that prevented consumers from accessing pharmacists of their choice and increased their costs for prescription drugs. CVS will undoubtedly enter into similarly exclusive arrangements if it is permitted to acquire Aetna.

In addition to the exclusive arrangements, CVS has allegedly engaged in a strategy of squeezing its rival retail pharmacies with "take-it-or-leave-it" non-negotiable contracts.[46] Rival retail pharmacies are required to sign contracts with CVS Caremark in order to process prescriptions through the PBM for payment. Because they have no bargaining power, CVS was able to depress the dispensing fees to rival retail pharmacists to uncompetitive levels in the fall of 2017 by drastically decreasing generic prescription and Medicaid reimbursement rates while at the same time reimbursing its own CVS pharmacies at higher rates.[47] Sometimes these rival pharmacies were not reimbursed enough to cover the cost of filling the prescription, and, in many cases, CVS was reimbursing the rival retail pharmacies less than half of what was being charged to the health insurance plans.[48] The declining reimbursement rates caused a number of rival retail pharmacies to shut their doors, reducing patients' treatment options and access. To the ones still in business, CVS sent letters offering to purchase them.[49] Because many of the rival retail pharmacists are small and lack bargaining power, they are susceptible to exclusionary conduct and take-it-or-leave-it contracts.

Moreover, CVS has successfully steered many of its PBM customers to its pharmacies and mail order. While CVS claims that its mail order saves money for customers and/or employers, there is considerable dispute on whether those claims are valid. Customers want choice and even after being steered to CVS's mail order, many of these patients reportedly come back to their independent and community pharmacies to ask questions about their prescriptions and medications even though they are receiving prescription drugs from CVS's mail order. This happens because patients want access to a pharmacist who sees them regularly. These patient access concerns are particularly great in underserved inner city and urban areas. In essence, CVS is free riding on independent and community pharmacists, and if this continues, this could eventually run these rival retail pharmacists out of business.

While CVS proclaims that its acquisition of Aetna will result in substantial efficiencies, it is often the case that efficiencies even if realized are rarely passed on to consumers in the form of lower prices and better services.

In fact, past health insurer-PBM alliances have not led to lower health care prices or improved quality of care. In 2007, UnitedHealthcare acquired CatamaranRx, then the fourth-largest PBM, into its OptumRx PBM, and in 2011, Express Scripts and Medco, two of the three largest PBMs at the time, merged. While both deals promised efficiencies that would result in lower prices for consumers, there has been no evidence of improved care, lower premiums and overall costs, increased savings, or any resulting benefits passed on to consumers. Rather, consumers have

---

[46] Linette Lopez, *What CVS is Doing to Mom and Pop Pharmacies in the U.S. Will Make You Boil,* Business Week (March 30, 2018). https://www.businessinsider.com/cvs-squeezing-us-mom-and-pop-pharmacies-out-of-business-2018-3
[47] *Id.*
[48] *Id.*
[49] *Id.*

suffered through higher drug prices, fewer choices, poorer service, and increased fraud and abuse.

### D. CVS/Aetna Merger Is Likely to Harm Competition

CVS's history suggests that it will continue to engage in exclusionary conduct to steer patients away from rivals. The acquisition of Aetna enhances the ability and incentive of the merged firm to impede competition in retail pharmacy, provider services, health insurance, and PBM services.

Pre-merger, Aetna has the incentive to deal with all retail pharmacies for its commercial insureds. Post-merger, this will change as CVS/Aetna will have the increased incentive and ability to steer Aetna's patients to CVS's mail order or its retail pharmacy stores. CVS will be able to cut off rival retail pharmacies' access to Aetna insureds by implementing some changes either explicitly requiring the Aetna insureds to use CVS mail order and/or retail pharmacies or implementing financial disincentives to Aetna insureds from using rival retail pharmacies.

Primary care physicians are also at risk of being squeezed out of the marketplace to the detriment of patients.[50] CVS will be able to steer patients covered by Aetna to receive their care from CVS-run clinics, instead of from their own physicians.[51]

Further, while a standalone CVS has strong incentives to sell its PBM services to all health insurers, after integrating with Aetna, the incentive to sell such services to other health insurers changes.[52] Given the significance of being one of three largest PBMs, CVS could enact a number of strategies related to drug formularies, providing less transparency of drug costs, and gathering information about rival insurers' drug spend and customers that could be used to disadvantage health insurer rivals.[53] This could raise rival health insurers' cost of prescription drugs. Finally, CVS could cut off Aetna subscribers from rival PBMs.

In sum, patients will see higher prescription drug prices, lower quality, and less choice. This merger will unquestionably result in CVS steering patients to its services and products and away from competitors' offerings.

### Concluding Thoughts

We believe that antitrust enforcement is crucial to protecting consumers and that the Court should carefully review the PFJ to determine whether it is in the public interest. The PFJ needs to be as thorough as possible to prevent post-merger harm. The DOJ is taking a risk when it accepts remedies to resolve anticompetitive concerns posed by mergers so the Court must be comfortable that the proposed remedies are actually sufficiently complete to avoid any enforcement problems in the future. The PFJ must also insure that the healthcare markets remain as competitive as possible. History suggests that restoring competition is especially difficult in

---

[50] Letter from Marilyn Singleton to the Department of Justice, September 21, 2018. http://aapsonline.org/cvs-aetna/.
[51] *Id*.
[52] Letter from Diana Moss, President of American Antitrust Institute to the Department of Justice, Regarding *Competitive and Consumer Concerns Raised by the CVS-Aetna Merger* dated March 26, 2018.
[53] *Id.*

the health insurance industry. It is far from certain that any divestitures required of the merging parties will succeed today, given that they have so clearly failed in the past. And seniors are most likely to lose out. The PFJ, here, is not in the public interest because it is unlikely to preserve competition in the individual Medicare Part D PDP markets nor does the PFJ resolve all of the wide-ranging harm that will be caused by vertical integration.

Sincerely,

Consumer Action

U.S. PIRG