**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** *et al.,* | |
| **Plaintiffs,** | |
| **v.** | **Case No. 1:18-cv-02340-RJL** |
| **CVS HEALTH CORPORATION** *et al.,* **Defendants.** | |

**PHARMACISTS UNITED FOR TRUTH AND TRANSPARENCY and PHARMACISTS SOCIETY OF THE STATE OF NEW YORK'S MOTION FOR LEAVE TO INTERVENE, OR IN THE ALTERNATIVE TO PARTICIPATE AS *AMICUS CURIAE***

Pursuant to Rule 24 and 15 U.S.C. §16(f)(3), Pharmacists United for Truth and Transparency ("PUTT") and Pharmacists Society of the State of New York, Inc. ("PSSNY") respectfully request leave to intervene in this Tunney Act proceeding for the limited purpose of assisting the Court in its public interest determination of the Department of Justice's ("DOJ") Proposed Final Judgment ("PFJ") concerning the merger between CVS Health, Inc. and Aetna Inc.  15 U.S.C. §16(f) authorizes the Court to grant full or limited participation in proceedings before the court by interested persons or agencies, including appearance *amicus curiae* and intervention as a party pursuant to the Federal Rules of Civil Procedure.

PUTT and PSSNY, both advocates for independent pharmacists across the country, respectfully request that this Court permit their intervention for the limited purpose of 1) submitting a response to the Court's December 3, 2018 Show Cause Order including making oral argument at the hearing currently scheduled for December 18, 2018; 2) submitting a response to the Court to the DOJ's response to public comments submitted pursuant to this Tunney Act review; 3) participating in hearings held by the Court, (or seeking a hearing if necessary); and 4)

1

participating in any discovery relevant to DOJ's relevant market definition, competitive effect in the relevant market, and any information DOJ considered in determining the proposed remedy. In the alternative, PUTT and PSSNY respectfully request leave to participate to a similar extent as *amicus curiae.*

Pursuant to Local Rule 7(m), PUTT and PSSNY conferred, or attempted to confer with counsel for DOJ, State Plaintiffs and Defendants.  DOJ opposes the Motion to Intervene but will not oppose a motion to participate as *amicus curiae*.  The State of California takes no position on the Motion to Intervene, but reserves its right to object; and also consents to the motion to participate as *amicus curiae* but takes no position on whether it is appropriate for the Court to allow such participation.  The States of Florida, Hawaii and Washington have yet to respond to this request.  These is no contact listed for the State of Mississippi on the Docket.  Defendant CVS has indicated that it is still taking time to determine its response to the request for consent, and has not yet given a determination as the time of this filing.  Defendant Aetna has yet to respond to this request.

Pharmacists United for Truth and Transparency is not a corporation and no corporations own 10% or more of its stock.  Pharmacists Society of the State of New York, Inc. is a corporation and no corporations own 10% or more of its stock.

Dated: December 14, 2018

Respectfully submitted

/s Andre Barlow
Andre P. Barlow (Bar No. 465683)
DOYLE, BARLOW & MAZARD PLLC
1110 Vermont Ave, N.W.  Suite 715
Washington, D.C.  20005
T:  (202) 589-1834
F:  (202) 589-1819
abarlow@dbmlawgroup.com

**MEMORANDUM IN SUPPORT OF PUTT AND PSSNY'S
MOTION TO INTERVENE or in the alternative
MOTION FOR LEAVE TO PARTICIPATE AS *AMICUS CURIAE* IN
PROCEEDINGS RELATED TO THE
TUNNEY ACT PUBLIC INTEREST REVIEW**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................ii
INTEREST OF PROPOSED INTERVENORS/*AMICUS CURIAE*.................................1
INTRODUCTION.............................................................................................................3
ARGUMENT....................................................................................................................7

    I.     The Tunney Act Provides the Court With Broad Latitude and Discretion to do
          what is Necessary for it to Determine Whether the PFJ is in the Public Interest. ...7
               A. The Court's Tunney Act Review Should Not Be Treated as a
               Formality........................................................................................................8

    II.    PUTT and PSSNY Should be Granted Permissive Intervention to Assist the Court
          in Making Its Public Interest Determination. ...........................................................12
               A. PUTT AND PSSNY's Motion is Timely and Will Not Unduly Delay or
               Prejudice the  Adjudication of the Rights of the Original Parties……………....12
               B.  PUTT and PSSNY Have a Claim that Shares a Question of Law or
               Fact with the Main
               Action……………………………………………………...……......13

    III.   The Court Could Hold Hearings to Determine Whether the Complaint was
          Narrowly Drafted as to Make a "Mockery of Judicial Power" and if the
          Divestiture to WellCare will Preserve Competition……………………………..15

    IV.   The PFJ Is Not in the Public Interest and Should Be Rejected Because it Does Not
          Preserve Competition in Individual PDPs…………………………………….....19
               A. Judge Bates Rejects Divestiture of Medicare Advantage Plans As
               Insufficient to Preserve Competition in 2016 Aetna/Humana
               Merger…………………………………………………………...…..……21
               B. WellCare Fails To Restore Competition in Medicare Advantage
               Markets as a Divestiture Buyer as it Helped Humana Obtain Approval to
               Acquire Arcadian……………………………………………………..21
               C. WellCare's Purchase Price for Aetna's Individual PDPs is a Red
               Flag……………………………………………………………………22

CONCLUSION………………………………………………………………….......24

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Diamond v. Charles*, 476 U.S. 54 (1986) .......................................................................................... 13

*Equal Employment Opportunity Comm'n v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042 (D.C. Cir. 1998) ............... 14

*Fed. Trade Comm'n v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015) ................................................. 20

*FTC v. CCC Holdings*, 605 F.Supp.2d 26 (D.D.C. 2009) ................................................................. 20

*Hodgson v. United Mine Workers of Am.*, 473 F.2d 118 (D.C. Cir. 1972) ............................................. 12

*Massachusetts v. Microsoft*, 373 F.3d 1199 (D.C. Cir. 2004) ........................................................ 13

*Nat. Ass'n for Advancement of Colored People v. New York*, 413 U.S. 345, 366 (1973) ................................ 12

*Nuesse v. Camp*, 385 F.2d 694, 704 (D.C. Cir. 1967) ................................................................. 14

*Piambino v. Bailey*, 757 F.2d 1112 (11th Cir. 1985) ................................................................ 14

*Providence Baptist Church v. Hillandale Committee, Ltd.*, 425 F.3d 309 (6th Cir. 2005) ............................ 14

*Smuck v. Hobson*, 408 F.2d 175 (D.C. Cir. 1969) .................................................................... 13

*Spring Constr. Co. v. Harris*, 614 F.2d 374 (4th Cir. 1980) ........................................................ 14

*Textile Workers Union of Am., CIO v. Allendale Co.*, 226 F.2d 765 (D.C. Cir. 1955) ................................ 14

*U.S. v. Metro. St. Louis Sewer Dist.*, 569 F.3d 829 (8th Cir. 2009) ................................................ 14

*U.S. v. Philip Morris USA, Inc.*, No. 99-2496, 2005 WL 1830815 (D.D.C. July 22, 2005) ............................. 14

*United States v. Aetna*, 240 F. Supp. 3d 1 (2017) ............................................................. 20-23

*U.S v. Anheuser-Busch InBev SA/NV and SABMiller PLC*, 1:16-cv-1483 (October 22, 2018 Order) ....................... 10

