**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| United States of America et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Case Number |
| | ) 1:18-cv-02340-RJL |
| CVS Health Corporation et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## <u>BRIEF OF AMICUS CURIAE BY AIDS HEALTHCARE FOUNDATION</u>

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ............................................................1

INTEREST OF AMICUS CURIAE .........................................................................1

INTRODUCTION .................................................................................................2

ARGUMENT .........................................................................................................4

I.     The Tunney Act Requires the Court to Make an Independent, Objective
       Determination in the Public Interest Without Undue Deference to the Department
       of Justice ...................................................................................................4

II.    The Division's Consent Decree Does Nothing to Remedy the Merger's
       Anticompetitive Effects in Three Separate Markets ............................................9

       A.     The Division Failed to Remedy the Anticompetitive Effects in the Health
              Care Provider Market .......................................................................... 10

       B.     The Division Failed to Remedy the Anticompetitive Effects in the PBM
              Market ............................................................................................. 13

       C.     The Division Failed to Remedy the Anticompetitive Effects in the Retail
              Pharmacy Market ............................................................................... 14

CONCLUSION....................................................................................................21

DM1\9352941.1

# TABLE OF AUTHORITIES

**Federal Cases**

*Beckett v. Aetna Inc., et al.,* Case No. 17-cv-03864 (E.D. Pa. 2017) ............................................19

*Doe One et al. v. CVS Health Corp. et al.*, Case No. 18-cv-00238 (S.D.Ohio 2018) ...........................................................................................................................................19

*Doe v. Aetna Inc., et al.*, Case No. 14-cv-02986 (S.D.Cal. 2014) .................................................16

*Heatransfer Corp. v. Volkswagenwerk, AG*, 553 F.2d 964 (5th Cir. 1977)...................................11

*Massachusetts School of Law v. United States*, 118 F.3d 776 (D.C. Cir. 1997)......................... 5-6

*United States v. AT&T*, 552 F. Supp. 131 (D.D.C. 1982)...........................................................5, 7

*United States v. Blavatinik*, 168 F.Supp.3d 36 (D.D.C. 2016) ......................................................7

*United States v. Microsoft Corp.*, 56 F.3d 1448 (D.C. Cir. 1995) ...................................... 4, 5, 8-9

*United States v. SBC Communications, Inc.*, 489 F. Supp. 2d 1 (D.D.C. 2007) .................. 8-9, 21

*United States v. Ticketmaster Entm't*, 2010 U.S. Dist. LEXIS 88626 (D.D.C. 2010) ....................................................................................................................................15

**Regulatory Cases**

*Am. Online, Inc.*, 131 F.T.C. 832 (2001) ....................................................................................15

In the Matter of: Acquisition of Control of Aetna Health Inc. and Aetna Better Health Inc., Case No.:  11022798 (Nov. 19, 2018) (Consent Order), available at https://www.oci.ga.gov/ExternalResources/Documents/Enforcement/Final%20Order%20CVS%20Aetna.pdf......................................................................................11

**Federal Statutes**

Antitrust Procedures and Penalties Act, 15 U.S.C. § 16 ("Tunney Act")...............................*Passim*

**Other Authorities**

150 Cong. Rec. S3615 (Apr. 2, 2004)............................................................................................5

150 Cong. Rec. S3616 (Apr. 2, 2004)............................................................................................6

150 Cong. Rec. S3617 (Apr. 2, 2004)........................................................................................ 5-6

Adam Fein, "The Top 15 US Pharmacies of 2017," Drug Channels (February 21, 2018), available at, https://www.drugchannels.net/2018/02/the-top-15-us-pharmacies-of-2017-market.html ..............................................................................................14

Allison Inserro, *CVS Health CEO Outlines How Aetna Deal Will Benefit Customers*, The Am. J. of Managed Care (Jan. 8, 2019), available at https://www.ajmc.com/newsroom/cvs-health-ceo-outlines-how-aetna-deal-will-benefit-customers ........................................................................................................12

Attorney General Mike DeWine Statement on PBM Investigation (July 23, 2018), available at https://www.ohioattorneygeneral.gov/Media/News-Releases/July-2018-%281%29/Attorney-General-Mike-DeWine-Statement-on-PBM-Inve ........................17

Catherine Dunn, *PA Auditor General Wants to Take a Whack at Firms That Negotiate Drug Benefits for the Medicaid Program*, Philadelphia Inquirer (December 11, 2018), available at http://www2.philly.com/business/pbms-pennsylvania-medicaid-drug-prices-cvs-auditor-general-20181211.html ...............................7

Christian Flanagan, *Hospitals Shut at 30-a-year Pace in U.S., With No End In Sight*, Bloomberg (August 21, 2018), available at https://www.bloomberg.com/news/articles/2018-08-21/hospitals-are-getting-eaten-away-by-market-trends-analysts-say ..............................................................................11

CVS Minute Clinic. CVS Health, "What's Next for MinuteClinic," available at https://cvshealth.com/thought-leadership/whats-next-for-minuteclinic ...................................10

Darren Bush, *The Death of the Tunney Act at the Hands of an Activitst D.C. Circuit*, 63 Antitrust Bulletin 113, 129 (2018) .........................................................................7

Department of Health and Human Services, Centers for Medicare & Medicaid Services, *Modernizing Part D and Medicare Advantage to Lower Drug Prices and Reduce Out-of-Pocket Expenses* (2018-25945), available at https://s3.amazonaws.com/public-inspection.federalregister.gov/2018-25945.pdf#page=82 ......................................................................................................19

Department of Justice, *United States v. CVS and Aetna*, *Questions and Answers for the General Public*, https://www.justice.gov/opa/press-release/file/1099806/download ...................................................................................10

