**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA *et al.*,

               *Plaintiffs*,

v.

CVS HEALTH CORPORATION

and

AETNA INC.,

               *Defendants.*

Case No. 1:18-cv-02340-RJL

**RESPONSE OF PLAINTIFF UNITED STATES TO**
**PUBLIC COMMENTS ON THE PROPOSED FINAL JUDGMENT**

# TABLE OF CONTENTS

I.    Introduction ............................................................................................................... 1

II.   Procedural History ..................................................................................................... 2

III.  Standard of Judicial Review ...................................................................................... 2

IV.   The Investigation, the Harm Alleged in the Complaint, and the Proposed Final
      Judgment .................................................................................................................... 8

V.    Summary of Public Comments and the United States' Response ........................... 12

      A.   Comments Regarding WellCare's Suitability as a Divestiture Buyer and
           Ability to Compete Effectively ..................................................................... 13

           1.   WellCare is an experienced and effective competitor. ............................ 13

           2.   WellCare is an independent competitor to CVS. ..................................... 17

           3.   Prior health insurance merger remedies do not cast doubt on the
                divestiture. ......................................................................................... 19

           4.   The remedy does not create new structural concerns in the markets
                for individual PDPs. .......................................................................... 21

           5.   The licensing provisions related to the Aetna brand protect WellCare's
                ability to compete using the divested assets. ..................................... 23

           6.   The sales price does not cast doubt on WellCare's intention to compete. .............. 23

      B.   Comments Related to the Vertical Aspects of CVS's Acquisition of Aetna .................. 24

           1.   Input foreclosure is unlikely to occur and is beyond the scope of
                the Complaint. ................................................................................... 26

           2.   Customer foreclosure is unlikely to occur and is beyond the scope of
                the Complaint. ................................................................................... 27

           3.   Vertical concerns are not addressable under the Tunney Act's standard
                of review. ........................................................................................... 29

      C.   Other Miscellaneous Comments ................................................................... 30

      D.   Comments in Support of the Merger ............................................................. 34

VI.   Conclusion ............................................................................................................... 35

## I.    Introduction

As required by the Antitrust Procedures and Penalties Act (the "APPA" or "Tunney Act"), 15 U.S.C. §§ 16(b)–(h), the United States hereby responds to the public comments received about the proposed Final Judgment in this case. After careful consideration of the comments, the United States continues to believe that the proposed remedy will address the harm alleged in the Complaint and is therefore in the public interest.

The remedy preserves competition for the approximately 21 million beneficiaries who purchase individual prescription drug plans ("individual PDPs") in the United States. The remedy fully addresses the competitive threat posed by the merger by requiring CVS to divest Aetna's nationwide individual PDP business to WellCare Health Plans, Inc., an experienced health insurer focused on government-sponsored health plans, including individual PDPs. By requiring a nationwide divestiture, the remedy provides WellCare with the assets and scale necessary to maintain competition in the 16 regions identified in the Complaint. The remedy also provides WellCare with access to all of the records, employees, and other rights necessary to ensure that WellCare can step into Aetna's shoes. The remedy thus preserves the competition that otherwise would be lost through the merger and ensures that WellCare will effectively replace Aetna as an independent and vigorous competitor.

The United States received 173 comments about the proposed remedy reflecting a wide range of views. Some comments supported the merger. Other comments acknowledged the significant scope of the divestiture, but expressed concerns about the divestiture buyer. Many comments raised issues that are outside the scope of the Tunney Act review. After careful consideration of these comments, the United States maintains that the remedy in the proposed Final Judgment provides comprehensive relief that satisfies the Tunney Act's public-interest standard.

The United States will publish the comments and this response on the Antitrust Division's website and is submitting to the *Federal Register* this response and the website address at which the comments may be viewed and downloaded, as authorized by the Court's order dated February 9, 2019. Following *Federal Register* publication, the United States will move the Court to enter the proposed Final Judgment.

## II.     Procedural History

On December 3, 2017, CVS entered into an agreement to acquire Aetna in a merger valued at approximately $69 billion. On October 10, 2018, the United States filed a civil antitrust Complaint seeking to enjoin CVS from acquiring Aetna because the proposed acquisition would substantially lessen competition for the sale of individual PDPs in 16 regions in the United States in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

Simultaneously with the filing of the Complaint, the United States filed a proposed Final Judgment, a Stipulation signed by the parties that consents to entry of the proposed Final Judgment after compliance with the requirements of the Tunney Act, and a Competitive Impact Statement describing the transaction and the proposed Final Judgment. The United States caused the Complaint, the proposed Final Judgment, and Competitive Impact Statement to be published in the *Federal Register* on October 17, 2018, *see* 83 Fed. Reg. 52558 (October 17, 2018), and caused notice regarding the same, together with directions for the submission of written comments relating to the proposed Final Judgment, to be published in *The Washington Post* on October 12–18, 2018. The 60-day period for public comment ended on December 17, 2018.

## III.     Standard of Judicial Review

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a 60-day comment period, after which

the court shall determine whether entry of the proposed Final Judgment "is in the public

interest." 15 U.S.C. § 16(e)(1). In making that determination, the court, in accordance with the

statute as amended in 2004, is required to consider:

> (A)    the competitive impact of such judgment, including termination of alleged
> violations, provisions for enforcement and modification, duration of relief
> sought, anticipated effects of alternative remedies actually considered,
> whether its terms are ambiguous, and any other competitive considerations
> bearing upon the adequacy of such judgment that the court deems
> necessary to a determination of whether the consent judgment is in the
> public interest; and
>
> (B)    the impact of entry of such judgment upon competition in the relevant
> market or markets, upon the public generally and individuals alleging
> specific injury from the violations set forth in the complaint including
> consideration of the public benefit, if any, to be derived from a
> determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). In considering these statutory factors, the court's inquiry is

necessarily a limited one as the government is entitled to "broad discretion to settle with the

defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d

1448, 1461 (D.C. Cir. 1995); *see generally United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d

1 (D.D.C. 2007) (assessing public-interest standard under the Tunney Act); *United States v. U.S.*

*Airways Group, Inc.*, 38 F. Supp. 3d 69, 75 (D.D.C. 2014) (explaining that the "court's inquiry is

limited" in Tunney Act settlements); *United States v. InBev N.V./S.A.*, No. 08-1965 (JR), 2009

U.S. Dist. LEXIS 84787, at *3 (D.D.C. Aug. 11, 2009) (noting that the court's review of a

consent judgment is limited and only inquires "into whether the government's determination that

the proposed remedies will cure the antitrust violations alleged in the complaint was reasonable,

and whether the mechanism to enforce the final judgment are clear and manageable").

As the U.S. Court of Appeals for the District of Columbia Circuit has held, under the

APPA a court considers, among other things, the relationship between the remedy secured and

the specific allegations in the government's complaint, whether the decree is sufficiently clear, whether its enforcement mechanisms are sufficient, and whether the decree may positively harm third parties. *See Microsoft*, 56 F.3d at 1458–62. With respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (quoting *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460–62; *United States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40 (D.D.C. 2001); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *3. Instead:

> [t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is "*within the reaches of the public interest*." More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[1]

In determining whether a proposed settlement is in the public interest, a district court "must accord deference to the government's predictions about the efficacy of its remedies, and may not require that the remedies perfectly match the alleged violations." *SBC Commc'ns*, 489 F. Supp. 2d at 17; *see also U.S. Airways*, 38 F. Supp. 3d at 74–75 (noting that a court should not reject the proposed remedies because it believes others are preferable and that room must be made for the government to grant concessions in the negotiation process for settlements); *Microsoft*, 56 F.3d at 1461 (noting the need for courts to be "deferential to the government's

---

[1] *See also BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass").

predictions as to the effect of the proposed remedies"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant "due respect to the government's prediction as to the effect of proposed remedies, its perception of the market structure, and its views of the nature of the case"). The ultimate question is whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest.'" *Microsoft*, 56 F.3d at 1461 (*quoting United States v. Western Elec. Co.*, 900 F.2d 283, 309 (D.C. Cir. 1990)). To meet this standard, the United States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *SBC Commc'ns*, 489 F. Supp. 2d at 17.

