UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** *et al.*, <br><br> **Plaintiffs,** <br><br> v. <br><br> **CVS HEALTH CORPORATION** *et al.*, <br><br> **Defendants.** | Case No. 1:18-cv-02340-RJL |

**PROPOSED MEMORANDUM IN SUPPORT OF CONSUMER ACTION and U.S. PIRG'S MOTION FOR LEAVE TO FILE A SUPPLENTAL BRIEF IN REPLY TO PLAINTIFF'S RESPONSE TO PUBLIC COMMENTS**

**David A. Balto**
Attorney at Law
8030 Ellingson Drive
Chevy Chase, MD 20815
(202) 577-5424
david.balto@dcantitrustlaw.com
*Attorney for Consumer Action and U.S. PIRG*

1

**Table of Contents**

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ......................................................................................................................... 1

ARGUMENT ................................................................................................................................. 2

    I. THE COURT HAS BROAD POWERS TO DETERMINE WHETHER THE PROPOSED FINAL JUDGMENT IS IN THE PUBLIC INTEREST ………..........................................................................................................................4

    II. THE PFJ IS NOT IN THE PUBLIC INTEREST BECAUSE IT DOES NOT PRESERVE COMPETITION IN MEDICARE PART D INDVIDIUAL PDP MARKET..........................................................................................................................5

    III.  THE DOJ RESPONSE FAILED TO ADEQUATELY ADDRESS ANY VERTICAL CONCERNS.......................................................................................................................8

CONCLUSION............................................................................................................................ 10

# Table of Authorities

**CASES**

*Fed. Trade Comm'n v. Sysco Corp.,* 113 F. Supp. 3d 1(D.D.C. 2015) ..................................................7,8
*United States v. Aetna*, 240 F. Supp. 3d 1 (D.D.C. 2017)...................................................................5,6
*United States v. Airline Tariff Pub. Co.,* 836 F. Supp. 9 (D.D.C. 1993) ..................................................4
*United States v. Am. Tel. & Tel. Co.,* 552 F. Supp. 131 (D.D.C. 1982)................................................4,9
*United States v. AT&T Inc.*, 541 F. Supp. 2d  (D.D.C. 2008) ..................................................................4
*United States v. Blavatnik*, No. CV 15-1631 (RDM), 2016 WL 593449 (D.D.C. Feb. 12, 2016)...............4
*United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d  (D.D.C. 2007).........................................1, 2,4, 9
*White Consol. Indus. v. Whirlpool Corp*., 781 F.2d 1224 (6th Cir. 1986) ................................................8

**STATUTES**

Antitrust Procedures and Penalties Act, 15 U.S.C. § 16 ("Tunney Act") ..............................................2,4, 9

**OTHER AUTHORITIES**

Aetna Reports Fourth-Quarter and Full Year 2017 Results, January 30, 2018............................................2
Comments from Consumer Action and U.S. PIRG submitted on December 17, 2018 .............................2
Competitive Impact Statement ...................................................................................................................7
Letter from Diana Moss, President of American Antitrust Institute to the Department of Justice, Regarding *Competitive and Consumer Concerns Raised by the CVS-Aetna Merger* dated March 26, 2018. ..........................10
Letter from Marilyn Singleton to the Department of Justice, September 21, 2018 .....................................9
Medicare Part D in 2016 and Trends Over Time. Kaiser Family Foundation. September 2016 ...................8
Reforming Biopharmaceutical Pricing at Home and Abroad, The council of Economic Advisors, White Paper, February 2018 ....................................................................................................................3
WellCare Earnings Call Transcript dated October 30, 2018 .................................................................2, 7
WellCare Health Plans, Inc. 2017 Annual Report (Form 10-K)................................................................2, 8

Amici Curiae Consumer Action and U.S. PIRG respectfully submit this Supplemental Brief in support of their earlier Amicus Curiae Brief and in retort to the Plaintiff United States Department of Justice's ("DOJ") Response to Public Comments ("Response").

## INTRODUCTION

The DOJ's Response doubles down on its insistence that this Court's authority in Tunney Act proceedings is limited. Response at 4-6. The DOJ's Response fails to sufficiently address the deficiencies with the divestiture of Aetna Inc.'s ("Aetna") Medicare Part D individual prescription drug plans ("individual PDPs") to WellCare Health Plans, Inc. ("WellCare"). While the DOJ identifies a horizontal competitive concern raised by CVS Health Corporation's ("CVS Health") acquisition of Aetna, the Proposed Final Judgment ("PFJ") pulls up short of resolving the horizontal concern, and consequently, cannot be deemed in the public interest. Besides the PFJ not restoring competition in the individual PDP markets, the DOJ narrowly drafted the Complaint without alleging the extensive competitive concerns raised by the merger "as to make a mockery of judicial power." *United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1, 15 (D.D.C. 2007). The DOJ's lack of response to the legitimate vertical concerns raised by Consumer Action and U.S. PIRG, and other amici is telling.

