# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, *et al.* | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-02340-RJL |
| | ) | |
| CVS HEALTH CORPORATION | ) | |
| | ) | |
| and | ) | |
| | ) | |
| AETNA INC. | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## AMICUS CURIAE AMERICAN MEDICAL ASSOCIATION'S
## NOTICE OF WITNESS LIST

Pursuant to the Court's order of April 8, 2019 [Dkt. # 70], the American Medical

Association respectfully submits the following list of three witnesses that it proposes to offer at a

hearing on the Government's Motion for Entry of Final Judgment.

### Richard M. Scheffler, Ph.D.

*Knowledge and Expertise*

Professor Scheffler is a Distinguished Professor of Health Economics and Public Policy

at the School of Public Health and the Goldman School of Public Policy at the University of

California, Berkeley. He is also the director of UC Berkeley's Nicholas Petris Center on

Healthcare Markets and Consumer Welfare, and UC Berkeley's Global Center for Health and

Economic Policy Research. Professor Scheffler has testified before the California Department of

Insurance on the likely competitive impacts of the recently proposed mergers of Anthem and

Cigna, Aetna and Humana, and CVS and Aetna. This year he is the principal investigator for the California Healthcare Foundation's and the Commonwealth Fund's sponsored research on the impact of consolidation on healthcare prices and quality. Professor Scheffler's resume is attached as Exhibit A.

*Proposed Testimony*

Based on publicly available information, including the Centers for Medicare & Medicaid Services' (CMS) enrollment data for Medicare Part D Standalone Prescription Drug Plans (PDPs), Professor Scheffler is expected to testify that he has measured market concentrations, market concentration trends and post-merger HHIs for the 34 PDP geographic regions created by CMS.

According to the Department of Justice's own Horizontal Merger Guidelines, mergers that would increase HHIs by more than 100 points and result in post-merger HHIs between 1500 and 2500 "potentially raise significant competitive concerns and often warrant scrutiny." Professor Scheffler has identified seven PDP geographic regions (encompassing nine states) for which the proposed merger and divestiture would satisfy these conditions.

Professor Scheffler is expected to testify further that the CVS–Aetna merger and divestiture are likely to lead to consumer harm, including higher premiums. Accordingly, the government's proposed final judgment is not in the public interest.

*Approximate Length of Testimony*

One hour of direct examination.

**Neeraj Sood, Ph.D.**

*Knowledge and Expertise*

Professor Sood is the Professor of Health Policy and Vice Dean for Research at the Sol Price School of Public Policy, University of Southern California (USC). He is also a faculty member and past director of research of USC's Leonard D. Schaeffer Center for Health Policy and Economics, and is a research associate at the National Bureau of Economic Research—the nation's premier economics research organization.

Professor Sood has published more than 100 papers and reports on health policy and economics. His research has focused on health insurance markets, pharmaceutical markets, and global health. This research has been published in leading journals in economics, health policy, and medicine, including the Journal of Economics, Journal of Economic Perspectives, Journal of Health Economics, Journal of the American Medical Association, and Health Affairs. His work on healthcare costs in the pharmaceutical supply chain has been cited by the Council of Economic Advisers of President Obama and President Trump. Professor Sood has been invited to participate in expert consensus committees of the National Academies of Sciences, Engineering and Medicine. His work has been featured in media outlets, including the New York Times, Washington Post, U.S. News & World Report, and Scientific American. He is an associate editor for leading journals in his field, including the Journal of Health Economics and Health Services Research. He is also a board member of the American Society of Health Economists. Professor Sood's resume is attached as Exhibit B.

*Proposed Testimony*

Based on his assessment of economic theory, past research, and data on the structure, conduct and performance of firms in the relevant industries, Professor Sood is expected to testify

that the proposed divestiture will not even come close to restoring competition to premerger levels.

