## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, *et al*.,

              Plaintiffs,

v.

CVS HEALTH CORPORATION; and
AETNA INC.,

              Defendants.

Civil Action No. 1:18-cv-02340-RJL

## CVS'S MOTION TO EXCLUDE

CVS Health Corp. ("CVS") respectfully moves to exclude, from the record on which this Court will make its public interest determination pursuant to the Antitrust Procedures and Penalties Act ("Tunney Act"), 15 U.S.C. § 16, any witness testimony and other evidence and argument pertaining to purported antitrust concerns other than the violations alleged in the Complaint.

The issue before the Court is whether entry of the proposed Final Judgment is in the public interest in light of the government's allegation that the CVS/Aetna merger would otherwise cause anticompetitive effects in the individual Medicare Part D plan market in certain geographic regions. *See* ECF No. 1 (Compl.), ¶¶ 30–40. Yet the amici curiae recognized by the Court ("Amici")[1] have made clear they intend to use these Tunney Act proceedings as a platform to present theories of purported harms to competition that the government has not alleged— theories the government in fact rejected after a lengthy and thorough review. Amici propose to

---

[1] Amici include the AIDS Healthcare Foundation ("AHF"), American Medical Association ("AMA"), Consumer Action, U.S. PIRG, Pharmacists United for Truth and Transparency ("PUTT"), and Pharmacists Society of the State of New York ("PSSNY").

offer these irrelevant theories through witnesses who plan to represent competitors' interests rather than the public interest.  For example:

- Amicus AHF's proposed expert witnesses seek to testify on "the effect of increased vertical integration" and "the lack of . . . consumer benefits from the merging parties' strategies of vertical integration and diversification."  ECF No. 76 at 2–3.  These issues have nothing to do with competition in the Part D industry, and everything to do with AHF's own interest in weakening its competitor in the retail medical clinic, pharmacy, and health insurance markets.

- Amicus AMA, whose members compete with CVS, plans to sponsor testimony that the merger will increase the cost of retail pharmacy inputs available to CVS's rivals and that the integration of the PBM/health insurance businesses increases the danger of collusion.  This testimony furthers AMA's members' interests in preventing competition from lower-priced, higher quality, and more convenient alternatives to traditional doctor's office visits, but it has nothing to do with the relevant question: whether the proposed Final Judgment is in the public interest.

- Amici Consumer Action and U.S. PIRG propose an expert witness, Diana Moss, to testify about "vertical considerations" and the alleged anticompetitive effects of integrating CVS's retail pharmacy, PBM, and health insurance businesses.  ECF No. 75 at 4.  These Amici are represented by a lawyer who has consistently supported anti-competitive restrictions on pharmacy services in his capacity as general counsel to an organization whose members compete with CVS's pharmacies.

Such evidence and arguments are irrelevant to the proposed Final Judgment and threaten to turn this Tunney Act proceeding into a forum for airing competitors' grievances about the CVS-Aetna merger and about the healthcare industry more generally.  That is not what Tunney Act review is for, as the statute and its legislative history make clear.  The Court accordingly should limit the presentations at any evidentiary hearing to evidence and argument pertaining to the remedy for the alleged harm in the Medicare Part D plan market asserted in the Complaint.  It also should exclude from the record Amici's written submissions, to the extent they stray beyond that issue.

In light of Amici's witness list submissions, CVS also respectfully suggests that the Court should exercise its discretion to dispense altogether with an evidentiary hearing with live witness

testimony.  Amici's submissions demonstrate that such a hearing is unnecessary in light of the considerable record already before the Court, and Amici's planned presentations, consisting almost exclusively of unreliable competitor testimony on issues that are not relevant to the Court's Tunney Act determination, will add little, if anything, of value.

## BACKGROUND

On October 10, 2018, the United States and five States filed a civil antitrust Complaint, pursuant to Section 7 of the Clayton Act, 15 U.S.C. § 18, seeking to enjoin CVS's acquisition of Aetna on the ground that it would substantially lessen competition for the sale of individual prescription drug plans in 16 of 34 geographic regions nationwide.  In accordance with § 16(b) of the Tunney Act, the United States simultaneously filed, and caused to be publicly published, a proposed Final Judgment; a Stipulation signed by the parties consenting to entry of the proposed Final Judgment after compliance with the requirements of the Tunney Act; and a Competitive Impact Statement detailing the history of the transaction, the remedy proposed for the alleged violation, and an evaluation of alternatives considered by the United States.

