**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>                              Plaintiffs,<br><br>        v.<br><br>CVS HEALTH CORPORATION; and<br>AETNA INC.,<br><br>                              Defendants. | Civil Action No. 1:18-cv-02340-RJL |

## <u>CVS HEALTH'S NOTICE OF WITNESS LIST FOR TUNNEY ACT HEARING</u>

Pursuant to the Court's order of April 8, 2019 (Dkt. #70) that Defendants identity witnesses to rebut the Amici's witnesses, CVS Health Corp. ("CVS Health") on behalf of itself and its affiliates, including Aetna Inc., respectively submits the following list of three witnesses for any hearing on the United States' Motion for Entry of Final Judgment.[1] In addition to the subject matters described below for each witness, CVS Health reserves the right for its witnesses to rebut any other testimony or evidence entered into the record by Amici's witnesses.  In an earlier submission to the Court, CVS Health moved to exclude certain testimony that Amici intend to introduce at any hearing, and reiterated its view that no evidentiary hearing is necessary in light of Amici's planned presentations and the considerable record already before the Court. CVS Health lists below, in rebuttal, certain topics that touch upon those same subject matters in the event the Court denies CVS Health's Motion To Exclude, but does not waive, and expressly reasserts, its arguments for exclusion.

---

[1] CVS Health understands the Court's order to permit the Plaintiffs to identify up to three witnesses combined, and the Defendants to identify up to three witnesses combined. If the Court instead intended to permit only three witnesses among all parties, CVS Health respectfully requests the opportunity to call up to three witnesses regardless of the number identified by Plaintiffs.

### I.     Dr. Alan Lotvin (Fact Witness)

#### A.     Knowledge and Expertise

Dr. Alan Lotvin is Executive Vice President of Transformation for CVS Health and reports directly to Larry Merlo, CVS Health's President and Chief Executive Officer. In this role, Dr. Lotvin has oversight of business transformation initiatives across CVS Health with a focus on identifying opportunities for growth and innovation to create a new healthcare model that is easier to use, less expensive, and puts consumers at the center of their care. He is knowledgeable of CVS Health's business strategy to combine the complementary services of CVS and Aetna to build an open platform offering new services unavailable in the marketplace today.

Dr. Lotvin has extensive experience in medical and pharmacy services. Prior to his current role, he served as Executive Vice President of CVS Specialty, and before joining the company, Dr. Lotvin was President and Chief Executive Officer of ICORE Healthcare, a healthcare management company that provides medical pharmacy, formulary management, and specialty pharmacy solutions. Previously, Dr. Lotvin held multiple roles at Medco Health Solutions, including President of Medco Specialty Pharmacy Services.

Dr. Lotvin began his career as a practicing cardiologist in New Jersey. He holds a master's degree in Medical Informatics from Columbia University and a Medical Degree from the State University of New York Health Science Center in Brooklyn.

A copy of Dr. Lotvin's biography is attached as Exhibit A.

#### B.     Expected Subject Matter of Testimony

*CVS Health's Vertical Integration Strategy and Experience*

CVS Health has a long history of doing business with rivals of its PBM, pharmacy, and other services. The addition of Aetna does not impact this strategy. CVS will continue (and has strong commercial incentives to continue) its long-standing efforts to grow its PBM and

pharmacy business with health plans, including those that compete with Aetna. CVS intends to make its improved offerings available to all of its health plan clients—just as it does today.

CVS's experience in Medicare Part D shows how health plans can and will benefit from the merger. CVS Caremark currently provides PBM services to several Part D sponsors that compete with CVS's SilverScript business. Far from disadvantaging these competing sponsors, Caremark has helped its Part D clients to grow at a higher rate than the overall marketplace.

Strong commercial business incentives, contractual obligations, and robust compliance programs drive CVS's successful services to rivals and the protection of their competitively-sensitive customer information. CVS has substantial experience in maintaining firewalls to protect sensitive customer information and has extended those firewalls to cover Aetna.

*Consumer Benefits Generated by the Transaction*

The integration of CVS's pharmacy expertise and local presence with Aetna's medical expertise and predictive analytics will result in better patient outcomes, lower medical costs, and a more competitive healthcare marketplace. The combination will eliminate silos in the healthcare system by combining medical data and pharmacy data, and CVS expects to generate substantial healthcare cost savings and improvements in patient outcomes by, among other things, reducing hospital admissions, improving medication adherence, improving chronic care management, and using lower-cost sites of care, where appropriate.

