## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA *et al.*,<br><br>            *Plaintiffs*,<br><br>v.<br><br>CVS HEALTH CORPORATION<br><br>and<br><br>AETNA INC.,<br><br>            *Defendants.* | Case No. 1:18-cv-02340-RJL |

## UNITED STATES' SUPPLEMENTAL BRIEF
## IN SUPPORT OF ENTRY OF THE PROPOSED FINAL JUDGMENT

On October 10, 2018, the United States filed a complaint alleging that the merger of CVS and Aetna would violate Section 7 of the Clayton Act by decreasing competition for the sale of individual Medicare prescription drug plans (PDPs) in 16 regions.  The complaint followed a lengthy investigation during which the United States analyzed potential vertical and horizontal theories of harm.  After a careful analysis, the United States determined that the merger was unlikely to cause CVS to increase costs to Aetna's health insurance rivals or enable CVS to profitably raise its PBM or retail pharmacy prices post-merger.

At the same time that the United States filed suit, it filed its proposed consent judgment, which required CVS to divest Aetna's individual PDP business to WellCare Health Plans, Inc., an experienced health insurer focused on government-sponsored health plans, including individual PDPs.  This divestiture remedied the harms alleged in the United States' complaint.  It protected consumers, protected competition, and avoided the cost and uncertainty of a trial.

Following compliance with the Tunney Act's procedural requirements, the United States moved for entry of the final judgment on February 25, 2019.  Since that time, this Court has engaged in a far-ranging review.  Rather than focusing on whether the consent judgment remedies the harms alleged in the complaint, the proceedings have expanded to focus on concerns not shared by the Executive Branch and not included in the United States' complaint.[1] This process has not only compromised the United States' constitutionally protected prosecutorial discretion, but also interfered with the United States' ability to manage its resources to best serve American consumers.[2]  The Court should return to the narrow focus of the question before it:  whether the proposed consent judgment serves the public interest by providing a "reasonably adequate remed[y] for the alleged harm."  *See United States v. Iron Mountain, Inc.*, 217 F. Supp. 3d 146, 152–53 (D.D.C. 2016); *see also United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995) (directing the court to review whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").[3]

Section I explains why the materials submitted by the United States easily meet the public-interest standard.  Section II addresses the testimony presented at the hearing and demonstrates that nothing in the record undermines the conclusion that the proposed consent judgment is in the public interest.  Section III concludes by reaffirming that the United States' submissions satisfy the public-interest standard after taking account of amici's submissions.

---

[1] *See* Dkt. No. 90.

[2] *See* Mot. to Limit Scope (Dkt. No. 82), at 6–7; Resp. to Order to Show Cause (Dkt. No. 32), at 3–4.

[3] As noted in the United States' Resp. to Order to Show Cause (Dkt. No. 32) at 5–6, even *Microsoft*'s "judicial mockery" language does not permit a court to look beyond the complaint in evaluating the public interest.  That language also does not provide a basis for rejecting the proposed consent judgment in this case. *See id.* at 7–8.

I.      **The United States' submissions demonstrate that the proposed consent judgment is in the public interest.**

      A.      **The United States has satisfied the Tunney Act's procedural requirements.**

At the same time that it filed its complaint and proposed consent judgment, the United States filed a competitive impact statement that explained the nature of the proposed consent judgment and an explanation of consent decree procedures.[4]  The proposed judgment was published for public comment, and, after the 60-day comment period, the United States filed its response to public comments.[5]  Because none of the public comments changed the United States' view that the decree remedied the harms in the complaint, the United States moved for entry of the proposed consent judgment on February 25, 2019.  These filings (collectively, the "Tunney Act Materials") fulfilled the United States' procedural obligations, and this Court accepted the materials as part of the record of the Tunney Act hearing on May 13, 2019.[6]

      B.      **The United States' proposed consent judgment is in the public interest.**

The Tunney Act requires that proposed consent "judgment[s]" be "in the public interest." 15 U.S.C. § 16(e)(1).  The court makes the public-interest determination by considering whether the proposed consent judgment is a "reasonably adequate remed[y] for the alleged harm."  *See Iron Mountain, Inc.*, 217 F. Supp. 3d at 152–53.  In evaluating the public interest, the court is prohibited from "reaching beyond the complaint to examine practices the government did not challenge."  *Microsoft Corp.*, 56 F.3d at 1460; *see also United States v. Fokker Servs. B.V.*, 818 F.3d 733, 743 (D.C. Cir. 2016) (noting that the Tunney Act "preserves the Executive's long-settled primacy over charging decisions and . . . denies courts substantial power to impose their own charging preferences").  This limitation is grounded in constitutional separation of powers

