## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** *et al.,* | |
| **Plaintiffs,** | |
| **v.** | **Case No. 1:18-cv-02340-RJL** |
| **CVS HEALTH CORPORATION** *et al.,* | |
| **Defendants.** | |

---

### AMICI CURIAE POST-HEARING BRIEF OF CONSUMER ACTION AND U.S. PIRG IN OPPOSITION TO THE UNITED STATES' MOTION FOR ENTRY OF THE PROPOSED FINAL JUDGMENT

Pursuant to the Court's June 7, 2019 Order, Amici Curiae Consumer Action and United States Public Interest Research Group ("U.S. PIRG") respectfully submit this Post-Hearing Brief.

## I.      Introduction

Amici represent consumers and have participated in these proceedings to make sure that consumers and competition in all relevant markets are fully protected by the Department of Justice's ("DOJ") proposed final judgment ("PFJ").  The ultimate question is whether the PFJ is in the public interest and whether the divestiture will adequately and completely restore competition.  Based on the hearings, there is clear evidence that the proposed divestiture will not fully restore competition.  Not only does the divestiture fail to resolve the competitive concerns identified in the DOJ's Complaint, but it also fails to address how this merger will exacerbate conflicts of interest and self-dealing in the prescription drug supply chain.  Therefore, the PFJ should be rejected.

During the evidentiary hearing, the Court heard significant testimony regarding the reduction in consumer welfare and harm to the public interest that will result from CVS Health Corporation's ("CVS") acquisition of Aetna Inc. ("Aetna").  The merger combines CVS, the owner of the nation's largest retail pharmacy and specialty pharmacy chains, second largest pharmacy benefit manager ("PBM"), and the nation's largest provider of Medicare Part D individual prescription drug plans ("PDPs"), with Aetna, the third largest health insurer in the country.[1]  United States Response to Public Comments at 8, Dkt No. 56 (Feb. 13, 2019).  With the acquisition of Aetna, CVS will now serve in every facet of the U.S. drug supply chain, effectively negotiating with itself from the time the medicine is launched all the way through pickup of the prescription by the patient without any effective checks and balances along the way since all arms-length negotiations will effectively be gone.  This vertical integration increases the opportunities for self-dealing and conflicts of interest.  Indeed, a USC study found that nearly 2/3 of every $1 for generic drugs goes to others in the supply chain beside the manufacturer and nearly 1/3 of every $1 for brand drugs goes to supply chain intermediaries.[2]

PBMs determine what price insurer/payors will pay for prescription drugs by setting the negotiated price for the drug.  The merger will further allow CVS to fully self-deal because CVS will be both the PBM and the insurer, positioning CVS to retain large markups between the negotiated price CVS sets wearing its PBM hat versus what CVS sets as the price it pays to the pharmacies.  The conflict is even more acute for specialty generic drugs especially when they are dispensed through CVS specialty pharmacies.[3]  When a PBM owns its specialty pharmacy there

---

[1] Thomas L. Greaney, *The New Health Care Merger Wave: Does the Vertical, Good Maxim Apply?,* Journal of Law, Medicine & Ethics, 2018.
[2] USC Shaeffer Study, "Flow of Money through the Pharmaceutical Distribution System" June 2017 https://healthpolicy.usc.edu/wp-content/uploads/2017/06/USC_Flow-of-MoneyWhitePaper_Final_Spreads.pdf
[3] According to IQVIA, specialty prescription medicines make up less than 2% of all prescriptions in the United States but account for more than 40% of prescription spending, underscoring the critical need for consumers to have more access to competition through lower cost alternatives.  IQVIA, *Medicine Use and Spending in the U.S,* (April

is no independent entity to control utilization or cost. Additionally, because PBMs have not established specialty generic formulary tiers with more favorable patient cost sharing, patients are not getting the benefit of lower cost sharing for these highest spend medicines. A recent analysis shows that PBM profits have doubled from 2012 to 2018 from spread pricing and specialty pharmacy profits.[4]

The DOJ's PFJ that requires a divestiture of Aetna's PDPs to WellCare Health Plans, Inc. ("WellCare") is undoubtedly not in the public interest.  Competition in the PDP market is critically important as it serves a vulnerable population, our nation's seniors, many of whom are on fixed incomes.  (Evidentiary Hr'g Tr. at 141).  The DOJ's remedy falls short of resolving the competitive harms alleged in the Complaint because the divestiture will not restore competition in the PDP market for the following reasons:

- The remedy is inconsistent with the law and the DOJ's own policy because it does not entail a divestiture of a standalone business.  The sale of select assets such as year to year subscriber contracts is less likely to succeed than a sale of an ongoing business. This court rejected a similar remedy in Aetna-Humana because it was not an ongoing business. *United States v. Aetna*, 240 F. Supp. 3d 1 (D.D.C. 2017), (Evidentiary Hr'g Tr. at 151);

- The divestiture fails to include on a long-term basis the most crucial asset: Aetna's brand.  Two years after the divestiture nothing prevents CVS from poaching back former Aetna subscribers using the Aetna brand. (Evidentiary Hr'g Tr. at 150);

- The low acquisition price demonstrates that WellCare is not confident that the assets are viable so there is an increased chance that WellCare will fail as a divestiture buyer, which it has done in the past. (Evidentiary Hr'g Tr. at 57, 148);

