**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** *et al.,* | |
| **Plaintiffs,** | |
| **v.** | **Case No. 1:18-cv-02340-RJL** |
| **CVS HEALTH CORPORATION** *et al.,* | |
| **Defendants.** | |

**AMICUS CURIAE AIDS HEALTHCARE FOUNDATION'S POST-HEARING BRIEF IN OPPOSITION TO THE UNITED STATES' MOTION FOR ENTRY OF THE PROPOSED FINAL JUDGMENT**

AIDS Healthcare Foundation ("AHF") plays an essential role in providing high quality healthcare services for HIV/AIDS patients. AHF treats approximately 35,000 patients in the United States across 60 clinics in more than 15 states, and approximately 1.1 million HIV/AIDS patients worldwide. Testimony of Dr. Michael Wohlfeiler, June 4, 2019, Afternoon Session ("Wohlfeiler Tr.," 102-103). AHF has created a highly successful model for delivery of care to HIV/AIDS patients, a "one-stop shop" model in which AHF functions as a testing, linkage, specialist, health insurer, pharmacy, and primary care facility. Wohlfeiler Tr. 103. AHF recognizes that pharmacists are a critical part of the healthcare delivery team and that the pharmacist-patient relationship is so important that most AHF clinics have a pharmacy co-located within them. Wohlfeiler Tr. 103. AHF's full-service clinics are staffed by highly specialized physicians and mid-level practitioners—nurse practitioners and physician assistants—who are supervised by physicians. Wohlfeiler Tr. 106. AHF's "high touch" model—involving AHF physicians, nurses, pharmacists, benefits counselors, case managers, and referral coordinators all working together for the patient—has resulted in HIV/AIDS suppression rates that are approximately double the national average. Wohlfeiler Tr. 101-102, 106, 110-111. In fact, the existence of full-service clinics like AHF helped change an HIV/AIDS diagnosis from a death sentence to a chronic, manageable condition. Wohlfeiler Tr. 102-103, 105.

AHF's testimony is critically important to this Court's determination of whether the Department of Justice's ("DOJ") Proposed Final Judgment ("PFJ") is in the public interest. AHF's innovative model, a model that delivers comprehensive lifesaving healthcare services to HIV/AIDS patients, is threatened by this merger, which would break up or take away services that are valued by patients. Wohlfeiler Tr. 105-06.

This brief makes the following points. First, the PFJ fails to address wide-ranging competitive concerns presented by CVS Health Corporation's ("CVS") acquisition of Aetna Inc. ("Aetna"). Second, the PFJ fails to protect the vulnerable segment of consumers that AHF serves because DOJ refuses to acknowledge that (1) the relevant markets, particularly the pharmacy benefit manager ("PBM") market, are highly concentrated and lack meaningful competition and (2) the merged firm's changed incentives and CVS's past history indicate that CVS/Aetna will likely engage in exclusionary conduct after the merger, which will lead to less consumer choice, lower quality of care, and higher prices. Third, if DOJ does not reverse its position and block the merger, it should at the very least negotiate additional remedies that would protect patients' ability to choose their providers. Fourth, this Court can and should look outside the DOJ's Complaint to determine if the PFJ is in the public interest.

## ARGUMENT

## I.     DOJ Failed to Address Wide-Ranging Competitive Concerns in its Proposed Final Judgment

CVS's proposed acquisition of Aetna threatens to make the healthcare marketplace substantially less competitive. This transaction will combine the nation's largest retail pharmacy chain and specialist pharmacy, one of the two largest PBMs commanding roughly a third of the market, with the country's third largest health insurer. The combination creates a large, vertically integrated firm that operates in markets where only a few meaningful rivals compete. The merger increases the merged firm's incentive and ability to favor its own providers and threatens to foreclose rival providers (pharmacies, healthcare clinics, pharmacists, and doctors) from having access to Aetna insureds or to raise rival providers' cost of doing business.

DOJ approved the CVS/Aetna merger on the condition that Aetna divest its individual Medicare Part D prescription drug plans ("PDPs") to WellCare Health Plans Inc. ("WellCare").

The DOJ's Complaint focuses solely on the anticompetitive impact that the acquisition will have on individual Medicare Part D PDPs and completely ignores the other anticompetitive concerns presented by the merger. The acquisition, however, will exacerbate the existing competitive problems across various healthcare markets to the detriment of providers and patients. By not addressing these issues, the DOJ's Complaint and PFJ are deficient. CVS's acquisition of Aetna will likely harm both providers and patients because there are no conditions to prevent the merging parties from engaging in strategic exclusionary conduct.