*United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131 (D.D.C. 1982) ............................................... 9

*United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1 (D.D.C. 2003) ...................................... 8

*United States v. AT&T Co.*, 642 F.2d 1285 (D.C. Cir. 1980) ........................................................ 12

*United States v. AT&T Inc.*, 541 F. Supp. 2d 2 (D.D.C. 2008) ................................................ 7, 9, 11

*United States v. Blavatnik*, 168 F. Supp. 3d 36 (D.D.C. 2016) ...................................................... 9

*United States v. BNS, Inc.*, 858 F.2d 456 (9th Cir. 1988) ......................................................... 10

*United States v. Microsoft Corp.*, 56 F.3d 1448 (D.C. Cir. 1995) .......................................... 10, 12, 14

*United States v. SBC Commc'ns, Inc. et al.*, 489 F.Supp.2d 1 (D.D.C. 2007) ....................................... 7, 9

*Westchester Fire Ins. Co. v. Mendez*, 585 F.3d 1183 (9th Cir. 2009) ............................................... 14

*White Consol. Indus. v. Whirlpool Corp.*, 781 F.2d 1224 (6th Cir. 1986) ........................................... 20


**STATUTE**

Antitrust Procedures and Penalties Act, 15 U.S.C. § 16 ("Tunney Act") ........................................ *passim*


**OTHER AUTHORITIES**

150 Cong. Rec. S3617 (Apr. 2, 2004) ................................................................................ 11

Blueprint to Lower Drug Prices and Reduce Out-of-Pocket Costs, Request for Information, U.S. Department of
   Health & Human Services ("HHS"), May 14, 2018 ..................................................................... 4

David Balto, *CVS-Aetna Merger is a Robber Baron's Dream Come True*, The Hill (Dec. 6, 2017) ...................... 17

David Balto, *How PBMs Make Drug Pricing Problem Worse*, The Hill (Aug.31, 2016) ................................... 15

David Balto, *Why the DOJ Must Block the Cigna-Express Merger*, The Hill (Mar. 27, 2018) ........................... 17

*Hidden Profits in the Prescription Drug Supply Chain*, Charlie Grant, February 24, 2018, Wall Street Journal ....... 15

Karen E. Klein, *End of Days for Independent Pharmacists?*, Bloomberg Business Week, (March 8, 2012) .............. 4

Letter from Diana Moss, President of American Antitrust Institute, to Assistant Attorney General of the Antitrust
   Division, Makan Delrahim, March 26, 2018 .......................................................................... 17

Reforming Biopharmaceutical Pricing at Home and Abroad, The Council of Economic Advisors, White Paper,
   February 2018 ............................................................................................. 4, 15, 16

*Rutledge to Investigate Reimbursement Rates from CVS Caremark*, KARK Local News (Feb. 8, 2018 08:43 pm) . . 18

Secretary Alex Azar Interview on CNBC's Squawk Box, May 11, 2018 ................................................... 4

Susan Moore, *Aetna Whistleblower Accuses CVS Health's Caremark of Fraud in Medicare Part D Drug Prices*, Healthcare Finance (April 10, 2018) ................................................................................................................. 18

Testimony of Charles Rothbert, NYS Deparment of Financial Services regarding the Proposed CVS Acquisiton of Aetna (Oct. 18, 2018).................................................................................................................................................. 19

Testimony of David Balto Before the California Senate Committee on Business Practices and Economic Development ........................................................................................................................................................... 16

Testimony of Mark Merritt, Pharmaceutical Care Management Association, before the United States House of Representatives Energy and Commerce Committee Subcommittee on Health, "Examining the Drug Supply Chain," Dec.13, 2017……………………………………………………………………………………………..5

The Pharmacists Society of the State of New York Presentation to the Department of Financial Services Public Hearing, October 18, 2018...................................................................................................................... 17, 18, 20

*The State of Competition in the Pharmacy Benefits Manager and Pharmacy Marketplaces*, Hearing before Subcomm. on Regulatory Reform, Commercial and Antitrust Law, House Comm. on the Judiciary, November 17, 2015 (statement for record of Lynn Quincy and George P. Slover, Consumers Union)........................................ 17

Topher Spiro, Maura Calsyn, and Meghan O'Toole, *Divestitures Will Not Maintain Competition in Medicare Advantage*, Center for American Progress (March 8, 2016) .......................................................................... 11, 22

**RULES**

Fed. R. Civ. P. 24 ............................................................................................................................................. 12,15

**INTEREST OF PROPOSED INTERVENORS/*AMICUS CURIAE***

Pharmacists United for Truth and Transparency ("PUTT") is a national non-profit advocacy organization with a coalition of over 1,200 independent and community pharmacies.   PUTT was founded by independent pharmacists to expose the anticompetitive tactics of the major players in the pharmacy benefit manager ("PBM") industry, of which CVS Health Corporation is one. CVS's acquisition of Aetna, Inc. ("Aetna") will have dire consequences for independent pharmacies throughout the country.

The Pharmacists Society of the State of New York ("PSSNY") represents licensed pharmacists throughout the state of New York. The vast majority of its members work in community pharmacies and a significant number of them are pharmacy owners.  As the voice of more than 2,300 New York community pharmacies and their patients, PSSNY is an important voice on this issue, as the outcome will invariably impact those who rely on their neighborhood pharmacies for access to medication and the opportunity to choose what is right for themselves in the personal matter of their healthcare.  New York has the largest number of independent pharmacies within in its state. These local New York businesses generate more than $7.7 billion in pharmacy sales and create more than 21,000 full-time jobs. They fill nearly 139 million prescriptions each year and generate an additional $7.5 billion in economic activity and create 8,742 jobs outside the pharmacy in their local communities.[1]  They are major contributors to their local communities and economies.

PUTT and PSSNY's participation in this proceeding is further warranted by the fact the DOJ and Defendants are presumably in agreement that the Court's Tunney Act role should be

---

[1] *NCPA Digest 2017*, National Community Pharmacists Association.

restricted, and there is not current party to the action that has the incentive to argue against the DOJ's position.

PUTT and PSSNY submitted Comments pursuant to the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16 ("Tunney Act"), explaining to Plaintiff United States Department of Justice ("DOJ") and the Court that the Proposed Final Judgment ("PFJ") should be rejected because it is not in the public interest and the DOJ should reconsider a block of CVS's acquisition of Aetna.  The vertical integration of CVS and Aetna would increase the merged firm's incentive and ability to steer patients away from its pharmacy rivals and to its own mail-order and retail pharmacy services and products and to raise the costs of rival retail pharmacies. This exclusionary conduct will lead to higher prices, lower quality, and less choice for consumers and patients.

PUTT and PSSNY submit this Motion to Intervene and in the alternative *amicus* brief to address the Court's concerns as stated in its Order to Show Cause dated December 3, 2018 and to provide further background and information to this Court as it determines whether the PFJ serves the public interest.  PUTT and PSSNY seek to intervene because the PFJ's divestiture requirements do not provide an adequate remedy for the harm alleged in the Complaint nor does it resolve the competitive problems presented by the merger.  The PFJ proposes a divestiture of individual PDP contracts to a company with a dismal track record of managing such assets from a government divestiture, and for a price so far below market value as to make the divestiture's success highly unlikely.