John J. Flynn and Darren Bush, *The Misuse and Abuse of the Tunney Act: The Adverse Consequenses of the "Microsoft Fallacies,"* 34 Loyola U. Chicago L. J. 749, 758 (2003) ......................................................................................................6

Letter to Hon. Katherine L. Wade, Commissioner, Connecticut Insurance Department from Maria T. Vullo, Superintendent, New York Department of Financial Services at 3 (September 17, 2018) .........................................................................11

Matthew Boyle, *Walmart Pharmacies to Stop Being Part of CVS Health's Prescription Drug Network*, Bloomberg (January 15, 2019), available at http://www.philly.com/business/walmart-cvs-prescription-drugs-medicine-splits-20190115.html ...........................................................................................17

Michael Carrier, *A Six-Step Solution to the PBM Problem*, Health Affairs (August 30, 2018), available at https://www.healthaffairs.org/do/10.1377/hblog20180823.383881/full/ ...............................13

*Rutledge Investigate Reimbursement Rates From CVS Caremark*, Press Release (February 8, 2018), available at https://arkansasag.gov/media-center/news-releases/rutledge-to-investigate-reimbursement-rates-from-cvs-caremark ............................17

Steven C. Salop & Daniel P. Culley, *Revising the U.S. Vertical Merger Guidelines: Policy Issues and an Interim Guide for Practitioners*, 4 J. Antitrust Enforcement 1 (2016) ..............................................................................................10

Steven Pearlstein, *CVS Bought Your Local Drugstore, Mail-Order Pharmacy and Health Insurer. What's Next, Your Hospital?*, The Washington Post (Jan. 31, 2019), available at https://www.washingtonpost.com/business/cvs-bought-your-local-drugstore-mail-order-pharmacy-and-health-insurer-whats-next-your-hospital/2019/01/31/4946dcda-1f2c-11e9-9145-3f74070bbdb9_story.html?utm_term=.9dea679f4fb4 ...........................................................15

White House Council of Economic Advisors, *Reforming Biopharmaceutical Pricing at Home and Abroad* (February 2018), available at https://www.whitehouse.gov/wp-content/uploads/2017/11/CEA-Rx-White-Paper-Final2.pdf...............................................................................................................13

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 7.1, amicus disclose that AIDS Healthcare Foundation is a private, nonprofit entity and no corporation owns 10% or more of its stock.

## INTEREST OF AMICUS CURIAE

The AIDS Healthcare Foundation ("AHF") is the largest non-profit provider of care and treatment to people with HIV and AIDS in the world, servicing over one million patients in 43 countries. Established in 1987, AHF's mission is to provide cutting-edge medicine and advocacy for individuals living with HIV and AIDS. Representing a special needs population that depends upon a competitive marketplace for lifesaving drugs and treatments, AHF is profoundly troubled by the merger between CVS and Aetna.  The increasing consolidation and vertical integration of the health care industry—particularly where, as here, the result is that the payor, pharmacy benefits manager ("PBM"), and provider are under the same roof—can only lead to higher prices, reduced access, and less choice for consumers and patients.  For these reasons, as explained more fully below, AHF and its patients have a significant interest in the outcome of the Court's determination on whether the Division's Proposed Final Judgment is in the public interest.

In the United States, AHF has health care centers and pharmacies in 15 states, and has Medicaid and Medicare managed care plans in California, Florida and Georgia. For every dollar earned by AHF Pharmacies, 96 cents goes to patient care, assisting communities afflicted with HIV and AIDS.

AHF submitted comments, pursuant to the Antitrust Procedures and Penalties, 15 U.S.C. § 16 ("Tunney Act"), to the Department of Justice Antitrust Division (the "Division") outlining its concerns regarding the Division's Proposed Final Judgment. In short, AHF believes that the Proposed Final Judgment is not sufficient to protect consumers or competition generally.  AHF

- 1 -

submits this amicus brief to inform the Court of its concern that the Division's Complaint and

proposed remedy fail to adequately address significant anticompetitive effects of the CVS/Aetna

merger in the health care provider, PBM, and pharmacy markets.  AHF believes that the merger

will harm AHF and the vulnerable population it serves.

AHF also believes that, before making its determination as to whether the Proposed Final

Judgment is in the public interest, the Court should hold a public hearing to allow those affected

by the merger to express their concerns.  AHF would be pleased to participate in such a hearing.

## INTRODUCTION

CVS Health's ("CVS") $69 billion acquisition of Aetna, Inc. ("Aetna") is the latest in a

series of recent combinations that have made the health care industry substantially less

competitive.   The merger would give control of the nation's third-largest health insurer to a

company that is already the nation's largest retail pharmacy chain, largest PBM, and a rapidly

expanding health care provider.

On October 10, 2018, the Division, along with the states of California, Florida, Hawaii,

Mississippi and Washington, approved the merger on the condition that the merging parties

divest Aetna's individual Medicare Part D prescription drug plan ("PDP") business. The

Division's Complaint identifies competitive concerns in only one product market—the PDP

market—and the Proposed Final Judgment addresses only that market, while ignoring the other

markets in which the merger will have anticompetitive effects.  The Division's Competitive

Impact Statement states that CVS and Aetna entered an agreement to divest the PDP business to

WellCare, a health insurance company with "experience providing individual PDPs throughout

the United States." Competitive Impact Statement at 9.