Moreover, under *Microsoft*, the court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its complaint, and does not authorize the court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459; *see also U.S. Airways*, 38 F. Supp. 3d at 75 (noting that the court must simply determine whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlements are reasonable); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *20 ("the 'public interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged"). Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Microsoft*, 56 F.3d at 1459–60. To inquire about claims that are not in a complaint would violate the separation of powers and aggravate the "constitutional difficulties that inhere

in this statute." *See* United States' December 14, 2018 Response to Order to Show Cause, Dkt. #32 at 3–7 (discussing the constitutional difficulties with the Tunney Act); *see also Microsoft* 56 F.3d at 1459; *United States v. Fokker Servs.*, 818 F.3d 733, 738 (D.C. Cir. 2016) (recognizing the "long-settled understandings about the independence of the Executive with regard to charging decisions"); *Heckler v. Chaney*, 470 U.S. 821, 832 (1985) (quoting U.S. Const. art. II, § 3) (recognizing that the decision about which claims to bring "has long been regarded as the special province of the Executive Branch.").

An amicus brief filed by the AIDS Healthcare Foundation erroneously argues that the 2004 amendments to the Tunney Act overrule *Microsoft*, allowing courts to consider allegations that are not in the complaint.[2] In fact, however, the amendments addressed a separate issue. In the *Microsoft* opinion, after the court held that the Tunney Act does not allow courts to look beyond the scope of the complaint, the opinion says that a district judge is not obliged to accept a consent decree that "appears to make a mockery of judicial power." 56 F.3d at 1462. According to legislative history of the 2004 amendments, Congress was concerned that subsequent courts had taken this latter language too far, limiting their review solely to the question of whether "antitrust consent judgments" would make "a mockery of the judicial function."[3] As a result, Congress changed the language of § 16(e) from saying that the court "may" consider the public-interest factors to the court "shall" consider those factors, making them mandatory.[4] Congress also modified the list of factors, for example, adding a new factor (whether the terms of the

---

[2] Amicus Brief from the AIDS Healthcare Foundation, Dkt. # 50-1.
[3] Antitrust Criminal Penalty Enhancement and Reform Act of 2004, Pub. L. No. 108-237, tit. II, § 221(a), 118 Stat. 661, 668 (2004) (finding that "it would misconstrue the meaning and Congressional intent in enacting the Tunney Act to limit the discretion of district courts to review antitrust consent judgments solely to determining whether entry of those consent judgments would make a 'mockery of the judicial function.'").
[4] *Compare* 15 U.S.C. § 16(e) (2004), *with* 15 U.S.C. § 16(e)(1) (2006).

judgment are ambiguous[5]), which the *Microsoft* court had already made clear was appropriate to

consider, 56 F.3d at 1461–62. Thus, as Senator Hatch observed, "this amendment essentially

codifies existing case law."[6] *See also SBC Commc'ns,* 489 F. Supp. 2d at 11 (concluding that the

2004 amendments "effected minimal changes" to the Tunney Act review).

Indeed, rather than overruling *Microsoft*, the 2004 amendments reaffirm that courts

should focus solely on how the judgment impacts the harms alleged in the complaint by

(1) keeping the language in § 16(e) that directs courts to limit their analysis to the competitive

impact of the "consent judgment,"[7] (2) adding language that directs courts to consider

competition "in the relevant market or markets,"[8] and (3) making those considerations

mandatory rather than permissive. As Senator Kohl's floor statement explained, "A mandate to

review the impact of entry of the consent judgment upon 'competition in the relevant market or

markets' . . . will ensure that the Tunney Act review is properly focused on the likely competitive

impact of the judgment, rather than extraneous factors irrelevant to the purposes of antitrust

enforcement."[9]

Finally, in the 2004 amendments, Congress addressed the Tunney Act review process,

adding the unambiguous instruction that "[n]othing in this section shall be construed to require

the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene."

15 U.S.C. § 16(e)(2); *see also U.S. Airways*, 38 F. Supp. 3d at 76 (indicating that a court is not

required to hold an evidentiary hearing or to permit intervenors as part of its review under the

Tunney Act). This language explicitly wrote into the statute what Congress intended when it first

---

[5] 15 U.S.C. § 16 (e)(1)(A).
[6] 150 Cong. Rec. S3610, at S3613 (daily ed. Apr. 2, 2004).
[7] 15 U.S.C. § 16(e)(1).
[8] *Compare* 15 U.S.C. § 16(e) (2004), *with* 15 U.S.C. § 16(e)(1)(B) (2006).
[9] 150 Cong. Rec. S3618 (statement of Sen. Kohl).

enacted the Tunney Act in 1974. As Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Sen. Tunney). Rather, the procedure for the public-interest determination is left to the discretion of the court, with the recognition that the court's "scope of review remains sharply proscribed by precedent and the nature of Tunney Act proceedings." *SBC Commc'ns*, 489 F. Supp. 2d at 11. A court can make its public-interest determination based on the competitive impact statement and response to public comments alone. *U.S. Airways*, 38 F. Supp. 3d at 76; *see also United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); S. Rep. No. 93-298 93d Cong., 1st Sess., at 6 (1973) ("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized.").

## IV.   The Investigation, the Harm Alleged in the Complaint, and the Proposed Final Judgment

The proposed Final Judgment is the culmination of a thorough, comprehensive investigation conducted by the Antitrust Division of the U.S. Department of Justice into CVS's proposed acquisition of Aetna. As noted in the Complaint, CVS is one of the largest companies in the United States. It operates the nation's largest retail pharmacy chain. It owns a large pharmacy benefit manager ("PBM") called Caremark, which manages the pharmacy benefits for various health plans and negotiates their drug pricing with pharmaceutical companies and retail pharmacies. Through its subsidiary called SilverScript, CVS is also the nation's largest provider of individual PDPs, which provide Medicare beneficiaries with insurance coverage for their

prescription drugs. Aetna is the nation's third largest health insurer and, before the divestiture, offered individual PDPs throughout the United States.

Based on the evidence gathered during its investigation, the United States concluded that CVS's proposed acquisition of Aetna would likely substantially lessen competition for the sale of individual PDPs in the 16 geographic regions where CVS and Aetna are particularly strong, resulting in higher prices, less innovation, fewer choices, and lower-quality individual PDPs for Medicare beneficiaries in these regions. Accordingly, the United States filed a civil antitrust lawsuit to block the acquisition as a violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

The proposed Final Judgment provides an effective and appropriate remedy for the transaction's likely competitive harm by requiring CVS to divest Aetna's individual PDP business nationwide. The proposed Final Judgment has several components, which the parties agreed to abide by during the pendency of the Tunney Act proceeding, and which the Court ordered in the Asset Preservation Stipulation and Order of October 25, 2018, Dkt. # 15.

First, CVS must divest both of Aetna's individual PDP contracts with the Centers for Medicare and Medicaid Services ("CMS"), which is the federal agency that administers the PDP program. Aetna's individual PDP business was the only portion of Aetna's business where the merger with CVS would have caused a substantial lessening of competition. Divesting Aetna's nationwide individual PDP business—and not just Aetna's business in the regions identified in the Complaint—provides WellCare with the same scale and capabilities to implement a national PDP strategy as Aetna had before the merger. Aetna's individual PDP contracts were transferred to WellCare on November 29, 2018. From December 2018 to January 2019, WellCare's enrollment in its legacy PDP plans increased by over 400,000 members nationwide, and its

market share grew in all 34 PDP regions. The enrollment in the divested Aetna plans also grew, adding over 140,000 members.[10]

Second, the proposed Final Judgment requires CVS and Aetna to transfer to WellCare (1) data relating to Aetna's individual PDP business, (2) information regarding the amount that Aetna pays to retail pharmacies in exchange for filling prescriptions for Aetna members, and (3) any contracts with brokers that currently sell Aetna's individual PDPs. The transfer of this data, information, and contracts helps ensure that WellCare has sufficient information to negotiate with retail pharmacies and brokers on the same footing as Aetna did before the merger.