This Supplemental Brief is limited to responding to (1) the DOJ's insistence that this Court has a limited role in the Tunney Act proceeding; (2) DOJ's failure to sufficiently address the concerns related to its divestiture of insurance contracts to WellCare; and (3) DOJ's failure to sufficiently address certain vertical antitrust concerns.

1

**ARGUMENT**

This Court has an obligation to determine if the PFJ is in the public interest. 15 U.S.C. § 16(e)(1). In applying the public interest standard, the burden is on the government to "provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms" as well as "issues unrelated to the competitive impact of the settlement." *SBC Commc'ns, Inc*., 489 F.Supp.at 16-17.  For a number of reasons, the PFJ as it currently stands will not sufficiently remedy the significant anticompetitive harm arising from this merger.

Indeed, the PFJ is wholly inadequate and inconsistent with Judge John D. Bates' decision to reject a similar remedy in the Aetna-Humana merger.[1]  The DOJ paid lip service to Amici's concerns about the adequacy of the divestiture package and whether WellCare is an appropriate buyer.  Indeed, the DOJ, in its Response, acknowledges and/or does not refute that:

- WellCare failed as a divestiture buyer in the past.[2]

- WellCare acquired the subscriber contracts for a low acquisition price, which raises serious concerns whether it will successfully compete;

- WellCare's CEO recognizes the inherent risk in acquiring year to year subscriber contracts rather than purchasing a stand-alone business;[3]

- WellCare is substantially smaller than Aetna, lacks Aetna's economies of scope and scale, and lacks Aetna's brand reputation and number of covered lives;[4] and

---

[1] Comments from Consumer Action and U.S. PIRG submitted on December 17, 2018.
[2] Response at 20.
[3] Kenneth Burdicek, WellCare CEO, October 30, 2018, WellCare Earnings Call.  "Therefore, we'll be working in 2019 to enhance our products and capabilities and filing bids in June of 2019 to preserve as much membership as possible with the new WellCare products in 2020."
[4] WellCare is much smaller than Aetna; as of December 31st, 2017, Aetna's total membership was 22.2 million and it had assets of $55.137 billion, and WellCare had 4,371 million members and assets of $8.364 billion. And WellCare's membership of individual PDPs has declined from 1,392,000 in 2014 to 1,152,000 in 2017. Aetna Reports Fourth-Quarter and Full Year 2017 Results, January 30, 2018. *See* https://news.aetna.com/newsreleases/ aetna-reports-fourth-quarter-and-full-year-2017-results/; *see also* WellCare Health Plans, Inc. 2017 Annual Report (Form 10-K), U.S. Securities and Exchange Commission (Feb. 2018), *available at:* https://www.sec.gov/Archives/edgar/data/1279363/000127936318000011/wcg-2017123110k.htm.

- WellCare is in a vulnerable position to the extent that it must rely on transition services agreements with CVS.

Although CVS Health's acquisition of Aetna creates a large, vertically integrated PBM-insurer that operates in upstream and downstream markets featuring only a few meaningful rivals, the DOJ's Response maintains that this Court does not have the authority to review competitive concerns that are not raised in the Complaint.  The DOJ's interpretation is wrong and goes against the very language and purpose of the Tunney Act itself.

The DOJ's Response simply fails to address the harm to patients resulting from the vertical integration of the nation's largest retail pharmacy chain, one of the three largest PBMs, which combined control approximately 85% of the PBM market, and the nation's third largest health insurer.[5]  Here, there is evidence that vertical integration between a retail pharmacy and a PBM has resulted in anticompetitive conduct.  CVS Health's past history shows that after vertically integrating with Caremark, CVS steered patients to its own pharmacies and mail order business and created exclusive pharmacy networks, thereby reducing patient choice and driving prices up.  It is likely that CVS will continue the same exclusionary conduct going forward. Indeed, the merged firm will have enhanced incentives to use its market positions to disadvantage rival PBMs, independent pharmacies, physicians and rival health insurers.