The divestiture of Aetna's PDP business will not increase the number of firms competing in the PDP market, and therefore will not address the anticompetitive effects of the CVS–Aetna merger. Aetna, CVS and WellCare all participate in all 34 geographic markets for PDP services. If the CVS–Aetna merger were approved then there would be one less firm or plan sponsor in the market. The loss of competition resulting from this merger will likely not be rectified by entry of new insurers due to substantial barriers to entry in the PDP market. The reduction in the number of firms competing in the market or the exit of Aetna from the market would likely change plan bids, consequently increasing premiums for the elderly and costs of subsidizing these premiums for the government.

The merger and divestiture would eliminate the unique and important role of competition between Aetna and CVS in the PDP market.

The divestiture of Aetna's PDP business to WellCare is unlikely to make WellCare as formidable a competitor as Aetna and therefore unlikely to fully remedy the anticompetitive effects of the merger. WellCare is not as well known a brand as Aetna, and the divestiture allows WellCare to use the Aetna brand till only December 2019. Also, the divestiture will not give WellCare the same negotiating or bargaining power with pharmacies and manufacturers that Aetna enjoys because of its size in the PDP market and other markets.

As WellCare's pharmacy benefit management (PBM) supplier and a major pharmacy chain, CVS provides critical services to WellCare, such as negotiating with manufacturers and pharmacies. CVS therefore can increase costs and reduce efficiency for WellCare. In contrast,

Aetna performs its own core PBM functions. Thus, WellCare, more so than Aetna, is vulnerable to input foreclosure and a weak competitor of CVS/Aetna.

As a company that purchases its PBM services, WellCare, faces a PBM market that is highly concentrated. CVS/Caremark, Express Scripts (owned by WellCare's competitor Cigna), and OptumRx (owned by WellCare's competitor UnitedHealth Group) (the Big Three), account for at least 70% of the market. They are all vertically integrated into health insurance markets, including the PDP markets in which they compete with WellCare. Consequently, there is an appreciable danger that CVS and the other Big Three PBMs, with the scale to drive deep discounts with pharmaceutical companies, would engage in market-wide express or tacit collusion or oligopoly behavior by not competing aggressively for PBM customers who compete with them, such as WellCare.

Further dampening WellCare's prospects is a significant danger that CVS/Aetna would raise the costs of retail pharmacy inputs available to its competitors, including WellCare.

The poor prospects for WellCare to become as formidable a competitor as Aetna in the PDP market, are reflected in the low purchase price of the divested PDP assets, which amounts to a small fraction of Aetna's annual profits from its PDP business.

Therefore, the divestiture of Aetna's PBM business to WellCare would not restore competition to premerger levels and is therefore not in the public interest.

*Approximate Length of Testimony*

Two hours of direct examination.

**Thomas L. Greaney, J.D.**

*Knowledge and Expertise*

Professor Greaney is the Visiting Professor of Law at the University of California,

Hastings College of Law, and Distinguished Senior Fellow with the UCSF/UC Hastings

Consortium on Law, Science and Health Policy. He is also the Chester A. Myers Professor

Emeritus at Saint Louis University School of Law, where he was on the faculty for 29 years and

directed the Center for Health Law Studies. He has devoted most of his 30-year academic career

to studying issues related to competition and regulation in the healthcare sector, writing

numerous articles on the subject and co-authoring the leading casebook on health law. He has

recently co-authored, with Professor Barak Richman of Duke University, a two-part white paper

for the American antitrust Institute analyzing consolidation in the delivery and payment of

healthcare services. Professor Greaney has testified before Congressional committees and federal

regulatory agencies concerned with competition and antitrust enforcement in healthcare. Before

becoming an academic, he served as Assistant Chief in the Antitrust Division of the Department

of Justice, litigating and supervising cases involving health care. Professor Greaney's resume is

attached as Exhibit C.