The remedy is CVS's full divestiture of Aetna's individual prescription drug plan (PDP) business to WellCare Health Plans, Inc., a Fortune 500 health insurer with experience in the PDP industry, as well as additional measures to ensure the continued competitiveness of the divested assets.  The remedy required CVS to divest Aetna's entire PDP business, in all 34 geographic regions, even though the government found likely harm in only 16 of them.

The Court granted the United States' motion to appoint a monitoring trustee to oversee the divestiture to WellCare and to ensure compliance with the requirements set forth in the proposed Final Judgment.  In addition, after a hearing and after receiving written submissions,

the Court accepted CVS's proposed voluntary measures to facilitate the Court's Tunney Act review.

During the period for public comment, the United States received 173 public comments. Among the public commenters were six advocacy groups (Amici) who requested and received leave to participate in these proceedings as amicus curiae. All of the Amici devoted significant portions of their briefs, supplemental submissions and public comments to vertical concerns about the combination of CVS's pharmacy and PBM businesses with Aetna's health insurance business. Although the United States and the five States had determined not to raise these issues in their Complaint—because an extensive investigation had revealed such vertical harms were unlikely to occur—the United States nonetheless provided responses to these vertical concerns, as well as to the horizontal concerns that properly form the basis of the Court's Tunney Act determination, that were described in the 173 public comments that it received. ECF No. 56.

On February 25, 2019, the United States moved for entry of the proposed Final Judgment. ECF. No. 25. After a status conference, the Court ordered the parties and Amici to provide lists of witnesses they proposed to offer at a hearing on the United States' motion, as well as information regarding the bases of each proposed witness's knowledge or expertise and the subject matters to be covered in each witness's testimony. ECF No. 70.

On April 19, 2019, Amici filed their proposed witness lists. ECF Nos. 74–76. These submissions confirm Amici's intent to adduce testimony on issues well beyond the scope of the Court's Tunney Act review. For the reasons discussed below, the Court should exclude such evidence and argument and, because Amici's proffered evidence is almost entirely immaterial, it should now exercise its discretion to decline to hold an evidentiary hearing.

**ARGUMENT**

I.     **Evidence and Argument Should Be Limited to the Sufficiency of the Proposed Remedy in Addressing the Antitrust Violations Alleged in the Complaint.**

The Court should instruct all participants in these proceedings to limit their evidence and arguments in any upcoming Tunney Act hearing to the sufficiency of the asset divestiture and related measures to remedy the alleged loss of competition within the individual Medicare Part D plan market, and should exclude all other evidence and arguments from the record.

A.     **Amici Intend To Offer Evidence Beyond the Scope of These Proceedings.**

By their written submissions and witness lists, Amici have made clear they intend to offer witness testimony and argument addressing purported vertical concerns about the merger of CVS's pharmacy, PBM, and healthcare businesses with Aetna's health insurance business. Amici devote much of their briefing to the alleged possibility that CVS could use its participation in the pharmacy and PBM industries to disadvantage competing health plans, or that CVS could use its participation in the health insurance industry to disadvantage competing healthcare providers. Their proposed witness lists confirm that the testimony they seek to introduce will provide more of the same:

AIDS Healthcare Foundation ("AHF"). AHF—a $1.6 billion healthcare organization that competes directly with CVS/Aetna's retail medical clinics, pharmacies, and health insurance businesses—intends to introduce testimony pertaining almost exclusively to broad vertical concerns not alleged in the Complaint. AHF argues that the merger will enable CVS to incentivize Aetna patients to use lower cost CVS pharmacies and MinuteClinics instead of the clinics and pharmacies of higher-cost healthcare providers such as AHF, and will eliminate Aetna as a potential competitor in the PBM industry. *See* ECF No. 60.

The subject matter of AFH's proposed witness testimony reflects the same focus:

- AHF's two expert witnesses, Hal Singer and Lawton Burns," seek to testify on "the effect of increased vertical integration" and "the lack of . . . consumer benefits from the merging parties' strategies of vertical integration and diversification." ECF No. 76 at 2–3. Notably, the terms "Medicare," "Part D," "WellCare," "Prescription Drug Plans," and "divestiture" do not appear anywhere in AHF's description of their planned testimony.

- Although little can be ascertained from AHF's description of the subject matter of Michael Wohlfeiler's proposed fact testimony, it also makes no mention of Medicare Part D and AHF's briefing to date strongly suggests that his description of the "increasing consolidation in the health care industry" also will focus on vertical concerns.