Over the near term, the transaction is expected to generate more than $750 million in annually recurring cost savings in addition to more than $1 billion in savings from the elimination of double marginalization, resulting in significant customer benefits. CVS/Aetna have been unable to achieve these benefits as separate companies despite their long-term relationship dating back to 2011. By taking responsibility for both the medical and pharmacy

spend for patients, the transaction creates new incentives for CVS Health to invest in new products and services. These initiatives were not economically feasible prior to acquiring Aetna. And no practical commercial arrangement with Aetna short of the merger provides CVS with sufficient financial incentives to make the investments necessary to generate these innovations and consumer benefits.

Over the longer term, Aetna identified approximately $2 billion per year in opportunities to increase the combined company's operating efficiency by the fifth full year following completion of the transaction. The transaction has allowed the combined company to launch several new clinical programs that provide direct patient benefits—not only to Aetna members, but to patients throughout the country, regardless of their insurer. For example, CVS Health has launched a readmissions prevention program to better support patients who are at risk of hospital readmissions; a medication adherence program handled by CVS pharmacists to help patients with adherence difficulties who are at risk of an adverse health event; an emergency room avoidance program to better educate patients at a high risk of avoidable ER visits of the many, lower-cost options available to them; and a vaccination and immunization program to protect at-risk and unvaccinated members against various illnesses and other medical conditions.

The transaction has also led CVS Health to expand the footprint, scope of services, and operating hours for CVS MinuteClinic. This expansion increases access to healthcare for patients, generates better health outcomes, and reduces avoidable emergency room visits, among other consumer benefits.

Similarly, CVS is developing a new HealthHUB store format for its pharmacies that offers consumers a broader range of healthcare services, on-demand health kiosks, and

personalized care. The early results and customer response to HealthHUBs, which are designed to be a new front door to healthcare, have been positive.

### C.      Estimated Duration of Direct Testimony

One hour.

## II.      Terri Swanson (Fact Witness)

### A.      Knowledge and Expertise

Ms. Terri Swanson has served as Vice President for Aetna Medicare Part D products since 2010. In this role, she was responsible for overall management of Aetna's divested Part D business, including operations, financial performance, growth initiatives, and regulatory compliance. Ms. Swanson is knowledgeable about the services Aetna provided Part D members, the Part D competitive landscape, Aetna's long-term relationship with its PBM, CVS Caremark, and the sale and transition of the divested assets to WellCare.

Ms. Swanson holds a B.A. in computer science, and a master's degree in management of technology, both from the University of Minnesota.

A copy of Ms. Swanson's biography is attached as Exhibit B.

### B.      Expected Subject Matter of Testimony

*PBM Services Provided by CVS Caremark and Aetna*

Aetna's Part D business relied on CVS Caremark to provide a wide variety of pharmacy benefit management (PBM) services. Aetna was able to successfully grow its business with Caremark as its PBM even though CVS Health operated a competing Part D plan. Aetna was not concerned that Caremark would misuse Aetna's confidential information to give SilverScript an advantage or to harm Aetna's Part D business. If CVS had engaged in such behavior, Aetna had other PBM options available.

*The Divestiture*

Aetna's divestiture of its Part D assets provided WellCare with all of the assets and transition services that it would need to compete effectively in the marketplace going forward.

*Competition and Scale in Medicare Part D*

The Medicare Part D business is highly competitive with many rivals in every region, including several Fortune 500 companies. Aetna's competitors included UnitedHealth, Humana, Express Scripts, Cigna, Rite Aid's EnvisionRx, Anthem, Blue Cross Blue Shield plans, WellCare, CVS Health, and many others. WellCare was only one of these many competitors and was relatively small; it was not a particularly close competitor to Aetna. However, as result of the added scale gained through its acquisition of Aetna's Part D business, WellCare's Part D membership now exceeds that of Aetna's prior to the divestiture. This added scale enables WellCare to lower its costs further, grow its business, and become even more competitive in the marketplace today.

**C.      Estimated Duration of Direct Testimony**

One hour.

**III.      Dr. Lawrence Wu (Expert Witness)**

**A.      Knowledge and Expertise**

Dr. Lawrence Wu has served since 2013 as the President of NERA, a global economic consulting firm. Dr. Wu is one of the world's preeminent healthcare economics experts and has been called to testify in a variety of court, congressional, and regulatory proceedings. He specializes in antitrust economics, including the evaluation of the competitive effects of mergers and acquisitions. He earned his PhD from the University of Chicago Graduate School Of Business and his B.A. degree from Stanford University.