---

[4] Dkt. Nos. 2, 3.
[5] Dkt. No. 56.
[6] Dkt. No. 90.

principles, and recognizes "the prosecution's exercise of its traditional authority over charging and enforcement decisions." *Fokker Servs.*, 818 F.3d at 743.[7]

Contrary to the Court's statements during the hearing, the inquiry in Tunney Act proceedings is not whether the "transaction" or the "merger" as a whole is in the public interest; it is not whether there will be higher or lower prices as a result of the merger; and it is not whether certain products will become more or less available or accessible as a result of the merger.[8]  These questions about the societal benefits of the merger are far broader than the Tunney Act's directive to review whether the *judgment* is in the public interest, and are questions that cannot be addressed through the limited Tunney Act procedures.  The Tunney Act hearing was not a trial on the merits of CVS's acquisition of Aetna and the divestiture to WellCare.[9] Thus, the United States cannot be expected to prove the ultimate likely price effects of the merger and divestiture before the Court can approve the proposed consent judgment.  *See United States v. US Airways Grp., Inc.*, 38 F. Supp. 3d 69, 76 (D.D.C. 2014) (noting that "it is improper for a court to require a proposed settlement to perfectly remedy antitrust violations when those violations have not yet been proven at trial, and when the government needs room to negotiate a settlement"); *see also Microsoft Corp.*, 56 F.3d at 1458  (prohibiting courts from "engag[ing] in an unrestricted evaluation of what relief would best serve the public").  Nor does the Tunney Act envision taxing limited resources in this way.[10]

---

[7] *See also* Mot. to Limit the Scope of the Tunney Act Hearing (Dkt. No. 82), at 3; United States' Resp. to Order to Show Cause (Dkt. No. 32), at 1–7; United States' Resp. to Public Comments on the Proposed Final Judgment (Dkt. No. 56), at 2–8.
[8] *See* Tr. at 41; 70–71; 269–70.
[9] *See, e.g.*, Tr. at 365:17.
[10] *See* Mot. to Clarify and Amend Tunney Act Procedure (Dkt. No. 102), at 6.

The United States' submissions to date provide "a factual basis for concluding that the [remedy in the proposed consent judgment] is a reasonably adequate remedy for the harm predicted in the Complaint." *See United States v. Abitibi-Consol. Inc.*, 584 F. Supp. 2d 162, 165 (D.D.C. 2008). The United States has more than adequately established this factual basis given "the deferential review to which the government's proposed remedy is accorded." *United States v. Republic Servs., Inc.*, 723 F. Supp. 2d 157, 160 (D.D.C. 2010); *see also Microsoft*, 56 F.3d at 1461 (noting the "due respect" that should be given to the government's "view of the nature of [the] case").[11]

Having collected and reviewed documents from the parties and industry participants, having received and analyzed proprietary data from numerous sources, having talked to over one hundred industry participants, and having carefully considered all plausible theories of competitive harm, the United States exercised its prosecutorial discretion to challenge the merger because its effect may be substantially to lessen competition in 16 markets for the sale of individual PDPs. Although the United States investigated vertical theories of harm, it was not ultimately convinced that the merger likely would substantially lessen competition through vertical foreclosure. The United States did not conclude that the combined entity was likely to cause CVS to increase costs to Aetna's health insurance rivals or to enable CVS to profitably raise its PBM or retail pharmacy prices post-merger.

For the sale of individual PDPs, the merger eliminated horizontal competition between CVS's SilverScript and Aetna. This competition benefited consumers in the form of lower prices, innovative plan designs, improved formularies, and better service.[12] The merger would

---

[11] *See also* Mot. to Clarify and Amend Tunney Act Procedure (Dkt. No. 102), at 3–7.
[12] *See* Compl. ¶¶ 1, 33.

have eliminated this head-to-head competition and would have led to highly concentrated markets in certain regions throughout the country.  The United States therefore sought a remedy that would offset the increased concentration in those markets and ensure that the remaining market participants faced competitors that were sufficiently strong to still provide the incentive to lower prices, innovate, improve features, and provide better service.

The divestiture of Aetna's PDP business to WellCare achieves that goal.  First, the divestiture prevents the combination of two of the largest PDP businesses.  Additionally, the divestiture ensures that market participants (including CVS) still face the same level of competition as they did from Aetna before the merger.[13]  Several aspects of the proposed consent decree ensure that WellCare provides this competitive constraint.  WellCare is a longstanding national PDP insurer with a proven track record of serving PDP consumers even before acquiring Aetna's individual PDP business.  Adding Aetna's assets to WellCare's existing business will make WellCare even more competitive moving forward.  The proposed consent decree requires a national divestiture of Aetna's individual PDP business, data necessary to use the divested assets to their best competitive advantage, and the opportunity for the divestiture buyer to hire Aetna employees.  The combination of these elements was designed to permit WellCare to incorporate the strategies that made Aetna a successful competitor in the past.  The proposed consent judgment also put in place a monitoring trustee and transitional service requirements to ensure that Aetna's individual PDP enrollees face minimal disruption.