---

19, 2018), https://www.iqvia.com/institute/reports/medicine-use-and-spending-in-the-us-review-of-2017-outlook-to-2022. In the case of specialty generics, "negotiated prices" are paid by PBMs/plans to PBM owned specialty pharmacies. These prices are set by the PBMs (not the generic manufacturer) and are often set much higher than the pharmacies' acquisition costs for those drugs. One example of this practice was cited in public comments to the OIG proposed safe harbor rule, where the negotiated price for a specialty generic ranged from $450 to $8,980 per month across PBM/plans (range shows the nearly unfettered discretion PBMs have in setting negotiated prices for specialty generics) even though the specialty generic drug had a current market price of just $467 per month.
[4] Adam Fein, Operationalizing a World without Rebates Webinar, Drug Channels Institute and Nephron Research (April 12, 2019).

- WellCare is substantially smaller than Aetna and lacks its economies of scope and scale, and number of overall covered lives. (Evidentiary Hr'g Tr. at 149-151, 156-157);

- WellCare does not have the capacity to handle such a large increase in covered lives (growing from about 1 million to over 3 million covered lives in such a short time frame) (Evidentiary Hr'g at Tr. 151); and,

- The divestiture entails a significant amount of risk because the DOJ tacks on a number of behavioral conditions to a divestiture of something that is less than an ongoing business.  (Evidentiary Hr'g at Tr. 151).

This is especially concerning because the PDP market is concentrated and vulnerable seniors are likely to be harmed.  The loss of Aetna as a competitor to CVS in the PDP market is a loss of an intense rivalry that "led not only to lower premiums and out-of-pocket expenses but also improved drug formularies, more attractive pharmacy networks, enhanced benefits, and innovative product features."[5]

In addition to making sure that seniors are protected, the Court needs to determine whether CVS' acquisition of Aetna exacerbates the competitive problems that already exist in the prescription drug supply chain to the detriment of vulnerable patients, who are purchasing prescribed life-saving and -managing medicines to treat their conditions.  (Evidentiary Hr'g Tr. at 137-138).  These patients are not making a discretionary purchase.  When determining the public interest, this Court must consider whether this merger will help bring down and control the escalating prices of prescription drugs or whether it will contribute to higher drug prices and less access to affordable medicines for patients.

The essential question is whether the PFJ is in the public interest and the answer is an unequivocal no because it fails to account for the numerous anticompetitive effects that will permeate the healthcare industry as a result of this merger.  First, vertical consolidation has

---

[5] DOJ Competitive Impact Statement at 5.

fundamentally restructured the healthcare industry and this merger will exacerbate the competitive concerns from that integration.  (Evidentiary Hr'g Tr. at 137).  As Dr. Moss testified, there has been sweeping and massive consolidation in all levels of the healthcare markets: hospitals, PBMs, retail pharmacies, and health insurers.  (Evidentiary Hr'g Tr. at 137).  There is no longer vigorous competition by standalone rivals at each level in the prescription drug supply chain as the markets are now characterized by vertically integrated platforms of PBMs, insurers, and pharmacies.  (Evidentiary Hr'g Tr. at 137).  The White House Council of Economic Advisors has found that the three vertically integrated PBM/health insurer firms – UnitedHealth/OptumRx, Cigna/Express Scripts, and CVS Caremark – operate in a tight oligopoly and exercise market power against manufacturers, the health plans and beneficiaries they are supposed to be representing, and pharmacies.[6]  These conglomerates engage in self-dealing at every level throughout the supply chain, and wield their massive power to extract all value from industry participants while passing nearly nothing back to consumers. Conflicts of interest abound as evidenced by the rebates and the fees that they earn and their desperate effort to keep all pricing, rebating and negotiating practices secret.[7]  Vertical integration has changed their "incentives to foreclose their rivals or to make it difficult for their rivals to compete" and there is every reason to believe that this merger will exacerbate the trend. (Evidentiary Hr'g Tr. at 138).

Moreover, the Court's public interest determination is "high-stakes", with vulnerable seniors potentially having to pay for higher premiums and more out-of-pocket costs for prescription drugs.  (Evidentiary Hr'g Tr. at 138).  Because the analysis is related to Medicare

---

[6] Reforming Biopharmaceutical Pricing at Home and Abroad, The Council of Economic Advisors, White Paper, February 2018. (hereinafter referred to as CEA White Paper).
[7] CEA White Paper.

Part D, which is subsidized by the federal government, taxpayers are also harmed by this merger. (Evidentiary Hr'g Tr. at 138). Indeed, the rapidly increasing costs of prescription drugs threaten our nation's ability to control Medicare Part D spending and the overall cost of healthcare. The unreasonably high out-of-pocket costs for prescription drugs threaten patients' access to medicines, as some may choose to stop or delay treatment because they cannot afford it. Ensuring that patients can afford life-saving and life-managing prescription drugs is crucial to the public health of the nation. But a combined PBM/pharmacy/insurer firm has every incentive to introduce more opacity and complexity into the system, which will in turn create new opportunities to exploit its position as the gatekeeper of life-saving and life-managing drugs.