The stakes are high. Since 2006, Medicare Part D spending has more than doubled to roughly $100 billion per year in 2017 and spending is expected to climb as a growing and aging population of baby boomers becomes Medicare eligible.[1]  Allowing this merger to proceed with the current PFJ has real consequences because the merger will negatively impact patients' lives. Wohlfeiler Tr. 125-33. The PBM and health insurer markets are highly concentrated. Wohlfeiler Tr. 114; Professor Neeraj Sood Testimony, June 4, 2019 Morning Session ("Sood Morning Session Tr."), 31; Professor Neeraj Sood Testimony, June 4, 2019 Afternoon Session ("Sood Afternoon Session Tr."), 98. A lack of competition and transparency exist and, because of vertical integration of the big three PBMs with three of the four largest health insurers in the nation (CVS Caremark/Aetna, Cigna/Express Scripts, and UnitedHealth's OptumRx), numerous conflicts of interest exist. Wohlfeiler Tr. 114, 117; Sood Morning Session Tr. 25, 31.[2]

---

[1] Juliet Cubanski, The Facts on Medicare Spending and Financing, Henry J. Kaiser Family Foundation, June 22, 2018 available at https://www.kff.org/medicare/issue-brief/the-facts-on-medicare-spending-and-financing/.

[2] The Council of Economic Advisors, *Reforming Biopharmaceutical Pricing at Home and Abroad,* February 2018. (hereinafter "CEA White Paper"). According to the Council of Economic Advisors ("CEA"), three PBM firms - OptumRx, Express Scripts, and CVS Caremark – account for 85% of the PBM market. The CEA observed, "[t]he size of manufacturer rebates and the percentage of the rebate passed on to health plans and patients are secret." The CEA found that "the system encourages manufacturers to set artificially high list prices, which are reduced via manufacturers' rebates but leave uninsured individuals facing high drug prices."

## A.  DOJ Ignored the Lack of Competitiveness in the Relevant Markets

Although CVS and Aetna witnesses testified that vertical integration among PBMs and health insurers shows that the PBM business is competitive, they also acknowledge that the PBM and the health insurer industries are scale businesses. Testimony of Terri Swanson, June 5, 2019 Afternoon Session ("Swanson Tr."), 342, 349. In other words, the more scale that a PBM and insurer have, the more leverage they will have in negotiations. Swanson Tr., 342 ("The additional scale certainly gives them additional leverage as they're negotiating with their PBMs or other suppliers."), 349 ("The PBM business is also a scale business.").

Moreover, PBMs are failing to provide many Americans with access to better healthcare or lower priced prescription drugs. PBMs have deviated from their original purpose of acting as honest brokers to lower medical costs and are now a key contributor to the ever-increasing cost of prescription drugs. As the testimony demonstrates, the PBMs and health insurers control the drug formularies, which determine the specific drugs that patients are allowed to purchase, how many times patients can fill prescriptions, and the amount of patients' co-pays. Testimony of Alan Lotvin, June 5, 2019 Afternoon Session, ("Lotvin Tr.") 322-23; Swanson Tr. 355-57. Formulary manipulation to maximize profits means high drug costs for people with expensive diseases. Wohlfeiler Tr. 121 (citing an example where PBM moved all HIV medications to highest co-pay tier, of a drug that cost $1,800 a month with 50% copay).

Because they wield so much power and benefit from higher drug prices, the role of PBMs has been under scrutiny by the federal government[3] In fact, the Department of Health and Human

---

[3] Blueprint to Lower Drug Prices and Reduce Out-of-Pocket Costs, Request for Information, U.S. Department of Health & Human Services ("HHS"), May 14, 2018 at 22 ("American patients have the right to know what their prescription drugs will really cost before they get to the pharmacy."). See also Secretary Alex Azar Interview on CNBC's Squawk Box, May 11, 2018, available at https://www.cnbc.com/2018/05/11/azar-says-everybody-is-wetting-their-beak-on-high-drug-list-prices.html.

DM1\9727462.1

Services has taken aim at the contracting and negotiating practices of PBMs and payors (insurers and self-insured employers) because they have resulted in the escalation of list prices and out-of-pocket costs for patients. As a result, HHS is currently considering proposed new rules to eliminate the safe harbor protections under federal anti-kickback laws for manufacturer rebates in Medicare Part D plans and to create new safe harbor protections for discounts to patients at the point of sale.[4]

### B.    DOJ Ignored the Risk of Exclusionary Behavior After the Merger

There is persuasive, unrebutted evidence that CVS/Aetna will likely engage in exclusionary behavior after the merger. All we need to examine is past history in the healthcare marketplace and of the merging parties, and the merged firm's changed incentives.