This merger will further harm the thousands of independent pharmacists across the country that have already been harmed by CVS's heavy-handed abuse of its market position to price these pharmacists out of business.

## INTRODUCTION

CVS Health's proposed acquisition of Aetna will combine the nation's largest retail pharmacy, one of the two largest pharmacy benefit managers ("PBM"), and the third largest health insurer in the United States, all under one roof.  The deal creates a large, vertically integrated firm that operates in markets where only a few meaningful rivals compete.

The DOJ approved the acquisition with conditions requiring the divestiture of Aetna's individual Medicare Part D prescription drug plans ("PDPs"), but did not identify any of the wide-ranging competition concerns raised by this merger nor did it include any conditions on the merging parties' future conduct.  Despite the proposed divestiture, CVS' acquisition of Aetna will harm pharmacists and consumers because the DOJ failed to address the types of strategic, exclusionary conduct presented by the merger.  PUTT and PSSNY have serious doubts that the divestiture in the PFJ resolves the concerns in the individual PDP market or whether any divestiture could resolve the foreclosure concerns raised by this merger.

Past experience can be used to predict the future on what may happen if CVS is allowed to integrate with Aetna.  Previous vertical mergers in the healthcare industry have resulted in anticompetitive conduct that has harmed independent pharmacies and patient choice.  In 2007, CVS acquired Caremark, a PBM giant, and the merged firm then engaged in exclusionary conduct, reduced patient access to vital healthcare services from their pharmacists of choice, and drove up prices. The merged firm formed exclusive pharmacy networks that prevented consumers from choosing their own pharmacists and increased their costs for prescription drugs. Undoubtedly, CVS will enter into similarly exclusive arrangements if it is allowed to integrate with Aetna.[2]

---

[2] Karen E. Klein, *End of Days for Independent Pharmacists?*, Bloomberg Business Week, (March 8, 2012).

The PBM market is highly concentrated and uncompetitive.  The White House Council of Economic Advisers found that the three large PBMs control more than 85% of the market, "which allows them to exercise undue market power against manufacturers and against health plans and beneficiaries they are supposed to be representing, thus generating outsized profits for themselves."[3]  The three major PBMs each have conflicts of interest because they own mail-order operations, specialty pharmacies, and, in the case of CVS, the largest retail and specialty pharmacy chain and the dominant long-term care pharmacy.  Health plans and employers contract with PBMs, the middlemen, to secure prescription drugs from pharmaceutical manufacturers and services from pharmacies.  The lack of competition, lack of transparency and negotiating tactics of PBMs are a key structural component to the escalating list prices of prescription drugs and increasing out-of-pocket costs for consumers.  For good reason, the role of PBMs has been under scrutiny by other parts of the Trump Administration[4] because they wield so much power and benefit from escalating drug prices.[5]  Moreover, the PBMs control the drug formularies, which determines what drugs patients are allowed to purchase, how many times patients can fill the prescription, and the number of patients' co-pays.

CVS/Caremark, the PBM business for CVS, manages approximately 34% of all covered lives, which amounts to about 90 million lives,[6] and it used its market power in the past to impose gag clauses; depress pharmacist reimbursement rates to uncompetitive levels; to offer

---

[3] Reforming Biopharmaceutical Pricing at Home and Abroad, The Council of Economic Advisors, White Paper, February 2018.

[4] Blueprint to Lower Drug Prices and Reduce Out-of-Pocket Costs, Request for Information, U.S. Department of Health & Human Services ("HHS"), May 14, 2018. **"American patients," HHS points out, "have the right to know what their prescription drugs will really cost before they get to the pharmacy."**

[5] Secretary Alex Azar Interview on CNBC's Squawk Box, May 11, 2018 at https://www.cnbc.com/2018/05/11/azar-says-everybody-is-wetting-their-beak-on-high-drug-list-prices.html.

[6] According to CVS Health, it has 90 million PBM plan members. *See* CVS Health, *available at* https://cvshealth.com/about/facts-and-company-information. The Pharmaceutical Care Management Association testified that PBMs administer drug plans for more than 266 million Americans. *See* Testimony of Mark Merritt, Pharmaceutical Care Management Association, before the United States House of Representatives Energy and Commerce Committee Subcommittee on Health, "Examining the Drug Supply Chain," Dec.13, 2017.

take it or leave it contracts, and to generate outsized profits for itself.  As a result, community pharmacies have no negotiating power and are routinely forced to accept contracts with onerous terms to be part of the PBM's pharmacy network.  In some cases, the pharmacy is reimbursed less than what it pays for a prescription drug.  In other cases, the PBM will simply exclude the pharmacy from its networks altogether, limiting patient access and choice.

Aetna, for which CVS/Caremark administers the pharmacy benefit, has recently engaged in this practice of exclusion.  The 2018 plan year marks the second consecutive year in which Aetna excluded many independent pharmacies from the opportunity to bid for preferred status in Aetna's Part D pharmacy networks. The opportunity to be a part of a plan's preferred network is critical for both pharmacies and beneficiaries, as nearly all Part D plans include preferred networks with lower co-pays.  Aetna, however, still engages in commercial business with independent pharmacists.

Pre-merger, Aetna has the incentive to deal with all retail pharmacies for its commercial insureds.  Post-merger, these incentives change because CVS/Aetna will have the increased incentive and ability to steer Aetna's commercial patients to CVS' mail-order or its retail pharmacy stores.  CVS/Aetna will be able to cut off rival retail pharmacies' access to Aetna insureds by implementing changes either explicitly requiring the Aetna insureds to use CVS mail-order and/or retail pharmacies, or implementing financial disincentives to Aetna insureds for using rival retail pharmacies.  If CVS integrates with Aetna, the community and independent pharmacists will lose commercial business.

The irony of the PFJ's divestiture to WellCare is that CVS/Caremark is its current PBM. Therefore, post-merger, CVS Health retains control over both the pharmacy network and WellCare's Medicare Part D drug formulary.  The Aetna/CVS Caremark/WellCare relationship offers a perfect example of the challenges presented by the new vertically-integrated business

model.  It is impossible to control the conflicts of interest in the marketplace.  The decision process for WellCare may follow a new pathway and the money may flow through different channels, but the result is the same.  CVS will have access to more patient data and will control multiple revenue streams.

Making matters worse, the DOJ's approval of CVS/Aetna was done shortly after its approval of Cigna's acquisition of Express Scripts, another vertical integration between a health insurer and PBM.  That deal was approved without any conditions at all. The two mergers will dramatically change the healthcare industry and how it will function going forward.

CVS and Aetna already hold significant market power in the retail pharmacy, PBM, and health insurance markets. Given the structure of these markets, a merged CVS-Aetna will increase its bargaining leverage over its rival retail pharmacies and have an enhanced incentive and ability to disadvantage them.  The role of community and independent pharmacies is vitally important to competition and patient choice because pharmacists have daily interactions with patients.  Competition and patients will likely suffer through higher prices, lower quality, less innovation, and less choice.  Some mergers should simply be blocked, and this is one of them.

PUTT and PSSNY appreciate that this Court is taking its Tunney Act obligations seriously.  While the Court makes its determination of whether the PFJ adequately resolves the competition concerns presented by this merger, it certainly has the power under the Tunney Act to do what serves the public interest.  Thus, if the Court is inclined to enter a hold separate order to maintain the status quo and prevent any further integration of CVS and Aetna, it should do so. Otherwise, the DOJ gets what it wants: a rubber stamp approval.