AHF is not the only third party with these concerns.  The Division informed the Court

that it received approximately ninety-five (95) Tunney Act public comments, and that "a

substantial portion" of those comments "are similar to each other" and "come from independent pharmacies that compete with CVS in many ways." Hearing Tr. 14:16-25 (Dec. 18, 2018). While AHF has not seen the comments submitted by independent pharmacies, it is reasonable to assume that they express these same concerns.  In addition, the American Medical Association previously submitted a 140-page letter to the Division expressing many of these concerns, and also submitted a Tunney Act comment with several appendices.  *Id.* at 15: 22-16:2. A divestiture that amounts to approximately 0.1% of the merger purchase price (or $50-$100 million), Hearing Tr. 11:17-18 (Nov. 29, 2018), is on its face inadequate to resolve the many competitive concerns with a merger of this magnitude.  As the Court has appropriately stated, the Complaint "raises anti-competitive concerns about one-tenth of one percent of this $69 billion deal." Hearing Tr. 7:4-6 (Dec. 3, 2018).

But even in the one narrow market that the Division chose to address, the PDP market, the remedy is inadequate.  The divestiture buyer, WellCare, comes to this divestiture having recently failed to remedy the allegedly anticompetitive effects of another merger.  In 2012, WellCare purchased 4,000 Medicare Advantage lives in Arizona as a condition of the government's approval of Humana, Inc.'s acquisition of Arcadian.  WellCare exited the market within two years of its purchase of the divested assets.

The Court has broad authority, under the Tunney Act's "public interest" standard, to look not only at the market and remedy the Division has chosen, but to determine whether the merger would lead to anticompetitive effects in other markets.  There are three other markets that the Court should analyze—the health care provider, PBM and pharmacy markets.  In each of these markets the merger would lead to a substantial lessening of competition that would harm AHF and its patients.

**ARGUMENT**

I.    **The Tunney Act Requires the Court to Make an Independent, Objective Determination in the Public Interest Without Undue Deference to the Department of Justice**

In its filings with the Court, the Division takes the position that the Court's review of a proposed consent decree under the Tunney Act is "necessarily a limited one" and that the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest."  Competitive Impact Statement at 14 (citing *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995)); *see also* Status Report on Merger Integration, Dkt. 25, at 3; The United States' Response to Order to Show Cause, Dkt. 32, at 3. The Division goes further, asserting that the Court is not permitted to look beyond the complaint in determining whether a proposed consent decree is in the public interest.  *Id.*  Without expressly stating such, the Division is asking this Court to "rubber-stamp" its proposed consent decree. However, the Court's discretion in making the public interest determination is much broader that the Division claims.

The Tunney Act allows the Court to make a determination that the entry of a proposed consent judgment is in the public interest. 15 U.S.C. § 16(e)(1). The Act requires the Court to consider the following enumerated factors in making its determination:

> (A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, *and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest*; and

> (B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) and (B) (emphasis added).

In passing the Tunney Act, Congress rejected the idea that courts must defer broadly to the government's proposed consent decrees when determining whether such decrees are in the public interest. Courts cannot "unquestionably accept a proffered decree as long as it somehow, and however inadequately, deals with the antitrust and other public policy problems implicated in the lawsuit. To do so would be to revert to the 'rubber stamp' role which was at the crux of the congressional concerns when the Tunney Act became law." 150 Cong. Rec. S3617 (Apr. 2, 2004) (quoting *United States v. AT&T*, 552 F. Supp. 131, 151 (D.D.C. 1982)). Thus, the Court was correct when it stated, at the November 29, 2018 hearing, that the Court is "not a rubber stamp" and that the proceedings to determine whether the Proposed Final Judgment will be approved is not "just some rubber-stamp operation."  Hearing Tr. at 16:25-17:2 (Nov. 29, 2018).

The problem with the Division's argument is that it relies upon pre-2004 case law.   In 2004, Congress amended the Tunney Act after determining that case law—specifically two D.C. Circuit Court opinions, *Massachusetts School of Law v. United States*, 118 F.3d 776, 783 (D.C. Cir. 1997), and *Microsoft*, 56 F.3d at 1462—was "contrary to the intent of the Tunney Act and effectively strips the courts of the ability to engage in meaningful review of antitrust settlements." 150 Cong. Rec. S3615 (Apr. 2, 2004).

The Tunney Act amendments made at least two significant changes.  First, Congress mandated that the Court take the enumerated factors above (15 U.S.C. § 16(e)(1)(A) and (B)) into account in its analysis of the consent decree. Second, Congress enacted another enumerated factor – requiring the Court to consider "the impact of the entry of such judgment upon competition in the relevant market or markets." *Id*.

The intent of the 2004 Amendments was "to explicitly restate the original and intended role of the District courts in this process by mandating that the court make an independent judgment based on" the enumerated factors cited above. *Id*. Congress "wanted the courts to make an independent, objective, and active determination" without undue deference to the government. 150 Cong. Rec. S3617 (Apr. 2, 2004) (quoting John J. Flynn and Darren Bush, *The Misuse and Abuse of the Tunney Act:  The Adverse Consequences of the "Microsoft Fallacies,"* 34 Loyola U. Chicago L. J. 749, 758 (2003)).  Thus, the Court's role in reviewing proposed consent decrees is vital, to "deter and prevent settlements…which [are] plainly inadequate…[by giving] real scrutiny…[and] carefully review[ing] antitrust consent decrees to ensure that they are in the public interest." 150 Cong. Rec. S3616 (Apr. 2, 2004).

The Division attempts to minimize the significance of the 2004 amendments, relegating the amendments to footnotes and asserting that the amendments "do not alter *Microsoft*'s holding that district courts should not look outside the complaint."  The United States' Response to Order to Show Cause, Dkt. 32, at 5 n.1; *see also* Competitive Impact Statement at 15 n.1.  But the Division fails to acknowledge that in amending the Act, Congress intended to broaden the view of judicial discretion stated in both *Microsoft* and *Massachusetts School of Law*.  Moreover, the Division has yet to explain how its proposed highly deferential review comports with the language of the Tunney Act itself, particularly the mandate that the Court consider "*any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest*."  15 U.S.C. § 16(e)(1)(A) (emphasis added).