Third, during the 60-day period following the sale to WellCare, the proposed Final Judgment has provided WellCare the opportunity to interview and hire Aetna's current employees with expertise related to the individual PDP business. The transfer of data and recruiting of Aetna employees are moving forward according to the terms of the proposed Final Judgment.

The proposed Final Judgment also includes provisions aimed at ensuring that the divested assets are handed off in a seamless and efficient manner, particularly for the two key competitive events for individual PDPs: the submission of bids to CMS each June (for the following year) and open-enrollment season for members, which occurs from October through December. In this case, before the contracts were transferred to WellCare on November 29, 2018, Aetna had already submitted its bids for the divestiture assets and open-enrollment was well under way. Thus, to assist WellCare during the 2019 plan year, CVS must, at WellCare's option, enter into an administrative services agreement to provide WellCare with all of the services required to

---

[10] *See* CMS Monthly Enrollment by CPSC for January 2019, *available at* https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/MCRAdvPartDEnrolData/Monthly-Enrollment-by-Contract-Plan-State-County-Items/Monthly-Enrollment-by-CPSC-2019-01.html?DLPage=1&DLEntries=10&DLSort=1&DLSortDir=descending.

manage the divestiture assets through the plan year, which ends on December 31, 2019. These services include contracting with pharmacy networks, administering the plans' formularies, and providing back-office support and claims administration functions. Requiring CVS to support and service these plans provides continuity to members who purchased an Aetna individual PDP during the open-enrollment period that ran from October through December 2018 and will ensure that members receive the plans that they have chosen. CVS and WellCare have entered into an administrative services agreement and, since the divestiture, CVS has been providing WellCare with the necessary services to manage the divestiture assets in 2019 while WellCare has begun preparing for the June 2019 submission of its bid for 2020.

Additionally, CVS and Aetna must allow WellCare to use the Aetna brand for the divestiture assets through December 31, 2019, and CVS and Aetna are prohibited, through 2020, from using the Aetna brand for the CVS individual PDP business that they are retaining. This will provide WellCare with a window to establish a relationship with current Aetna individual PDP beneficiaries and avoid customer confusion.

The proposed Final Judgment also includes robust mechanisms that will allow the United States and the Court to monitor the effectiveness of the relief and to enforce compliance. For example, the proposed Final Judgment provides for the appointment of a monitoring trustee, which the Court appointed on December 3, 2018. As a result, the monitoring trustee, Ms. Julie Myers Wood, is actively working to ensure that the divestiture proceeds appropriately. She has the power and authority to investigate and report on Defendants' compliance with the terms of the Final Judgment and the Asset Preservation Stipulation and Order during the pendency of the divestiture and is required to file reports with the United States every 90 days. In addition, the proposed Final Judgment provides the United States with the ability to investigate Defendants'

compliance with the Final Judgment and expressly retains and reserves all rights for the United States to enforce the provisions of the proposed Final Judgment, including its rights to seek an order of contempt from the Court.

Together, the requirements in the proposed Final Judgment ensure that WellCare can step into Aetna's shoes, thereby preserving the competition that the merger would otherwise destroy.

### V.     Summary of Public Comments and the United States' Response

The United States received 173 comments[11] from different categories of commenters. These commenters included advocacy groups, such as the American Medical Association ("AMA"), the American Antitrust Institute ("AAI"), Consumer Action and U.S. PIRG, and the Medical Society of the State of New York ("MSSNY"). In addition, the United States received comments from several groups representing pharmacists that compete with CVS, including the National Community Pharmacists Association ("NCPA"), the Pharmacists Society of the State of New York ("PSSNY"), and Pharmacists United for Truth and Transparency ("PUTT"), as well as approximately 120 individual pharmacies. The United States also received a handful of comments from business associations and healthcare industry associations.

The comments can be grouped into four categories: (1) comments about WellCare's suitability as a divestiture buyer, including whether it will have sufficient assets, expertise, and incentives to preserve competition; (2) comments related to the vertical combination of CVS's pharmacy and PBM businesses with Aetna's health insurance businesses; (3) other miscellaneous comments, including questions about whether the merger will facilitate coordination, have

---

[11] These comments are provided as attachments TC-001 through TC-085. Aside from redactions of personally identifiable information such as personal email addresses, phone numbers, and patient information, the comments are provided in their entirety. Four groups of substantially similar comments are included together as attachments TC-007, TC-020, TC-057 and TC-061. Amicus filings made before the end of the comment period by (1) Consumer Action and U.S. PIRG and (2) PUTT and PSSNY are included as attachments TC-023 and TC-060, respectively.

anticompetitive effects in various healthcare markets, increase entry barriers in the PBM or health insurance markets, or reduce PBM competition by eliminating Aetna as a PBM competitor; and (4) comments in support of the merger. The Court's analysis under the Tunney Act should focus on the first category of comments, as they are the only comments that relate to whether the proposed remedy addresses the harms alleged in the Complaint. *See Microsoft*, 56 F.3d at 1459.

**A.    Comments Regarding WellCare's Suitability as a Divestiture Buyer and Ability to Compete Effectively**

WellCare has extensive experience and qualifications in the individual PDP market and, with the assets provided by the proposed Final Judgment, is a suitable divestiture buyer. Although the AMA, Consumer Action and U.S. PIRG, NCPA, PUTT and PSSNY, and numerous independent pharmacies, raised concerns regarding WellCare as the buyer of the divested assets, none of those concerns is valid for the reasons explained below.[12] These commenters raised six primary objections: (1) WellCare will not compete as effectively as Aetna; (2) WellCare will not operate independently of CVS because WellCare uses CVS's PBM, Caremark; (3) some health insurance divestitures have not been successful, indicating that the divestiture to WellCare may not be successful; (4) the divestiture creates new structural concerns in the markets for the sale of individual PDPs; (5) the divestiture raises concerns related to WellCare's license of the Aetna brand; and (6) the divestiture sales price is too low.

**1.    WellCare is an experienced and effective competitor.**

WellCare has experience and qualifications in government-funded insurance programs. Despite this, commenters said that WellCare may not compete as effectively as Aetna in

---

[12] TC-003, TC-015, TC-023, TC-024, TC-047, TC-054, TC-059, TC-060, TC-061, TC-063, TC-064, TC-072, TC-080, TC-081, and TC-085.

individual PDP markets because WellCare is smaller and less capable than Aetna and because WellCare is not purchasing a stand-alone business unit; these concerns are misplaced.[13] Although Aetna's overall membership is larger when taking into account its commercial business, WellCare is already a large and established insurer that has competed in the markets for individual PDPs for over a decade. WellCare is a Fortune 200 company with over 12,000 employees, 5.5 million members, and a market capitalization of approximately $15 billion. Even before acquiring over 2.1 million members from Aetna as part of the divested business, WellCare had attracted nearly 1.1 million individuals in its PDPs throughout the United States. WellCare is thus starting from a strong base and its acquisition of all of Aetna's individual PDP business will enable WellCare to improve its PDP business and become a more significant competitor.

Some commenters expressed a concern that, despite its size, WellCare will not be as competitive as Aetna because Aetna's overall health insurance business was larger than that of WellCare.[14] Before the divestiture, however, WellCare already competed successfully as a smaller competitor than Aetna. From 2018 to 2019, WellCare organically grew its business by over 40 percent, from approximately 1 million members to over 1.4 million members.[15] More importantly, with the acquisition of Aetna's individual PDP business, WellCare's total individual PDP membership is well over three million members, approximately 50 percent more than Aetna's pre-divestiture individual PDP membership. Following the divestiture, WellCare will be well-positioned to achieve any benefits of scale that Aetna had enjoyed in its individual PDP business, enabling it to be an even more formidable competitor than it previously was and

---

[13] *See, e.g.*, TC-003, TC-024, and TC-060.

[14] *See, e.g.,* TC-003, TC-024.