Consumers will suffer through higher prices, lower quality, less innovation, and less choice.  This is why the DOJ received a remarkable 173 public comments, most of them, including comments from consumer groups, provider groups, patient advocacy groups, independent and community pharmacists, the American Antitrust Institute, and the American

---

[5] Reforming Biopharmaceutical Pricing at Home and Abroad, The Council of Economic Advisors, White Paper, February 2018. (White House Council of Economic Advisors found that the three large PBMS control more than 85% of the market, which allows them to exercise undue market power against manufacturers and against health plans and beneficiaries they are supposed to be representing, thus generating outsized profits for themselves.").

Medical Association, questioning the DOJ's decision to approve the merger with such a small divestiture in one overlap market.  Response at 12.

## I. THE COURT HAS BROAD POWERS TO DETERMINE WHETHER THE PFJ IS IN THE PUBLIC INTEREST

The DOJ's Response minimizes the importance of the Court's role in Tunney Act proceedings, but, undoubtedly, this Court is required to make an independent, objective, "determination of whether a proposed settlement is in the public interest." *United States v. AT&T Inc.*, 541 F.Supp.2d 2, 6 (D.D.C. 2008); 15 U.S.C. § 16(e)(1); Response at 4-6.  In making that determination, this Court, in accordance with the statute as amended in 2004, is required to consider not just the competitive impact of such judgment, but also "*any other competitive considerations* bearing upon the adequacy of such judgment."   15 U.S.C. § 16(e)(1)(A) (emphasis added).

Under the Tunney Act, the court must act as "an independent check upon the terms negotiated by the DOJ." *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 149 (D.D.C. 1982).  The language of the Tunney Act and its legislative history contradict the government's argument for a sharply proscribed, highly deferential review.  Moreover, Congress enacted the Tunney Act to eliminate excessive secrecy from the consent decree process and address its perception that the DOJ entered into a number of weak settlements. *See United States v. Airline Tariff Pub. Co.*, 836 F. Supp. 9, 11 (D.D.C. 1993); *United States v. Blavatnik*, No. CV 15-1631 (RDM), 2016 WL 593449, at *7 (D.D.C. Feb. 12, 2016).[6]

---

[6] "In enacting the Tunney Act, Congress sought to ensure that the Justice Department's use of consent decrees in antitrust cases would fully promote the goals of the antitrust laws and foster public confidence in their fair enforcement.  The legislators found that prior practice, which gave the Department almost total control of the consent decree process, with only minimal judicial oversight, failed to accomplish these ends." *AT&T Co.,* 552 F. Supp. at 148.

## II. THE PFJ IS NOT IN THE PUBLIC INTEREST BECAUSE IT DOES NOT PRESERVE COMPETITION IN MEDICARE PART D INDVIDIUAL PDP MARKET

In the present situation, there are serious questions whether a divestiture of individual PDP subscriber contracts to WellCare will preserve competition in the relevant market, in accordance with the DOJ's own policy that a divestiture must "effectively preserve competition in the relevant market." *United States v. Aetna*, 240 F. Supp. 3d 1, 60 (D.D.C. 2017) (citing to U.S. Dep't of Justice, Antitrust Division Policy Guide to Merger Remedies 1 (2011) ("Remedies Guide")).

Here, past history of the divestiture buyer and an extremely low purchase price for the divested assets indicates that the buyer could profit from the transaction even if it does not restore competition in all of the problematic markets. *Aetna* 240 F. Supp. 3d a 68, 72-74. No matter how the DOJ's Response characterizes the divestiture, the DOJ's acceptance of CVS's divestiture of PDP contracts to a divestiture buyer that has failed in the past at a low bargain price is inconsistent with Judge Bates' decision in *Aetna*. *Aetna Inc.*, 240 F. Supp. 3d at 72.

The DOJ acknowledges that WellCare failed to restore competition when it was a divestiture buyer in Humana/Arcadian. Response at 19-20. Even with this checkered past, the DOJ maintains that the Court should not have any concerns about WellCare's ability to manage an acquisition of 2.1 million lives. The DOJ's logic is that managing 5,000 lives in two counties in Arizona is more difficult than managing 2.1 million lives across the entire nation. There is no evidence to support DOJ's contention. What we do know is that WellCare pulled out of both counties within two years of making the acquisition of Medicare Advantage health insurance contracts, and WellCare will cut and run out if it cannot maintain its subscriber base. Past experience indicates that seniors have lost when relying on WellCare as a divestiture buyer.