*Proposed Testimony*

Professor Greaney is expected to testify that an important purpose of the antitrust merger

law is to arrest certain practices in their incipiency, by preventing business firm acquisitions that

are likely to facilitate them. There is a sound economic rationale for the incipiency standard, and

especially the need to address markets *trending* toward increasing concentration. That is because,

once concentration reaches a high level, antitrust law has few tools to deal with it. Among the

high risk situations in which the incipiency standard should be applied include mergers to

oligopoly and vertical mergers. Healthcare markets are rife with the preconditions that raise these two concerns: High levels of concentration, a history of collusion and coordination, high barriers to entry, and inelastic demand. Economic studies show that the persistently high costs of healthcare are in large part attributable to market concentration.

In the PDP market, the central objective of divestitures—to restore competition to ex ante levels—is plainly not achieved. Moreover, it would seem to ignore the importance of the incipiency standard to allow an *increase* in a concentrated market, even if the concentration levels were at the low end of the Merger Guidelines thresholds.

Plainly, the DOJ has not meaningfully responded to the competitive concerns raised by the horizontal merger and divestiture in PDP markets. The country needs aggressive antitrust enforcement in health insurance and pharmaceutical markets. Yet the government is proposing the approval, as in the public interest, of a merger and divestiture that in seven PDP regions covering nine states would fall into the category of potentially raising significant competitive concerns under the Horizontal Merger Guidelines. This is a consequence the government itself concedes and is reason enough for rejecting the proposed final judgement as not in the public interest.[1]

In addition, the PDP marketplace is currently dominated by five plan sponsors.[2] Upon divestiture, WellCare will assume Aetna's PDP business. However, in contrast with Aetna, WellCare has competitive handicaps and vulnerability to rivals' anticompetitive strategies. Therefore, the market would effectively go from having five principal competitors to four. When

---

[1] Response to Public Comments, at 22; Competitive Impact Statement at 6.

[2] These five plan sponsors are CVS Health, UnitedHealth Group, Humana, Express Scripts, and Aetna. According to Professor Scheffler, they account for 83% of PDP enrollment.

the number of effective players, measured in terms of individual firms' realistic ability to upset collusion or oligopoly by cutting price, is reduced from eight or 10 in the case of express collusion or from five or seven in the case of oligopoly, collusive behavior is more likely. The horizontal anticompetitive effects are made even more dangerous because this merger is also vertical, which increases the risk of input foreclosure or refusal to deal, or raises the probability of coordination among oligopolists, which is hard to detect. CVS provides PBM services to WellCare, making it, compared to Aetna (which self- supplies its core PBM services), vulnerable to input foreclosure and a weak competitor of CVS/Aetna. If Aetna and CVS merge, WellCare would need to shop for PBM services in a marketplace where the three principal suppliers—CVS/Caremark, Express Scripts and UnitedHealth group's Optum RX-comprising 70% of the PBM market and capable of driving deep drug discounts- would all be vertically integrated with a WellCare competitor in the PDP market. The result would be enhanced incentives to engage in horizontal coordination and an appreciable danger that the three firms would engage in market-wide express or tacit collusion or oligopoly behavior of not competing aggressively for PBM customers competing with the big three's PDP business.

Therefore, the proposed final judgment is not in the public interest.

*Approximate Length of Testimony*

One hour of direct examination.

Dated:  April 19, 2019

Respectfully submitted,

*/s/ Henry C. Quillen*
Henry C. Quillen (Bar ID 986686)
WHATLEY KALLAS LLP
159 Middle St., Suite 2C
Portsmouth, NH 03801
Telephone: (603) 294-1591
Fax: (800) 922-4851
hquillen@whatleykallas.com

Henry S. Allen, Jr. (admitted *pro hac vice*)
Senior Attorney, Advocacy Resource Center
AMERICAN MEDICAL ASSOCIATION
330 N. Wabash
Chicago, IL 60611
Telephone: (312) 464-4271
Fax: (312) 224-6919
henry.allen@ama-assn.org

*Counsel for the American Medical Association*