<u>American Medical Association ("AMA")</u>. AMA's amicus brief relies on and appends the statements of Neeraj Sood and Thomas Greaney for their analyses of vertical issues outside the scope of these proceedings. AMA has now proposed both as expert witnesses for the upcoming hearing and has indicated they will testify on those issues. *See* ECF No. 74 at 3–9. For example:

- Sood and Greaney plan to testify that the merger will increase the cost of retail pharmacy inputs available to CVS's rivals and that the integration of the PBM/health insurance markets increases the danger of collusion. *Id.* at 5, 7.

- Although AMA argues its witnesses will tie some of this testimony to the likely effects on WellCare's competitive strength as the divestiture asset buyer, AMA's amicus brief—which relies heavily on the findings of both Sood and Greaney—suggests it intends to use perfunctory references to WellCare as purported justification for extensive exposition of vertical issues that are irrelevant to the harms alleged in the Complaint. *See* ECF 62 at 10–20; *see also* Exs. E–H (statements of Neeraj Sood).

- AMA also seeks to call Richard Scheffler to present arithmetic, without any apparent specialized knowledge of the Part D industry or analysis of competitive effects. ECF No. 74 at 2.

<u>Consumer Action and U.S. PIRG</u>. These groups' proposed expert witness, Diana Moss, also plans to testify about alleged vertical concerns. Moss is well-known for her extensive criticism of this Court's ruling declining to enjoin the vertical merger of AT&T and Time Warner. Similarly, here, she supposedly "will testify that vertical considerations bear directly on the likely effectiveness of the divestiture remedy in the relevant markets for the sale of PDPs that

are alleged in the complaint," but also intends to speak broadly on the alleged anticompetitive effects of integrating CVS's retail pharmacy, PBM, and health insurance businesses, particularly for standalone rivals who do not offer both PBM and health insurance services.  ECF No. 75 at 4. In their amicus briefs, Consumer Action and U.S. PIRG relied on Moss's work solely to support their arguments regarding the general vertical implications of the merger, not for any analysis about the sufficiency of the remedy viewed in light of the harms proposed in the Complaint.  *See* ECF No. 34 at 6, 18; ECF No. 71 at 10.

      **B.**     **The Tunney Act Does Not Permit the Scope of Review Amici Seek.**

      In the event the Court permits Amici's witnesses to testify, they should be instructed to tailor closely any testimony to their assessment of the merger's effects on the individual Medicare Part D plan industry and the sufficiency of the proposed remedy.  AHF's planned testimony regarding the general vertical effects of the merger should be excluded, as should any attempt by AMA, Consumer Action, and U.S. PIRG to shoehorn into the record irrelevant testimony on vertical issues in the guise of addressing WellCare's ability to compete in Medicare Part D.  These alleged vertical concerns have no place in an evidentiary hearing on whether the proposed Final Judgment is in the public interest.

      The public interest inquiry under the Tunney Act necessarily is a "limited" one:  Because the Government "is entitled to 'broad discretion to settle with the defendant within the reaches of the public interest,'" the courts "may not 'engage in an unrestricted evaluation of what relief would best serve the public.'"  *United States v. U.S. Airways Grp., Inc.*, 38 F. Supp. 3d 69, 75 (D.D.C. 2014) (quoting *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *United States v. Graftech Int'l*, No. 10–cv–2039, 2011 WL 1566781, at *12 (D.D.C. Mar. 24, 2011)).  The only issue that calls for judicial scrutiny is whether the Government has demonstrated "that the settlement is a reasonably adequate remedy for the harms alleged in the

complaint." *United States v. Republic Servs., Inc.*, 723 F. Supp. 2d 157, 160 (D.D.C. 2010) (citing *United States v. Abitibi–Consol. Inc.*, 584 F. Supp. 2d 162, 165 (D.D.C. 2008)).