Prior to joining NERA, Dr. Wu was an economist in the Federal Trade Commission's Bureau of Economics, where he focused on assessing the antitrust aspects of mergers in healthcare and other industries. He has served as an Adjunct Professor of Public Health Administration at New York University, a Visiting Scholar at Stanford University's Institute for Economic Policy Research, and a Lecturer at the University of Chicago's Department of Economics. Dr. Wu also worked for the Federal Reserve Bank of New York's Banking Studies Department.

A copy of Dr. Wu's CV is attached as Exhibit C.

**B.      Expected Subject Matter of Testimony**

_The vertical aspects of the transaction are unlikely to result in higher prices in any market._

Based on economic modeling commonly used to assess pricing incentives in vertical mergers, the transaction will not lead to price increases to customers. Downward pricing pressure produced through the transaction's elimination of double marginalization and other efficiencies more than offset any theoretical harm.

For both PBM and retail pharmacy services, health plan rivals to Aetna's health insurance business have a number of viable alternatives they can turn to in the hypothetical event that CVS were to attempt to raise prices or otherwise foreclose these customers. The primary impact of an attempted CVS price increase for PBM or retail pharmacy services would be to drive these rivals to those other options—not raise their costs and thereby divert a sufficient quantity of customers to Aetna. The various vertical theories of harm proposed by Amici's expert witnesses are unfounded.

_The transaction is likely to lead to substantial cost reductions and other efficiencies, to the benefit of consumers._

The transaction's elimination of double marginalization will result in annual recurring cost savings on the services CVS provided to Aetna. These double marginalization cost savings will benefit Aetna's customers and members.

In addition, CVS has identified other significant measurable efficiencies from a range of improvements made possible by the transaction. As healthcare costs are reduced as a result of these efforts, CVS's and Aetna's customers will benefit from lower premiums and their members will benefit from improved health outcomes as well as other quality improvements. The transaction also creates new merger-specific incentives for innovation in products and services that will benefit consumers and the overall healthcare system.

_The divestiture of Aetna's individual Medicare Part D business to WellCare eliminates any potential concern about adverse competitive effects in the Part D marketplace._

The divestiture of all of Aetna's individual Medicare Part D lives preserves any competition that theoretically would have been lost in overlapping individual Part D marketplaces. WellCare's acquisition of Aetna's individual Part D business does not raise competitive concerns in any Part D region. In addition, there is no basis for the concern that CVS will seek to or be able to disfavor WellCare post-divestiture.

C.    **Estimated Duration of Direct Testimony**

Two hours.

Dated: May 3, 2019                                   Respectfully submitted,


/s/ *Michael G. Cowie*
Michael G. Cowie
     D.C. Bar No. 432338
Rani A. Habash
     D.C. Bar No. 981388
Michael H. McGinley
     D.C. Bar No. 1006943
**DECHERT LLP**
1900 K Street, N.W.
Washington, DC 20006
Telephone: (202) 261-3300
Facsimile: (202) 261-333
E-Mail: mike.cowie@dechert.com


Enu A. Mainigi
     D.C. Bar No. 454012
Craig D. Singer
     D.C. Bar No. 445362
Jonathan B. Pitt
     D.C. Bar No. 479765
**WILLIAMS & CONNOLLY LLP**
725 12th Street, N.W.
Washington, D.C. 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
E-Mail: emainigi@wc.com

*Counsel for CVS Health Corporation*

## CERTIFICATE OF SERVICE

I, Michael G. Cowie, hereby certify that on May 3, 2019, I caused a copy of the foregoing document to be served upon all parties via the Court's CM/ECF system, with the exception of Plaintiff State of Mississippi.  I caused a copy of the foregoing document to be served upon Plaintiff State of Mississippi by mailing the document electronically to its duly authorized legal representative:

**Counsel for State of Mississippi:**
Crystal Utley Secoy
Consumer Protection Division
Mississippi Attorney General's Office
P.O. Box 22947
Jackson, Mississippi 39225
Phone: (601) 359-4213
cutle@ago.state.ms.us

*/s/ Michael G. Cowie*
Michael G. Cowie
      D.C. Bar No. 432338
DECHERT LLP
1900 K Street, NW
Washington, DC 20006
Tel.:  (202) 261-3300
Fax:  (202) 261-3333
Email: mike.cowie@dechert.com