---

[13] Contrary to Dr. Moss's testimony, *see* Tr. at 146:19–147:10, the United States did adhere to its Remedies Guide in reaching its settlement with CVS and Aetna.  Regardless, the standard in the Department's Remedies Guide—that the remedy must "restore" the lost competition—is not the standard by which this Court reviews the proposed consent judgment during Tunney Act proceedings.  *See Iron Mountain*, 217 F. Supp. 3d at 152–53 (describing the Tunney Act's public-interest standard as requiring only that the proposed consent judgment provide a "reasonably adequate remed[y] for the harms alleged in the Complaint").

In sum, the proposed consent judgment adequately remedies the harms to competition alleged in the complaint, making WellCare a more effective competitor against CVS, United, Humana, Blue Cross entities, Cigna, and other insurers that sell PDPs, thereby preserving the competition that would have been lost.[14]  By offering a tailored remedy, the proposed consent judgment also preserves any benefits that may arise from the merger.  The judgment easily surpasses the Tunney Act's standard of providing a reasonably adequate remedy for the harms alleged in the complaint.

## II.    Amici's submissions do not rebut the United States' public-interest showing.

Amici's criticisms are largely opinions, and are based on incorrect facts, making them unreliable.  As Dr. Moss conceded, "we don't have access to confidential documents that were produced in an investigation."[15]  Thus, it is unsurprising that amici's testimony was inaccurate and unhelpful for analyzing whether the proposed consent judgment is in the public interest.

The problem of amici's unreliable testimony was compounded by the United States' functional exclusion from the Tunney Act hearing held on June 4–5.  The United States was not permitted to present witnesses, not permitted to cross-examine witnesses, not permitted to object to the evidence presented, and not permitted to submit rebuttal.[16]  Although the Tunney Act provides the Court with a certain level of discretion in terms of procedures employed, it "does not authorize [the district court's] cursory dismissal of [defendant's] (and the government's) protests," and it does not permit the district court "to abandon all precedent governing accepted process in federal courts."  *See Microsoft*, 56 F.3d at 1464; *see also* Dkt. No. 116.  Thus, it would

---

[14] *See also* United States' Resp. to Public Comments on the Proposed Final Judgment (Dkt. No. 56); Competitive Impact Statement (Dkt. No. 3).
[15] Tr. at 169:6–9 (Moss).
[16] At the Court's direction, the United States submitted a motion for the opportunity to submit rebuttal on June 13. (Dkt. No. 116).  That motion remains pending.

be inappropriate for the Court to rely on the testimony presented by amici at the Tunney Act hearing on the basis of the current record.

Below, the United States highlights the key portions of inaccurate and unreliable testimony from amici.[17]  Included among these are several new arguments to which the United States is responding for the first time, as they were not raised previously.[18]  None of them provide a basis for concluding that the proposed consent judgment is not in the public interest.

### A.   WellCare is a well-situated divestiture buyer that received the assets necessary to succeed.

Two of amici's witnesses attacked WellCare as a divestiture buyer and expressed concern that WellCare did not receive the scope of assets required to succeed.  This testimony is either factually incorrect or based on incorrect assumptions about the scope of the divestiture or WellCare's business.  Moreover, none of amici's witnesses attempted to explain how WellCare can be viewed as a weak divestiture buyer in light of its strong 2019 growth.[19]  Even without the errors articulated below, amici's arguments on this point would be unpersuasive.

Dr. Moss's and Dr. Sood's first error is their claim that WellCare lacks Aetna's economies of scale, given WellCare's smaller size.  Neither of these witnesses testified that WellCare's millions of covered lives leave it too small to compete at an effective scale.  Instead, they argue that the relative scale of WellCare and Aetna should cause concern about WellCare's competitive significance.  This testimony, however, misrepresents the companies' relative sizes

---

[17] The Court previously denied (Dkt. No. 90, at 5) the United States' request (Dkt. No. 82) that the Court apply the Federal Rules of Evidence and ruled that "[t]here will be no objections."  (Tr. at 105).  In compliance with these orders, the United States does not list in this brief all of the objections relevant to amici's evidence, without prejudice to its ability to assert objections based on the Federal Rules of Evidence at a later date should the Court reconsider its previous orders. *See* Fed. R. Evid. 103(b) (a party need not renew its objection "[o]nce the court rules definitively on the record").