Finally, the remedy does not account for the conglomerate effects that will ripple throughout the industry upon the creation of a single Goliath. These shortcomings are irredeemable, and the Court's only effective remedy is to block a merger as the DOJ did when it blocked Aetna's acquisition of Humana to protect head-to-head competition in Medicare Advantage markets. (Evidentiary Hr'g Tr. at 147). To do anything else would be to render the most vulnerable in the population as collateral damage; and as Assistant Attorney General for Antitrust Makan Delrahim has stated, "consumers, [especially our nation's seniors] should not have to bear the risks that a complex settlement may not succeed."[8] The Court does not need a crystal ball to see into the future; CVS' history of abusing its size and position in the industry is the Oracle at Delphi. The PFJ fails the American consumer and is not in the public interest because it will not restore competition in the PDP market and does nothing to prevent the merged

---

[8] Makan Delrahim Remarks at ABA 2017 Fall Forum (quoting former Assistant Attorney General Bill Baer).

firm from expanding the self-dealing and egregious conduct that will continue to plague consumers. This Court must reject the PFJ.

**II.     The PFJ is Not in the Public Interest Because the Divestiture of Assets of Aetna's PDP Does Not Fully Restore Competition in the PDP Market**

As Dr. Diana Moss testified, the purpose of divestiture remedies is to fully preserve and restore competition to pre-merger levels.  (Evidentiary Hr'g at Tr. 147); *United States v. Aetna*, 240 F. Supp. 3d 1, 60 (D.D.C. 2017) (citing to U.S. Dep't of Justice, *Antitrust Division Policy Guide to Merger Remedies* 1 (2011) ("Remedies Guide") and Fed. Trade Comm'n, *The FTC's Merger Remedies 2006-2012: A Report of the Bureaus of Competition and Economics*, 15 (Jan. 2017) ("Merger Remedy Study").  This Court, however, has held that "[r]estoring competition requires replacing the *competitive intensity* lost as a result of a merger…" rather than just maintaining premerger levels. *Fed. Trade Comm'n v. Sysco Corp.,* 113 F. Supp. 3d 1, 72 (D.D.C. 2015) (emphasis in original).  Replacing the competitive intensity lost by this merger is just about impossible because WellCare lacks Aetna's scale and unique understanding of how to recruit CVS subscribers.  As the DOJ alleged in its Complaint, "throughout the country, CVS and Aetna have been close competitors.  For example, in 2016 and 2018, CVS found that individuals leaving its individual PDPs went to Aetna more often than to any other competitor."[9] Moreover, this merger results in a loss of significant head-to-head competition between close competitors. (Evidentiary Hr'g at Tr. 17-18).

The PFJ fails the antitrust agencies' own standards. Both the DOJ and the Federal Trade Commission ("FTC") have provided guidance as to what is necessary to have an effective remedy. That guidance emphasizes that the divestiture of an ongoing business is essential.  In

---

[9] DOJ Complaint at ¶31.

2017, the FTC's Merger Remedy Study found that buyers of a limited package of divestiture assets, which is the case here with the divestiture of subscriber contracts to WellCare, often fails to maintain or restore competition.[10]  (Evidentiary Hr'g Tr. at 151).  On the other hand, 100% of divestitures of ongoing businesses were successful.[11]  The Merger Remedy Study cautioned that the FTC analyzes a divestiture of selected assets with a higher level of scrutiny.  Likewise, the DOJ's Merger Remedies Guide also suggests that the purchase of an existing business entity is more likely to effectively preserve competition.[12]  The DOJ offers no explanation for its sudden abandonment of the policies generated through empiricism and experience.

The DOJ's acceptance of Aetna's divestiture to WellCare of 2.2 million subscriber contracts is inconsistent with its own policy as well as with Judge John D. Bates' decision in Aetna/Humana where he held that a divestiture of an existing business entity is more likely to preserve competition than simply a sale of assets and rejected a divestiture of almost 300,000 Medicare Advantage insurance contracts to Molina Healthcare.  (Evidentiary Hr'g Tr. at 157); *Aetna*, 240 F. Supp. 3d at 60.  The divestiture in the Aetna/Humana merger was "a mere fraction of the size of a divestiture as compared to the one that is being proposed here."  (Evidentiary Hr'g Tr. at 157).

Consumers are facing fewer choices and paying higher prices in a number of industries because of failed merger remedies in the health insurance,[13] airline,[14] grocery store,[15] dollar

---

[10] Fed. Trade Comm'n, *The FTC's Merger Remedies 2006-2012: A Report of the Bureaus of Competition and Economics*, (Jan. 2017); *Id.* at 21–23, 32.

[11] *Id.* at 22.

[12] DOJ Antitrust Division Policy Guide to Merger Remedies, June 2011, at 8-10.

[13] Topher Spiro, Maura Calsyn, and Meghan O'Toole, *Divestitures Will Not Maintain Competition in Medicare Advantage*, Center for American Progress (March 8, 2016).

[14] Catherine A. Peterman, The Future of Airline Mergers after the US Airways and American Airlines Merger, 79 J. Air L. & Com. 781 (2014) https://scholar.smu.edu/jalc/vol79/iss4/3

[15] In 2015, the FTC approved Safeway's acquisition of Albertson's, a large grocery merger, on the condition that the merged company divest itself of 146 stores to Haggens, a small chain of 18 stores.  Within months, that small chain filed for bankruptcy and the merged company wound up buying back about 36 stores.  Ana Marum, *Failed*

store,[16] and rental car industries.[17]   (Evidentiary Hr'g Tr. at 148).   Some of these failures were monumental, predictable, and unbelievably fast.   The fact that WellCare failed as a divestiture buyer of Arcadian's assets in 2012 should give this Court great pause.[18]   WellCare purchased Arcadian's Medicare Advantage assets, which covered about 4,000 members in two Arizona counties.[19]   It then exited the markets within two years of making the acquisition showing both that it lacked the size to compete effectively and is willing to abandon the market in the face of adversity.[20] (Evidentiary Hr'g Tr. at 148, 150).   DOJ's faith in WellCare is refuted by all evidence.