Previous vertical integration in the healthcare industry has resulted in anticompetitive conduct that has harmed AHF as well as other independent pharmacies. In 2011, United HealthGroup, the largest health insurer in the United States, formed its PBM, OptumRX.[5] As Dr. Wohlfeiler testified, shortly afterward, the combined firm engaged in exclusionary conduct which reduced patient access to vital healthcare services by limiting a patient's pharmacy choice as Optum RX took active steps to steer AHF pharmacy patients to Optum's mail order service. Wohlfeiler Tr. 114-118. Similarly, after CVS and Caremark merged in 2007, there were allegations that CVS Caremark, the PBM arm, used its PBM business to steer patients to CVS retail pharmacies.[6] Through that merger, CVS obtained competitively sensitive information of

---

[4] HHS Fact Sheet, available at https://www.hhs.gov/sites/default/files/20190131-fact-sheet.pdf.
[5] Press Release, UnitedHealth Group Announces "Optum" Master Brand for its Health Services Businesses, April 11, 2011 available at  https://www.unitedhealthgroup.com/newsroom/2011/0411optum.html.
[6] Reed Abelson and Natasha Singer, Pressure Grows to Unwind CVS Merger, NY Times, April 14, 2011 available at https://www.nytimes.com/2011/04/15/business/15cvs.html?mtrref=undefined&gwh=D7479295A20E42C95C29B09 D28E2800B&gwt=pay. *See* Letter from Bruce T. Roberts, executive vice president and chief executive officer, National Community Pharmacists Association to FTC Chairman William Kovacic, December 23, 2008, available at http://www.ncpanet.org/pdf/leg/cvscaremarkncpaltr.pdf (outlining competition and privacy concerns).

non-CVS pharmacies including the identity of their customers and prescribers, the drugs

prescribed, the cost of the drugs, the amount of the drugs acquired, the drug acquisition cost, and

the reimbursement amount.[7] Non-CVS pharmacists believe that Caremark shared its patient data

with CVS's pharmacy arm and used the information to steer customers toward CVS's

pharmacies by directly informing patients who use non-CVS pharmacies of the risks of using

multiple pharmacies, and by urging them to consolidate all of their prescription drug purchases

through CVS or pay an increased copay.[8] As recently as April 2018, non-CVS pharmacies were

still expressing these concerns.[9] This type of conduct could also happen to other medical

providers and their patients.

Pre-merger, Aetna has the incentive to deal with all providers—such as medical clinics,

doctors, pharmacies, and pharmacists—for its insureds. Post-merger, these incentives change—

once it owns Aetna, the merged entity will have the incentive, and the ability, to cut off rival

providers' access to Aetna insureds ("customer foreclosure").  In addition, CVS/Aetna will have

the increased incentive and ability to raise the costs to rival insurers that need CVS's retail chain

footprint ("input foreclosure").

## C.    DOJ Ignored the Risk of Reduced Quality of Care After the Merger

This integration will result in not only higher out–of–pocket costs for patients, but will

also likely result in numerous non-price effects that the Court should consider in its public

interest determination. Testimony of Dr. Diana Moss, June 4, 2019 Afternoon Session ("Moss

Tr.") 145-46 (stating that non-price effects such as those contained in Dr. Wohlfeiler's testimony

---

[7] Letter from Holly Henry, president, National Community Pharmacists Association to FTC Chairman Jon Leibowitz; May 12, 2009, available at http://www.ncpanet.org/pdf/needftcinvestigation.pdf. (citing potential violations of the Clayton and the FTC Act).
[8] *See* letter from Roberts and letter from Henry, *supra* notes 7 and 8.
[9] Catherine Candisky, Darrel Rowland, and Marty Schladen, *Three CVS actions raise concerns for some pharmacies, consumers*, Columbia Dispatch, April 15, 2018, available at https://www.dispatch.com/news/20180415/three-cvs-actions-raise-concerns-for-some-pharmacies-consumers.

are cognizable). If CVS steers Aetna insureds to its minute clinics, health hubs, and pharmacies, patients living with HIV/AIDS, who are insured by Aetna, would be subjected to serious quality of care problems. Wohlfeiler Tr. 126-28. This merger threatens to disrupt the healthcare of AHF's patients because AHF patients may lose their pharmacist, specialist, and primary care doctor. Wohlfeiler Tr. 116. The pharmacist-patient relationship; the doctor-patient relationship; the advice patients receive from their providers; privacy concerns; and AHF's 35-day call report, whereby AHF calls patients who have not filled their prescription for more than 35 days, are all important in the Court's assessment of the public interest. Moss Tr. 146.

PBMs and insurers do not typically cater to HIV/AIDS patients. Wohlfeiler Tr. 115-16 (describing how Optum essentially forced AHF patients to adopt anonymous mail order services against their choice, which creates problems for HIV/AIDS patients). Confidentiality and privacy are especially important concerns for patients living with HIV/AIDS, yet PBMs and insurers such as CVS and Aetna have a history of breaching these patients' privacy. Wohlfeiler Tr. 117 (describing privacy concerns of HIV/AIDS patients), 128.[10]

AHF is concerned about how this merger will likely impact patients' lives. Patients deserve choice when making their healthcare decisions. Too often, patients are forced to choose a doctor or pharmacist not because of their need for special treatment but because the PBM and insurer direct the patients to their own preferred networks of providers. Moreover, AHF's concerns are not unique to its particular patient population, but rather are concerns that other patient populations share. Moss Tr. 170.