## **ARGUMENT**

**I.    The Tunney Act Provides the Court With Broad Latitude and Discretion to do what is Necessary for it to Determine Whether the PFJ is in the Public Interest.**

The Tunney Act directs the Court to determine whether the proposed final judgment is "in the public interest." 15 U.S.C. §16(e)(1). As DOJ notes in its Competitive Impact Statement ("CIS"), the district court is statutorily "required" under the Tunney Act to take into account "competitive considerations bearing upon the adequacy" of the PFJ.  Competitive Impact Statement at 14; 15 U.S.C. § 16(e)(1)(A).  The Court must "evaluate both 'the competitive impact of the proposed remedies, *i.e.*, how well the settlement remedies the harms alleged in the complaint[],' as well as 'issues unrelated to the competitive impact of the settlement.'" *United States v. AT&T Inc.*, 541 F. Supp. 2d 2, 6 (D.D.C. 2008) (quoting *United States v. SBC Commc'ns, Inc. et al.*, 489 F. Supp. 2d 1, 17 (D.D.C. 2007)); 15 U.S.C. § 16(e)(1)(A), (B).  In other words, the Court is obligated to conduct a review of the competitive considerations, which may include the examination of U.S. antitrust agencies' past enforcement in the healthcare industry, past statements about competition in healthcare, and independent economic analysis of the competitive effects arising from past mergers of PBMs, retail pharmacies, and health insurers as well as failed remedies in these markets.  Examining competitive considerations are particularly applicable here because the DOJ took a myopic view of the relevant market as it failed to address vertical foreclosure concerns raised by pharmacists.  By the DOJ's own admission, it acknowledges that its chosen market has high entry barriers and is highly concentrated.  Compl. at ¶¶ 34, 37.

**A.    The Court's Tunney Act Review Should Not Be Treated as a Formality**

It is fairly obvious that the DOJ in this case is treating the Tunney Act's standard of review as a mere formality and expects the Court to simply rubber stamp its PFJ. The DOJ states that a hold separate order to keep CVS from integrating with Aetna is not necessary because "the only part of Aetna's business that raised competitive issues" was its standalone, individual Medicare

7

Part D PDPs, which "is now owned by WellCare." [12/2/18 DOJ Status Report on Merger Integration, Dkt. 25, p. 2].  Indeed, the DOJ on November 29, 2018 informed the Court that CVS has closed the Aetna acquisition, Aetna already divested the assets to WellCare, and that CVS and Aetna intend to "begin their integration."  Dec. 3, 2018 Show Cause Order at 2.

The DOJ wants the Court to believe that it has limited authority to take any action other than to approve the settlement at this point. That is not correct. The parties consummated these transactions at their own risk.  They knew that the district court had to conduct a public interest review of the PFJ and that nothing is certain until the Court enters a Final Judgment.  CVS and Aetna certainly understand this as they stipulated that the government is free to withdraw its consent at any time before the Court enters judgment. *See* Asset Preservation and Stipulation and Order at 3.  That means the government's approval of a consent decree is not a wholesale permission for the parties to complete the transaction.

Nonetheless, the DOJ does all it can to admonish the Court to simply rubber stamp the PFJ, arguing that the Court should defer and grant "due respect" to the Government's analysis.  [Dkt. No. 3, p. 16 (quoting *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003)].  It goes on to claim that the Court in a Tunney Act review "is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint."  [*Id.* at 17].  The DOJ's interpretation is wrong and goes against the very language and purpose of the Tunney Act itself.  The Tunney Act was enacted to address the secretive nature of DOJ consent decrees and the DOJ's repeated failure to provide appropriate relief.  *See United States v. Am. Tel. & Tel. Co.,* 552 F. Supp. 131, 148 (D.D.C. 1982); *United States v. Blavatnik*, 168 F. Supp. 3d 36, 27 (D.D.C. 2016) (recognizing that "Congress was spurred to act by its perception that the Justice Department had repeatedly settled antitrust cases for injunctive decrees that were less demanding

than Congress believed appropriate").[7]  Therefore, Congress gave the courts broad power to ensure that the federal government was acting transparently and in the public interest.

In making a public interest determination, courts have discretion *sua sponte*, to: 1) take testimony of government officials or expert witnesses; 2) appoint a special master and such outside consultants or expert witnesses; 3) authorize full or limited participation in proceedings before the court by interested persons or agencies, including appearance *amicus curiae*, intervention as a party, examination of witnesses or documentary materials; 4) review any comments including any objections filed with the United States concerning the PFJ; and 5) take such other action in the public interest as the court may deem appropriate.  15 U.S.C. § 16.  "[T]he procedure for making the public interest determination is generally left to the discretion of the Court." *SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1, 10 (D.D.C. 2007).  Hence, this Court has the authority to make its own call on how it conducts its independent and objective determination of the PFJ.  Moreover, the Ninth Circuit has explained that:

> by expanding a district court's authority over consent decrees through the independent review provisions of the [Tunney Act], Congress necessarily intended that the court have the power to make its review effective. We believe that the review process in merger cases would be undermined if courts were unable to maintain the status quo while determining whether a proposed consent decree is in the public interest. That very interest could be harmed irreparably by permitting a merger to become a fait accompli while the court awaited public comments and performed its [Tunney Act] review function. For example, if after review of public comments, a court were to disapprove a proposed consent decree because of the possibility of a substantial lessening of competition, and the government were to reconsider its position in view of the court's decision, harm from the interim restraints of trade could be irreparable.

---

[7] "In enacting the Tunney Act, Congress sought to ensure that the Justice Department's use of consent decrees in antitrust cases would fully promote the goals of the antitrust laws and foster public confidence in their fair enforcement.  The legislators found that prior practice, which gave the Department almost total control of the consent decree process, with only minimal judicial oversight, failed to accomplish these ends." *AT&T Co.*, 552 F.Supp. at 148.

*United States v. BNS, Inc.*, 858 F.2d 456, 461-62 (9th Cir. 1988).  Accordingly, if the Court is inclined, it certainly has the authority to enter a hold separate order to prevent CVS from integrating with Aetna in order to maintain the status quo as it completes its Tunney Act review. Without a hold separate order, the Court's review would be undermined.

Entering a hold separate order is appropriate here because Tunney Act proceedings take a very long time.  Indeed, Judge Emmet Sullivan just presided over a Tunney Act proceeding that took 27 months from beginning to end.[8]  Here, the Court needs time to explore two overarching issues as it conducts its independent and objective review of the consent.  First, this Court was right to suspect the insufficiency of the Complaint as it *"*is drafted so *narrowly* as to 'make a mockery of judicial power.'"  [12/3/18 Order to Show Cause Dkt. No. 27, p. 2 (quoting *United States v. Microsoft Corp.,* 56 F.3d 1448, 1462 (D.C. Cir. 1995)].  Here, the Complaint focuses only on the anticompetitive impact the acquisition will have on individual Medicare Part D PDPs, while completely ignoring the foreclosure concerns presented by the merger.  The merger will exacerbate some of the competitive problems that already exist in the various healthcare markets to the detriment of both independent pharmacies and consumers.  In this respect, the Complaint and the PFJ are deficient.  If the Court were to find after holding hearings that the PFJ is not in the public interest and the DOJ reconsidered a challenge, it would be extremely difficult to unscramble the eggs if the parties go through with integration plans.      Second, even if the Court only considers the DOJ's competitive concerns as stated in the Complaint, the PFJ still does not adequately address the competitive concerns in the sale of individual Medicare Part D PDPs.  Past history suggests that restoring competition is especially difficult in the health insurance industry.  For example, in 2012, the DOJ conditioned Humana's acquisition of

---

[8] *U.S v. Anheuser-Busch InBev SA/NV and SABMiller PLC,* 1:16-cv-1483 (October 22, 2018 Order).  The complaint was filed on July 20, 2016.