If Congress had intended to limit the Court's power under the Tunney Act, by, for example, limiting the Court's review to violations alleged in the complaint, it would have done

so. However, Congress instead expressed two principal concerns in enacting and amending the

Tunney Act – (1) the excessive secrecy of the consent decree process, and (2) the Division's

failure to provide appropriate relief. *United States v. AT&T*, 552 F. Supp. at 148 (Green, J.), *aff'd*

*sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); *United States v. Blavatinik*, 168

F.Supp.3d 36, 46 (D.D.C. 2016) (recognizing that "Congress was spurred to act by its perception

that the Justice Department had repeatedly settled antitrust cases for injunctive decrees that were

less demanding than Congress believed appropriate."). One commentator stated the case this

way: "Because the entry of a decree is an inherently judicial function, it cannot be the case that

the Court should be obligated to defer to the DOJ in terms of either the adequacy of the remedies

proposed by the parties in the consent decree or in terms of the behavior restrained in light of the

complaint." Darren Bush, *The Death of the Tunney Act at the Hands of an Activist D.C. Circuit*,

63 Antitrust Bulletin 113, 129 (2018).

Thus, to ensure that a consent decree is in the public interest, Congress gave the district

courts broad power. The Tunney Act allows the Court to do the following:

> (1) take testimony of Government officials or experts or such other expert witnesses,
> upon motion of any party or participant or upon its own motion, as the court may deem
> appropriate;
>
> (2) appoint a special master and such outside consultants or expert witnesses as the court
> may deem appropriate; and request and obtain the views, evaluations, or advice of any
> individual, group or agency of government with respect to any aspects of the proposed
> judgment or the effect of such judgment, in such manner as the court deems appropriate;
>
> (3) authorize full or limited participation in proceedings before the court by
> interested persons or agencies, including appearance amicus curiae, intervention as a
> party pursuant to the Federal Rules of Civil Procedure, examination of witnesses or
> documentary materials, or participation in any other manner and extent which serves the
> public interest as the court may deem appropriate;
>
> (4) review any comments including any objections filed with the United States under
> subsection (d) concerning the proposed judgment and the responses of the
> United States to such comments and objections; and

(5) take such other action in the public interest as the court may deem appropriate.

15 U.S.C. § 16(f).

The Division first acknowledges, and then denies, that the appropriate standard was set forth in this Court's decision in *United States v. SBC Communications, Inc*., 489 F. Supp. 2d 1, 14 (D.D.C. 2007).  In its Competitive Impact Statement, filed on October 10, 2018, the Division states "As this Court recently confirmed in *SBC Communications*, courts 'cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power.'" *Id.* at 17.  The "judicial mockery" standard had first been articulated in *Microsoft, supra* 56 F.3d at 1462.

Several weeks after the filing of the Competitive Impact Statement, on December 4, 2018, the Court issued its Order to Show Cause, in which the Court stated "Because the Tunney Act procedures have not yet been completed, neither I, nor the public, has had a chance to evaluate whether the proposed final judgment adequately remedies the harm alleged in the complaint and, more importantly perhaps, whether the complaint as drafted is actually in the public interest or *is drafted so narrowly as to 'make a mockery of judicial power'* as prohibited by our Court of Appeals.  *United States v. Microsoft Corp.*, 56 F.3d 1448, 1462 (D.C. Cir. 1995)."  Order to Show Cause, Dkt. 27, at 3 (emphasis added).  In its Response to Order to Show Cause, the Division did an about-face, now stating that "[u]pon further examination, …the United States concludes that the language in *SBC Communications* goes too far and is inconsistent with the *Microsoft* decision."  The United States' Response to Order to Show Cause Dkt. 32, at 5.

It is telling that the Division only changed its tune when the Court indicated that it may consider matters beyond the complaint in making its public interest determination.  Moreover,

the Division fails to acknowledge the obvious point that *SBC Communications* was decided in

2007, after the 2004 Tunney Act amendments, while *Microsoft* was decided nine years before

those amendments.  Because it is a much more recent opinion that followed the 2004

amendments, *SBC Communications* stands as persuasive authority that the Court may indeed go

beyond the complaint if it is drafted so narrowly as to make a "mockery of judicial power."

The Division's final argument against the Court's authority to look beyond the complaint

is a constitutional one: for the Court to "inquire about claims that are not in the complaint would

violate the separation of powers and aggravate the 'constitutional difficulties that inhere in this

statute.'" *Id.* at 2 (*citing* Microsoft, 56 F.3d at 1462). The Division even goes so far as to suggest

that the Tunney Act itself may be unconstitutional. *Id*. at 6. But the Division does not support

this constitutional argument with any binding authority.  Its suggestion that the Act *may* be

unconstitutional— derived from language by Justice Rehnquist in a dissenting opinion—does

nothing to advance its argument.

The Division cannot escape the language of the Tunney Act, as interpreted by this Court,

which gives the Court broad discretion in determining whether the Division's proposed

resolution of this massive merger is in the public interest.

## II.     The Division's Consent Decree Does Nothing to Remedy the Merger's Anticompetitive Effects in Three Separate Markets

The Division's Complaint alleges one theory of harm from the merger—a horizontal

theory that the merger will substantially lessen competition in the Medicare Part D PDP market.