[15] *See* CMS Monthly Enrollment by CPSC for January 2019, *available at* https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/MCRAdvPartDEnrolData/Monthly-Enrollment-by-Contract-Plan-State-County-Items/Monthly-Enrollment-by-CPSC-2019-01.html?DLPage=1&DLEntries=10&DLSort=1&DLSortDir=descending.

ensuring that the remedy is well within the "reaches of the public interest," as required under the Tunney Act. *See Microsoft*, 56 F.3d at 1461.

Concerns that WellCare is not getting enough assets or a stand-alone business unit from Aetna misunderstand the context of the remedy here.[16] The Antitrust Division's experience, as reflected in the 2004 Policy Guide to Merger Remedies,[17] is that in some instances, an in-market buyer does not need a stand-alone business unit to be successful: "The Division will approve the divestiture of less than an existing business entity if the evidence clearly demonstrates that certain of the entity's assets already are in the possession of, or readily obtainable in a competitive market by, the potential purchaser."[18]

Consistent with this principle, the proposed Final Judgment ensures that WellCare will have all that it needs to preserve competition in the sale of individual PDPs. WellCare has purchased Aetna's entire individual PDP business throughout the United States, including the relevant contracts, the right to hire employees, and access to all relevant data. Focusing on a stand-alone "business unit" in this case ignores the critical fact that WellCare already offers individual PDPs throughout the United States, is licensed in all 50 states, and has scalable in-house capabilities that it does not need to duplicate. These capabilities include experience competing in individual PDP markets throughout the country, actuarial expertise, as well as clinical and administrative resources. Because of these existing capabilities, WellCare does not need to acquire a stand-alone business unit to compete for the sale of individual PDPs. Instead,

---

[16] *See, e.g.,* TC-024, TC-060.
[17] This is the operative guide on remedies following the September 25, 2018 withdrawal of the 2011 Policy Guide to Merger Remedies. *See* Makan Delrahim, *It Takes Two: Modernizing the Merger Review Process*, Remarks at the 2018 Global Antitrust Enforcement Symposium (September 25, 2018), *available at* https://www.justice.gov/opa/speech/assistant-attorney-general-makan-delrahim-delivers-remarks-2018-global-antitrust.
[18] Antitrust Division Policy Guide to Merger Remedies, October 2004, at 14, *available at* https://www.justice.gov/sites/default/files/atr/legacy/2011/06/16/205108.pdf.

WellCare is acquiring key competitive assets that complement its existing capabilities and allow WellCare to step quickly and effectively into Aetna's shoes as a significant competitor for the sale of individual PDPs.

Despite WellCare's in-market expertise, the joint comments by Consumer Action and U.S. PIRG[19] and PUTT and PSSNY[20] erroneously argue that WellCare is similarly situated to Molina, the proposed divestiture buyer of Aetna's Medicare Advantage business that Judge Bates rejected in an opinion enjoining Aetna's proposed acquisition of Humana.[21] This concern fails to appreciate that WellCare is differently situated than Molina in several ways. Unlike Molina, which had "made forays into the individual Medicare Advantage market" but never succeeded,[22] WellCare has consistently maintained a presence in the individual PDP business since the program's inception in 2006. Also, Aetna proposed to divest only small portions of each of the merging parties' Medicare Advantage business to Molina. In contrast, while WellCare has not purchased a stand-alone business unit, it has purchased Aetna's entire individual PDP business, including Aetna's business outside the affected geographic markets. Medicare Advantage products also differ significantly from individual PDP products. In addition to the pharmacy networks used by PDPs, Medicare Advantage products require a comprehensive network of hospitals, doctors, and other healthcare providers at competitive rates. In *Aetna/Humana*, Molina had no presence at all in 89 percent of the counties referenced in the United States' complaint and no Medicare presence in 95 percent of the counties, so the company would have needed to build its own provider network to compete in the market.[23] By contrast, WellCare already has an

---

[19] TC-023 at 3–4, TC-024 at 5–6.
[20] TC-060 at 21.
[21] *United States v. Aetna, Inc.*, 240 F. Supp. 3d 1, 73 (D.D.C. 2017).
[22] *Id.* at 62.
[23] Id. at 65.

extensive pharmacy network that it uses to sell individual PDPs throughout the United States and will not have to assemble any new networks in any region to offer individual PDPs. Thus, unlike Molina in *Aetna/Humana*, WellCare is both purchasing an entire business and is a qualified buyer with the assets and capabilities to continue competing successfully.

> ## 2.   WellCare is an independent competitor to CVS.

Although some commenters raised concerns that WellCare will not operate independently of CVS because WellCare uses Caremark (which CVS owns) as its PBM,[24] the United States carefully considered this relationship in evaluating WellCare's suitability as the divestiture buyer and ultimately concluded that WellCare will continue to be an independent competitor to CVS for several reasons.

First, CVS has no governance control over WellCare. Rather, WellCare is a separate corporate entity with an independent board of directors. Second, CVS and WellCare do not have common financial incentives. As a separate company, WellCare is driven to focus on its own business and compete vigorously against CVS. Third, while WellCare may make the independent business decision to use Caremark rather than its other PBM options, nothing in the proposed Final Judgment requires WellCare to do so. In fact, WellCare recently announced that it is putting its PBM services contract out to bid in the summer of 2019.[25] Fourth, WellCare recently acquired a small PBM called Meridian, which improves WellCare's ability to provide its own PBM services. Finally, Caremark's business has internal firewalls designed to prevent insurance customers' information from being shared with SilverScript and other insurance customers. This means that WellCare, like all of Caremark's health plan customers, can make its own

---

[24] *See, e.g.,* TC-003, TC-015, TC-060, TC-061, and TC-080.
[25] *See* "WellCare Fourth Quarter 2018 Earnings Conference Call Transcript" (February 5, 2019) *available at* https://www.fool.com/earnings/call-transcripts/2019/02/05/wellcare-health-plans-inc-wcg-q4-2018-earnings-con.aspx (last visited February 13, 2019).

independent business decisions with the protections these firewalls provide against the risk that SilverScript, or any other Caremark customer, will have access to competitively sensitive information or advance knowledge of its business plans and other competitive decisions.

Because WellCare retains control of the divestiture assets and has the financial incentive to use them in its best interests, rather than CVS's, WellCare's relationship with Caremark does not change the conclusion that the proposed remedy is in the public interest. This conclusion is bolstered by the success of Aetna's individual PDP plans, which used Caremark for PBM services before the merger, showing that a relationship with Caremark does not impede an individual PDP's competitiveness. Similarly, WellCare has also competed against CVS's SilverScript business for many years despite using Caremark for PBM services.

Other comments incorrectly suggest that, because the proposed Final Judgment includes transition services agreements for 2019, WellCare will not operate the divestiture assets independently of CVS.[26] As described above, the proposed Final Judgment requires that, at WellCare's option, CVS must enter into an administrative services agreement to provide WellCare with all of the services required to manage the divestiture assets through the 2019 plan year. CVS must offer these services at the direction of WellCare and subject to the review of both the monitoring trustee and the United States, whose oversight will likely deter any attempts to undermine WellCare's competitiveness.

The transition services agreements are also only in place through 2019. This temporary arrangement provides continuity to members who purchased an Aetna individual PDP during the open-enrollment period that ran from October through December 2018, but ends when plans for 2020 will become effective. These transition services are necessary for the seamless and efficient

---

[26] TC-003, TC-023, and TC-024.

transition of Aetna's individual PDP business to WellCare. Importantly, the agreements do not affect the prices, design, coverage amounts, and other terms of the plans WellCare is now offering to seniors. Rather, these terms have been fixed for all of 2019.

Further, the monitoring trustee is closely tracking CVS's compliance with the terms of the transition services agreements. CVS's obligations are clearly stated in the proposed Final Judgment, and the monitoring trustee is already ensuring that CVS is fulfilling its responsibilities. Because Aetna's contracts with CMS, as well as the related data, have been transferred in accordance with the terms of the proposed Final Judgment, WellCare has all the assets it needs to independently prepare for the next competitive event—the June 2019 submission of the bid for 2020—which is not impacted by the transition services agreements.