5

If WellCare's track record is not enough to cast doubt on its viability as an effective competitor going forward, the low purchase price of a mere $50 to $100 million should. The DOJ recognized that a low price could raise concerns, but it noted that is not the case here, because it could mean that WellCare simply got a good bargain.  Response at 22.  In *Aetna*, Judge Bates recognized that the divestiture buyer was getting a bargain but he was concerned that "an extremely low purchase price reveals the divergent interest between the divestiture purchaser and the consumer: an inexpensive acquisition could still 'produce something of value even if it does not become a significant competitor.'"  *Id.* (quoting U.S. Dep't of Justice, Antitrust Division Policy Guide to Merger Remedies 1 (2011) at 9).  While the DOJ attempts to distinguish Judge Bates' decision in *Aetna*, Judge Bates was right to be concerned about a low purchase price because "a low purchase price may raise concerns whether a proposed divestiture buyer will be a successful competitor."  Response at 23-24.  Moreover, Judge Bates, in agreeing with the DOJ, was concerned that the divestiture of Medicare Advantage contracts at a low bargain price supported the conclusion that the divestiture buyer had serious doubts about its own ability to manage all the divestiture plans.  *Id.*  He also agreed with the DOJ that the bargain price did not give him confidence in the divestiture buyer's ability to effectively replace the competition lost by the merger.

These same concerns exist here because WellCare is not acquiring a stand-alone business rather it is merely acquiring insurance subscriber contracts.  Significantly, health insurer relationships with subscribers are fragile assets on which to base a merger remedy.  It is well understood that a divestiture of an existing business entity is more likely to preserve competition than simply a sale of assets.  *Aetna*, 240 F. Supp. 3d at 60.  Though the DOJ characterizes the divestiture to WellCare as a divestiture of Aetna's individual PDP business, the DOJ admits that

6

what really occurred on November 29, 2018, was a transfer of Aetna's individual PDP contracts to WellCare.  Response at 9.  And, while the DOJ requires CVS and Aetna to transfer data and information as well, at the end of the day, it is simply a transfer of contracts not a sale of a business.  As WellCare's CEO recognized on an earning's call, preserving membership that it acquired is a risk when it is simply purchasing insurance contracts that are up for grabs every year and by 2021, CVS/Aetna will be in prime position to compete against WellCare for those same contracts.[7]  While the DOJ does its best in its Response to argue that a divestiture of 2.1 million year to year insurance contracts with behavioral requirements including transition services agreements should allow WellCare to restore competition, we remain skeptical that a divestiture of insurance contracts that are up for grabs is meaningful.

Moreover, "[R]estoring competition requires replacing the *competitive intensity* lost as a result of a merger…" rather than just maintaining premerger levels.  *Fed. Trade Comm'n v. Sysco Corp.*, 113 F. Supp. 3d 1, 72 (D.D.C. 2015) (emphasis in original).  Despite the DOJ's assurances in its Response, it will be difficult to replace the "competitive intensity" lost as a result of the merger.  The DOJ explains that "[C]ompetition between [CVS and Aetna's PDPs] has led not only to lower premiums and out-of-pocket expenses but also improved drug formularies, more attractive pharmacy networks, enhanced benefits, and innovative product features."[8]  The DOJ claims that WellCare is an experienced and effective competitor.  Response at 13-15.  The DOJ points out that from 2018 to 2019, WellCare organically grew its business from 1 million members to over 1.4 million members.  Response at 14.  What the DOJ did not say was that WellCare's membership dropped from approximately 1.4 million members in 2014

---

[7] WellCare Earnings Call Transcript dated October 30, 2018. https://seekingalpha.com/article/4215999-wellcare-health-plans-wcg-q3-2018-results-earnings-call-transcript?page=2
[8] Competitive Impact Statement at 5.

to 1 million members in 2018 because its membership is unstable.[9]  Undeniably, WellCare is a smaller player that has not competed as effectively as Aetna has.  Adding 2.1 million lives to its portfolio does not change the way that WellCare has chosen to compete in the past.  It is either an innovator with respect to non-price terms or it is not.  Patients should not bear the risk as past history indicates that WellCare has not been as meaningful of a competitor to CVS.

Finally, the DOJ spends some time explaining that WellCare is an independent competitor from CVS Health.  Response at 17.  But as WellCare's CEO noted on the earnings conference call discussing the acquisition of Aetna's individual PDP contracts, he was happy to be able to help out its partner CVS.[10]  The point is that WellCare depends on CVS Health for PBM services and the PFJ includes transition services agreements for 2019 suggesting that WellCare is in a vulnerable position.   Indeed, a divestiture that calls for a "continuing relationship between the seller and buyer of divested assets" is problematic as it "may increase the buyer's vulnerability to the seller's behavior."  *Sysco*, 113 F. Supp. 3d at 77 (quoting *FTC v. CCC Holdings*, 605 F.Supp.2d 26, 59 (D.D.C. 2009)); *see also White Consol. Indus. v. Whirlpool Corp.*, 781 F.2d 1224, 1227–28 (6th Cir. 1986).