The United States and five States decided not to allege any harm related to vertical concerns in their Complaint because they determined, after an extensive 10-month investigation, that such vertical harms are unlikely to occur.  *See* ECF No. 56 at 8-12.  Amici should not be permitted to second-guess this determination by presenting irrelevant evidence, in an effort to divert attention and resources from the Complaint's actual allegations.[2]

Amici's references to a purported "judicial mockery exception" do not justify permitting inquiry into purported harms not alleged in the Complaint.  *See* ECF No. 34 at 1, 17; ECF No. 34-1 at 1; ECF No. 35 at 10; ECF No. 60 at 8.  Amici's argument relies on a misreading of *Microsoft*.  There, the D.C. Circuit concluded that, because "neither [the courts nor amici] have the power to force the government to make [a] claim," the proper focus of the court's inquiry is to determine whether "the remedies were [] so inconsonant *with the allegations charged* as to fall outside of the reaches of the public interest."  *Microsoft Corp.*, 56 F.3d at 1460, 1461 (emphasis added) (internal quotation marks omitted).  It is in that rare circumstance of extreme dissonance—between the consent decree and the Complaint, not the Complaint and speculation as to what the government might have charged—that the court is "not obliged to accept [a

---

[2] The Tunney Act's legislative history further confirms this point.  In response to the Antitrust Division's concern "that a judge reading this legislation may feel compelled to run a rather broad-ranging inquiry," Senator Tunney stated unequivocally, "We don't want the judge to run a broad-ranging inquiry.  That is not the purpose."  *The Antitrust Procedures and Penalties Act: Hearing on S. 782 & S. 1088 Before the Subcomm. on Antitrust & Monopoly of the S. Comm. on the Judiciary*, 93d Cong., 1st Sess. 107 (March 16, 1973) (statement of Sen. John Tunney).  Senator Tunney further explained that the purpose of the Act was to establish a review process that respects that "a judge has a role to play in making an evaluation as to whether or not the consent decree achieves *the goal of the complaint*."  *Id.* (emphasis added).

decree] that, on its face and even after government explanation, appears to make a mockery of judicial power." *Id.* at 1462.

The *Microsoft* Court devoted most of its decision to a comprehensive analysis of the respective "constitutional role[s]" of the executive and judicial branches in connection with a consent decree.  The court's "mockery" language cannot reasonably be read to create an exception to that analysis—such an exception would swallow the rule.  Perhaps for that reason, no court has ever used the *Microsoft* Court's "mockery" reference to reject a consent decree, much less to rewrite the allegations that the government has, in the exercise of its prosecutorial discretion, chosen to bring.  Such an outcome could not be reconciled with the legal reality that "[t]he court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place." *Id.* at 1459–60.

The Court therefore should limit all evidence and argument to the issues germane to its Tunney Act determination: whether entry of the proposed Final Judgment would be in the public interest in light of the harms alleged in the Complaint.  All other evidence and argument should be excluded.

## II.    In Light of Amici's Proposed Witnesses and Testimony, the Court Should Exercise Its Discretion To Decline To Hold an Evidentiary Hearing.

Amici's witness list submissions demonstrate that an evidentiary hearing is unnecessary, both because the record already before the Court is sufficient to enable it to make its public-interest determination, and because Amici propose to sponsor testimony that speaks only to competitors' interests, not the public interest.

### A.    An Evidentiary Hearing Is Unnecessary.

Undersigned counsel are unaware of any Tunney Act proceedings in which a court has heard live testimony.  This is consistent with the Act's legislative history, which reveals

Congress disfavored sweeping inquiries and intended for witness testimony to serve only as a last resort, in the rare case where written submissions proved insufficient to demonstrate whether a settlement is in the public interest.

The Tunney Act requires certain procedures to ensure that the public is afforded a meaningful opportunity to "scrutinize and comment upon" proposed consent decrees arising out of civil antitrust suits brought by the United States. *United States v. Airline Tariff Pub. Co.*, 836 F. Supp. 9, 11 (D.D.C. 1993). Although the Act expressly allows the court to make its public interest determination without further process, 15 U.S.C. § 16(e)(2), the Court has discretion to fashion additional procedures where it determines they are necessary, *id.* § 16(f). *United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000).

The legislative history demonstrates Congress's intent that the courts exercise that discretion in favor of conserving time and judicial resources wherever possible. In their reports recommending the passage of the Tunney Act, both the Senate and House Judiciary Committees sought to balance the court's need to obtain information with its need to "preserve the consent decree as a viable settlement option." S. Rep. No. 93-298, at 6 (1973); H. Rep. No. 93-1463, at 8 (1974). As the Senate Judiciary Committee explained, and the House Judiciary Committee reiterated:

> It is not the intent of the Committee to compel a hearing or trial on the public interest issue. It is anticipated that the trial judge will adduce the necessary information through the least complicated and least time-consuming means possible. Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, this is the approach that should be utilized. Only where it is imperative that the court should resort to calling witnesses for the purpose of eliciting additional facts should it do so.