[18] Mot. to Clarify and Amend Tunney Act Procedure (Dkt. No. 102), at 12–14.

[19] *See* Resp. to Comments (Dkt. No. 56), at 14.

by failing to confine the inquiry to the relevant business.  The number of Medicare lives is the key figure in negotiations with PBMs and pharmacies, as companies typically negotiate their Medicare contracts separately from their commercial business.[20]  Post-divestiture, WellCare will have *more* covered Medicare pharmacy lives (4.5 million) than pre-merger Aetna had (3.5 million).[21]  To the extent amici believe scale is a determinative factor in effective competition, post-merger WellCare would be a *stronger* competitor than Aetna on this metric.

Second, both Dr. Moss and Dr. Sood testified that WellCare's brand is not strong enough to permit effective competition.  This argument relies on the unfounded assumption that WellCare needs the Aetna brand to compete successfully in the sale of individual PDPs.  An Aetna employee, however, acknowledged that, recently, the Aetna brand was not strong enough to overcome even a small price differential with WellCare.[22]  WellCare's ability to succeed without the Aetna brand is further supported by a review of industry conduct.  For example, Aetna did not use the Aetna brand name for many of its individual PDP products during the period when it established its competitive position.  Moreover, WellCare grew its individual PDP business under its own brand more than the Aetna-branded plans did for the 2019 plan year.[23]  Thus, even if the Aetna brand were a competitive differentiator in the individual PDP market,

---

[20] Tr. at 346:4–16 (Swanson).

[21] *See* Aetna Inc., Quarterly Report (Form 10-Q) (Sept. 30, 2018), available at http://www.aetna.com/investors-aetna/assets/documents/3Q18-earnings-call/3q18-form-10q.pdf (noting total Medicare covered lives of 3.486 million, which includes those enrolled in group PDPs as well as Medicare Advantage plans with prescription drug coverage); WellCare Health Plans, Inc., Quarterly Report (Form 10-Q) (Apr. 29, 2019), available at http://ir.wellcare.com/Cache/397732446.pdf (noting total Medicare covered lives of 2.188 million before receiving the approximately 2.4 million individual PDP lives from the divestiture).

[22] Tr. at 346:17–347:24 (Swanson).

[23] Tr. at 346:17–347:24 (Swanson); *see also* Tr. at 340:8–17, 341:20–342:3 (Swanson).  These plans were submitted to CMS in June of 2018, before the divestiture.

WellCare's past success demonstrates that it has more than sufficient brand recognition to compete successfully.

Third, Dr. Moss characterizes the assets that WellCare received as too "limited" to permit WellCare to succeed.  Any characterization of the divestiture as "limited" is belied by the facts. The proposed final judgment required Aetna to divest an entire nationwide business, including data, pharmacy contracts, and the opportunity to hire employees.[24]  Moreover, the transition services agreement that accompanies the divestiture permits WellCare to smoothly incorporate these members into its business.[25]  As WellCare's Mike Radu would have testified, WellCare believes that these assets, including several new hires,[26] are more than sufficient to complement its existing capabilities and to allow it to compete aggressively in the future.[27]

Fourth, both Dr. Moss and Dr. Sood testified that WellCare does not have the necessary incentives to continue competing as an independent PDP provider, focusing largely on the purportedly low price that WellCare paid for the divestiture assets.  This argument lacks merit. WellCare was able to extract a favorable price because it knew that the sale of the divestiture assets was not voluntary and the amount of time for the sale was limited.  As the Department of Justice's Remedies Guide notes, where the sale must occur on a short timeline and there are "few potential purchasers to bid up the price, the divesting firm may fail to realize full competitive value."[28]  Particularly where "the Division has other sufficient assurances that the proposed

---

[24] Resp. to Comments (Dkt. No. 56), at 10.

[25] *See* Tr. at 353–54 (Swanson).

[26] *See also* First Report of Monitoring Trustee (Dkt. No. 65), at 22.

[27] *See* Mot. to Present Rebuttal (Dkt. No. 116), at 5.