If WellCare's poor track record is not enough to cast doubt on its viability as an effective competitor going forward, the low purchase price of $107 million should.   (Evidentiary Hr'g Tr. at 56-57).   Again, the DOJ recognizes in its Response that a low purchase price can raise concerns, but it noted that is not the case here because it could simply mean that WellCare got a good bargain.   (Response at 23-24).   In *Aetna*, Judge Bates recognized that the divestiture buyer was getting a bargain but he was concerned that "an extremely low purchase price reveals the divergent interest between the divestiture purchaser and the consumer: an inexpensive acquisition could still 'produce something of value even if it does not become a significant

---

divestiture: *Albertsons is bidding on 36 Haggen stores, including some it used to own,* The Oregonian, November 10, 2015.   https://www.oregonlive.com/window-shop/index.ssf/2015/11/albertsons_bids_on_36_haggen_s.html
[16] In 2015, the FTC conditioned Dollar Tree's acquisition of Family Dollar, a merger of dollar stores, on a divestiture of stores to Sycamore.   The private equity buyer sold the assets to the other large national dollar store player, Dollar General, within 21 months.   FTC Press Release, "*FTC Approves Sycamore Partners II, L.P. Application to Sell 323 Family Dollar Stores to Dollar General*", April 27, 2017. https://www.ftc.gov/news-events/press-releases/2017/04/ftc-approves-sycamore-partners-ii-lp-application-sell-323-family
[17] In 2012, the FTC conditioned Hertz's acquisition of Dollar Thrifty on a divestiture of Advantage to a small rental car company and the buyer filed for bankruptcy within a year only to have some of the assets auctioned back to Hertz.   Bret Kendall, *How the FTC's Hertz Antitrust Fix Went Flat,* Wall Street Journal, December 8, 2013. https://www.wsj.com/articles/how-the-ftc8217s-hertz-antitrust-fix-went-flat-1386547951?ns=prod/accounts-wsj
[18] Topher Spiro, Maura Calsyn, and Meghan O'Toole, *Divestitures Will Not Maintain Competition in Medicare Advantage*, Center for American Progress (March 8, 2016).
[19] *Id.* at 3.
[20] *Id*.

9

competitor.'" *Aetna*, 240 F. Supp. 3d at 8. Professor Wu testified that CVS has 6.1 million PDP members with approximately $3 billion in revenues, which suggests that 2.2 million PDP lives would bring in roughly $1 billion in revenues. (Evidentiary Hr'g Tr. at 258-259). A $107 million investment for assets that can generate a $1 billion in revenues seems like a bargain. The only logical conclusion is that the $107 million figure is indicative of the value WellCare has placed on the assets, which are unlikely to remain viable. (Evidentiary Hr'g Tr. at 56-57).

There are numerous flaws in the proposed divestiture package. Subscriber contracts alone do not guarantee the viability of the business. Professor Neeraj Sood and Dr. Moss testified in accordance with DOJ and FTC merger remedy policies that there is an inherent risk in acquiring a select set of assets (year-to-year subscriber contracts) rather than purchasing a standalone business. (Evidentiary Hr'g Tr. at 51, 151, 156).[21] WellCare CEO Kenneth Burdick corroborated this opinion on an earnings call when he recognized that there is a risk that the company won't be able to keep all of the acquired lives because of contracts that are up for grabs every year and by 2021,[22] CVS/Aetna will be in a prime position to compete against WellCare for those same subscribers. When one looks at WellCare's history as a failed divesture buyer and of declining membership of approximately 400,000 members from 2014 to 2018,[23] one can only conclude that CVS is just biding its time to reacquire the contracts. (Evidentiary Hr'g Tr. at 150).

One critical element is the value of the brand. Under the PFJ, CVS and Aetna are required to provide WellCare with the Aetna brand for the Medicare PDPs for only one year.

---

[21] FTC Merger Remedy Study at 21–23, 32; Remedies Guide, at 8-9.

[22] WellCare Earnings Call Transcript dated October 30, 2018. https://seekingalpha.com/article/4215999-wellcare-health-plans-wcg-q3-2018-results-earnings-call-transcript?page=2.

[23] WellCare Health Plans, Inc. 2018 Annual Report (Form 10-K). U.S. Securities and Exchange Commission, at http://ir.wellcare.com/Docs. From 2014 to 2018, WellCare lost approximately 400,000 members February 2019.

The merged firm, however, will continue to use the Aetna brand for its other products and will be able to use the Aetna brand for PDPs in the future.  Starting in 2021, CVS can use the Aetna brand to poach back its former subscribers.  The testimony as well as the Merger Remedy Study illustrate the critical nature of brand loyalty to retain customers.[24] (Evidentiary Hr'g Tr. at 65, 150, 155).