---

[10] CVS recently settled a class action lawsuit over its revealing the HIV-positive status of up to 6,000 Ohioans through a mailing concerning such prescriptions. *Doe One et al. v. CVS Health Corp. et al.*, Case No. 18-cv-00238 (S.D.Ohio 2018). This follows a 2017 breach by Aetna that revealed the HIV status of patients across several states. *See* https://www.npr.org/sections/health-shots/2018/01/17/572312972/aetna-agrees-to-pay-17-million-in-hiv-privacy-breach.

In short, the PFJ fails to address any of these wide-ranging concerns presented by the merger and is not in the public interest.

## II.    The PFJ Fails to Protect Vulnerable Patients From the Effects of the Merger: Higher Prices, Reduced Access, and Lower Quality of Care

### A.    The Lack of Competition in the PBM Market Makes Anticompetitive Effects from the Merger Likely

Patients are paying higher prices for prescription drugs than they should be because PBMs are not adequately fulfilling their purpose in controlling costs, as shown by the $900 copay example cited by Dr. Wohlfeiler. Wohlfeiler Tr. 121, 130. The PBM market is not competitive; it lacks transparency and choice while conflicts of interest abound. Wohlfeiler Tr. 120; Sood Morning Session Tr. 31; Moss Tr. 164. Several witnesses at the hearing testified that the PBM market is highly concentrated and that the big three vertically integrated PBMs (CVS Caremark/Aetna, Cigna/Express Scripts, and UnitedHealth's OptumRx) control their tier in the drug supply chain. Sood Morning Session Tr. 25, 31.[11]  The White House Council of Economic Advisors ("CEA") found that the big three's control of the PBM market "allows them to exercise undue market power against manufacturers and against health plans and beneficiaries they are supposed to be representing, thus generating outsized profits for themselves."[12] Indeed, the three largest PBMs have a higher gross profit than any other players involved in the drug supply chain (distributors, insurers, or pharmacies).[13]

Perversely, massive rebates paid by drug manufacturers to PBMs create an incentive for PBMs and insurers to actually support higher, artificial list prices for brand drugs (since drug companies will raise prices to provide bigger rebates) and sales of brand drugs over lower cost

---

[11] CEA White Paper. The CEA states that the three PBMs have approximately 85% of the PBM market.
[12] *Id.*
[13] Charley Grant, *Hidden Profits in the Prescription Drug Supply Chain*, Wall Street Journal, February 24, 2018.

generics.  But consumers suffer in this shell game, as beneficiaries' cost sharing (*e.g.*, coinsurance) is set off of list the prices, not the after-the-fact rebated price.[14] Dr. Wohlfeiler testified that he has seen situations where the PBM moved HIV medications to the highest cost sharing tier and set the patient portion to 50% of the retail cost of the drug. Wohlfeiler Tr. 121. Dr. Wohlfeiler also testified that one PBM told him that it puts HIV medications in a high cost-sharing tier to discourage HIV patients from choosing its plan because they are high-cost patients. Wohlfeiler Tr. 130. Because the PBM market is not competitive, regulated, or transparent, the three largest PBMs are able to extract massive rebates from pharmaceutical manufacturers, which are not shared with patients to the extent that they should be. Indeed, rebates have more than doubled in the last five years and in 2018, pharmaceutical manufacturers paid $166 billion in rebates and price concessions to PBMs, insurers, and the supply chain.[15] PBMs along with the insurers use their market power to secure higher rebates based off a percentage of the list prices.[16]

Further evidence of PBMs' market power was their ability in the past to implement "gag" clauses in pharmacy contracts that prohibited pharmacists from informing consumers of lower-priced prescription drug alternatives. Wohlfeiler Tr. 120. These gag clauses served no procompetitive purpose, but rather were designed to conceal the costs of prescription drugs from consumers at the pharmacy, causing consumers to pay more, with the only clear benefit going to

---

[14] Pharmaceutical price concessions like rebates are not reflected at point of sale, which is the point when beneficiaries are charged their cost sharing by a pharmacy.  Rather, the cost-sharing amount is based on a percent of the list price (not the rebated price) and thus beneficiaries end up paying a larger share of the actual cost of a drug. Department of Health and Human Services, *Fraud and Abuse: Removal of Safe Harbor Protection for Rebates Involving Prescription Pharmaceuticals and Creation of New Safe Harbor Protection for Certain Point-of-Sale Reductions in Price on Prescription Pharmaceuticals and Certain Pharmacy Benefit Manager Services Fees*, published on February 6th, 2019. Available at https://www.federalregister.gov/documents/2019/02/06/2019-01026/fraud-and-abuse-removal-of-safe-harbor-protection-for-rebates-involving-prescription-pharmaceuticals, page 2343.

[15] Adam J. Fein, *The Gross Net Bubble Reached a Record $166 Billion in 2018*, Drug Channels, April 2, 2019.