Arcadian Management Services Inc. ("Arcadian") on divestitures of Medicare Advantage plans in 51 counties that covered 12,700 lives.  Within a couple of years, WellCare, who purchased divested assets in 2 counties, completely exited both markets.  Cigna, another purchaser, lost over half of the counties it purchased within the same two years.[9]  WellCare and Cigna are not novices in the health insurance industry, but they both failed because divestiture buyers will do what is best for their bottom line and not what is best for competition and consumers.  Here, WellCare, a relatively small player, is only purchasing contracts with subscribers it is not acquiring a standalone business from Aetna.  Moreover, WellCare does not appear to have much skin in the game given its low purchase price.  So, there are some serious concerns about whether WellCare is an appropriate buyer.

While the DOJ has treated this whole process as a mere formality,[10] the Court has an important role.  Thus, "[i]n making its determination the Court may not simply 'rubberstamp' the government's proposal, but rather it must engage in an 'independent determination of whether a proposed settlement is in the public interest.'"  *United States v. AT&T Inc.*, 541 F. Supp. 2d 2, 7 (D.D.C. 2008) (quoting *Microsoft Corp.*, 56 F.3d at 1458).[11]

---

[9] Topher Spiro, Maura Calsyn, and Meghan O'Toole, *Divestitures Will Not Maintain Competition in Medicare Advantage*, Center for American Progress (March 8, 2016), https://cdn.americanprogress.org/wp-content/uploads/2016/03/04044219/MergersFollowUp.pdf.

[10] Indeed, in its response to the Court's 12/3/18 Order to Show Cause, the DOJ doubles down on its insistence that the Court's role here is trivial, even suggesting that the entire Tunney Act procedure is unconstitutional.  [12/14/18 U.S. Response to Order to Show Cause, p. 6 Dkt No. 32].  The DOJ's prosecutorial discretion is no doubt broad, but it is not wholly without limit.  In amending the Tunney Act, Congress criticized some of the case law that has limited the district court's role in Tunney Act proceedings as "contrary to the intent of the Tunney Act and effectively strips the courts of the ability to engage in meaningful review of antitrust settlements." 150 Cong. Rec. S3615 (Apr. 2, 2004).

[11] Congress "wanted the courts to make an independent, objective, and active determination" without undue deference to DOJ. 150 Cong. Rec. S3617 (Apr. 2, 2004).

## II.     PUTT and PSSNY Should be Granted Permissive Intervention to Assist the Court in Making Its Public Interest Determination.

In order to assist the Court in making its public interest determination, PUTT and PSSNY should be granted permissive intervention pursuant to Rule 24(b) of the Federal Rules of Civil Procedure. Rule 24(b) states:

> [u]pon timely application anyone may be permitted to intervene in an action: (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common.

Fed R. Civ. P. 24(b).  Permissive intervention is granted upon a showing of timeliness and the applicant's claim or defense sharing a question of law or fact with the main action.  Fed. R. Civ. P. 24(b)(2). "In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." *Id*.  The Tunney Act also makes clear the Court may allow intervention in antitrust consent decree matters to assist in its public interest determination. 15 U.S.C. § 16(f)(3).

### A. PUTT AND PSSNY's Motion is Timely and Will Not Unduly Delay or Prejudice the Adjudication of the Rights of the Original Parties.

Courts determine whether a motion to intervene is timely based on an assessment of the surrounding circumstances. *Nat. Ass'n for Advancement of Colored People v. New York*, 413 U.S. 345, 366 (1973).  Among the circumstances considered are the purpose for which intervention is sought, the necessity of intervention as a means of preserving the applicant's rights, and the improbability of prejudice to those already in the case.  *Hodgson v. United Mine Workers of Am.*, 473 F.2d 118, 129 (D.C. Cir. 1972).

The D.C. Circuit has held that a motion to intervene is timely if made soon after it becomes reasonable to expect inadequate representation by the United States.  *United States v. AT&T Co.*, 642 F.2d 1285, 1294-95 (D.C. Cir. 1980).  Because the PFJ does not adequately resolve anticompetitive concerns alleged in the Complaint or otherwise and the DOJ has

cavalierly allowed CVS and Aetna to begin merging their operations before the period for public comment is even complete, this motion to intervene is timely. *Id.*  The present Tunney Act proceeding is about whether the PFJ resolves the antitrust concerns identified in the Complaint and whether the DOJ drafted the complaint so narrowly as to "make a mockery of judicial power."  *United States v. Microsoft Corp.* 56 F.3d 1448 (D.C. Circ. 1995).

PUTT and PSSNY seek limited intervention to address the PFJ's inadequacies before it is finalized. *See Smuck v. Hobson*, 408 F.2d 175, 181-82 (D.C. Cir. 1969) (intervention was timely even when made after the final judgment).  PUTT and PSSNY's request for intervention is timely as it is being submitted to the Court after an opportunity to review the PFJ, but prior to the Court's final judgment on the PFJ's adequacy.  Furthermore, the limited scope of PUTT and PSSNY's request – to submit a response to the DOJ's response to their comments and participate in (or seek) hearings – ensures that this limited intervention will not result in undue delay. Therefore, this motion to intervene is timely and prevents undue delay and prejudice to the existing parties.

### B.  PUTT and PSSNY Have a Claim that Shares a Question of Law or Fact with the Main Action.

Rule 24(b)(2) gives the court discretion to grant intervention "when an applicant's claim or defense and the main action have a question of law or fact in common." Fed. R. Civ. P. 24(b)(2). "Claim[s]" refers "to the kinds of claims ... that can be raised in courts of law as part of an actual or impending law suit."  *Diamond v. Charles*, 476 U.S. 54, 76 (1986) (O'Connor, J., concurring).  A motion to intervene, filed without a pleading should not be considered a reason to deny PUTT and PSSNY's present motion to intervene.  Under *Massachusetts v. Microsoft*, 373 F.3d 1199, 1236 n. 19 (D.C. Cir. 2004), the D.C. Circuit questioned whether the failure to file a pleading with a motion to intervene constitutes a defect and holds that even if it is a defect, that is "no reason to bar intervention" because "procedural defects in connection with intervention

motions should generally be excused by a court." *Id*. This comports with the law of several

jurisdictions. *See, e.g.*, *Westchester Fire Ins. Co. v. Mendez*, 585 F.3d 1183, 1188 (9th Cir.

2009); *U.S. v. Metro. St. Louis Sewer Dist.*, 569 F.3d 829, 834 (8th Cir. 2009) ("Statement of

Interest" provided sufficient notice and thereby satisfied requirement); *Providence Baptist

Church v. Hillandale Committee, Ltd.*, 425 F.3d 309, 314 (6th Cir. 2005) (abuse of discretion to

reject motion to intervene for failure to include pleading); *Piambino v. Bailey*, 757 F.2d 1112,

1121 (11th Cir. 1985) (noting majority of circuits will not deny intervention because of

"nonprejudicial technical defects"); *Spring Constr. Co. v. Harris*, 614 F.2d 374, 377 (4th Cir.