Any concerns that the merger will lead to horizontal anticompetitive effects in the PBM market,

or vertical effects in other markets, are absent.  The Division states that it "conducted a thorough,

11-month investigation and challenged the proposed merger in the only markets where it

concluded that the merger would result in likely harm."  The United States' Response to Order to

Show Cause, Dkt. 32, at 7.  In an information sheet published on its website, the Division briefly addresses the vertical aspects of the merger by stating that it "thoroughly considered whether the merger would raise the cost of (i) CVS/Caremark's PBM services or (ii) retail pharmacy services to Aetna's health insurance rivals," and concluded that the merger was not problematic in these areas.  *See* Department of Justice, *United States v. CVS and Aetna*, *Questions and Answers for the General Public* at 5, https://www.justice.gov/opa/press-release/file/1099806/download.

As this Court well knows, while vertical mergers do not eliminate direct competition between the merging firms, they can nonetheless restrain competition by raising barriers to entry, foreclosing or threatening to foreclose competitors' access to an important input, or otherwise raising rivals' costs by limiting their access to customers. *See* Steven C. Salop & Daniel P. Culley, *Revising the U.S. Vertical Merger Guidelines: Policy Issues and an Interim Guide for Practitioners*, 4 J. Antitrust Enforcement 1 (2016). This merger will have such anticompetitive effects in the health care provider market, and will exacerbate competitive problems already prevalent in the PBM and pharmacy markets.

### A.   The Division Failed to Remedy the Anticompetitive Effects in the Health Care Provider Market

Over the past few years, CVS has become a significant provider of health care services through its rapidly expanding CVS Minute Clinics.  CVS currently has 1,100 Minute Clinics across 33 states.  Moreover, CVS recently announced that its immediate goal is to grow that number to 1,500 clinics, and its longer-term goal is for half of all Americans to live within 10 miles of a CVS Minute Clinic. CVS Health, "What's Next for MinuteClinic," available at https://cvshealth.com/thought-leadership/whats-next-for-minuteclinic.  The combination of CVS and Aetna will create an unfair competitive advantage for CVS in the health care provider market. Post-merger, CVS will have the ability and incentive to foreclose the opportunity for

other medical providers to participate in Aetna insurance networks, limiting consumer choice and likely raising costs to consumers as well as competing providers. *Cf. Heatransfer Corp. v. Volkswagenwerk, AG*, 553 F.2d 964, 982 (5th Cir. 1977) (acquisition of company supplying authorized dealers unlawfully foreclosed other suppliers' opportunities to make sales to these dealers); *see also,* Letter to Hon. Katherine L. Wade, Commissioner, Connecticut Insurance Department from Maria T. Vullo, Superintendent, New York Department of Financial Services at 3 (September 17, 2018) (expressing concern that the combination of CVS and Aetna, through the use of Minute Clinics "creates significant concerns for consumer choice and cost, as well as employment in the health care system overall.") (attached as Exhibit A).

Health care providers have already been forced to close their doors as insurers push patients toward providers such as CVS Minute Clinics. *See* Christian Flanagan, *Hospitals Shut at 30-a-year Pace in U.S., With No End In Sight*, Bloomberg (August 21, 2018), available at https://www.bloomberg.com/news/articles/2018-08-21/hospitals-are-getting-eaten-away-by-market-trends-analysts-say ("Hospitals have been closing at a rate of about 30 a year, according to the American Hospital Association,…as insurers push [patients] toward…clinics such as CVS Health Corp's MinuteClinic."). In recognition of these real and legitimate concerns, at least one state, Georgia, approved CVS' acquisition of Aetna only on the condition, among others, that the merged entity must invite non-CVS health care providers to join its networks, and must set the same criteria for each of its providers. The merged entity is also required to allow Georgia residents to use any health care provider, in or out of network, if that provider accepts the same conditions as those within the network. In the Matter of:  Acquisition of Control of Aetna Health Inc. and Aetna Better Health Inc., Case No.: 11022798 (Nov. 19, 2018) (Consent Order), available at

https://www.oci.ga.gov/ExternalResources/Documents/Enforcement/Final%20Order%20CVS%20Aetna.pdf. Similar modifications to the Division's Proposed Final Judgment would serve the public interest.

Beyond the foreclosure effects of the merger for health care providers, AHF has real quality of care concerns with more Aetna patients being directed to Minute Clinics.  Minute Clinics replace fundamental elements of the patient-physician relationship with "cookie cutter" treatment administrated by non-physicians.  Post-merger, CVS will have the ability and incentive to direct Aetna patients to a CVS Minute Clinic instead of the patient's chosen physician. This is not a theoretical concern--CVS has already announced its intention to significantly integrate Aetna insureds into Minute Clinics. *See* Allison Inserro, *CVS Health CEO Outlines How Aetna Deal Will Benefit Customers*, The Am. J. of Managed Care (Jan. 8, 2019), available at https://www.ajmc.com/newsroom/cvs-health-ceo-outlines-how-aetna-deal-will-benefit-customers (describing plans for Aetna care managers to schedule Minute Clinic visits after patient hospital discharge).

Where the insurance company (which in this case would be owned by CVS post-merger) is determining where an insured can go to receive services, there is a risk that such determinations will be made for financial reasons rather than medical ones.  This can be dangerous for the health of the insured. AHF runs numerous clinics focused on the treatment of individuals living with HIV or AIDS, and thus understands that the treatment for such a patient must be comprehensive and under the watchful eye of the patient's primary care physician/HIV specialist. Even the most "routine" services are not routine for a person with HIV. For example, a CVS Minute Clinic delivering a flu shot to a person with HIV is risking the health of a person whose immune system might be vulnerable to a partial live virus vaccine.  AHF's patients will

be harmed if more of them are forced into Minute Clinics rather than a provider who understands and can service their unique medical needs.