### 3.    Prior health insurance merger remedies do not cast doubt on the divestiture.

In 2012, the United States required Humana Inc. and Arcadian Management Services Inc. to divest assets relating to Arcadian's Medicare Advantage business in 51 counties in five states in order for Humana to proceed with an acquisition of Arcadian.[27] Several commenters looked at this and other divestitures in hindsight and conclude that they failed or that divestitures in general are not successful remedies.[28] As a general matter, however, the factual circumstances in every divestiture are different. Furthermore, the concerns that the experience of prior divestitures indicates that the divestiture to WellCare will fail in this instance are wrong because the circumstances here are different.

Indeed, there are several key differences between this divestiture and the ones in *Humana/Arcadian*, the most important of which is the scope of the divestiture. In

---

[27] *See* "Justice Department Requires Divestitures in Humana Inc.'s Acquisition of Arcadian Management Services Inc.," *available at* https://www.justice.gov/opa/pr/justice-department-requires-divestitures-humana-incs-acquisition-arcadian-management-services.
[28] TC-003, TC-023, TC-024, and TC-060.

*Humana/Arcadian* the divestiture did not constitute an entire business, as it included only 12,700 covered lives in 51 rural counties and was split between three different acquirers. In contrast, CVS has divested Aetna's entire individual PDP business, consisting of over two million members and including assets outside the markets described in the Complaint. Additionally, similar to Molina in *Aetna/Humana,* the *Humana/Arcadian* divestitures concerned Medicare Advantage products and some of those divestitures went to buyers that did not have Medicare Advantage provider networks in the divested markets. In contrast, WellCare already has pharmacy networks in every region of the United States. Divesting the entire line of business to WellCare, a well-positioned buyer, will help ensure that WellCare continues to compete effectively and capture additional economies of scale across its entire business.

Despite these factual differences, commenters also note that WellCare was the buyer of one set of divested assets in *Humana/Arcadian* and wrongly suggest that, because that divestiture failed, this one likely will too.[29] As described above, the two divestitures are substantially different. In *Humana/Arcadian*, WellCare acquired fewer than 5,000 lives in two counties in Arizona. In contrast, WellCare is acquiring over 2.1 million individual PDP lives across the United States from Aetna. Additionally, as described above, WellCare did not have a Medicare Advantage provider network in Arizona before the divestiture in *Humana/Arcadian* while WellCare already has an established pharmacy network in place that it can use for the PDP business it is acquiring from Aetna. Further, WellCare has grown significantly as a company since 2012—more than doubling from 2.7 million[30] members to 5.5 million[31]—and overhauled

---

[29] TC-023, TC-024, and TC-060; *see also* Amicus Brief from the AIDS Healthcare Foundation, Dkt. # 50-1.
[30] *See* "WellCare 2011 Annual Report", *available at*
http://ir.wellcare.com/file/4091918/Index?KeyFile=1500074253.
[31] *See* "WellCare Corporate Overview", *available at* https://www.wellcare.com/en/Corporate/Company-Overview (last visited February 13, 2019).

its leadership team, including the CEO, CFO, CIO, CMO, and the EVP for Clinical Operations.[32]

Because of the larger scale of the current divestiture, WellCare's growth as a health insurance

company, and its experience and existing capabilities with individual PDPs, WellCare's

performance with the Humana/Arcadian assets does not indicate how successful it will be with

Aetna's PDP business. Because a district court "must accord deference to the government's

predictions about the efficacy of its remedies," *SBC Commc'ns*, 489 F. Supp. 2d at 17, and

because the divestiture to WellCare is readily distinguishable from the ones that commenters

allege failed in *Humana/Arcadian*, the Court should afford deference to the government's

prediction of a successful divestiture in this instance.

### 4. The remedy does not create new structural concerns in the markets for individual PDPs.

The AMA incorrectly argues that, because WellCare and Aetna both compete in all 34

Medicare regions, the divestiture itself creates competitive concerns simply by reducing the

number of competitors in every region.[33] The AMA further alleges that, in seven regions, the

divestiture "would potentially raise significant competitive concerns [that] often warrant

scrutiny" because it exceeds certain Herfindahl–Hirschman Index ("HHI") thresholds in the

Horizontal Merger Guidelines.[34]

HHIs are a commonly accepted measure of market concentration and are calculated by

squaring the market share of each firm competing in the market and then summing the resulting

numbers.[35] The U.S. Department of Justice, consistent with the Federal Trade Commission,

---

[32] *See* "WellCare Corporate Management Team", *available at* https://www.wellcare.com/Corporate/Management-Team (last visited February 13, 2019).
[33] TC-030 at 6-7.
[34] *Id.*
[35] For example, for a market consisting of four firms with shares of 30, 30, 20, and 20 percent, the HHI is 2,600 ($30^2 + 30^2 + 20^2 + 20^2 = 2,600$).

generally considers markets in which the HHI is between 1,500 and 2,500 points to be moderately concentrated, and considers markets in which the HHI is in excess of 2,500 points to be highly concentrated.[36] Transactions that increase the HHI by more than 100 points in moderately concentrated markets or between 100 and 200 points in highly concentrated markets "potentially raise significant competitive concerns and often warrant scrutiny."[37] Transactions that increase the HHI by more than 200 points in highly concentrated markets are "presumed to be likely to enhance market power."[38]

In this case, although some regions fall into the category of "potentially" raising concerns under the Horizontal Merger Guidelines after the divestiture, no regions are above the threshold for "presumed" concerns. Moreover, as described in the 2010 Horizontal Merger Guidelines, while the United States does use HHIs and other concentration statistics, such as the number of firms in the market, as an important part of its investigative toolkit, "[t]he purpose of these thresholds is not to provide a rigid screen to separate competitively benign mergers from anticompetitive ones … [r]ather, they provide one way to identify some mergers unlikely to raise competitive concerns and some others for which it is particularly important to examine whether other competitive factors confirm, reinforce, or counteract the potentially harmful effects of increased concentration."[39] Consistent with these principles, the United States considered the strength of WellCare, Aetna, and their competitors in all 34 PDP regions. The combined market share of Aetna's and WellCare's individual PDP businesses does not exceed 25 percent in any region. The United States determined that the combination of Aetna's and WellCare's PDP

---

[36] *See* U.S. Department of Justice & FTC, Horizontal Merger Guidelines § 5.3 (2010), *available at* https://www.justice.gov/atr/file/810276/download.
[37] *Id.*
[38] *Id.*
[39] *Id.*

business was not likely to substantially lessen competition, in part due to the presence of other significant competitors—including CVS's SilverScript product—in every market.

     **5.**     **The licensing provisions related to the Aetna brand protect WellCare's ability to compete using the divested assets.**

Under Section IV.I. of the proposed Final Judgment, Aetna is required to license the Aetna brand to WellCare for use with the divested business only for 2019. For 2020, Section IV.J. of the proposed Final Judgment prohibits CVS from using the Aetna brand for the sale of individual PDPs. Misunderstanding these provisions, the joint comment from Consumer Action and U.S. PIRG raises concerns that WellCare's one-year license to the Aetna brand fails to create an incentive to properly invest in the Aetna brand name.[40] The proposed Final Judgment, however, is not meant to give WellCare a long-term incentive to invest in the Aetna brand name. Rather, these provisions give WellCare a two-year opportunity to establish its relationship with the customers of the divested plans without a competing Aetna-branded individual PDP plan. Given that, as previously explained, the divestiture improves WellCare's established ability to compete for PDP customers, these provisions further enhance the effectiveness of the proposed Final Judgment.