### III. THE DOJ RESPONSE FAILED TO ADEQUATELY ADDRESS ANY VERTICAL CONCERNS

Besides the PFJ's failure to resolve the horizontal concern alleged in DOJ's complaint, the DOJ simply failed to allege any of the wide-ranging harms raised by this merger.  The DOJ took a myopic view of the competition problems raised by the merger.  The DOJ's Response summarily dismissed all comments that raised vertical competition concerns and stated that they

---

[9] Medicare Part D in 2016 and Trends Over Time. Kaiser Family Foundation. September 2016, Pg. 9. http://files.kff.org/attachment/Report-Medicare-Part-D-in-2016-and-Trends-over-Time; Medicare Part D in 2018 and Trends Over Time. Kaiser Family Foundation.  May 17, 2018; WellCare Health Plans, Inc. 2017 Annual Report (Form 10-K).
[10] *Id.*

are outside the scope of the Tunney Act review. DOJ Response 25-30. As this Court confirmed in *SBC Communications,* courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." *SBC Commc'ns, Inc.*, 489 F. Supp. 2d at 15. Here, the DOJ narrowly drafted the Complaint and completely failed to identify any of the extensive competitive concerns raised by Amici and others during the comment period. This Court has broad authority to dig deeper and allow third parties an opportunity to participate so that they can explain the vertical foreclosure concerns that exist. 15 U.S.C. § 16; *AT&T Co.*, 552 F. Supp. at 148 n.70 (quoting 119 Cong. Rec. 3452 (1973) (Sen. Tunney)).

CVS's history suggests that it will continue to engage in exclusionary conduct to steer patients away from the provider of their choice. The acquisition of Aetna enhances the ability and incentive of the merged firm to impede competition in retail pharmacy, provider services, health insurance, and PBM services. Pre-merger, Aetna has the incentive to deal with all retail pharmacies for its commercial insureds. Post-merger, this will change as CVS/Aetna will have the increased incentive and ability to steer Aetna's patients to CVS's mail order business or its retail pharmacy stores. CVS will be able to cut off rival retail pharmacies' access to Aetna insureds by implementing some changes either explicitly requiring the Aetna insureds to use CVS mail order and/or retail pharmacies or implementing financial disincentives to Aetna insureds from using rival retail pharmacies. Primary care physicians are also at risk of being squeezed out of the marketplace to the detriment of patients.[11] CVS will be able to steer patients covered by Aetna to receive their care from CVS-run clinics, instead of from their own

---

[11] Letter from Marilyn Singleton to the Department of Justice, September 21, 2018. http://aapsonline.org/cvs-aetna/.

physicians.[12] Further, while a standalone CVS has strong incentives to sell its PBM services to all health insurers, after integrating with Aetna, the incentive to sell such services to other health insurers changes.[13] Given the significance of being one of three largest PBMs, CVS could enact a number of strategies related to drug formularies, providing less transparency of drug costs, and gathering information about rival insurers' drug spending and customers that could be used to disadvantage health insurer rivals.[14] This could raise rival health insurers' cost of prescription drugs. Finally, CVS could cut off Aetna subscribers from rival PBMs.

In sum, patients will see higher prescription drug prices, lower quality, and less choice. This merger will unquestionably result in CVS steering patients to its services and products and away from competitors' offerings.

## CONCLUSION

This Court has the authority and responsibility to conduct a thorough review of the PFJ to determine whether it is in the public interest and fully restores competition for millions of patients. This Court has the authority to hold a hearing so it can conduct additional fact-finding necessary to carefully consider the PFJ in light of the number of concerns raised in Amici's previous brief, this brief, other amicus briefs, and the flood of public comments regarding the divestiture to WellCare as well as the sweeping competitive concerns that the DOJ glossed over in its Response. Finally, such a hearing would fully develop the record regarding the potential areas of failure in the PFJ before the Court makes its decision on whether the PFJ adequately resolves the competitive harm raised by the merger.

---

[12] *Id.*
[13] Letter from Diana Moss, President of American Antitrust Institute to the Department of Justice, Regarding *Competitive and Consumer Concerns Raised by the CVS-Aetna Merger* dated March 26, 2018.
[14] *Id.*

Dated: March 25, 2019

Respectfully submitted,

/s/ David Balto
**David A. Balto**
Attorney at Law
8030 Ellingson Drive
Chevy Chase, MD 20815
(202) 577-5424
david.balto@dcantitrustlaw.com
*Attorney for Consumer Action and U.S. PIRG*