S. Rep. No. 93-298, at 6; *see* H. Rep. No. 93-1463, at 8 (underscoring agreement with this passage).[3]

This case proves the point.  The Court has shown great care in protecting the public right to participate in the Tunney Act process, resulting in 173 public comments and comprehensive briefing from six Amici.  To the extent the Court has outstanding questions about the adequacy of the divestiture in remedying the loss of competition alleged in the Complaint, "the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments."  S. Rep. No. 93-298, at 6; H. Rep. No. 93-1463, at 8; *see also United States v. Apple, Inc.*, 889 F. Supp. 2d 623, 633 (S.D.N.Y. 2012) ("It is not necessary to hold an evidentiary hearing before approving the decree.  Given the voluminous submissions from the public and the non-settling parties, which describe and debate the nature of the alleged collusion and the wisdom and likely impact of settlement terms in great detail, as well as the detailed factual allegations in the Complaint, the Court is well-equipped to rule on these matters."); *cf. United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1, 9 (D.D.C. 2007) (ordering additional submissions and declining to hold evidentiary hearing where there was "insufficient material in the record, which consisted largely or exclusively of unverified legal pleadings, to allow the Court to adequately discharge its duties").

---

[3] The Committees' emphasis on judicial economy is echoed elsewhere in the legislative record. In legislative hearings, for example, Senator Tunney emphasized that procedures such as the "taking of sworn testimony" would be "optional with the court" and expressed confidence "that the court would use those options rather sparingly, and only if the court decided that it was in the public interest to require them." *Antitrust Procedures & Penalties Act: Hearing on S. 782 & S. 1088 Before Subcomm. on Antitrust & Monopoly of S. Comm. on Judiciary*, 93d Cong., 1st Sess. 99 (March 16, 1973) (statement of Sen. John Tunney).  He further explained that "in the great, great majority of cases, the court would not require such a full hearing." *Id.*  And the 2004 amendments to the Act further confirmed that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene."  15 U.S.C. § 16(e)(2).

**B.      Amici's Witness Lists Demonstrate that an Evidentiary Hearing Would Feature Testimony on Competitors' Interest, Not the Public Interest.**

It is apparent from Amici's submissions that they intend to use the proposed evidentiary hearing to further their competitive interests and not the public interest.  As this Court has recognized, "particularly in the context of a vertical merger case," competitor opposition to a merger should be viewed with skepticism because "there is a threat that such testimony reflects self-interest rather than genuine concerns about harm to competition." *United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 211 (D.D.C. 2018), *aff'd sub nom. United States v. AT&T, Inc.*, 916 F.3d 1029 (D.C. Cir. 2019); *see also id.* ("Not surprisingly, most of the third-party competitor witnesses testified that they oppose the challenged merger for a number of reasons.").

This concern is especially important in the Tunney Act context.  As Dr. Donald Turner, former Assistant Attorney General of the Antitrust Division, explained prior to the legislation's enactment, "[C]ompetitors of a defendant have a private interest in seeing him as crippled as possible . . . which may be inconsistent with the public interest in competition." *Hearing on S. 782 & S. 1088 Before the Subcomm. on Antitrust & Monopoly of the S. Comm. on the Judiciary*, 93d Cong., 1st Sess. 200 (April 5, 1973).  When recommending the legislation's enactment, both the Senate and House Judiciary Committees took pains to distinguish competitor interests from the public interest, stressing that codifying the courts' public interest determination was not "intended to force the government to go to trial for the benefit of potential private plaintiffs," and that DOJ's "primary focus . . . should be to obtain a judgment . . . which protects the public by insuring healthy competition in the future."  S. Rep. No. 93-298, at 6; H. Rep. No. 93-1463, at 8.

This Court correctly rejected competitor testimony opposing the AT&T/Time Warner merger, noting that the "central issue" in that case was "not about protecting AT&T's rivals from any and all competitive pressures they would experience should the merger go through." *AT&T*,

12

310 F. Supp. 3d at 211; *see id.* at 214 (discounting competitor testimony because "the third-party competitor witnesses have an incentive to oppose a merger that would allow AT&T to increase innovation while lowering costs"); *id.* at 211 ("third-party competitor witness testimony fails to provide meaningful, reliable support"). For example, in examining the defendants' statements in prior regulatory filings, the Court concluded that "they acted as competitors to (or customers of) distributors whose competitive positions would be affected by FCC review. For that reason alone, [the Court is] hesitant to assign any significant evidentiary value to those prior regulatory filings." *Id.* at 205–06.[4]

Yet the witnesses who appear on Amici's lists, and Amici's description of their proposed testimony, make clear that Amici view this hearing as an opportunity "to force the government to go to trial for [the Amici's own] benefit," rather than to engage issues that bear upon the public interest. The absence of "meaningful, reliable" evidence, *id.* at 211, in Amici's submissions further illustrates these competitors' attempt to weaponize this Tunney Act proceeding against a pro-competitive merger.