[28] Antitrust Division Policy Guide to Merger Remedies, October 2004, at 33, available at https://www.justice.gov/sites/default/files/atr/legacy/2011/06/16/205108.pdf; *see also* WellCare Earnings Call (Oct. 2018), available at https://www.fool.com/earnings/call-transcripts/2018/10/30/wellcare-health-plans-inc-wcg-q3-2018-earnings-con.aspx (stating that

purchaser intends to compete in the relevant market," the purchase price itself may be less important.[29]  In other words, the real question is whether the company will use the assets to compete going forward.  As an in-market buyer, WellCare will continue to have the same incentive to compete and bolster its offerings that it did prior to the merger—an incentive that the United States verified through its interviews with industry participants and review of contemporaneous documents.  Additionally, the United States interviewed WellCare's executives, reviewed its business plans, and discussed WellCare with relevant third parties to determine that the purchase price in this instance was not a concern.[30]

Finally, Dr. Moss points to the subsequent proposed acquisition of WellCare by Centene as a reason to question WellCare's competitive significance moving forward.  Dr. Moss offered no support for her entirely speculative opinions about WellCare's business plans should the merger with Centene go through.  In fact, her arguments are directly contradicted by Centene's public statements that WellCare's Medicare business, which includes the individual PDP assets acquired from Aetna, are a part of Centene's strategy going forward if the merger takes place.[31]

**B.    The divestiture will not cause anticompetitive effects.**

Amici's witnesses also presented a number of theories for why the proposed divestiture would create new competitive problems.  Again, however, each of these theories fails in light of factual and regulatory errors and omissions.  Correcting these errors makes clear that the

---

WellCare knew that the DOJ was forcing CVS and Aetna to make a divestiture and factored that into its bid).

[29] Antitrust Division Policy Guide to Merger Remedies, October 2004, at 34.

[30] *See* Resp. to Comments (Dkt. No. 56), at 23–24.

[31] *See* Centene Corp.'s Frequently Asked Questions (Mar. 27, 2019), available at https://investors.centene.com/node/23961/html (highlighting that the acquisition of WellCare fits into Centene's strategy by "increas[ing] our exposure to . . . Medicare Prescription Drug Plans").

divestiture to WellCare resolves the competitive concerns identified in the complaint without creating any new competitive concerns.

In a variation of the argument that WellCare is not an adequate divestiture buyer, Dr. Sood presented a "retention analysis" that purports to show that WellCare will not retain all of the divested lives, and that those lives will instead return to CVS.  Not only does Dr. Sood's model start from the faulty underlying premise that WellCare will not be able to retain customers, *see supra* § II.A, but the model presents a novel and untested form of analysis that, contrary to Dr. Sood's assertion,[32] does not have a basis in the Horizontal Merger Guidelines or the Division's Remedies Guide.  At a theoretical level, the analysis is misguided in that it focuses on WellCare's ability to retain particular subscribers rather than WellCare's ability to compete, and it is protecting the ability to compete that is the fundamental goal of the antitrust laws.  *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487 (1977) (noting that the antitrust laws are designed "to protect *competition*, not *competitors*").

Even if Dr. Sood presented an appropriate method of analysis, the analysis itself has several flaws.  First, the HHI calculations contain basic errors regarding the relevant product and geographic markets:  they inappropriately include employer-sponsored *group* prescription drug plans, and in some instances assign market share to plans in regions where the plans are not offered.  Second, the analysis wrongly assumes that CVS would win back *all* of the business that WellCare lost, rather than accounting for diversion to other health insurers—a basic feature of any economic model of this type.[33]  Third, the analysis ignores the role of automatic enrollment in individual PDP markets, incorrectly assuming that all individual PDP customers choose their

---

[32] Sood Demonstrative, at 16.
[33] *See, e.g.*, Tr. at 51:14–17 (Sood) (asserting that if only 90 percent of Aetna's customers stay with WellCare, the remaining 10 percent will all go back to CVS).

plan (and would therefore choose to go back to Aetna), when, in fact, a significant fraction are auto-enrolled.[34]  When correcting for these errors, the divestiture is not presumptively anticompetitive in any individual PDP market even if WellCare lost 50 percent of the divested business, the percentage that Dr. Sood referred to as a "good number."[35]

Additionally, both Dr. Sood and Dr. Moss ignore applicable CMS oversight with their concern that CVS will be able to effectively undo the benefits of the divestiture by reintroducing the divested Aetna products in two years and attracting back former Aetna customers.  CMS permits a company to offer only three individual PDPs in any given region, and CVS currently offers the maximum three plans in every region under its SilverScript brand.  This limitation means that CVS would have to discontinue, significantly modify, or rebrand one of its SilverScript-branded products to make room for a product that uses Aetna's brand or replicates Aetna's former offerings on factors like formulary or out-of-pocket costs.  Neither Dr. Sood nor Dr. Moss offer reason to think this change would be profitable for CVS.