Dr. Moss' testimony that WellCare is in an extremely fragile position because it must rely on transition administrative services agreements with CVS is compelling.  (Evidentiary Hr'g Tr. at 151).  This Court need only follow its own precedent to conclude that it cannot approve the PFJ. A divestiture that calls for a "continuing relationship between the seller and buyer of divested assets" is problematic as it "may increase the buyer's vulnerability to the seller's behavior."  *Sysco*, 113 F. Supp. 3d at 77 (quoting *FTC v. CCC Holdings*, 605 F.Supp.2d 26, 59 (D.D.C. 2009)); *see also White Consol. Indus. v. Whirlpool Corp.*, 781 F.2d 1224, 1227–28 (6th Cir. 1986).[25]  In addition to the administrative services agreement, there is a real concern that WellCare will have difficulty absorbing over 2 million enrollees in such a short period of time. (Evidentiary Hr'g Tr. at 150).  The assumption of Aetna's PDP enrollees means that WellCare will have a 180 percent increase in its enrollees, which is "an enormous uptick in the number of enrollees" for a company that lacks the economies of scale of Aetna. (Evidentiary Hr'g Tr. at 150).

Dr. Moss further testified that in the middle of this Tunney Act Proceeding while this Court is trying to determine whether the PFJ is the public interest, Centene announced a deal to acquire the divestiture buyer, WellCare.  (Evidentiary Hr'g Tr. at 157).  That acquisition fundamentally changes WellCare's incentives. (Evidentiary Hr'g Tr. at 157-158).  The proposed

---

[24] *Merger Remedy Study* at 25, 35.
[25] *Id*. at 33.

buyer of the PDP divestiture may no longer exist, and the Court is determining whether the PFJ remedies the competitive harm when there is actually a different deal on the table that needs to be analyzed.  The entire remedy as crafted by the DOJ is in flux as it was negotiated under a circumstance that may no longer exist.

In summary, the PFJ is wholly inadequate and inconsistent with Judge Bates' decision to reject the proposed remedy in the Aetna-Humana merger.[26]  (Evidentiary Hr'g Tr. at 156-157). The proposed divestiture here is not in the public interest for the following reasons:

- WellCare cannot restore the competitive intensity between CVS and Aetna that is lost in the PDP market.  DOJ Complaint at ¶31 and Competitive Impact Statement at 5. (Evidentiary Hr'g Tr. at 149-151, 156-157);

- WellCare's past failure as a divestiture buyer shows that it cannot overcome structural barriers to growth.  (Evidentiary Hr'g Tr. at 148);

- WellCare acquired 2.2 million subscriber contracts for the low acquisition price of $107 million, which raises serious concerns as to whether it will retain the customers and successfully compete.  (Evidentiary Hr'g Tr. at 57);

- WellCare is further hamstrung because it is only acquiring a "limited set of assets" such as year-to-year subscriber contracts rather than purchasing a standalone business, which raises the risk of failure.  WellCare's CEO stated to investors that it would be "filing bids in June of 2019 to preserve as much membership as possible."[27]  (Evidentiary Hr'g Tr. at 151);

- The PFJ does not even equip WellCare with everything it needs to be viable, such as the administrative services agreement, leaving WellCare at CVS' mercy and increasing the odds that CVS positions itself to win back the business at the first opportunity (Evidentiary Hr'g at Tr. 151);

- Approval of this proposed divestiture of over 2 million lives is inconsistent with Judge Bates' decision to reject a much smaller divestiture of 290,000 lives.[28] (Evidentiary Hr'g Tr. at 157);

---

[26] Comments from Consumer Action and U.S. PIRG submitted on December 17, 2018.

[27] Kenneth Burdicek, WellCare CEO, October 30, 2018, WellCare Earnings Call.  "Therefore, we'll be working in 2019 to enhance our products and capabilities and filing bids in June of 2019 to preserve as much membership as possible with the new WellCare products in 2020."

[28] *Aetna*, 240 F. Supp. 3d at 60.

- WellCare needs the administrative services agreement to function extremely well in short order to handle such a large increase in covered lives (growing from about 1 million to over 3 million covered lives).  (Evidentiary Hr'g at Tr. 150-151);

- WellCare is substantially smaller than Aetna, lacks Aetna's economies of scope and scale, and lacks Aetna's brand reputation and number of covered lives.[29] (Evidentiary Hr'g Tr. at 150); and

- Centene's proposed acquisition of WellCare fundamentally changes WellCare's incentives.  (Evidentiary Hr'g Tr. at 157-158).