[16] Peter J. Pills, *PBMs Are Hogging Our Discounts,* Fortune, August 28, 2018.

the PBM's bottom line. Fortunately, Congress stepped in and outlawed the practice in the fall of

2018.[17]  Nonetheless, the fact that PBMs were able to force pharmacies not to disclose this

information to their patients demonstrates that the big three PBMs have market power.

When the PBM is commonly owned with the entity it is supposed to bargain with, or one

that has its own insurer or mail order operations, there is an inherent conflict of interest which

can lessen consumer choice and quality of care. Wohlfeiler Tr. 114-118.  The three major PBMs

are vertically integrated with mail order operations, specialty pharmacies, insurers, and, in the

case of CVS Caremark, the largest retail and specialty pharmacy chain and the dominant long-

term care pharmacy. CVS's acquisition of Aetna's 19 million subscribers makes matters worse

as the combined firm will have the incentive and ability to engage in strategic exclusionary

conduct that will disadvantage rival providers and their patients.

**B.      Vertical Foreclosure Concerns Have the Potential to Harm Providers and Insurers**

The merger carries the potential for vertical foreclosure that will impact rival providers

including pharmacies, hospitals, medical clinics, doctors, and mid-levels. Wohlfeiler Tr. 116,

119, 120-125, 126-127. Foreclosure is likely to occur in the pharmacy, medical clinic, and

insurer markets.

**1.      Pharmacy Foreclosure Concerns Are Unrebutted By Testimony**

After the merger, CVS/Aetna is likely to engage in "customer foreclosure" in the

pharmacy market by denying rival pharmacies access to Aetna subscribers.  Moss Tr. 159, 165.

AHF has specialty pharmacies serving particularly vulnerable consumers. Prior to the merger,

AHF can negotiate with CVS and Aetna to be a part of their pharmacy networks. After the

---

[17] On October 10, 2018, President Donald Trump signed into law the "Know the Lowest Price Act of 2018" and the "Patients' Right to Know Drug Prices Act of 2018".

merger, CVS/Aetna will have the incentive to disadvantage its pharmacy competitors by steering Aetna insureds to narrow networks that exclude independent or specialty pharmacies, and by steering patients to CVS pharmacies in certain local markets around the country where CVS retail stores have market power, or to CVS's mail order operations. CVS/Aetna could also frustrate patients' access to rival pharmacies through the design and implementation of restrictive formularies and tiering policies, designation of CVS pharmacies as preferred providers, implementation of narrow networks for specialty pharmacies, and implementation of financial incentives to use CVS mail order. Moss Tr. 162, 165; Wohlfeiler Tr. 119-20, 122-25 (explaining how CVS's PBM creates preferred pharmacy networks, narrow networks, and patients could be forced to pay higher copays for purchasing prescription drugs from AHF); Lotvin Tr. 322-23, 335 (testifying that CVS's PBM constructs pharmacy networks for payors, CVS's PBM has standard formularies that many employers use, and CVS's PBM constructs narrow networks that exclude independent pharmacies).

When United and OptumRx vertically integrated, AHF's patients were told that they could no longer use the AHF pharmacy and that "they were being forced into mail order programs for their medications and it was a real disruption of their continuity of care and emotionally was very difficult" for them. Wohlfeiler Tr. 114-115. Steering patients from AHF pharmacies to CVS pharmacies or mail order operations could result in non-price effects that could violate patients' confidentiality and privacy. Wohlfeiler Tr. 117 (discussing tragic consequences of mail order services failing to protect HIV/AIDS patient privacy). AHF pharmacies take extra precautions to make sure that the delivery of medication is done in a discreet manner. Wohlfeiler Tr. 113. AHF pharmacies use a 35-day report, whereby a patient is contacted if the patient has not had his prescription filled within the past 35 days. Such high-

touch care is essential to maintain adherence to the medication regimen, and is the key component of AHF's successful model of care for HIV/AIDS patients. Wohlfeiler Tr. 110-11; 125 (stating that if Aetna patients are directed away from specialty pharmacies like AHF and into CVS pharmacies "you're going to see more patients getting sick, frankly"). The potential loss of choice and service by AHF pharmacies is a cognizable non-price effect that should be considered by the Court when making its public interest determination.

In addition, after the merger, CVS will have an increased incentive and ability to squeeze rival pharmacies by reducing reimbursements to uncompetitive levels and/or increasing direct and indirect remuneration ("DIR") fees. Wohlfeiler Tr. 117-122. PBMs have been using DIR fees for many years.[18] The Center for Medicare and Medicaid Services ("CMS") defines DIR fees as additional compensation paid to Part D plans or PBMs after the point-of-sale that serves to change the final cost of the drug for the insurer, or the price paid to the pharmacy for the drug.[19] Examples of such compensation include rebates provided by manufacturers and concessions paid by pharmacies. DIR fees were originally supposed to be a way to offer incentives but now they are being used as a way for PBMs to "claw back" money from pharmacies and the practice is under scrutiny.[20] Indeed, Dr. Wohlfeiler explained that "PBMs are … increasingly … assessing higher DIR fees … with very little transparency …  It's clawed back millions of dollars from us, and those are dollars that would normally be used to support our programs and our mission as a safety net provider." Wohlfeiler Tr. 117.