1980).  PUTT and PSSNY as representatives of pharmacists have a significant interest in the

outcome of the matter and therefore "claims an interest" under Fed. R. Civ. P. 24(a) in the

subject-matter of this Tunney Act litigation, which is sufficient to justify intervention even

without an independent cause of action or defense.  Fed. R. Civ. P. 24(a) does not require that the

proposed intervener have a "cause of action," only an interest. *U.S. v. Philip Morris USA, Inc.*,

No. 99-2496, 2005 WL 1830815, at *5 (D.D.C. July 22, 2005).

The D.C. Circuit "eschew[s] strict readings of the phrase 'claims or defense,' allowing

intervention even in 'situations where the existence of any nominate "claim" or "defense" is

difficult to find,'" preferring a broad, liberal reading of "claim and defense" so as not to preclude

permissive intervention. *Equal Employment Opportunity Comm'n v. Nat'l Children's Ctr., Inc.*,

146 F.3d 1042, 1046 (D.C. Cir. 1998) (quoting *Nuesse v. Camp*, 385 F.2d 694, 704 (D.C. Cir.

1967)); *see also Textile Workers Union of Am., CIO v. Allendale Co.,* 226 F.2d 765, 768 (D.C.

Cir. 1955) ("failure to come within the precise bounds of Rule 24's provisions does not

necessarily bar intervention if there is a sound reason to allow it.").

PUTT and PSSNY's claims clearly share a question of law and fact with the claims and

defenses in this case.  Both PUTT and PSSNY claim that the remedies proposed in the PFJ are

grossly inadequate to remedy the anticompetitive harms alleged in the Complaints. Thus, the

main question of law and fact raised by PUTT and PSSNY is the same as that already at issue

here: will the proposed remedies ensure against the harm to competition in the sale of individual

Medicare Part D PDPs caused by these mergers?[12]

## III. The Court Could Hold Hearings to Determine Whether the Complaint was Narrowly Drafted as to Make a "Mockery of Judicial Power" and if the Divestiture to WellCare will Preserve Competition.

Under the Tunney Act, the Court can hold hearings to make a careful determination of

whether the merger harms consumers and if the narrowly drafted complaint makes a "mockery of

judicial power."  15 U.S.C. § 16.  *See United States v. SBC Communications, Inc.*, 489 F. Supp.

2d 1, 14 (D.D.C. 2007) (where complaint "is drafted so narrowly as to make a mockery of

judicial power," the court has authority to reject consent decree "due to matters outside the scope

of the underlying complaint.").  The DOJ took a short-sighted view of the competition problems

raised by this merger.  The PBM market is highly concentrated.[13]  PBMs make larger profits than

any other players involved in the drug supply chain (distributors, insurers, or pharmacies).[14]

PBMs take advantage of a lack of transparency, misaligned incentives, and conflicts of interest.

Ultimately this leads to higher drug costs.[15]  The lack of enforcement, regulation, and

competition has created a situation in which PBMs reign free to engage in anticompetitive and

deceptive conduct that harms consumers, employers, unions, and pharmacists.[16]  The profits of

---

[12] Both PUTT and PSSNY, as associations of representing pharmacies, which are service providers and competitors to the Defendants, have standing to bring Sherman Act Section 7 cases against the merging parties. The Clayton Act gives private parties standing to assert a Section 7 claim. 15 U.S.C. § 26 (allowing any person, firm, corporation, or association to sue for injunctive relief against threatened loss or damage by a violation of federal antitrust laws).
[13] Reforming Biopharmaceutical Pricing at Home and Abroad, The Council of Economic Advisors, White Paper, February 2018.
[14] *Hidden Profits in the Prescription Drug Supply Chain*, Charlie Grant, February 24, 2018, Wall Street Journal.
[15] *Id.*
[16] David Balto, *How PBMs Make Drug Pricing Problem Worse*, The Hill (Aug.31, 2016); *The State of Competition in the Pharmacy Benefits Manager and Pharmacy Marketplaces*, Hearing before Subcomm. on Regulatory Reform, Commercial and Antitrust Law, House Comm. on the Judiciary, November 17, 2015 (statement for record of Lynn

the major PBMs are increasing at a rapid pace, and now exceed $6 billion annually.[17]  PBMs are not adequately fulfilling their function in controlling costs and, indeed, PBM profits are increasing at the same time drug costs increase, in part because PBMs secure higher rebates from the increased prices charged.  Plan sponsors (employers and unions) cannot attack this problem, because PBMs fail to provide adequate transparency and the lack of competition.

Currently, three PBMs (CVS Caremark, Express Scripts, and UnitedHealth's OptumRx) control 85% of their tier in the drug supply chain.[18]  UnitedHealth, a health insurer, is vertically integrated with its PBM, OptumRx.  Cigna, a health insurer, will be integrating its PBM arm, Express Scripts, in short order.  The final approval of CVS/Aetna would further exacerbate the concerns associated with an already concentrated and anticompetitive PBM market.  What health plans and employers are fundamentally wanting to purchase when they contract with a PBM is the services of an "honest broker" to secure the lowest prices and best services from both pharmaceutical manufacturers and from pharmacies.  When the PBM is commonly owned with the entity it is supposed to bargain with, or one that has its own mail-order operations, there is an inherent conflict of interest which can lead to deception, anticompetitive conduct, and higher prices.

The three major PBMs clearly face this conflict, since they own mail-order operations, specialty pharmacies, and, in the case of CVS Caremark, the largest retail and specialty pharmacy chain and the dominant long-term care pharmacy.  If CVS/Aetna is permitted to integrate, all three major PBMs would own their own health insurer as well.  While vertical

Quincy and George P. Slover, Consumers Union), https://consumersunion.org/research/the-state-of-competition-in-the-pharmacy-benefits-manager-and-pharmacy-marketplaces/.

[17] Reforming Biopharmaceutical Pricing at Home and Abroad," The Council of Economic Advisors, White Paper, February 2018.

[18] Testimony of David Balto Before the California Senate Committee on Business Practices and Economic Development, March 20, 2017 at http://www.dcantitrustlaw.com/assets/content/documents/testimony/PBM%20Testimony.Balto.pdf.

mergers do not directly eliminate rivals, they enhance the ability and incentive for the merged firm to behave in ways that harm competition and consumers.  In the PBM context, there are already problems with conflicts of interest and a lack of transparency, and those concerns would be exacerbated by these mergers.[19]  Without independent health insurers to question the costs, there is no one to monitor the PBM rebate scheme or to ensure rebate savings are shared with consumers. Maintaining independent entities in the drug supply chain enables more scrutiny over pricing.