### B.     The Division Failed to Remedy the Anticompetitive Effects in the PBM Market

The Division's Complaint acknowledges that the PDP market is highly concentrated with high entry barriers, Complaint at ¶ ¶ 34, 37; however, the Division has failed to recognize the anticompetitive effects stemming from this merger in the highly concentrated PBM market. The current PBM market is ultra-concentrated, with the top three PBMs, led by CVS, controlling approximately 85% of the market. The White House Council of Economic Advisors, *Reforming Biopharmaceutical Pricing at Home and Abroad* (February 2018), available at https://www.whitehouse.gov/wp-content/uploads/2017/11/CEA-Rx-White-Paper-Final2.pdf. PBMs are middle-men that operate at the intersection of drug manufacturers, payors and pharmacies. PBMs negotiate prices with drug companies, receive rebates from drug companies to place specific drugs on formularies, provide drug benefit services for insurers, and establish pharmacy networks for the insured beneficiaries to utilize.  However, the PBM market suffers from a lack of transparency and an absence of meaningful regulation. This is so despite the substantial impact that PBMs have on health care costs in the United States.

As the PBM market has become more highly concentrated, the power of PBMs in the marketplace has only increased.  PBMs have the ability to reap significant rebate dollars from drug manufacturers that need to get their drugs on the PBM's formulary.  In addition, PBMs can now dictate which pharmacies patients can utilize.  PBMs like CVS/Caremark have also been reducing reimbursement to competing pharmacies, while charging those pharmacies significant performance fees, averaging in the millions of dollars to specialty pharmacies. *See* Michael

Carrier, *A Six-Step Solution to the PBM Problem*, Health Affairs (August 30, 2018), available at https://www.healthaffairs.org/do/10.1377/hblog20180823.383881/full/.

The merger removes a potential competitor, Aetna, from the PBM market, further securing CVS' dominant position as a PBM with significant market share. The loss of Aetna as a potential competitor in the PBM market will all but cement CVS' dominant position. Aetna is one of the few insurers with the resources and expertise to enter and compete in the highly concentrated PBM market. By removing a significant potential competitor, CVS' acquisition of Aetna makes it substantially more difficult for new potential competitors to enter the PBM market and compete effectively.

### C.   The Division Failed to Remedy the Anticompetitive Effects in the Retail Pharmacy Market

In addition to operating one of the largest PBMs in the United States, CVS is also the largest retail pharmacy chain in the country, and operates large mail-order and specialty pharmacies. Roughly half of CVS' $184 billion in 2017 revenue was through its pharmacy services. Adam Fein, "The Top 15 US Pharmacies of 2017," Drug Channels (February 21, 2018), available at, https://www.drugchannels.net/2018/02/the-top-15-us-pharmacies-of-2017-market.html. Thus, CVS clearly has an incentive to continue to sustain and grow its pharmacy business.

Currently, there is no obvious incentive for Aetna to favor CVS pharmacies for its insureds. However, post-merger, CVS will have the incentive and the ability to shift all Aetna subscribers to CVS pharmacies in local markets throughout the country, thus foreclosing independent pharmacies like AHF from servicing Aetna subscribers in those markets. In markets where Aetna has a strong presence—which are many—such customer foreclosure would have significant anticompetitive effects, not only on independent pharmacies like AHF but also on

pharmacy competition in general.  Independent pharmacies will be forced to either raise drug prices or exit the market altogether.  Either way, consumers will suffer.

This is not a theoretical concern. Large PBMs affiliated with insurance companies have demonstrated the ability to force patients to obtain their medications only at such captive pharmacies, thus denying patients the freedom of choice of pharmacy providers. *See, e.g.,* Steven Pearlstein, *CVS Bought Your Local Drugstore, Mail-Order Pharmacy and Health Insurer. What's Next, Your Hospital?*, The Washington Post (Jan. 31, 2019) ("CVS often requires consumers to buy drugs for chronic conditions from its mail-order pharmacy, or makes it more expensive not to do so.") (attached as Exhibit B). The Division, and the Federal Trade Commission, have previously recognized the harm of input foreclosure to downstream rivals, and customer foreclosure to upstream rivals. As a result, both agencies have entered into consent decrees allowing for access to essential inputs or customers in order to resolve such vertical foreclosure concerns. *See, e.g., United States v. Ticketmaster Entm't*, 2010 U.S. Dist. LEXIS 88626 (D.D.C. 2010) (consent order resolving vertical foreclosure concerns that the merger of Ticketmaster and Live Nation would help to preserve Ticketmaster's market power in the primary ticketing business); *Am. Online, Inc.*, 131 F.T.C. 832 (2001) (consent order resolving vertical foreclosure concerns raised by AOL/Time Warner merger by requiring merged firm to offer AOL's rival internet service providers access to Time Warner's cable systems.).

There are other ways in which the merger will embolden CVS to take actions that will raise pharmacy costs for health plans and consumers. For example, CVS, combined with Aetna, may force an increase in mandatory utilization of mail order pharmacy services to obtain medication. Mandatory mail order is particularly dangerous for individuals living with HIV, as the loss of direct access to a pharmacist complicates the patient's treatment regimen. Control of

the virus is dependent upon rigid adherence to a drug treatment plan, and such adherence is

dependent upon routine contact with multiple touch points in the health care delivery system.

The pharmacist is one of those key touch points--mail order delivery distances the patient from

that touch point. These concerns have already led to litigation against Aetna. In 2014, Aetna

subscribers brought a lawsuit alleging that a proposed Aetna mandatory mail order HIV and

AIDS prescription drug plan threatened patients' health and privacy. Aetna settled the lawsuit,

allowing affected subscribers to opt-out of any mail order program. *See Doe v. Aetna Inc., et al.*,

Case No. 14-cv-02986 (S.D.Cal. 2014) (attached as Exhibit C).  CVS' acquisition of Aetna will

increase the captive population to whom CVS can force the use of mail order services, denying

this population the benefits of direct access to a pharmacist.