     **6.**     **The sales price does not cast doubt on WellCare's intention to compete.**

Several commenters raise misplaced concerns related to the price paid by WellCare.[41] For example, the joint comment from Consumer Action and U.S. PIRG estimates the divestiture purchase price to be $45 per life and then claims—without evidence—that this "seems like a very cheap price."[42] In some cases, a low purchase price may raise concerns whether a proposed

---

[40] TC-023, TC-024; *see also* TC-003.
[41] TC-003, TC-023, TC-024, and TC-060.
[42] TC-023 at 5, TC-024 at 7.

divestiture buyer will be a successful competitor.[43] As described in the 2004 Policy Guide to Merger Remedies, "the purchase price will not be approved if it clearly indicates that the purchaser is unable or unwilling to compete in the relevant market."[44] The Policy Guide also states, however, that "a successful divestiture does not depend on the price paid for the assets."[45] Rather, a low price "may simply mean the purchaser is getting a bargain" and "if the Division has other sufficient assurances that the proposed purchaser intends to compete in the relevant market, the Division will not require … [a certain] price."[46]

In this case, the Antitrust Division has those assurances. The United States thoroughly vetted WellCare, which has offered individual PDPs since the program's inception in 2006 and has recently experienced strong organic growth.[47] The United States interviewed WellCare's executives, reviewed its business plans, and discussed WellCare with relevant third parties. Based on these efforts, the United States believes that WellCare will continue to compete in individual PDPs, a market it has participated in for over a decade. The commenters do not provide any evidence that their estimated purchase price undermines this conclusion.

**B.    Comments Related to the Vertical Aspects of CVS's Acquisition of Aetna**

Asking the Court to go outside the permissible scope of review under the Tunney Act, commenters also raise vertical concerns about the merger combining CVS's pharmacy and PBM businesses with Aetna's health insurance businesses, alleging that the merger will enable CVS to

---

[43] *See, e.g.*, *United States v. Aetna, Inc.*, 240 F. Supp. 3d 1, 72 (D.D.C. 2017) (citing to an "extremely low" purchase price as evidence that the divestiture buyer was not likely to be able to replace the competition lost by the merger).
[44] Antitrust Division Policy Guide to Merger Remedies, October 2004, at 33 *available at* https://www.justice.gov/sites/default/files/atr/legacy/2011/06/16/205108.pdf.
[45] *Id*.
[46] *Id*. at 34.
[47] *See* CMS Monthly Enrollment by CPSC for January 2019, *available at* https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/MCRAdvPartDEnrolData/Monthly-Enrollment-by-Contract-Plan-State-County-Items/Monthly-Enrollment-by-CPSC-2019-01.html?DLPage=1&DLEntries=10&DLSort=1&DLSortDir=descending.

use its assets to harm competitors. CVS can be viewed as competing at three different levels of the healthcare industry: (1) the sale of drugs through channels such as retail, mail order, and long-term care pharmacies; (2) the provision of PBM services that are offered to insurers, including the negotiation of rates with pharmaceutical manufacturers and the negotiation of coverage networks with pharmacies; and (3) the sale of various types of insurance, including individual PDPs. CVS competes at all three of these levels through its branded retail, long-term care, and other pharmacies; through its PBM, Caremark; and through SilverScript, its individual PDP. Aetna competes with SilverScript at the third level, and offers additional types of insurance, but does not offer stand-alone PBM services or own any retail pharmacies of its own.

Recognizing that CVS and Aetna do not compete against each other either at the retail pharmacy level or the PBM level, commenters nonetheless raise two categories of vertical concerns relating to the merger: input foreclosure and customer foreclosure concerns, which are explained below. Commenters also raise vertical concerns about CVS's common ownership of its retail pharmacies and Caremark, its PBM, which CVS owned long before it sought to acquire Aetna and is unrelated to the current merger.

The United States investigated the potential for vertical harms from the merger by obtaining and reviewing documents as well as interviewing industry participants. For the reasons outlined below, the United States concluded that vertical harms were unlikely to occur and did not allege any harm related to vertical concerns in its Complaint. The vertical concerns therefore are outside the scope of this Tunney Act proceeding. *See* United States' December 14, 2018 Response to Order to Show Cause, Dkt. #32, at 3–7. Responding to the AAI's comment that there are benefits to transparency, the United States nonetheless describes the commenters' concerns and responds below.

1. **Input foreclosure is unlikely to occur and is beyond the scope of the Complaint.**

Although several comments raise the possibility that the merged firm will harm

competition in the sale of health insurance by raising the cost of important services or products

that CVS provides to insurers that compete with Aetna, which is known as input foreclosure, the

United States considered this possibility and determined that input foreclosure is unlikely to be

profitable for CVS. In particular, commenters argue that CVS will deny or restrict health

insurance rivals' access to inputs at two different levels of the supply chain: First, commenters[48]

allege that the company will not make its pharmacies available to competing health plans or will

otherwise disadvantage rival plans by raising pharmacy costs. Second, commenters[49] allege that

Caremark will not make its PBM services available to competing health plans or will raise the

prices for its PBM services to rival plans.[50] Neither is likely to occur.

As noted in a set of questions and answers issued on the same day the Complaint and

proposed Final Judgment were filed, the United States carefully considered these issues as part

of its investigation.[51] The evidence showed that CVS is unlikely to be able to profitably raise its

PBM or retail pharmacy costs post-merger. If CVS were to raise prices at any level of the supply

chain, it would lose customers to competing PBMs or retail pharmacies, and the merged entity

---

[48] TC-001, TC-002, TC-003, TC-023, and TC-024; *see also* Amicus Brief from the AIDS Healthcare Foundation, Dkt. # 50-1.

[49] TC-001, TC-002, TC-003, TC-023, TC-024, TC-048, TC-054, and TC-057.

[50] Additionally, some commenters also allege that CVS is foreclosing 340B administrators from its retail pharmacies. *See* TC-066, TC-068. 340B administrators offer services to assemble and administer pharmacy networks that provide rebates to qualified hospitals. CVS competes with these administrators through a subsidiary called Wellpartner. These commenters allege that CVS does not allow its pharmacies to participate in 340B networks unless Wellpartner is selected as the hospital's 340B administrator, which would be a form of input foreclosure. CVS's acquisition of Aetna does not relate to the 340B market or affect shares in that market. In part for this reason, the United States did not allege anticompetitive effects from the merger related to CVS or Wellpartner's practices, placing the concerns of these commenters outside of the Court's Tunney Act review. *See* Dkt. #32, at 3–7.

[51] *See* "United States v. CVS and Aetna Questions and Answers for the General Public," *available at* https://www.justice.gov/opa/press-release/file/1099806/download.

likely would not be able to offset these losses by capturing additional health insurance customers. For these reasons, the United States did not allege input foreclosure in its Complaint, making this issue beyond the scope of this Tunney Act proceeding.

Despite the evidence, the AMA also argues that the divestiture will fail because WellCare will be foreclosed from pharmacy and PBM services.[52] In effect, this argument asserts that the input foreclosure described above will occur and will be directed at WellCare. As discussed above, the United States concluded that such foreclosure—whether directed at WellCare or any other insurer—is unlikely to occur. Furthermore, even before the divestiture, WellCare (and Aetna) competed successfully against CVS's SilverScript PDP business despite the vertical relationship between SilverScript and Caremark. With the divestiture, CVS's share of the individual PDP market will not grow, so the merger will not increase CVS's incentive or ability to foreclose its PDP rivals—including WellCare—from CVS pharmacies or Caremark.

### 2.     Customer foreclosure is unlikely to occur and is beyond the scope of the Complaint.

Other comments allege that the merged firm would harm pharmacies by denying them access to Aetna members, even though the merger does not significantly increase CVS's incentive to engage in this behavior, which is known as "customer foreclosure."[53] Commenters— primarily independent pharmacies that compete with CVS—allege that Caremark favors CVS pharmacies in its reimbursements.[54] The commenters allege that this favoritism can be observed in Caremark programs such as mandatory mail order, which steers customers away from

---

[52] TC-003 at 12.

[53] TC-002, TC-023, TC-024, TC-035, TC-048, TC-059, TC-060, TC-070, TC-076, TC-078; *see also* Amicus Brief from the AIDS Healthcare Foundation, Dkt. # 50-1.

[54] TC-001, TC-002, TC-004 TC-012, TC-013, TC-016, TC-017, TC-021, TC-023, TC-024, TC-027, TC-031, TC-032, TC-033, TC-034, TC-039, TC-043, TC-044, TC-045, TC-050, TC-059, TC-060, TC-065, TC-075, TC-076, TC-080, TC-083, TC-085.

independent pharmacies.[55] Commenters also allege that Caremark manipulates reimbursement to independent pharmacies, sometimes later offering to buy them and turn them into CVS stores,[56] and that several states are investigating these practices.[57] From these allegations, these commenters incorrectly conclude that CVS is likely to use Aetna to steer additional customers away from rival pharmacies, causing them harm.