---

[4] This Court is not alone in its skeptical take on competitor complaints about a merger. *See, e.g.,* *Hospital Corp. of Am. v. FTC*, 807 F.2d 1381, 1391-92 (7th Cir. 1986) (Posner, J.) ("Hospital Corporation's most telling point is that the impetus for the Commission's complaint came from a competitor . . . . The hospital that complained to the Commission must have thought that the acquisitions would lead to lower rather than higher prices—which would benefit consumers, and hence, under contemporary principles of antitrust law, would support the view that the acquisitions were lawful."); *cf. Sprint Nextel Corp. v. AT&T Inc.*, 821 F. Supp. 2d 308, 320 (D.D.C. 2011) (allegations by competitors to merging parties that the transaction would lead to higher retail wireless prices did not confer antitrust standing because,"[t]o the contrary, 'You want your competitors to charge high prices.'") (citation omitted).

### 1.    AMA Competes with CVS in Multiple Businesses.

As a trade association and lobbying group for doctors, AMA is committed to "protecting physician payment"[5] and has sought to impede CVS's innovations to protect the financial interests of its members.  CVS's convenient, low-cost MinuteClinics and telemedicine offerings lessen patient demand for medical services provided in doctors' offices,[6] and CVS's home healthcare services and low-cost specialty pharmacy business cut into the infusion services doctors provide at hospitals and other higher-cost settings as well as the specialty drugs that doctors prescribe and administer.  As the FTC has observed, retail clinic innovation also benefits consumers by increasing competition and spurring necessary change: physician groups and hospitals have been forced to respond to retail clinics by making their services more accessible, establishing their own clinics, and extending their hours.[7]

AMA opposes the CVS/Aetna merger because it will expand MinuteClinics' retail footprint, scope of services, and hours[8]—to the great benefit of the public but to the detriment of traditional healthcare providers.  MinuteClinics offer high-quality care[9] and many pro-

---

[5] Am. Med. Ass'n, *Physicians Advocacy*, https://www.ama-assn.org/amaone/physicians-advocacy.

[6] *See* Press Release, CVS Health, CVS Health's MinuteClinic Introduces Virtual Care Offering (Aug. 8, 2018), https://cvshealth.com/newsroom/press-releases/cvs-healths-minuteclinic-introduces-new-virtual-care-offering.

[7] Fed. Trade Comm'n, Policy Perspectives: Competition and the Regulation of Advanced Practice Nurses 33 (Mar. 2014), https://www.ftc.gov/system/files/documents/reports/policy-perspectives-competition-regulation-advanced-practice-nurses/140307aprnpolicypaper.pdf.

[8] *See* Press Release, CVS Health, CVS Health Completes Acquisition of Aetna (Oct. 10, 2018), https://cvshealth.com/newsroom/press-releases/cvs-health-completes-acquisition-of-aetna-marking-the-start-of-transforming-the-consumer-health-experience.

[9] *See* Blue Cross Blue Shield, *Retail Clinic Visits Increase Despite Use Lagging among Individually Insured Americans*, at 8 (Jan. 18, 2017), https://www.bcbs.com/the-health-of-america/reports/retail-clinic-visits-increase-despite-use-lagging-among-individually (concluding

competitive innovations to patients[10] but cost 30% to 40% less than similar care at physician

offices and about 80% less than similar care in emergency rooms.[11]  Recognizing "that retail

clinics pose a financial threat to primary care providers by treating the latter's most profitable

patients," AMA has thus developed an official strategy to "address[] the alliance of retail clinics

with pharmaceutical chains" by lobbying "state and federal agencies to investigate" these

competitors and advocating for new laws that make it more difficult for retail clinics to operate.[12]

AMA's proposed witness testimony reflects a continuation of this self-interested strategy.