Dr. Sood also presented what purports to be a traditional concentration analysis, this time assuming that WellCare retains all of the divested lives.  In presenting this testimony, however, Dr. Sood repeatedly misstated the standard in the Horizontal Merger Guidelines.  While he is correct that HHI calculations show that several markets post-divestiture will become "moderately concentrated," he neglected to mention that such markets only "*potentially* raise significant competitive concerns,"[36] a fact also ignored by Dr. Moss who testified that the divestiture to WellCare is inadequate because it is "concentrative."[37]  This prediction is far

---

[34] *See generally* Compl. ¶ 12.
[35] Tr. at 55:5–7 (Sood).
[36] Horizontal Merger Guidelines § 5.3 (emphasis added).
[37] *See* Tr. at 146:19–147:10 (Moss).

different from "highly concentrated" markets, where a significant increase in concentration presumptively raises competitive concerns.  Where markets are moderately concentrated, reviewing other factors is necessary to determine whether harm is likely.  Those other competitive conditions here—including the number of strong competitors, the central role of LIS bidding for setting basic plan premiums, and WellCare's pre-divestiture position in the market— mitigate any concern that arises from moderate concentration.[38]  Dr. Sood's analysis failed to address these or other factors indicating the unlikelihood of competitive harm, instead incorrectly treating these moderately concentrated markets as having presumptive harm.  In light of this failure, Dr. Sood's analysis certainly does not displace the United States' "perception of the market structure" and "view of the nature of [the] case," which must be given "due respect."  *See Microsoft*, 56 F.3d at 1461.

Dr. Moss's also offered a concentration analysis, but her opinion is not reliable because she looks at the industry on a national level rather than conducting an appropriate antitrust inquiry that starts with defining the relevant market.  *See, e.g.*, *FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26, 37 (D.D.C. 2009).

Finally, Dr. Sood and Dr. Moss each incorrectly testified that the divestiture will create concentration concerns for LIS plans.  Dr. Moss's argument suffers from the same flaw as her broader concentration opinion:  she again ignores the relevant geographic markets and takes a national view, omitting the fact that the LIS benchmark has gone down in many relevant geographic markets over recent years.  Additionally, her claims that LIS premiums are increasing significantly are questionable in light of the fact that 90 percent of LIS enrollees are in a zero

---

[38] *See* Antitrust Policy Guide to Merger Remedies (2004), at 5 ("Restoring competition requires replacing the competitive intensity lost as a result of the merger rather than focusing narrowly on returning to premerger HHI levels.").

premium Part D plan, and 100 percent of the LIS-eligible population has a zero premium plan available to them.

Dr. Sood, on the other hand, testified that the divestiture would increase WellCare's share of low-income beneficiaries beyond 35 percent in Arkansas and Hawaii,[39] raising similar concerns to those described in the complaint.  This testimony appears to misunderstand the complaint.  The United States used 35 percent as a screen only to identify markets where increased LIS percentages *may* cause harm, depending on other market factors.[40]  For example, in one region (Mississippi), WellCare will have an LIS share of approximately 35 percent. Because a significant share of WellCare's LIS enrollment in Mississippi is in Medicare Advantage prescription drug plans, however, WellCare will not have the incentive to manipulate the LIS benchmark.  In addition, Dr. Sood's conclusion about Arkansas and Hawaii is incorrect because it does not incorporate Medicare Advantage plans that include prescription drug coverage.  Because CMS includes individuals receiving the low-income subsidy who are enrolled in Medicare Advantage plans in the calculation for setting the low-income subsidy benchmark, they must be included in any LIS percentage calculation—a fact that Dr. Sood's own demonstrative recognizes.[41]  When correcting for this mistake, WellCare's share of LIS beneficiaries is well below 35 percent in both Arkansas and Hawaii.

---

[39] *See* Tr. at 64:5–23 (Sood).

[40] *See* Compl. ¶ 35 ("In five of these Part D regions . . . as well as four additional regions . . . the merged company will account for 35 percent or more of LIS-eligible beneficiaries.  *When combined with other market factors*, this share of low-income subsidiary beneficiaries will likely result in an additional loss of competition.") (emphasis added)).

[41] Sood Demonstrative, at 22 (quoting the competitive impact statement's explanation of how the United States calculated LIS percentages, which includes "those who enroll in Medicare Advantage plans with prescription drug benefits").

### C.    CVS is unlikely to foreclose WellCare from being an effective competitor.

Amici's witnesses also spent extensive time testifying that CVS would be likely to foreclose WellCare from being an effective competitor.  Their theory is that CVS has multiple levers that it can use to hobble WellCare to the benefit of its own SilverScript individual PDP business.  Not only are these theories based on faulty factual assumptions, they fly in the face of CVS's past conduct.  Before the merger, Aetna was a direct competitor of CVS for the sale of individual PDPs, yet CVS did not foreclose Aetna from being a strong competitor.  The merger does not significantly change CVS's incentive to foreclose those very same Aetna individual PDP lives now that they are with WellCare.