## III. The Proposed Final Judgment is Not in the Public Interest Because It Fails to Resolve the Merger's Anticompetitive Effects Throughout the Healthcare Supply Chain

As Dr. Moss testified, consolidation has restructured the healthcare supply chain and all of the markets are concentrated.  (Evidentiary Hr'g Tr. at 141-143).  The three largest PBMs control anywhere from 70% to 85% of the market in a tight oligopoly.[30]  (Evidentiary Hr'g Tr. at 23).  As a result of this concentration and the aligned business practices of all three PBMs, the market lacks meaningful choice and transparency and is plagued by self-dealing and conflicts of interest.  In commercial insurance markets, almost 70% of the local markets across the country are highly concentrated.[31]  In half of all markets, the two largest health insurers have greater than 70% of the market.[32]  The two largest retail pharmacy chains control 50-75% of the drug stores in the 14 largest markets in the United States.[33]  Many of these are the same companies, and

---

[29] WellCare is much smaller than Aetna; as of December 31st, 2017, Aetna's total membership was 22.2 million and it had assets of $55.137 billion, and WellCare had 4,371 million members and assets of $8.364 billion. And WellCare's membership of individual PDPs has declined from 1,392,000 in 2014 to 1,057,000 in 2018. Aetna Reports Fourth-Quarter and Full Year 2017 Results, January 30, 2018. *See* https://news.aetna.com/newsreleases/ aetna-reports-fourth-quarter-and-full-year-2017-results/; *see also* WellCare Health Plans, Inc. 2018 Annual Report (Form 10-K). U.S. Securities and Exchange Commission, at http://ir.wellcare.com/Docs. February 2019.

[30] CEA White Paper.

[31] American Medical Association, Competition in Health Insurance:  A Comprehensive Study of U.S. Markets (2017).

[32] M. Gaynor, Examining the Impact of Healthcare Consolidation, Statement Before the Energy & Commerce Oversight Committee, U.S. House of Representatives, February 14, 2018, at 7.

[33] C. Stern, CVS and Walgreens are Completely Dominating U.S. Drug Industry, Business Insider, July 29, 2015.

CVS' acquisition of Aetna will only make matters worse. High concentration in PBM, health insurer, and pharmacy markets "should be given a significant amount of weight" and "creates a strong presumption of illegality." (Evidentiary Hr'g Tr. at 139).

Under these conditions, "no rocket science" or complicated "bargaining theory" models are necessary. With the merger of CVS and Aetna, the potential foreclosure concerns do not only involve input foreclosure, which would be potentially raising the costs to or cutting off rival insurers' access to "must have" CVS pharmacies and PBM services, but also customer foreclosure, which would essentially be denying rival pharmacies and PBMs the ability to get at Aetna as a potential customer.[34] (Evidentiary Hr'g Tr. at 158-159). This is more pronounced because CVS pharmacies are a "must have" for an insurer because CVS' 7,900 stores are located within 3 miles of 70% of the U.S. population. (Evidentiary Hr'g Tr. at 154, 312).

Post-merger, CVS/Aetna's incentives change and the merged firm will be in a position to disadvantage or raise the costs to rival insurers through its control of its "must have" PBM or retail pharmacy services. (Evidentiary Hr'g Tr. at 160). There is a robust list of ways in which the merged firm could disadvantage insurer rivals. (Evidentiary Hr'g Tr. at 160-162). The merged firm could impose a variety of conditions that would disadvantage rival insurers needing PBM services or the CVS retail pharmacies. CVS could develop formularies for rivals that exclude important drugs that are in demand by their subscribers or offer pharmacy networks that do not provide important pharmaceutical distribution options to rival subscribers. (Evidentiary Hr'g Tr. at 162). CVS' PBM could steer an insurer's customers to CVS pharmacies by charging higher copays if they do not use CVS pharmacies, which was done when CVS engaged in an

---

[34] Thomas Greaney. "Statement of Thomas Greaney, Before the U.S. Senate Committee on the Judiciary, Subcommittee on Antitrust, Competition Policy, and Consumer Rights." June 12, 2019. Available at https://www.judiciary.senate.gov/imo/media/doc/Greaney%20Testimony.pdf.

anti-smoking policy.  (Evidentiary Hr'g Tr. at 161).  CVS charged its PBM customers a $15 extra

copay if they used another pharmacy.[35]  (Evidentiary Hr'g Tr. at 161).  CVS could frustrate

smaller insurers is by failing, for example, to pass on rebates to rival health insurers, which can

easily be done as the amounts of the rebates are secret.[36]  (Evidentiary Hr'g Tr. at 162).  CVS

could design its pharmacy networks in a way that excludes important options like specialty

pharmacies.  (Evidentiary Hr'g Tr. at 162).  Insurers need to offer CVS pharmacies to their

potential customers -- plan sponsors, employers, and pension funds -- but with exclusive

networks the rival insurers will not be providing a wider network of pharmacies.  (Evidentiary

Hr'g Tr. at 162).  Post-merger CVS will have near-perfect information for all consumers, and can

use this information to impair rivals' ability to compete. The merged firm can use information

that it gathers about rival subscribers and drug spend to target certain segments of their customer

base. (Evidentiary Hr'g Tr. at 161).  Finally, the ultimate form of foreclosure would be for CVS

to simply deny to fill prescriptions for rival insurers.  (Evidentiary Hr'g Tr. 162).  Because CVS

is wearing a number of hats and engages in self-dealing, there are a number of ways for it to

harm rivals without repercussion.

High concentration in the PBM and insurer markets means that rival pharmacies and

PBMs have few alternatives -- CVS/Aetna, UnitedHealth/OptumRx, and Cigna/Express Scripts.