---

[18] Davy James, *Legislators Push HHS to Stop Pharmacy DIR Fees*, Specialty Pharmacy Times, August 6, 2018.
[19] *Id.*
[20] *Id.*

### 2.    Medical Clinic Foreclosure Concerns Are Unrebutted By Testimony

After the merger, CVS/Aetna will have the increased incentive and ability to steer Aetna insureds to CVS minute clinics and health hubs. Wohlfeiler Tr. 126-127.   AHF is a healthcare provider with over sixty U.S. clinics. AHF offers specialized care and a model of care for HIV/AIDS that includes coordination between AHF providers, clinics, and pharmacies. Wohlfeiler Tr. 106. CVS has minute clinics and health hubs and plans to expand them. Lotvin Tr. 313-317. In fact, according to Mr. Lotvin, CVS has already started the steering process. Mr. Lotvin testified that Aetna will provide more data to CVS, which can be used to provide Aetna's insureds with healthcare advice. Lotvin Tr. 312. Mr. Lotvin further testified that CVS is already using Aetna's data to contact patients and tell them to come into the minute clinics. Lotvin Tr. 317.

Steering vulnerable patients such as HIV/AIDS patients to minute clinics could have disastrous effects. Dr. Wohlfeiler testified that patients could be forced to seek care from preferred providers favored by CVS/Aetna, such as minute clinics, for financial reasons. Wohlfeiler Tr. 126-127. Any steering of Aetna insureds from AHF to CVS minute clinics would raise quality of care concerns because AHF's treatment of individuals with HIV/AIDS is highly specialized such that seemingly routine service may not, in fact, be routine for them. Wohlfeiler Tr. 127. As Dr. Wohlfeiler explained with regard to flu shots, certain live virus vaccines are not given to patients with HIV/AIDS because of their weakened immune systems; AHF clinics are equipped with highly specialized personnel, who understand the risks in such situations. As a practicing physician specializing in treating these patients, Dr. Wohlfeiler is concerned that minute clinics will not be familiar with their special needs. Wohlfeiler Tr. 127.  These quality of care concerns should be part of the Court's public interest determination.

### 3.      Insurer Foreclosure Is Also Likely to Occur

After the merger, CVS/Aetna is likely to engage in "input foreclosure" in the insurance market by denying health insurers a "must have" input, namely CVS pharmacies.  Moss Tr. 154. AHF offers Medicare and Medicaid health plans that compete with Aetna. Insurers view CVS's network of 7,900 retail pharmacy stores as a "must have" pharmacy network in various regional markets around the country. Moss Tr. 154. Even AHF views CVS pharmacies as "must have." Wohlfeiler Tr. 119. Because of CMS requirements, AHF cannot just use its own pharmacy network; AHF needs CVS retail pharmacies in its network. As Dr. Wohlfeiler put it "to have something that is convenient for our patients that meets CMS requirements, we need to be contracted with a large chain like CVS which has got locations everywhere." Tr. 119 (lines 14-16). Indeed, Mr. Lotvin testified that "[w]e have 4 and a half million people a day who walk into our stores [and that] [w]e're within 3 miles of 70 percent of the U.S. population."  Lotvin Tr. 312.

Before the merger, CVS has the incentive to provide AHF with its network of CVS retail pharmacy stores. After the merger, because it now owns Aetna, the combined firm will have the increased incentive and ability to raise the costs to rival insurers that need CVS's retail chain footprint. This concern is not simply about the combined firm flat-out denying insurer rivals from using CVS retail pharmacies; rather, it is about disadvantaging insurer rivals through increased pricing, or non-price factors that may be designed to frustrate access. Moss Tr. 162.

But, if there were a complete blackout of CVS pharmacy services, there is a concern that there would be a degradation of care if an AHF patient were forced out of an AHF plan to an Aetna or any other plan. Wohlfeiler Tr. 128-29 ("the biggest impact is that these Medicare Advantage plans are not special needs plans. … they could be assigned to a PCP who was just most likely a general internist or family practitioner who probably knows little to nothing about HIV treatment").   Forcing AHF's patients out of AHF's health insurance plans could be

detrimental to HIV/AIDS patients because most health insurers do not want HIV/AIDS patients. Wohlfeiler Tr. 130. Moreover, real pricing issues exist for AHF patients that would have to switch to Aetna or another health plan because AHF copays are set at the lowest tiers so moving an AHF insured to Aetna or another health plan could result in patient having to pay higher premiums and out of pocket costs. Wohlfeiler Tr. 128-29.[21]