Moreover, past history demonstrates that when CVS acquires firms in the prescription drug distribution chain, consumers pay more while service and quality suffer. Past acquistions have enabled CVS to restrict consumer access and force them to use more expensive drugs. Every day independent pharmacists work to provide the best service and lowest prices to consumers while facing coercive and exclusionary conduct by CVS' PBM Caremark.[20] Community pharmacies have little to no negotiating power and are routinely forced to accept take-it-or-leave-it contracts to be part of the PBM's pharmacy network, otherwise, they are excluded and patients are steered to CVS pharmacies.[21]  These onerous terms sometimes leave pharmacists' holding the bag as they are in some cases being reimbursed more than 40% below cost causing them to consider closing their doors.[22]  To the ones that chose to remain in business, CVS sent letters offering to purchase them.[23]  There are many examples of how CVS has already abused its market power to engage in deceptive and anticompetitive practices:

---

[19] That is why the leading consumer competition advocacy association opposes these mergers. *See* Letter from Diana Moss, President of American Antitrust Institute, to Assistant Attorney General of the Antitrust Division, Makan Delrahim, March 26, 2018; David Balto, *Why the DOJ Must Block the Cigna-Express Merger*, The Hill (Mar. 27, 2018); David Balto, *CVS-Aetna Merger is a Robber Baron's Dream Come True*, The Hill (Dec. 6, 2017).

[20] The Pharmacists Society of the State of New York Presentation to the Department of Financial Services Public Hearing, October 18, 2018. (PSSNY Presentation). http://files.constantcontact.com/599cc597301/b692892d-84a7-476b-88d4-fb1a7c99bb4a.pdf

[21] *Id.*

[22] *Id.*

[23] *Id.*

- Ohio is currently conducting an investigation into CVS' PBM practices.[24]

- In July 2018, the Kentucky Department of Insurance issued an Order of Civil
  Penalty and Probation against CVS/Caremark for multiple violations of the
  Kentucky Insurance Code. As a result, CVS Caremark's license was placed on
  probation. The Order cited four hundred fifty-four violations related to
  reimbursement claim denials issued to pharmacists across Kentucky and an
  additional thirty-eight (38) violations where Caremark provided inaccurate or
  inconsistent information to the Department of Insurance.[25]

- Arkansas Attorney General Leslie Rutledge announced in February 2018 that she
  is demanding information from CVS Caremark after reviewing complaints of
  plummeting medication reimbursement rates paid to local pharmacies.[26]

- An unsealed complaint from 2014, lodged by an Aetna actuary whistleblower
  against CVS Caremark alleged that the PBM (CVS Caremark) did not disclose to
  Aetna how much it was being paid by pharmacies, nor that it was pocketing the
  difference.[27]

In addition, CVS Caremark already administers the pharmacy benefit for Aetna's
Medicare Part D plans so Aetna started to use the same exclusionary tactics.[28]  Aetna, however,
continues to use independent pharmacists for its commercial insureds.  Given CVS' past history,
post-integration, this will change as CVS/Aetna will have the increased incentive and ability to
steer Aetna's patients to CVS's mail-order business or its retail pharmacy stores.  CVS will be
able to cut off rival retail pharmacies' access to Aetna insureds by either explicitly requiring the
Aetna insureds to use CVS mail-order and/or retail pharmacies or implementing financial
disincentives to Aetna insureds from using rival pharmacies.[29]

---

[24] *Id.*
[25] *Id.*
[26] *Rutledge to Investigate Reimbursement Rates from CVS Caremark*, KARK Local News (Feb. 8, 2018 08:43 pm),
https://www.kark.com/news/local-news/rutledge-to-investigate-reimbursement-rates-from-cvs-caremark/961514003.
[27] Susan Moore, *Aetna Whistleblower Accuses CVS Health's Caremark of Fraud in Medicare Part D Drug Prices*,
Healthcare Finance (April 10, 2018), https://www.healthcarefinancenews.com/news/aetna-whistleblower-accuses-
cvs-healths-caremark-fraud-medicare-part-d-drug-prices.
[28] The Pharmacists Society of the State of New York Presentation to the Department of Financial Services Public
Hearing. http://files.constantcontact.com/599cc597301/b692892d-84a7-476b-88d4-fb1a7c99bb4a.pdf
[29] *Id.*

Merging a pharmacy/PBM with a health plan will only cement problems with respect to pharmacy access issues, especially in underserved areas. CVS/Caremark structures pharmacy benefits in ways that disincentivize patients from using rival pharmacies.[30]  For example, the PBM can design the benefit to offer patients a lower co-pay for medications obtained at their own mail-order pharmacy or retail stores and a higher co-pay at non-CVS community pharmacies in their network.  An entity such as CVS that controls the healthcare benefit as well as the prescription drug benefit inevitably will give patients even less control over choice and access.[31]

There are a number of questions for the Court to consider that go beyond pharmacists because CVS Minute Clinics raise additional concerns for physicians.[32] Will Aetna adopt a plan design that only allows Aetna members to access CVS' Minute Clinics or will Aetna raise costs to competitors who want access to the clinics for their beneficiaries? Will Aetna direct patients into CVS Minute Clinics rather than the primary care provider of the patient's choice?  Will certain medical services be covered only at retail clinics?  Will those patients also be incentivized to use the CVS pharmacy where the Minute Clinic is located?

Moreover as explained further below, the PFJ does not come close to preserving competition in the individual Medicare Part D PDP market either. The DOJ's ready acceptance of a weak buyer is contrary to sound antitrust policy and the DOJ's actions in blocking the Aetna/Humana merger.

---

[30] *Id.*
[31] *Id.*
[32] Testimony of Charles Rothbert, NYS Deparment of Financial Services regarding the Proposed CVS Acquisiton of Aetna (Oct. 18, 2018), https://www.mssny.org/Documents/2018/Home/CVS-Aetna_DFS_Hearing_Testimony101918.pdf.

**IV.    The PFJ Is Not in the Public Interest and Should Be Rejected Because it Does Not Preserve Competition in Individual PDPs.**

The DOJ's complaint only alleges that the transaction raised competitive concerns in the sale of individual PDPs.  The PFJ is deficient because it will likely fail to preserve competition in the sale of individual PDPs.  According to the DOJ's own policy, a divestiture must "effectively preserve competition in the relevant market." *United States v. Aetna*, 240 F. Supp. 3d 1, 60 (2017) (citing to U.S. Dep't of Justice, Antitrust Division Policy Guide to Merger Remedies 1 (2011) ("Remedies Guide")).  "Restoring Competition requires replacing the *competitive intensity* lost as a result of a merger…" rather than just maintaining premerger levels.  *Fed. Trade Comm'n v. Sysco Corp.,* 113 F. Supp. 3d 1, 72 (D.D.C. 2015)(emphasis in original).  Divestiture of an existing business entity is more likely to preserve competition than simply a sale of assets.  *Aetna*, 240 F. Supp. 3d at 60.  A divestiture that calls for a "continuing relationship between the seller and buyer of divested assets" is problematic as it "may increase the buyer's vulnerability to the seller's behavior." *Sysco*, 113 F. Supp. 3d at 77 (quoting *FTC v. CCC Holdings*, 605 F. Supp. 2d 26, 59 (D.D.C. 2009)); *see also White Consol. Indus. v. Whirlpool Corp.*, 781 F.2d 1224, 1227–28 (6th Cir. 1986).