Further, a post-merger CVS, with the inclusion of Aetna's 22 million lives, will have the

leverage and incentive to use increasingly aggressive tactics to narrow its networks to exclude

small and specialty pharmacies. For example, a combined CVS/Aetna will be able to use its

increased leverage to exclude competing pharmacies from providing HIV/AIDS medication to

individuals enrolled in states' AIDS Drug Assistance Programs ("ADAP"). ADAP is a federally-

funded, state-run, prescription medication program for low-income uninsured or underinsured

people living with HIV/AIDS.  CVS is already the sole-source provider for the ADAPs in

Florida, Illinois and Ohio, affecting thousands of uninsured individuals living with HIV/AIDS.

The merger will only empower CVS/Aetna to exclude competing pharmacies from other states'

ADAPs.

CVS/Aetna will also have the incentive and ability to take anticompetitive PBM

measures such as driving down pharmacies' reimbursement rates and dispensing fees to

uncompetitive levels. Such reduction in reimbursement reduces the quality of care that

pharmacies can provide to their patients. While such conduct is already happening, for example

in Arkansas, Ohio and Pennsylvania, the merger will exacerbate the situation.

- Arkansas Attorney General Leslie Rutledge is currently investigating a scheme in which CVS is alleged to be providing unprofitable reimbursement arrangements to independent pharmacies, rendering the pharmacies unable to remain in operation, and then offering to buy out these pharmacies for pennies on the dollar. The Arkansas Attorney General has announced that it is investigating whether such practices are in violation of the state's Deceptive Trade Practices Act and other applicable laws. See *Rutledge to Investigate Reimbursement Rates From CVS Caremark*, Press Release (February 8, 2018), available at https://arkansasag.gov/media-center/news-releases/rutledge-to-investigate-reimbursement-rates-from-cvs-caremark.

- The Ohio Attorney General's office is conducting investigations into PBMs' conduct towards those doing business with Ohio agencies. It has stated that PBMs are "on notice that their conduct is being heavily scrutinized, and any action that can be taken and proven in court will be filed to protect Ohio taxpayers and the millions of Ohioans who rely on the pharmacy benefits provided." *See* Attorney General Mike DeWine Statement on PBM Investigation (July 23, 2018), available at https://www.ohioattorneygeneral.gov/Media/News-Releases/July-2018-%281%29/Attorney-General-Mike-DeWine-Statement-on-PBM-Inve.

- The Pennsylvania Auditor General, Eugene DePasquale, is conducting an investigation into PBMs' "spread pricing"—the difference between what PBMs charge state the Medicaid program and what they pay pharmacies for services to Medicaid beneficiaries. Specific concerns over depressed pharmacy reimbursements by CVS are a focus of the investigation. *See* Catherine Dunn, *PA Auditor General Wants to Take a Whack at Firms That Negotiate Drug Benefits for the Medicaid Program*, Philadelphia Inquirer (December 11, 2018), available at http://www2.philly.com/business/pbms-pennsylvania-medicaid-drug-prices-cvs-auditor-general-20181211.html.

CVS, with its acquisition of Aetna, will feel even more emboldened to reduce

reimbursement rates to rival pharmacies. A recent example makes the point:  Walmart recently

announced that its pharmacies had discontinued participation in CVS' prescription drug network.

As justification for this decision, Walmart cited the low reimbursement rates offered to Walmart

to fill prescription drugs for CVS members, as well as Walmart's push-back against CVS' efforts

to steer consumers to certain other pharmacies to have their prescriptions filled.  Mathew Boyle,

*Walmart Pharmacies to Stop Being Part of CVS Health's Prescription Drug Network*,

Bloomberg (January 15, 2019), available at http://www.philly.com/business/walmart-cvs-prescription-drugs-medicine-splits-20190115.html. While, after Walmart's announcement to discontinue participate in CVS' pharmacy network, CVS renegotiated reimbursement rates allowing Walmart to rejoin the network, if CVS is unwilling to negotiate freely with the largest retailer and one of the largest pharmacies in the country for fair reimbursement rates, it is unlikely to negotiate reasonable rates for any smaller competing pharmacy.

Moreover, the merger will provide incentives for CVS to implement additional fees on network pharmacies, in efforts to extract more money from its competitors or drive them out of the market.  One specific example is Direct and Indirect Remuneration ("DIR") fees, or "performance fees." PBMs impose such fees on pharmacies, requiring them to meet certain vague performance standards that in many cases do not apply to the pharmacies or the therapies provided by the pharmacies. If the pharmacies do not meet certain metrics, the PBMs retroactively claw back these fees out of reimbursements already paid to the pharmacies - often months or even a year after the medication was dispensed; if the pharmacies do meet certain metrics, less fees are clawed back. For pharmacies such as those run by AHF that concentrate on the treatment of HIV and AIDS, such mandated performance metrics simply do not apply, but the PBMs impose the fees anyway.

In recent proposed rule changes, the Centers for Medicare and Medicaid Services ("CMS") recognizes that such conduct by PBMs can lead to anticompetitive outcomes:

> Finally, the one-sided nature of the pharmacy payment arrangements that currently exist also creates competition concerns by discouraging independent pharmacies from participating in a plan's network and thereby increasing market share for the sponsors' or PBMs' own pharmacies. Part D is a market-based approach to delivery of prescription drug benefits, and relies on healthy market competition. Thus, adopting policies that promote competition is an important and relevant consideration in protecting Medicare beneficiaries and the Medicare trust fund from unwarranted costs. Market competition is

best achieved when a wide variety of pharmacies are able to compete in the market for selective contracting with plan sponsors and PBMs.

Department of Health and Human Services, Centers for Medicare & Medicaid Services,

*Modernizing Part D and Medicare Advantage to Lower Drug Prices and Reduce Out-of-Pocket Expenses* (2018-25945) at 92, available at https://s3.amazonaws.com/public-inspection.federalregister.gov/2018-25945.pdf#page=82.