The United States takes these allegations seriously and considered them during its investigation. Generally, the United States considers the merging companies' prior acts when evaluating the likely effects of a transaction, but mergers are illegal under the Clayton Act only if they will likely substantially lessen competition in a relevant market.[58] Based on its investigation, the United States determined that CVS's acquisition of Aetna likely would not result in an anticompetitive customer foreclosure strategy, particularly given Aetna's small share in many commercial health insurance markets. The combination of Aetna's small share of retail pharmacy purchases in many areas, competition from rival insurers who would win additional sales if Aetna provided a less desirable pharmacy network, and other factors make it unlikely that this strategy would be profitable for CVS. Therefore, the United States did not allege customer foreclosure in its Complaint, placing this issue beyond the scope of this Tunney Act proceeding. *See* Dkt. #32, at 3–7. Consequently, these comments do not provide a basis for rejecting the proposed Final Judgment. *See U.S. Airways*, 38 F. Supp. 3d at 76 ("'Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the

---

[55] TC-001, TC-002, TC-016, TC-020, TC-021, TC-027, TC-035, TC-039, TC-045, TC-046, TC-054, TC-059, TC-061, TC-062, TC-074, TC-080, TC-081.
[56] TC-004, TC-013, TC-017, TC-023, TC-024, TC-025, TC-031, TC-032, TC-033, TC-038, TC-039, TC-046, TC-061, TC-064, TC-074; *see also* Amicus Brief from the AIDS Healthcare Foundation, Dkt. # 50-1.
[57] TC-016, TC-031, TC-044, TC-054, TC-059, TC-060, TC-061, TC-063, TC-064, TC-072, TC-078, TC-080, TC-081, TC-082, TC-083; *see also* Amicus Brief from the AIDS Healthcare Foundation, Dkt. # 50-1.
[58] *See* 15 U.S.C. § 18.

United States has alleged in its Complaint. . . .'") (quoting *United States v. Graftech Int'l Ltd.,*
No. 1:10-CV-02039-RMC, 2011 WL 1566781, at *13 (D.D.C. Mar. 24, 2011)).

> **3.    Vertical concerns are not addressable under the Tunney Act's standard of review.**

Although their comments are outside the scope of the Court's Tunney Act review because
the Complaint does not allege vertical harms, some commenters weighed in on the standard of
review under the Tunney Act[59] or commented that the Court may still consider vertical concerns
if the Complaint is drafted so narrowly as to make a "mockery of judicial power," an argument
that is unsupported by the caselaw, as discussed above.[60] Indeed, as the D.C. Circuit recognized
in *Microsoft*, 56 F.3d at 1459, a district court may not evaluate the scope of the complaint during
a Tunney Act review, even if the court believes that additional claims would have been justified.
While a court is not obliged to accept a consent decree that "makes a mockery of judicial power,"
*id*. at 1462, under *Microsoft* that standard applies to the consent decree—not the complaint—and
subsequent cases suggesting otherwise are inconsistent with *Microsoft*.

In any event, neither the Complaint nor the proposed Final Judgment is drafted so
narrowly as to make a mockery of judicial power. To the contrary, the Complaint is significant in
scope: it challenges anticompetitive harm in 16 broad regions, encompassing 22 states, affecting
millions of seniors. The proposed Final Judgment goes even further, addressing the
anticompetitive harm with the nationwide divestiture of Aetna's entire individual PDP business.

Furthermore, the fact that the divestiture represents a small fraction of the underlying $69
billion merger is not relevant to the public-interest determination and is not a basis for

---

[59] TC-001, TC-002, TC-003, TC-023, TC-024, TC-060; *see also* Amicus Brief from the AIDS Healthcare
Foundation, Dkt. # 50-1.
[60] TC-001, TC-002, TC-023, TC-024, TC-059, and TC-060; *see also* Amicus Brief from the AIDS Healthcare
Foundation, Dkt. # 50-1.

concluding that the proposed remedy makes a mockery of the judicial process, as some commenters suggest.[61] Courts have routinely found proposed judgments to be in the public interest when the United States challenged only a small part of a large transaction,[62] and settlements are often ideal in these situations because they allow parties to proceed with transactions that could otherwise benefit consumers. Because Aetna was the nation's third-largest health insurance company, it is not surprising that its individual PDP business, while substantial, represents only a small percentage of the company's total value. The United States made these arguments in more detail in its December 14, 2018 Response to Order to Show Cause, *see* Dkt. #32, and incorporates that pleading herein by reference.

## C.    Other Miscellaneous Comments

Even though CVS and Aetna significantly compete against each other only in the sale of individual PDPs, several commenters raised irrelevant concerns related to other markets, including whether the merger will increase entry barriers in either the PBM or health insurance markets,[63] or reduce PBM competition by eliminating Aetna as a potential entrant in the PBM market.[64] During its investigation, the United States seriously considered whether the merger likely would harm competition in the PBM and health insurance markets, including by increasing entry barriers and eliminating Aetna as a PBM competitor. Among other things, the United States obtained and reviewed documents and interviewed industry participants about these issues. In

---

[61] TC-001; *see also* Amicus Brief from the AIDS Healthcare Foundation, Dkt. # 50-1.
[62] *See United States v. Parker-Hannifin Corp. and CLARCOR Inc.*, 1:17-cv-01354 (D. Del. Sept. 26, 2017) (complaint alleging harm in only two product markets, which resulted in a divestiture of a business with annual revenues of approximately $60 million, in challenge to $4.3 billion transaction); *United States v. United Technologies Corp. and Goodrich Corp.*, 1:12-cv-01230 (D.D.C. July 26, 2012) (complaint alleging harm in only two product markets, resulting in a divestiture of businesses expected to generate approximately $395 million in annual revenues, in challenge to $18.4 billion transaction); *United States v. InBev N.V./S.A. et al.*, 1:08-cv-01965 (D.D.C. Nov. 14, 2008) (complaint alleging harm in only three regions of upstate New York in challenge to InBev's proposed acquisition of Anheuser-Busch for approximately $52 billion).
[63] TC-002, TC-003.
[64] TC-001, TC-003; *see also* Amicus Brief from the AIDS Healthcare Foundation, Dkt. # 50-1.

reviewing such information, the United States determined that the evidence did not show that the

merger likely would harm competition in these areas. Accordingly, the Complaint did not allege

that CVS's acquisition of Aetna would harm competition in PBM and health insurance markets

other than the sale of individual PDP plans. These comments are thus beyond the purview of the

Tunney Act and do not provide a basis for rejecting the proposed Final Judgment. *See U.S.*

*Airways*, 38 F. Supp. 3d at 76 ("[T]he Court's role under the APPA is limited to reviewing the

remedy in relationship to the violations that the United States has alleged in its Complaint.")

(internal citation omitted).

   Although some commenters expressed concern about concentration in the PBM market,

these concerns are misplaced because Aetna does not provide stand-alone PBM services. These

commenters state that only three companies—Caremark, ESI, and Optum—control over 80% of

the PBM marketplace[65] and are simply too powerful,[66] with the ability to harm pharmacies,

including by forcing "take it or leave it" contracts on independent pharmacies. The commenters

also complain about PBM business practices, such as "spread pricing" on pharmaceuticals, which

the commenters allege limits transparency and harms independent pharmacies.[67] Additionally,

the AMA and other commenters raised concerns that the vertically integrated PBM/health

insurers (Cigna–Express Scripts, Optum Rx–United Healthcare, and CVS–Aetna) would have

increased incentives following the merger to coordinate by bidding less aggressively for PBM

contracts that would strengthen their health insurer rivals or that the large vertically integrated

---

[65] TC-002, TC-004, TC-009, TC-015, TC-020, TC-023, TC-024, TC-026, TC-029, TC-038, TC-044, TC-046, TC-054, TC-056,TC-059, TC-060, TC-061, TC-080, TC-083; *see also* Amicus Brief from the AIDS Healthcare Foundation, Dkt. # 50-1.
[66] TC-014, TC-023, TC-024, TC-026, TC-027, TC-037, TC-044, TC-046, TC-054, TC-056, TC-057, TC-059, TC-062.
[67] TC-009, TC-014, TC-015, TC-016, TC-017, TC-020, TC-021, TC-023, TC-024, TC-025, TC-031, TC-033, TC-044, TC-045, TC-047, TC-056, TC-059, TC-060, TC-061, TC-062, TC-063, TC-064, TC-072, TC-074, TC-078, TC-080, TC-081, TC-082, TC-085; *see also* Amicus Brief from the AIDS Healthcare Foundation, Dkt. # 50-1.