　　　AMA's members also oppose the merger because it threatens to expand CVS's low-cost

specialty pharmacy business and home infusion services.  The growth in low-cost specialty

pharmacies undermines the significant income that many doctors derive from prescribing and

administering specialty drugs, at relatively high cost to consumers and the healthcare system.[13]

Similarly, CVS's home infusion services business—which to date employs over 1,100 skilled

nurses and pharmacists—is a competitive alternative to traditional, high-cost medical care.

Studies show home infusion results in 50% fewer adverse effects compared to infusions in

---

that retail clinics "offer[] convenience, high-quality care and favorable prices compared to an ER
or doctor's office visit").

[10] These innovations include allowing patients to make appointments online on short notice;
posting wait times online so patients can better plan their visits; publishing straightforward price
lists for medical services; and offering more convenient hours of operation on nights and
weekends when doctors' offices are often closed and patients may otherwise turn to expensive
emergency rooms—or forego necessary care.

[11] Ateev Mehrotra, et al., *Comparing Costs and Quality of Care at Retail Clinics with That of
Other Medical Settings for 3 Common Illnesses*, 151 Annals of Internal Med. 321 (2009).

[12] Council on Med. Serv., Am. Med. Ass'n, Report 7. Retail Health Clinics 266-67 (2017),
https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/public/hod/a17-cms-
reports.pdf.

[13] Peter Wehrwein, *Should Specialty Drugs Be Shifted from Medical to Pharmacy Benefit?*,
Managed Care (Jan. 17, 2015), https://www.managedcaremag.com/archives/2015/1/should-
specialty-drugs-be-shifted-medical-pharmacy-benefit.

hospitals or other medical settings at a savings of between $1,928 and $2,974 per course of treatment.[14]

The planned testimony of AMA's proposed witnesses clearly reflects the tension between the financial interests of AMA and its members, on the one hand, and patient interests, on the other.  This testimony will not shed light on the public interest and should therefore be excluded.

### 2.    AHF Competes with CVS in Multiple Businesses.

Like AMA, AHF seeks to use its status as an amicus curiae to undermine a competitor rather than to offer any relevant analysis regarding the public interest.  AHF does not operate a Part D plan and does not act for Part D consumers.  But as a health insurer, pharmacy operator, and clinic operator with a budget of $1.6 billion, AHF competes with CVS/Aetna in virtually all of AHF's lines of business—the ones that have no relevance to these proceedings.  As an operator of Managed Medicaid and Medicare Advantage insurance plans in California, Florida, and Georgia, AHF competes with Aetna for plan members.  As a pharmacy operator with 46 locations nationwide,[15] AHF competes with CVS's retail, specialty, and mail order pharmacies; AHF also negotiates pharmacy reimbursement rates from PBMs like CVS Caremark to secure higher prices for its pharmacies and to get access to networks which PBMs have built for their clients.  And as a clinic operator, AHF competes with CVS's MinuteClinics.

Accordingly, AHF's amicus brief is devoted almost entirely to vertical concerns or other theories of harm that reflect its revenue interests as a competitor.  It makes no substantive

---

[14] J.M. Polinski et al., *Home Infusion: Safe, Clinically Effective, Patient Preferred, and Cost Saving*, 5 Healthcare (2017), https://www.healthnewsreview.org/wp-content/uploads/2016/05/Home-infusion-CVS.pdf.

[15] AIDS Healthcare Found., *Audited Consolidated Financial Statements and Supplementary Information*, at 6 (2017), https://www.aidshealth.org/wp-content/uploads/2018/05/aids-healthcare-fs-2017-final.pdf.

arguments about horizontal issues such as WellCare's viability as an asset buyer.  Indeed, as reflected in its arguments about the merger's effects on its own profitability, AHF's amicus brief is transparent that AHF is acting in its own self-interest in this matter.[16]  AHF's proposed witness testimony has nothing to do with the Complaint or Medicare Part D.  These witnesses should be excluded, as Tunney Act proceedings are not a forum for a competitor's airing of grievances irrelevant to the harms alleged by the government.