As an initial matter, amici's concerns about vertical foreclosure appear to stem from a series of fundamental misunderstandings about how the PBM industry works.  Contrary to Dr. Sood's testimony, the insurance company, not the PBM, typically sets the out-of-pocket cost that insureds pay for a drug,[42] and the insurance company, not the PBM, typically sets the benefit design for its insurance products.[43]  These are important facts that bear on CVS's ability to foreclose rival insurers, and are facts on which amici's testimony is demonstrably wrong.  Additionally, while the PBM market may be unfamiliar to consumers, it is not "opaque" to insurance companies such that they cannot determine the pricing of terms in their PBM services contracts.[44]

To arrive at their conclusion that CVS may foreclose WellCare, Dr. Sood and Dr. Moss also overstate CVS's power, both in the PBM market and in the retail pharmacy market.  Starting with retail pharmacies, CVS faces competition to which insurance companies could turn in the

---

[42] Tr. at 355:5–9 (Swanson).
[43] Tr. at 300:16–301:10 (Lotvin); Tr. at 354:8–355:14 (Swanson); Dkt. 118, at 1.
[44] Tr. at 324:20–326:22 (Lotvin), 358:12–23 (Swanson) (explaining that insurers rely on "market checks" to ensure that they are getting reasonable rates from PBMs); Dkt. 118, at 1.

face of a price increase.  Walgreens, Rite Aid, Walmart, and thousands of independent

pharmacies offer alternative options to CVS.  Indeed, CVS has fewer than 10,000 retail

pharmacies nationwide, but a CVS executive estimates that the average insurer's retail pharmacy

network includes between 50,000 and 60,000 pharmacies.[45]  Similarly, CVS is not the only

PBM, and WellCare has more PBM options than amici suggest.[46]  These competitors include

OptumRx, Express Scripts, and MedImpact, among others.

In addition to problems with the testimony regarding CVS's ability to foreclose

WellCare, amici's witnesses also mischaracterize CVS's incentive to foreclose WellCare.  Dr.

Sood's testimony, in particular, relied on an economic model that overstated the gains to CVS

from attempting to foreclose WellCare.  First, Dr. Sood assumes that CVS's PDP, SilverScript,

would win 100 percent of the customers that WellCare lost due to foreclosure, again failing to

account for the likely diversion to other health insurers.  A proper economic model would not

only incorporate diversion to other insurers, but would do so separately for each properly defined

geographic market.  Second, in calculating the profits that CVS would earn from recapturing

WellCare's customers, Dr. Sood overstated the likely gains by assuming that none of WellCare's

customers used CVS pharmacies, even though CVS is a preferred pharmacy in all of WellCare's

PDP networks.  Third, in calculating the profit margins, Dr. Sood uses his own estimates of

industry-wide margins rather than the companies' actual margins for their individual businesses,

thereby overstating the profitability of foreclosing WellCare.  Finally, Dr. Sood does not

complete the final step of his empirical analysis:  quantifying the vertical harm.  Even with these

faulty assumptions, Dr. Sood still concluded only that it "could be" profitable for CVS to

---

[45] Tr. at 334–35 (Lotvin).
[46] Tr. at 349:6–13 (Swanson).

foreclose WellCare through unfavorable pricing or service,[47] not that such foreclosure is likely. When the analysis is done correctly, it shows that CVS would not have an incentive to foreclose WellCare because CVS would lose a profitable PBM customer and would not be able to offset the lost profits by capturing additional health insurance customers.

Because insurance companies and customers have PBM and pharmacy options, CVS cannot dictate unfavorable terms without risk of losing a substantial number of customers. This risk is not one that CVS is willing to take. As a CVS executive testified during the hearing, and consistent with the United States' analysis during its 11-month investigation, it would be "economic suicide" to try to run CVS's business based only on Aetna's lives.[48] That is because Aetna's fewer than 10 million prescription drug insurance lives—the lives relevant for the markets identified in the complaint—pale in comparison to the 90 million members served by the PBM and the over 100 million lives served by CVS pharmacies.[49] Indeed, CVS has successfully served a range of insurers, with its PBM customers, including those that compete with CVS's SilverScript PDP, exceeding market growth rates.[50] In sum, CVS's incentives post-merger remain to attract and serve a broad range of insurance companies and customers, not to foreclose insurance company rivals or force its pharmacies on unwilling consumers.