As CVS testified, this is a scale business so smaller players are not meaningful options.  The

merger eliminates Aetna as a customer for independent pharmacies and PBMs.  Mr. Lotvin and

Professor Wu testified that PBMs construct standard pharmacy networks, preferred networks,

and drug formularies, which establish the tiering of drugs and copays, for payors (insurers and

---

[35] Houston Chronicle, "CVS tacks tobacco payment to prescription network," Oct. 21, 2014, https://www.houstonchronicle.com/business/retail/article/CVS-tacks-tobacco-payment-to-prescription-network-5838342.php
[36] CEA White Paper.

employers) much like a menu at a restaurant, but that insurers select the various options. (Evidentiary Hr'g Tr. 230, 234, 325).  With respect to specialty pharmacy, CVS provides narrow networks that typically exclude independent pharmacies.  (Evidentiary Hr'g Tr. at 335).

There are a number of mechanisms that CVS/Aetna could use to foreclose rival PBMs and pharmacies including:

- Providing financial incentives to Aetna subscribers to convert to CVS/Caremark mail order or CVS pharmacies;

- Refusing to grant rival PBMs' affiliations to serve Aetna subscribers, which is a necessity to be able to actually do business with a health insurer;

- Driving down dispensing fees for the independent pharmacies and delay reimbursements to smaller rival pharmacies;

- Cherry-picking profitable prescriptions, i.e., taking the most profitable for CVS and leaving the smaller rivals with the very unattractive low-margin prescriptions; and

- Creating yet another set of activities or forms of conduct that would make it very difficult for rival PBMs and pharmacies to get access to Aetna.  (Evidentiary Hr'g Tr. at 166).

## IV. The Merger Will Not Lead to Lower Prescription Drug Prices, as CVS Will Continue to Wield its Upstream and Downstream Negotiating Power to its Own Advantage

This Court honed in on the critical issue of access to lower priced drugs on consumers when it stated "the typical indicators of whether or not something is in the public interest when it comes to this kind of a merger is whether or not the pharmaceutical drugs are going to be at a lower price, whether they're going to be more readily available, whether they're going to be more easily accessible. Where do you see the evidence here that as a result of this merger, 19 million customers that have been acquired by CVS, that the drugs that those customers and future potential customers are going to be lower? Where's the evidence that they're going to be

more readily accessible? More readily available? More easily available?" (Evidentiary Hr'g Tr. at 269:23-270:10).

The Court's instincts are correct. The acquisition of Aetna by CVS will only further enhance the power of a colossal intermediary that wields this power to extract value from all sides of the healthcare industry. With such enhanced power, amici believe it is important that the Court also consider other harmful practices that will be exacerbated post-merger: unchecked purchasing power and PBM preferential tiering and rebating relationships that will preclude and diminish the impact of lower priced generic and biosimilar products to the detriment of consumers.

### A.   Upstream Harm: Unchecked Purchasing Power

Post-merger, with the addition of 19 million Aetna lives, CVS will wield unprecedented buying power. The Court rightfully scoffed at the notion that this may not be the case, posing rhetorically "Are you telling me that you didn't think it would be a stronger negotiator with manufacturing companies and wholesalers if they had the 19 million customers from Aetna? Are you being straight with me? Come on." (Evidentiary Hr'g Tr. at 319).[37] It strains credulity for a company whose entire business is predicated upon aggregated bargaining leverage to suddenly insist that increased mass does not affect its ability to negotiate. To be clear, however, the increased leverage that CVS obtains from this merger does not mean that consumers will have more access to affordable drugs.

### B.   Downstream Selling Power: Current PBM Conduct and Conflicts Exacerbated

---

[37] Judge Leon requested that CVS provide an answer as to whether "the PBM part of the business has been strengthened in their negotiating ability as a result of this merger to date." Evidentiary Hr'g Tr. at 321.CVS provided an answer late in the afternoon of June 20, 2019, hours before amici's brief was due. As a result, we have not had time to address the numerous misstatements made in CVS' letter to the Court, Dkt. No. 118-1, but intend to respond in due course.

Like with its buying power, CVS' PBM business will also benefit from increased bargaining leverage as a result of Aetna's 19 million lives, and the elimination of Aetna as one of the few managed care organizations that could force CVS to negotiate fairly will only exacerbate the competitive harm.  The simple truth is that PBMs frequently have a clear incentive to drive up the price of prescription drugs, resulting in higher out-of-pocket costs for many consumers, especially those whose copay is based on a percentage of the list price or if they have high-deductible health plans.  This incentive exists because PBMs receive rebates from drug manufacturers in exchange for preferential formulary placement, market share targets, or de facto exclusivity.  Because the portion of the rebate retained by the PBM and insurer may be based on a percentage of a drug's list price, PBMs and insurers have incentives to establish formularies that favor branded drugs with higher list prices and larger rebates over lower priced generics and biosimilars.[38]  In many instances the PBM – including CVS Caremark – extracts large rebates from brand manufacturers that either explicitly exclude biosimilar products, or prefer brand drug products. Two recent studies from Avalere found that seniors in Medicare Part D paid nearly $22 billion more than they should have when their lower priced generic drugs were moved by PBMs from generic formulary tiers onto brand drug tiers which have much higher out-of-pocket costs for patients.[39]  A recent report by the New York State Senate Committee on Operations and

---

[38] Elizabeth Seeley and Aaron S. Kesselheim, Pharmacy Benefit Managers: Practices, Controversies, and What Lies Ahead, THE COMMONWEALTH FUND, (Mar. 26, 2019).  For instance, a PBM may require "step-therapy" or prior authorization before allowing a patient to switch from the brand product to the biosimilar, erecting a barrier to switching that few patients will overcome.