## III.   Potential Remedies To Protect Patient's Ability to Choose Their Providers

As the testimony from the hearing shows, the CVS-Aetna merger will increase the merged firm's incentives and ability post-merger to steer Aetna insureds to its minute clinics, health hubs, and pharmacies through various mechanisms and to exclude rival insurers such as AHF's managed Medicare and Medicaid plans from CVS's retail pharmacy network. The merged firm could squeeze rival pharmacies in the form of lower reimbursements, higher drug prices and dispensing costs, and higher DIR fees. Dr. Wohlfeiler testified that he did not believe the PFJ was in the public interest because it did not address any of these issues, and that therefore the merger would create an "uneven, unfair playing field that will make it hard for AHF to compete." Wohlfeiler Tr. 131. Dr. Wohlfeiler also testified that if guarantees of patient choice and access were imposed, that such conditions would be helpful. *Id.* at 132. While, as Dr. Wohlfeiler observed, DOJ completely failed to address these public interest concerns, several state governments that investigated CVS's acquisition of Aetna did address them. Some of the states approved the merger so long as the merged firm agreed to certain conditions on its future behavior.

---

[21] We note that yesterday CVS Health submitted a letter from Gary Loeber, a CVS Health executive, who argued that Aetna and CVS must separately compete in the employer-sponsored healthcare market.  He notably does not mention where Aetna and CVS operate as one dominant player – including the Medicare Advantage, Medicaid managed care, and Exchange markets.

In Georgia, the Commissioner of Insurance imposed a number of conditions to maintain competition.[22]  First, CVS/Aetna is required to invite non-CVS healthcare providers (pharmacies, physicians, clinics, etc.) to join its networks, and must set the same criteria for all those providers. Second, CVS/Aetna must allow Georgia patients to use any healthcare provider — in or out of network — if that provider accepts the same conditions as those within the network. Third, CVS/Aetna cannot require patients to use CVS-owned pharmacies, period — not for regular prescriptions, refills, or specialty drugs. These concessions reduce the chance that a combined CVS/Aetna can limit patients' choice of healthcare providers. And, fourth, CVS/Aetna must disclose to the Department of Insurance the amount of rebates it receives from drug makers and how much of those it passed on to insurers.

In New York, the Final Order approving the CVS/Aetna merger required a number of conditions to resolve competition concerns. First, CVS/Aetna must continue to offer its current products throughout its current service area in New York, and use reasonable efforts to maintain its current network of providers, including pharmacies, without material changes, for a period of three years. Second, CVS/Aetna is required to adhere to a firewall policy that will keep Aetna employees from learning information concerning individual pricing and rates paid by other health plans and clients to CVS Caremark for PBM and retail pharmacy services. And, third, CVS/Aetna, for a period of three years, shall ensure that participating provider networks for insured products maintain access to independent New York pharmacies. CVS/Aetna is required to annually report to the New York Department of Financial Services the percentage of independent New York pharmacies in its New York pharmacy networks.

---

[22] Final Order, In the Matter of: Acquisition of Control of Aetna Health Inc., and Aetna Better Health Inc., Case No: 11022798 (Nov. 9, 2018), https://www.gasco.us/client_files/File/cvs-aetna-final-order.pdf.

While blocking the merger is the best solution to an anticompetitive merger, these states' imposition of restrictions on the combined firm's future behavior is a step in the right direction. To preserve the same level of competitive intensity that existed pre-merger, the DOJ and CVS should negotiate the following behavioral remedies to preserve competition.

- First, the PFJ should be modified to require that all rival pharmacies have non-discriminatory access to CVS Caremark's pharmacy networks at fair reimbursements that cover actual drug costs and dispensing costs, and that are no lower than the reimbursement that CVS Caremark pays its own pharmacies. The PFJ should require that, in states with Any Willing Provider laws, CVS may not skirt the law through unfair barriers and practices.

- Second, the PFJ should provide that managed care plans should not be denied access to CVS Pharmacy networks, and that managed care plans' access should be at a fair price, no worse than the fee that CVS Caremark charges Aetna.

- Third, the PFJ should provide that all Aetna plan members must be allowed to opt out of any specialty or other mail order programs, and Aetna/CVS may not put barriers in place that discourage patients from exercising their right to opt out (such as imposing higher cost-sharing on non-CVS pharmacies, or not providing members with adequate notice on how to opt out, or having CVS customer service representatives pressure members into staying in the CVS program).

Such protections are necessary to preserve competition and protect consumer welfare.

## IV. The District Court Can Look Outside the Complaint to Determine Whether the PFJ is in the Public Interest

In its Motion to Limit the Scope of the Tunney Act Hearing, DOJ continues with its incorrect interpretation that the Tunney Act is limited to determining whether the consent judgment reasonably remedies the harm alleged in the Complaint. [Dkt. No. 82, p. 3]. DOJ's interpretation goes against the plain language and purpose of the Tunney Act, which entrusts the district court with acting as "an independent check upon the terms negotiated by the DOJ." *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 149 (D.D.C. 1982). Congress enacted the Tunney Act to eliminate excessive secrecy from the consent decree process and address its perception that the DOJ entered into a number of weak settlements. *See United States v. Airline*

*Tariff Pub. Co.*, 836 F. Supp. 9, 11 (D.D.C. 1993); *United States v. Blavatnik*, No. CV 15-1631 (RDM), 2016 WL 593449, at *7 (D.D.C. Feb. 12, 2016).