In the present situation, there are serious questions whether a divestiture to WellCare will preserve competition.  WellCare's past experience demonstrates that it will cut and run when necessary.  It is also difficult to replace the "competitive intensity" lost as a result of the merger.  The DOJ explains that "[C]ompetition between [CVS and Aetna's PDPs] has led not only to lower premiums and out-of-pocket expenses but also improved drug formularies, more attractive pharmacy networks, enhanced benefits, and innovative product features."[33] Part of Aetna's individual PDP success and its ability to intensively compete with CVS relates to Aetna's status

---

[33] 12/2/18 Competitive Impact Statement at 5, Dkt. No. 25.

as one of the nation's largest health insurers.  WellCare is a smaller player.  How will WellCare

replace Aetna's ability to provide higher quality and more innovative products.  While the DOJ

requires the complete divestiture of Aetna's Medicare PDP contracts and allows WellCare to

attempt to hire Aetna's employees and to receive some administrative and transitional services

from CVS/Aetna, WellCare is not purchasing an existing business entity with an existing

infrastructure, nor is it guaranteed any of Aetna's best employees, and it is never a good idea for

the government to require a continuing relationship between a seller and a divestiture buyer.

### A. Judge Bates Rejects Divestiture of Medicare Advantage Plans As Insufficient to Preserve Competition in 2016 Aetna/Humana Merger.

In 2016, Judge John D. Bates presided over DOJ's lawsuit to block Aetna's acquisition of

Humana, Inc. alleging in part, that the transaction would substantially lessen competition in

Medicare Advantage markets in 364 counties.  *See Aetna, Inc.*, 240 F.Supp.3d 1 (D.D.C. 2017).

Aetna proposed a divestiture of Medicare Advantage plans that included 290,000 members in 21

states to Molina Healthcare as a remedy to the anticompetitive effects of its merger with

Humana.  The proposed divesture covered all of the areas identified as competitive concerns in

the DOJ's complaint to block the deal.  The DOJ would not accept the divestiture proposal and

neither did Judge Bates.

Judge Bates held that the divestiture was insufficient to preserve competition, as he

recognized that Molina was not an adequate divestiture buyer.  Judge Bates' ruling was made on

three primary points: 1) Molina would not be able to become an "effective competitor" in the

Medicare Advantage market, based in part on its lack of internal capabilities and ability to build

a viable provider network; 2) the "extremely low" purchase price of the divested assets indicated

that Molina could profit from the acquisition even if it did not restore competition in all of the

problematic markets; and 3) Molina's history of failures in attempting to enter the Medicare

Advantage market indicated that it was unlikely to be a successful competitor.  *Id.* at 68, 72-74.

**B.  WellCare Fails To Restore Competition in Medicare Advantage Markets as a Divestiture Buyer as it Helped Humana Obtain Approval to Acquire Arcadian.**

In 2012, Humana, Inc. acquired Arcadian Management Services, Inc.  The DOJ required the merging parties to divest Medicare Advantage plans in 51 counties in 5 states as a condition for approval.  According to the Center for American Progress,[34] WellCare Health Plans, Inc. was one of three approved purchasers for these divested assets.[35]  WellCare purchased Arcadian's Medicare Advantage plans, approximately 4000 lives, in two counties in Arizona.  Within two years, WellCare pulled out of both counties.  Accordingly, WellCare failed to restore competition in those markets.

This failure suggests that it is difficult to restore or maintain competition with divestitures in the health insurance industry, and for WellCare specifically.  Again, according to the Center for American Progress, WellCare's rapid, immediate decline in Medicare Advantage membership came at the same time that Medicare Advantage enrollment was expanding overall. WellCare can hardly be given the benefit of the doubt based on this track record.  It was given 4,000 lives to insure, and in only two counties, and lost it all in two years.[36]  Now, the DOJ expects this Court to believe that WellCare will be a viable competitor after being given over two million lives to insure.

**C.  WellCare's Purchase Price for Aetna's Individual PDPs is a Red Flag.**

If WellCare's track record is not enough to cast doubt on its viability as an effective competitor going forward, the unduly low purchase price for the divestiture is yet another red flag.  In the *Aetna/Humana* case, Judge Bates heard expert testimony that the usual purchase

---

[34] *See* Spiro et. al, *supra* note 8.

[36] Cigna also purchased assets under the Arcadian divestiture approved by the DOJ.  Cigna purchased the management of Medicare Advantage Plans in 32 counties, but due to rapidly declining enrollment, Cigna pulled out of the market in over half of the counties within two years.

price for individual Medicare Advantage Plans is from $7000-$10,000 per member. *Aetna*, 240 F.Supp.3d at 72.  Molina was able to purchase the plans for only $1,400 per member.[37] *Id.*  Judge Bates was duly concerned that such a low purchase price eliminated any incentive for Molina to become a significant competitor in all of the relevant markets, as "an extremely low purchase price reveals the divergent interest between the divestiture purchaser and the consumer: an inexpensive acquisition could still 'produce something of value even if it does not become a significant competitor.'"  *Id.* (quoting U.S. Dep't of Justice, Antitrust Division Policy Guide to Merger Remedies 1 (2011) at 9).

In the present case, the purchase price seems to be extremely low.  While the exact figures are not known, it appears that the DOJ has represented to the Court that the entire divestiture of 2 million lives has already taken place, and for a total price of a mere $50 to $100 million.  Judge Bates' concerns about the viability of the divestiture are only magnified here.

Lastly, it is important to consider the type of divestiture the DOJ is calling for.  Like the DOJ divestitures in Humana/Arcadia and Aetna/Humana, the assets are year to year insurance contracts.  Every year during open enrollment, the merged firm has every opportunity to sign up its lost subscribers, and as history suggests, that is exactly what it will do.  This is what happened as Humana benefitted from Cigna's and WellCare's exits.  Significantly, basing a merger remedy on health insurer relationships with subscribers is very risky.

Smaller players like WellCare, and even large ones like Cigna, one of the nation's most powerful health insurers can and often do fail to enter new markets. As DOJ notes in its Complaint,

> [e]ffective entry into the sale of individual PDPs requires years of planning, millions of dollars, access to qualified personnel, and competitive contracts with pharmacies and pharmaceutical manufacturers. Because of these barriers to entry, entry or expansion into

---

[37] This figure is $400 per member plus $1000 in statutory capital per member.  Statutory capital is the reserve legally required for the insurer to be licensed.

the sale of individual PDPs is unlikely to be timely or sufficient to
remedy the anticompetitive effects from this merger.

Compl. ¶ 37. Such difficulty calls for more scrutiny by the Court, not blind deference.  The Court

should hear testimony and demand answers.

## <u>CONCLUSION</u>

This Court has the authority and responsibility to conduct a thorough review of the PFJ to

determine whether it is in the public interest and fully restores competition for millions of

patients.  The Tunney Act provides this Court with significant latitude on how to conduct its

public interest review so it can engage in additional fact-finding necessary to carefully consider

the PFJ in light of the number of concerns raised in this memorandum including the foreclosure

concerns that were not raised in the DOJ's narrowly drafted complaint.  Such a hearing would

fully develop the record regarding the potential areas of failure in the PFJ.  To make the Tunney

Act proceeding more meaningful, a hold separate order to preserve the status quo at least until

such time as the Court can fulfill its role in determining whether the PFJ is in the public interest.


Dated: December 14, 2018

Respectfully submitted,


/s Andre Barlow
Andre P. Barlow (Bar No. 465683)
DOYLE, BARLOW & MAZARD PLLC
1110 Vermont Ave, N.W.  Suite 715
Washington, D.C.  20005
T:  (202) 589-1834
F:  (202) 589-1819
abarlow@dbmlawgroup.com
*Attorney for Pharmacists United for Truth and Transparency
and Pharmacists Society of the State of New York*

24