In addition, because the Tunney Act directs the Court to take into accont "other competitive considerations…that the court deems necessary," 15 U.S.C. § 16(e), in its determination of whether entry of the Proposed Final Judgment is in the public interest, it is appropriate for the Court to consider how CVS and Aetna have treated their current population. A merged CVS/Aetna substantially increases concerns about preserving patients' and insureds' privacy and confidentiality. CVS is currently defending a lawsuit over its revealing the HIV-positive status of up to 6,000 Ohioans through a mailing concerning such prescriptions.  *See Doe One et al. v. CVS Health Corp. et al*., Case No. 18-cv-00238 (S.D.Ohio 2018) (attached as Exhibit D). This follows a 2017 breach by Aetna that revealed the HIV status of patients across several states.  Several state attorneys general, including but not limited to those in Connecticut, New Jersey, New York, and Washington, recovered money from Aetna in the form of civil penalties for this breach. Additionally, Aetna settled a private lawsuit stemming from the same conduct for $17 million. *See Beckett v. Aetna Inc., et al.,* Case No. 17-cv-03864 (E.D. Pa. 2017) (attached as Exhibit E).  CVS' increased leverage through the merger—directing even more patients to CVS pharmacies—will embolden the merged company to increase costs on pharmacies such as AHF, leading to higher drug prices, and increased privacy concerns, to the detriment of consumers and health plans.

Finally, the Court should take notice of the numerous instances over the last decade in which CVS has engaged in various forms of misconduct, which the government has investigated, and for which CVS has paid the government millions of dollars.[1]

In short, CVS' increased leverage through the merger will embolden the merged company to increase costs on pharmacies such as AHF and drive out competition – leading to higher drug prices, decreased access to preferred providers, lower quality of care and increased privacy and safety concerns, to the detriment of providers, consumers and health plans.

---

[1] *See, e.g.*:

- June 28, 2018: CVS agreed to pay $1.5 million to the United States to resolve allegations by the Department of Justice of a violation of the federal Controlled Substances Act that several stores failed to timely report the loss of controlled substances, contributing to the opioid epidemic;

- July 11, 2017: CVS paid $5 million to the United States to resolve federal Controlled Substance Act allegations by the Department of Justice that its pharmacies failed to keep and maintain accurate records of controlled substances;

- October 17, 2016: CVS subsidiary agreed to a $28 million settlement with the Department of Justice to resolve allegations that it solicited and received kickbacks from a pharmaceutical manufacturer in exchange for promoting the prescription drug, Depakote;

- June 30, 2016: CVS agreed to pay $3.5 million to the United States to resolve allegations by the Department of Justice that fifty (50) of its stores violated the Controlled Substance Act by filling forged prescriptions for addictive painkillers more than 500 times between 2011 and 2014;

- February 12, 2016: CVS agreed to an $8 million settlement with the Department of Justice to resolve allegations that its Maryland pharmacies violated the Controlled Substance Act by dispensing controlled substances pursuant to prescriptions that were not issued for a legitimate medical purpose;

- May 13, 2015: CVS agreed to pay $22 million to resolve allegations by the Department of Justice that several retail stores distributed controlled substances based on prescriptions that had not been issued for legitimate medical purposes by a health care provider acting in the usual course of professional practice;

- September 26, 2014: CVS paid the United States $6 million to resolve False Claims Act allegations by the Department of Justice that it knowingly failed to reimburse Medicaid for prescription drug costs paid on behalf of Medicaid beneficiaries.

For a comprehensive listing of CVS violations, *see* https://violationtracker.goodjobsfirst.org/prog.php?parent=cvs-health&order=pen_year&sort=asc&page=1.

**CONCLUSION**

The Court is entrusted with the power to thoroughly review the Division's Proposed Final Judgment to ensure that it is in the public interest. The Court's authority includes "evaluat[ing] both 'the competitive impact of the proposed remedies, *i.e.*, how well the settlement remedies the harms alleged in the complaint[],' as well as "any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary." 15 U.S.C. § 16(e)(1)(A).  As this Court confirmed in *SBC Communications,* supra, 489 F. Supp. 2d at 17, the Court's power extends beyond the confines of the Division's complaint.  Accordingly, the Court should consider the anticompetitive effects of this merger beyond the "one-tenth of one percent of this $69 billion deal" that the Division's complaint addresses. AHF urges the Court to hold a public hearing to permit AHF, and parties affected by the merger, to express their concerns.  Such a hearing would allow the Court to more fully develop the record and aid in the Court's determination as to whether the Proposed Final Judgment is in the public interest.


Dated:  February 5, 2019                    Respectfully Submitted,


                                            /s/ Joseph J. Aronica
                                            Joseph J. Aronica (DC Bar No.:  446139)
                                            DUANE MORRIS LLP
                                            505 9th Street, N.W.
                                            Suite 1000
                                            Washington, DC 20004
                                            Telephone: 202-776-7824
                                            Fax:  202-478-1885
                                            Email:  JJAronica@duanemorris.com

                                            Christopher H. Casey (*Pro Hac Vice forthcoming*)
                                            Jonathan L. Swichar (*Pro Hac Vice forthcoming*)
                                            Bradley A. Wasser (*Pro Hac Vice forthcoming*)
                                            Duane Morris LLP

30 South 17th Street
Philadelphia, PA  19103-4196
Telephone: 215-979-1000
Fax: 215-979-1020
Email: CHCasey@duanemorris.com
        JLSwichar@duanemorris.com
        BAWasser@duanemorris.com


Attorneys for *Amicus Curiae AIDS Healthcare Foundation*