PBM/health insurers would have stronger incentives to prevent market entry by other PBMs or the introduction of innovative drug business models.[68] The merger, however, does not significantly increase concentration in the PBM market because Aetna does not offer stand-alone PBM services. Also, these comments do not relate to whether the proposed Final Judgment reasonably addresses the harms alleged in the Complaint. Therefore, they are well beyond the scope of this Tunney Act proceeding and do not provide a basis for rejecting the proposed Final Judgment. *See U.S. Airways*, 38 F. Supp. 3d at 76 ("[T]he Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint.") (internal citation omitted).

Some commenters raised concerns about the effectiveness of firewalls at Caremark, despite CVS's commercial incentive to maintain those firewalls. The AAI expressed concerns that ineffective firewalls would allow Caremark to facilitate coordination among health insurers that use it as a PBM.[69] The United States investigated this possibility and determined that CVS is commercially incentivized to maintain firewalls because that customers could switch to an alternative PBM if their information were not kept confidential. MSSNY raised a related concern regarding the potential for consumer data breaches due to data being shared between the merged entities, but CVS already handles sensitive consumer data from Caremark's PBM business. Nothing about the merger changes CVS's incentive or ability to protect this information.

Other commenters applied the wrong legal standard when they argued that the Court should reject the settlement because consumers may not benefit from the merger of CVS and Aetna. The AAI and the joint comment from Consumer Action and U.S. PIRG[70] argue that there

---

[68] TC-002, TC-003.
[69] *See also* TC-045.
[70] TC-002, TC-023, and TC-024.

is little evidence that past vertical mergers have benefitted consumers, and several commenters[71] suggested that there is no evidence that cost savings will be passed through to customers. Mergers, however, are illegal under the Clayton Act only if they substantially lessen competition in a relevant product market, not if they fail to pass on benefits to consumers in markets where competition likely will not be substantially lessened.[72] Consequently, these comments do not provide a basis for rejecting the proposed Final Judgment.

Some commenters raised other concerns that are beyond the scope of the Complaint in this case. For example, several commenters, including the MSSNY, said that the merger would harm physicians and other healthcare providers in a number of ways, including through steering patients away from physician groups or by imposing administrative burdens on physicians.[73] They also argue that these actions would harm patients. Without relating their concerns to the merger, other commenters allege that the pharmacy[74] or insurance[75] markets are concentrated, raise concerns relating to CVS's existing pricing practices,[76] note that CVS is involved in an ongoing federal whistleblower case,[77] or complain about CVS's long-term care pharmacy.[78] As these comments do not relate to whether the proposed Final Judgment reasonably addresses the harms alleged in the Complaint, they are well beyond the scope of this Tunney Act proceeding and do not provide a basis for rejecting the proposed Final Judgment. *See U.S. Airways*, 38 F.

---

[71] TC-003, TC-023, TC-024, TC-054, TC-059.
[72] *See* 15 U.S.C. § 18.
[73] TC-001, TC-004, TC-007, TC-011, TC-029, TC-048, TC-060, TC-067, TC-070, TC-078, TC-081; *see also* Amicus Brief from the AIDS Healthcare Foundation, Dkt. # 50-1. MSSNY further argued that these practices would be driven by the $40 billion in debt that CVS is incurring as part of the transaction.
[74] TC-002.
[75] TC-002, TC-023, and TC-024.
[76] TC-009, TC-014, TC-015, TC-016, TC-017, TC-020, TC-021, TC-023, TC-024, TC-025, TC-031, TC-033, TC-044, TC-045, TC-047, TC-056, TC-059, TC-060, TC-061, TC-062, TC-063, TC-064, TC-072, TC-074, TC-078, TC-080, TC-081, TC-082, TC-085; *see also* Amicus Brief from the AIDS Healthcare Foundation, Dkt. # 50-1.
[77] TC-007.
[78] TC-065.

Supp. 3d at 76 ("[T]he Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint.") (internal citation omitted).

## D.     Comments in Support of the Merger

Twenty-six commenters expressed support for the merger or praised CVS's business practices.[79] Commenters, including the California Asian Pacific Chamber of Commerce, Connecticut Business and Industry Association, Atlanta Children's Shelter, SISU Integrated Early Leaning, and API Council, discussed the merger's potential to create an innovative platform that will improve access to high quality and affordable healthcare. In particular, the Asian Business Association and the API Council discussed the potential of the merger to allow for more collaboration between doctors, pharmacists, and insurers, resulting in improved patient care. Commenters, including the Spanish Speaking Elderly Council-RAICES, Inc., the Latino Commission on AIDS, National Hispanic Medical Association, and the National Black Nurses Association, praised CVS for improving public health through removing tobacco from its stores, participating in programs to combat the opioid epidemic, and offering free biometric health screenings. Other commenters such as the Connecticut Business and Industry Association and ValueCare Alliance praised Aetna for providing jobs and collaborating with providers on innovative healthcare products. These comments are consistent with the United States' previous recognition that this merger has the potential to generate benefits by improving the quality and lowering the costs of healthcare services.[80]

---

[79] TC-005, TC-006, TC-008, TC-010, TC-018, TC-019, TC-022, TC-028, TC-030, TC-036, TC-040, TC-041, TC-042, TC-049, TC-051, TC-052, TC-053, TC-055, TC-058, TC-069, TC-071, TC-073, TC-074, TC-077, TC-079, TC-084.

[80] *See* "Justice Department Requires CVS and Aetna to Divest Aetna's Medicare Individual Part D Prescription Drug Plan Business to Proceed with Merger," *available at* https://www.justice.gov/opa/pr/justice-department-requires-cvs-and-aetna-divest-aetna-s-medicare-individual-part-d.

## VI.    Conclusion

After careful consideration of the public comments, the United States continues to believe that the proposed Final Judgment, as drafted, provides an effective and appropriate remedy for the antitrust violations alleged in the Complaint, and is therefore in the public interest. The United States will move this Court to enter the proposed Final Judgment after the comments and this response are published as required by 15 U.S.C. § 16(d).

Dated: February 13, 2019

Respectfully submitted,

_____/s/_____
Jay D. Owen
Shobitha Bhat
Natalie R. Melada
U.S. Department of Justice
Antitrust Division
450 Fifth Street NW, Suite 4100
Washington, D.C. 20530
Tel.: (202) 598-2987
Fax: (202) 616-2441
E-mail: Jay.Owen@usdoj.gov

## CERTIFICATE OF SERVICE

I, Jay D. Owen, hereby certify that on February 13, 2019, I caused a copy of the

foregoing document to be served upon Plaintiffs State of California, State of Florida, State of

Hawaii, State of Washington, and Defendants CVS Health Corporation and Aetna Inc., via the

Court's CM/ECF system, and to be served upon Plaintiff State of Mississippi by mailing the

documents electronically to its duly authorized legal representative:

**Counsel for State of Mississippi:**
Crystal Utley Secoy
Consumer Protection Division
Mississippi Attorney General's Office
P.O. Box 22947
Jackson, Mississippi 39225
Phone: (601) 359-4213
cutle@ago.state.ms.us

_____/s/_____
Jay D. Owen
U.S. Department of Justice
Antitrust Division
450 Fifth Street NW, Suite 4100
Washington, D.C. 20530
Tel.: (202) 598-2987
Fax: (202) 616-2441
E-mail: Jay.Owen@usdoj.gov