### 3. Consumer Action and U.S. PIRG Represent Plaintiff Lawyers' and Competitors' Interests, Not the Public Interest.

Consumer Action and U.S. PIRG have no apparent connection to Medicare Part D.[17]  But their counsel are closely tied to competitors' pharmacy groups.  David Balto is general counsel of the Independent Specialty Pharmacy Coalition,[18] an organization whose members compete with CVS's pharmacies.  Balto's coalition has sought anti-competitive regulatory restrictions on consumer access to mail-order pharmacy services.[19]  In addition, Consumer Action and U.S. PIRG's attorney Andre Barlow represents two other Amici in these proceedings whose members are competitors to CVS pharmacies—PSSNY and PUTT.  CVS previously highlighted that the interests of PSSNY and PUTT are "implicated not by alleged anticompetitive harm arising from the merger, but by the increased competitive pressure that the transaction is expected to create for their membership."  *See* ECF No. 37 at 3-4.

---

[16] *See* ECF 50-1 at 3 ("There are three other markets that the Court should analyze—the health care provider, PBM and pharmacy markets.  In each of these markets the merger would lead to a substantial lessening of competition that would *harm AHF* and its patients.") (emphasis added)

[17] *See* Consumer Action, *What We Do*, https://www.consumer-action.org/about/list/C281; U.S. PIRG, *About U.S. PIRG*, https://uspirg.org/page/usp/about-us-pirg-0.

[18] *See* Independent Specialty Pharmacy Coalition, http://www.ispcoalition.org/about-us.html.

[19] *See The State of Competition in the Pharmacy Benefits Manager and Pharmacy Marketplaces: Hearing Before the H. Judiciary Subcomm. on Regulatory Reform, Commercial & Antitrust Law of the H. Comm. on the Judiciary*, 114th Cong. (Nov. 17, 2015) (statement of David A. Balto).

Similarly, the witness proposed by Consumer Action and U.S. PIRG, Diana Moss, represents plaintiffs' lawyers whose interests do not reflect the public interest but rather lie in undercutting CVS/Aetna and its increased competitiveness as a result of the merger.[20]

## CONCLUSION

For the forgoing reasons, CVS requests that this Court limit evidence and argument to the horizontal issues raised in the Complaint, and to the remedy proposed by the government to address those issues.  CVS further requests that, in light of Amici's submissions, the Court exercise its discretion to decline to hold an evidentiary hearing with live witnesses.

---

[20] Moss is President of the American Antitrust Institute ("AAI"), which is largely funded and operated by plaintiffs' law firms.  Several of AAI's leaders have brought pending or past class action lawsuits against CVS or Aetna.  Ultimately, what Moss offers is unsubstantiated legal advocacy lacking the analytical rigor or industry knowledge of an expert witness, and her testimony is unlikely to assist the Court's evaluation under the Tunney Act's public interest standard.

Dated:  April 26, 2019                          Respectfully submitted,


                                                /s/ Enu A. Mainigi
                                                Enu A. Mainigi
                                                        D.C. Bar No. 454012
                                                Craig D. Singer
                                                        D.C. Bar No. 445362
                                                Jonathan B. Pitt
                                                        D.C. Bar No. 479765
                                                **WILLIAMS & CONNOLLY LLP**
                                                725 12th Street, N.W.
                                                Washington, D.C. 20005
                                                Telephone: (202) 434-5000
                                                Facsimile: (202) 434-5029
                                                E-Mail: emainigi@wc.com

                                                Michael G. Cowie
                                                        D.C. Bar No. 432338
                                                Rani A. Habash
                                                        D.C. Bar No. 981388
                                                Michael H. McGinley
                                                        D.C. Bar No. 1006943
                                                **DECHERT LLP**
                                                1900 K Street, N.W.
                                                Washington, DC 20006
                                                Telephone: (202) 261-3300
                                                Facsimile: (202) 261-333
                                                E-Mail: mike.cowie@dechert.com

                                                *Counsel for CVS Health Corporation*

## CERTIFICATE OF SERVICE

I, Jonathan B. Pitt, hereby certify that on April 26, 2019, I caused a copy of the foregoing document to be filed with the Court using the CM/ECF system, to be served upon Plaintiffs United States of America, State of California, State of Florida, State of Hawaii and State of Washingon via the CM/ECF system, and to be served upon Plaintiff State of Mississippi by mailing the documents electronically to its duly authorized legal representative:

**Counsel for State of Mississipi:**
Crystal Utley Secoy
Consumer Protection Division
Mississippi Attorney General's Office
P.O. Box 22947
Jackson, Mississippi 39225
Phone: (601) 359-4213
cutle@ago.state.ms.us

/s/ Jonathan B. Pitt
Jonathan B. Pitt
WILLIAMS & CONNOLLY LLP
725 12th Street, N.W.
Washington, D.C. 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
E-Mail: jpitt@wc.com