### D. The remaining arguments are irrelevant.

Amici's witnesses also testified about a variety of subjects that are irrelevant to the public-interest inquiry. Specifically, Dr. Wohlfeiler testified entirely about vertical theories of harm that the United States did not include in its complaint. Additionally, after Dr. Moss said that she did not have "anything else [she] want[ed] to say about the divestiture," she turned to

---

[47] Tr. at 34:24–35:3 (Sood).
[48] Tr. at 327:16–329:3 (Lotvin).
[49] *Id.*
[50] Tr. at 306:7–13 (Lotvin).

"vertical concerns" unrelated to the divestiture in the middle of her testimony.[51]  The remainder

of her testimony, along with all of Dr. Wohlfeiler's testimony, is irrelevant and cannot form the

basis for any portion of the Court's public-interest determination.[52]

Additionally, the Court repeatedly questioned whether the transaction provided CVS's

PBM with additional leverage as a result of the acquisition of the Aetna insured lives, a

monopsony theory.  As CVS explained in its letter filed on June 20, not only did CVS "acquire"

less than half of the 22 million lives implied by amici, but CVS did not increase its leverage as a

result of the merger, as its PBM already contracted on behalf of all the lives and, in fact, must

continue to compete for them.[53]  Moreover, the monopsony theory is not relevant to any claim

brought in the United States' complaint, and does not have a bearing on the public interest of the

proposed consent judgment.

## III.     The Court should enter the proposed Final Judgment.

Exercising its prosecutorial discretion, the United States decided to bring this suit to

address the likely harm to competition in 16 markets for the sale of individual PDPs.  To remedy

that harm, the United States required CVS to divest Aetna's entire individual PDP business to

WellCare.  As a smaller, but experienced, competitor, WellCare was well situated to step in and

provide a competitive constraint similar to that previously provided by Aetna.  As a result,

consumers will continue to have options across the United States from individual PDPs that are

of sufficient scale to offer competitive prices, that have enough experience to navigate CMS

regulations, and that have a proven track record of providing appealing products.

---

[51] Tr. at 158:8–15 (Moss).
[52] *See* Mot. to Limit the Scope of the Tunney Act Hearing (Dkt. No. 82), at 3; Resp. to Order to Show Cause (Dkt. No. 32), at 1–7; United States' Resp. to Public Comments on the Proposed Final Judgment (Dkt. No. 56), at 2–8.
[53] Dkt. No. 118, at 2–3.

By maintaining competition in the sale of individual PDPs, the divestiture remedies the harm alleged in the complaint.  This outcome is established by the United States' Tunney Act Materials and confirmed by additional evidence provided during the June 4–5 hearing.  Nothing that amici submitted has undermined this fundamental fact.  At most, amici's theories largely complain about a potential restructuring of competition, a result that the Supreme Court has made clear does not violate the antitrust laws.  As it explained, "[e]very merger of two existing entities into one, whether lawful or unlawful, has the potential for producing economic readjustments that adversely affect some persons.  But Congress has not condemned mergers on that account; it has condemned them only when they may produce anticompetitive effects."  *See Brunswick*, 429 U.S. at 487.

## Conclusion

For the foregoing reasons, the United States respectfully requests that the Court return to the statutorily and constitutionally appropriate inquiry before it, end the uncertainty for consumers and the market, and find that the proposed consent judgment is in the public interest.

Dated:  June 21, 2019                                    Respectfully submitted,


_____/s/_____
Jay D. Owen
Andrew J. Robinson
U.S. Department of Justice
Antitrust Division
450 5th Street, NW, Suite 4100
Washington, D.C. 20530
Tel.: (202) 598-2987
Fax: (202) 616-2441
E-mail: Jay.Owen@usdoj.gov

## CERTIFICATE OF SERVICE

I, Jay D. Owen, hereby certify that on June 21, 2019, I caused a copy of the foregoing document to be served upon Plaintiffs State of California, State of Florida, State of Hawaii, State of Washington, and Defendants CVS Health Corporation and Aetna Inc., via the Court's CM/ECF system, and to be served upon Plaintiff State of Mississippi by mailing the document electronically to its duly authorized legal representative:

**Counsel for State of Mississippi:**
Crystal Utley Secoy
Consumer Protection Division
Mississippi Attorney General's Office
P.O. Box 22947
Jackson, Mississippi 39225
Phone: (601) 359-4213
cutle@ago.state.ms.us

_____/s/_____
Jay D. Owen
U.S. Department of Justice
Antitrust Division
450 5th Street, NW, Suite 4100
Washington, D.C. 20530
Tel.: (202) 598-2987
Fax: (202) 616-2441
E-mail: Jay.Owen@usdoj.gov