[39] Chris Sloan and Ruth McDonald, Seniors Pay More for Generics in Medicare Prescription Drug Plans Despite Stable Prices, AVALERE (May 22, 2018), http://avalere-health-production.s3.amazonaws.com/uploads/pdfs/1526995040_Avalere_Part_D_Generic_Tiering_Analysis.pdf; Medicare Part D Generic Drug Tiering Request for Comment: Implications for Patient Out-of-Pocket Spending and Part D Plan Costs, AVALERE (Feb. 28, 2019), https://avalere.com/wp-content/uploads/2019/02/20190228-White-Paper-Part-D-Generic-Tiering.pdf.

Governments Investigations stated the problem more succinctly: "In effect, drug manufacturers are paying PBMs to increase the manufacturer's market shares."[40]

The Trump Administration agrees and has singled out the PBMs and rebates as having a significant role in the escalation of the list prices of prescription drugs and of out-of-pocket costs to patients.[41]  Secretary Azar of the Department of Health & Human Services has led the charge with a proposed rule to eliminate rebates in Medicare Part D plans.[42]  Former Food and Drug Administration Commissioner Gottlieb summarized the middleman risks well:

> The top three PBMs control more than two-thirds of the market; the top three wholesalers more than 80%; and the top five pharmacies more than 50%.  Market concentration may prevent optimal competition.  And so, the saving may not always be passed along to employers or consumers. Too often, we see situations where consolidated firms -- the PBMs, the distributors, and the drug stores -- team up with payors.  They use their individual market power to effectively split some of the monopoly rents with large manufacturers and other intermediaries rather than passing on the saving garnered from competition to patients and employers.[43]

Because the PBM market is not competitive, regulated or transparent, PBMs, insurers, and the supply chain extracted $166 billion in rebates from pharmaceutical manufacturers in 2018.[44]  As rebates have increased, so have the list prices of drugs.[45]

---

[40] Final Investigative Report: Pharmacy Benefit Managers in New York at 16 (May 31, 2019).

[41] Adam Fein, *Don't Blame Drug Prices on 'Big Pharma'*, Wall Street Journal, February 3, 2019.

[42] Fraud and Abuse: Removal of Safe Harbor Protection for Rebates Involving Prescription Pharmaceuticals and Creation of New Safe Harbor Protection for Certain Point-of-Sale Reductions in Price on Prescription Pharmaceuticals and Certain Pharmacy Benefit Manager Services Fees. Department of Health and Human Services, published on February 6th, 2019. Available at https://www.federalregister.gov/documents/2019/02/06/2019-01026/fraud-and-abuse-removal-of-safe-harbor-protection-for-rebates-involving-prescription-pharmaceuticals. This proposal would update the discount safe harbor at 42 CFR 1001.952(h) to explicitly exclude reductions in price offered by drug manufacturers to PBMs, Part D, and Medicaid managed care plans from the safe harbor's definition of a "discount."

[43] Scott Gottlieb, Commissioner of Food and Drugs, "Capturing the Benefits of Competition for Patients," Speech before America's Health Insurance Plans National Health Policy Conference (March 7, 2018)

[44] Adam J. Fein, *The Gross Net Bubble Topped $150 billion in 2017*, Drug Channels, April 24, 2018.

[45] Fein, *supra* note 4.  Johnson & Johnson, Merck, and Novartis disclosed that their drug prices declined in 2018.

In summary, given CVS' past history, prescription drugs prices won't be lower nor will lower priced generics and biosimilars be readily accessible because of CVS' tiering and rebating policies.  As the testimony demonstrated, CVS offers a number of standard formularies that are used by its clients.  (Evidentiary Hr'g Tr. 230, 234, 325).  CVS' acquisition of Aetna will only further enhance the power of CVS' PBM business to engage in exclusionary behavior as well as other anticompetitive conduct.

## V.    Conclusion

For all the reasons discussed, Amici believe that the PFJ as drafted is not in the public interest.  The PFJ will not fully restore competition in the PDP market nor will it restore competition for millions of patients.  Indeed, CVS' acquisition of Aetna only increases the merged firm's ability to engage in exclusionary tactics, and is therefore plainly contrary to the public interest.  Pre-merger, Aetna was incentivized to provide a check against CVS with regard to lower drug prices.  Post-merger this structural check will be eliminated for millions of consumers.

Dated: June 21, 2019

Respectfully submitted,

/s/ David A. Balto                          /s/_Andre Barlow___
David A. Balto                               Andre Barlow
Attorney at Law                            Doyle, Barlow & Mazard PLLC
8030 Ellingson Drive                     1110 Vermont Ave, Ste 715, NW
Chevy Chase, MD 20815              Washington, D.C. 20005
(202) 577-5424                              (202) 589-1836
david.balto@dcantitrustlaw.com    abarlow@dbmlawgroup.com

*Attorneys for Consumer Action and U.S. PIRG*

**CERTIFICATE OF SERVICE**

The undersigned certifies that on June 21, 2019 the foregoing document was filed electronically using the Court's ECF system, and thereby serving all counsel of record who are deemed to have consented to electronic service.

/s/Andre Barlow
Andre Barlow
Doyle, Barlow & Mazard PLLC
1110 Vermont Ave, Ste 715, NW
Washington, D.C. 20005
(202) 589-1838
abarlow@dbmlawgroup.com