Furthermore, in amending the Tunney Act in 2004, Congress criticized some of the case law that limited the district court's role in Tunney Act proceedings as "contrary to the intent of the Tunney Act and effectively stripp[ing] the courts of the ability to engage in [a] meaningful review of antitrust settlements." 150 Cong. Rec. S3615 (Apr. 2, 2004).  Moreover, Congress "want[s] the courts to make an independent, objective, and active determination" without undue deference to the DOJ. 150 Cong. Rec. S3617 (Apr. 2, 2004).

The district court is statutorily required under the Tunney Act to take into account "competitive considerations bearing upon the adequacy" of the PFJ.  Competitive Impact Statement at 14; 15 U.S.C. § 16(e)(1)(A).  Thus, the district court must "evaluate both 'the competitive impact of the proposed remedies, i.e., how well the settlement remedies the harms alleged in the complaint[],' as well as 'issues unrelated to the competitive impact of the settlement.'" *United States v. AT&T Inc.*, 541 F. Supp. 2d 2, 6 (D.D.C. 2008) (quoting *United v. SBC Commc'ns*, 489 F.Supp.2d 1, 17 (D.D.C. 2007)); 15 U.S.C. § 16(e)(1)(A), (B).  Moreover, the Court is obligated to conduct a review of "any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest."  15 U.S.C. § 16(e)(1)(A). Such competitive considerations should include (1) examination of U.S. antitrust agencies' past enforcement in the healthcare industry and (2) independent analysis of the competitive effects and failed remedies arising from past mergers of PBMs, retail pharmacies, and health insurers. The Court was correct in examining additional competitive considerations in this Tunney Act proceeding because the DOJ took a myopic view of the competitive problems raised by the CVS/Aetna merger.

DOJ understands, as it acknowledged in the Competitive Impact Statement, the "judicial mockery" standard, first articulated in *United States v. Microsoft Corp.*, 56 F.3d 1448, 1462 (D.C. Cir. 1995), *i.e.*, that the Court is empowered to look beyond the complaint in making the public interest determination when "the complaint is drafted so narrowly as to make a mockery of judicial power.'" Competitive Impact Statement, at 17 (quoting *United States v. SBC Communications, Inc.*, 489 F.Supp.2d 1, 14 (D.D.C. 2007)) Given the testimony at the hearings and the DOJ's less than transparent response to public comments, DOJ's narrowly drafted Complaint makes a mockery of judicial power and, therefore, the court can and should look beyond the Complaint in making its public interest determination.

## CONCLUSION

For all the reasons discussed, AHF believes that the PFJ as drafted is not in the public interest. The Court should reject the PFJ, or, in the alternative, impose conditions on the merger, as set forth above, to maintain competition and protect consumers.

Dated:  June 21, 2019

Respectfully Submitted,

/s/ Joseph J. Aronica

Joseph J. Aronica (DC Bar No.:  446139)
DUANE MORRIS LLP
505 9th Street, N.W.
Suite 1000
Washington, DC 20004
Telephone: 202-776-7824
Fax:  202-478-1885
Email:  JJAronica@duanemorris.com

Christopher H. Casey (Bar ID 418574) (*Pro Hac Vice*)
Sean P. McConnell (*Pro Hac Vice*)
Jonathan L. Swichar (*Pro Hac Vice*)
Bradley A. Wasser (*Pro Hac Vice*)
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA  19103-4196

19

Telephone: 215-979-1000
Fax: 215-979-1020
Email: CHCasey@duanemorris.com
      SPMcConnell@duanemorris.com
      JLSwichar@duanemorris.com
      BAWasser@duanemorris.com

Jeffrey Blend (Bar ID 989246)
AIDS HEALTHCARE FOUNDATION
517 C Street, NE
Washington, DC 20002
Telephone: (202) 543-1081
Fax: (323) 467-8450
jeffrey.blend@aidshealth.com

Attorneys for *Amicus Curiae AIDS Healthcare Foundation*

20

## CERTIFICATE OF SERVICE

I, Christopher H. Casey, hereby certify that on June 21, 2019, I caused a copy of the

foregoing document to be served upon Plaintiffs United States of America, State of California,

State of Florida, State of Hawaii, State of Washington, and Defendants CVS Health Corporation

and Aetna, Inc., via the Court's CM/ECF system, and to be served upon Plaintiff State of

Mississippi by mailing the document electronically to its duly authorized legal representative:

**Counsel for the State of Mississippi:**
Crystal Utley Secoy
Consumer Protection Division
Mississippi Attorney General's Office
PO Box 22974
Jackson, Mississippi 39225
Phone: 610-359-4213
cutle@ago.state.ms.us

/s/      Christopher H. Casey
Christopher H. Casey (Bar ID 418574)