**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *et al*., <br><br> Plaintiffs, <br> v. <br><br> CVS HEALTH CORPORATION; and <br> AETNA INC., <br><br> Defendants. | Civil Action No. 1:18-cv-02340-RJL |

**CVS'S POST-HEARING BRIEF
IN SUPPORT OF ENTRY OF PROPOSED FINAL JUDGMENT**

After a nearly year-long investigation, the United States and five States concluded that

the merger of CVS Health Corp. ("CVS") and Aetna Inc. ("Aetna") would not harm competition

in any market beyond a subset of geographic regions within the individual Part D prescription

drug plan ("PDP") market, and that divesting Aetna's PDP business would fully remedy any

such harm.  The investigation was exhaustive, including review of millions of industry

documents, over 100 interviews of industry participants, and numerous depositions of CVS and

Aetna executives.

This Court has taken extraordinary steps to ensure that those who oppose the proposed

consent decree may have their voices heard, through extensive briefing and in an evidentiary

hearing that was, by all accounts, the first ever under the Tunney Act.  Multiple groups of amici

curiae ("Amici") thus had a full opportunity to explain their opposition to this merger and the

proposed remedy.  The written record, and the testimony during the two-day hearing on June 4–

5, 2019, confirm that entry of the proposed Final Judgment would be in the public interest.

**I.      Legal Standard**

The government has "broad discretion to settle with the defendant within the reaches of

the public interest." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995). The

Tunney Act charges the Court with determining whether entry of a proposed consent decree falls

within those reaches. 15 U.S.C. § 16(e)(1). A decree satisfies this standard if it creates "a

reasonably adequate remedy for the harms alleged in the complaint." *United States v. Republic

Servs., Inc.*, 723 F. Supp. 2d 157, 160 (D.D.C. 2010). Throughout these proceedings, Amici

have pressed the Court to consider arguments and testimony irrelevant to the Complaint's

allegations on the mistaken ground that courts may reject a decree drafted so narrowly as to

make "a mockery of judicial power." *E.g.*, ECF No. 88, at 5–6. But the government's decision

to bring certain charges and not others cannot be "a mockery of judicial power" because that

decision lies at the core of the prosecutorial power.[1] *See, e.g.*, *U.S. Airways Grp.*, 38 F. Supp. 3d

69, 75 (D.D.C. 2014) (*Microsoft* confines public interest determination to harms actually alleged

by government).[2] A court conducting a Tunney Act review thus may not reject a consent decree

---

[1] Consideration of allegations not addressed in the Complaint or in the consent decree would violate the separation of powers and raise significant constitutional concerns. The constitutionality of the Tunney Act has long been debated because "[t]he question assigned to the district courts by the Act is a classic example of a question committed to the Executive." *Maryland v. United States*, 460 U.S. 1001, 1005 (1983) (Rehnquist, J., dissenting). The courts have thus "narrowly construed" judicial review authority "to avoid encroaching on the Executive's core discretion over enforcement decisions." *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 743 (D.C. Cir. 2016); *see also Microsoft*, 56 F.3d at 1460–61.

[2] Although the court in *United States v. SBC Communications* extrapolated from *Microsoft* that there may be cases in which "the complaint is drafted so narrowly as to make a mockery of judicial power," 489 F. Supp. 2d 1, 15 (D.D.C. 2007), that dictum did not affect its holding that the government "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms" and that the proposed final judgments there satisfied that standard, *id.* at 17, 21. Following *SBC*, no court has declined to enter a decree for failure to address harms not alleged by the government. *See Republic Servs.*, 723 F. Supp. 2d at 159 ("[A] court may not 'effectively redraft the complaint' by considering competitive effects that have not been raised or pursued by the government." (quoting *Microsoft*, 56 F.3d at 1459–60)); *United States v. Abitibi–Consol., Inc.*, 584 F. Supp. 2d 162, 165 (D.D.C. 2008) ("If there is a factual basis for concluding that the divestiture is a reasonably adequate remedy for the harm predicted in the Complaint, then the settlement should be approved.").

for failing to address allegations of harm the government did not advance.

Judged under any standard, however, entry of the proposed Final Judgment is in the public interest:  The divestiture remedy fully addresses the harms alleged by the government, and the other purported harms claimed by Amici are wholly unsupported by the evidence.

## II.    The Hearing Confirmed That Entry of the Consent Decree Is in the Public Interest.

### A.    The Merger Generates Significant Consumer Benefits.

As this Court observed in *AT&T*, vertical mergers may be efficiency-enhancing where integration provides each company with capabilities it otherwise lacks, giving the merged entity the ability to offer products it otherwise could not bring to market.  The Court concluded in that case that the proposed merger would provide Time Warner with subscriber relationships and subscriber information it otherwise lacked, and AT&T with high-quality content, enhancing the merged entity's ability to compete and offer new products in a rapidly changing marketplace. *United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 181–83 (D.D.C. 2018).

That same dynamic is at work here:  As explained by Dr. Alan Lotvin—CVS's Chief Transformation Officer and an M.D. with experience in a variety of healthcare roles, Tr. 297:15–298:24—CVS for years has tried to improve the model for treatment of chronic disease and to lower medical costs by bringing innovations to market; but before the merger, although CVS had a broad retail presence in local communities, it lacked the medical information necessary to revamp healthcare delivery.  Aetna, on the other hand, possessed such information and analytical capabilities but lacked customer contact.  *Id.* at 311:23–312:20.  The merger creates the incentives needed to bring these innovations to market.  *Id.* at 312:21–313:15.

### 1.   The evidence demonstrates the merger will allow CVS to improve health care and generate cost savings.

As Dr. Lotvin testified, the current healthcare delivery system does a poor job of treating chronic illness.  Tr. 310:1–22.  Care is fragmented, and patients struggle to navigate a complex system.  Providers in a fee-for-service model lack the incentives to support behaviors that keep patients well, while insurers have incentives to reduce costs but lack the patient contact needed to promote healthy behaviors.[3]  Patients therefore suffer preventable health conditions, and payors bear the burden of inefficient spending.  Combining Aetna's insurance business with CVS's provider workforce and retail convenience meets these challenges.  *Id.* at 310:23–311:22.[4]

This merger "'create[s] vertical integration efficiencies between purchasers and sellers,'" thereby "'cut[ting] sales and distribution costs, facilitat[ing] the flow of information between levels of the industry[, and] creat[ing] economies of scale.'"  *AT&T*, 310 F. Supp. 3d at 193 & n.19 (citations omitted).  As Dr. Lawrence Wu testified, the merger delivers significant benefits through the elimination of double marginalization and improved care.  Tr. 269:2–272:18.  The merger is projected to create $800 million in efficiencies by 2020, and over $2 billion in annual long-term value,[5] largely through cost-reducing programs that combine Aetna's analytics capabilities with CVS's retail presence.  For example, the merger enabled CVS to launch a hospital-readmission-prevention program, using Aetna data to identify CVS customers who

---

[3] *See, e.g.*, Inst. of Med., *Crossing the Quality Chasm* 187–88, 191–92 (2001) (fee-for-service payment "offers little incentive to contain total costs"); Am.'s Health Ins. Plans, *Prevention and Wellness Programs of Commercial Health Insurance Plans* 59 (June 21, 2017), https://www.ahip.org/wp-content/uploads/2018/08/Prevention-and-Wellness-Programs-of-Commercial-Health-Insurance-Plans__Final-Technical-Report4.pdf (most health plans have programs promoting wellness, but "engaging providers in the process is a challenge for most plans that are not in an integrated health system").

[4] *See also* CVS Analyst Day Tr. 11–12 (June 4, 2019) (Lotvin), https://s2.q4cdn.com/447711729/files/doc_events/2019/InvestorDay2019/CVS-USQ_Transcript_2019-06-04-(1).pdf.

[5] *Id.* at 7, 16 (Boratto, Lotvin).

recently were released from the hospital to provide timely medication evaluations and thereby prevent errors that often lead to unnecessary readmissions. *Id.* at 317:16–319:7 (Lotvin).

In perhaps the most significant new investment, CVS will convert roughly 1,500 stores into HealthHUBs with more space allocated to health and wellness, more MinuteClinic staff, and a wider array of MinuteClinic services. *Id.* at 313:16–315:2 (Lotvin). CVS launched three pilot HealthHUBs in Houston based on an analysis of Aetna data showing these stores were located in areas with high concentrations of patients with chronic disease—and justifying the considerable investments required. *Id.* at 317:1–15. HealthHUBs are also testing an intervention program that uses Aetna data to identify high-risk patients, whom CVS Pharmacists then contact and counsel on the actions they can take to improve their health, such as attending follow-up appointments, getting a flu shot, or picking up required medication. *Id.* at 314:8–315:10.

### 2.     The efficiencies are merger-specific.

CVS would be unable to offer these programs without the merger. Because the financial benefits of improved preventive care accrue first to insurers and patients, a provider like CVS cannot negotiate a contract that would justify large investments in cost-saving innovations. CVS tried to negotiate such agreements in the past, but never could achieve commercially viable terms. Tr. 312:21–313:18, 318:1–19 (Lotvin). The merger was essential to overcome bargaining friction resulting from "the difficulty inherent in assigning value to and negotiating over new, innovative" healthcare programs. *AT&T*, 310 F. Supp. 3d at 173.

### 3.     Amici's criticisms do nothing to disprove these efficiencies.

Amici offered no testimony to rebut these efficiencies. Dr. Diana Moss did not address merger efficiencies at all. Dr. Michael Wohlfeiler actually supported key innovations made possible by the merger despite insisting he could not "even conceive" how the merger could improve healthcare, Tr. 131:7–8. Among other things, he testified about the importance of

medication adherence, *id.* at 109:22 ("[A]dherence is a huge issue in this disease."); of "touch points" between providers and patients, *id.* at 111:6–22 ("[A] big part of it is having high touch with the patients."); and of sharing information between pharmacists and other providers, *id.* at 124:2–15 ("[V]ery frequently I find out for the first time that a patient is having side effects or problems with medication [because] the patient has told the pharmacist[.]").

Prof. Neeraj Sood testified that the Aetna data amount to "just medical bills" and that the merger would not provide sufficient "clinical detail" to improve pharmacist-delivered programs. *Id.* at 96:13–24.  This wildly under-sells the procedure-level information available to Aetna.  *See, e.g.*, *id.* at 312:2–20, 317:4–15 (Lotvin).  Information about patients' prior treatments makes it possible to implement HealthHUBs and myriad other innovations that generate significant direct benefits for employers and patients, including improved health outcomes, lower out-of-pocket costs (copays, coinsurance, deductibles), and lower premiums.  *Id.* at 329:6–24.

### B.     The Remedy Fully Addresses Any Competitive Concerns.

The remedy fully addresses any competitive concerns posed by the merger by requiring a total divestiture of Aetna's individual PDP business to WellCare, an experienced participant in the Part D industry with a demonstrated record of success.  WellCare is obtaining not only the assets necessary to maintain premerger levels of competition in the 16 regions in which the government alleged potential harm, but all of Aetna's standalone Part D assets in all 34 regions established by the Centers for Medicare and Medicaid Services (CMS).  And in addition to enhancing WellCare's economies of scale, the remedy provides WellCare all of the services, records and rights it needs for a smooth transition on a logical timeline built on the Medicare cycle.  Tr. 350:6–17, 350:22–353:19 (Swanson).

6

**1.  WellCare is fully capable of using the divestiture assets to bring even greater competition to the Part D industry.**

WellCare is a strong asset purchaser ideally positioned to step into Aetna's shoes and to effectively compete in the individual PDP market.  The Court heard testimony on this issue from Terri Swanson, Aetna's Vice President of Medicare Product and the Medicare Part D Business, who has led multiple insurers' Part D businesses since Part D first began in 2006, and who has worked with WellCare's management team on the transition as required to ensure the divestiture's success, providing her with the opportunity to observe WellCare, its management, and its place in the competitive landscape.  Tr. 336:24–337:16, 338:10–16, 339:11–22.

Ms. Swanson testified to WellCare's experience in the Part D space, its infrastructure, its capable and experienced management team, and its competitive offerings.  WellCare is a Fortune 200 company with 12,000 employees and $18 billion in annual revenue; excluding Aetna's divested assets, WellCare has 5.5 million members, all in highly regulated government programs. *Id.* at 340:2–7.  WellCare specializes in government-sponsored insurance programs and has operated as a nationwide Part D competitor since Part D began.  *Id.* at 344:22–345:25.  WellCare is the fastest-growing Part D competitor in the country, expanding from 1.1 million standalone Part D members to 1.6 million—more than three times the members Aetna gained over the same period.  *Id.* at 340:8–342:3.  In both absolute and relative terms, and as confirmed by CMS Part D enrollment data, WellCare's growth in 2019 exceeded that of every other PDP—including Aetna, CVS SilverScript, AARP, UnitedHealth, Humana, and Cigna.  *See id.* at 346:4–16.

The added scale from Aetna's 2.5 million standalone Part D members will further enhance WellCare's ability to negotiate with suppliers and offer high-value, low-cost plans as a vigorous Part D competitor for years to come.  *Id.* at 342:4–343:15, 350:12–21.  Part D plans must compete vigorously, because Part D beneficiaries are highly price-conscious; because each

region has 19 to 26 standalone Part D plans and multiple Medicare Advantage plans, all of which compete for customers; and because it is exceedingly easy for such consumers to compare prices and benefits, and to switch plans to get the best deal. *Id.* at 338:3–9, 343:16–344:21.

### 2. Amici's criticisms of WellCare and the divestiture lack support.

WellCare's size and scope. Both Prof. Sood and Dr. Moss claim WellCare is too small compared to Aetna, and that WellCare's lack of commercial business means it lacks the scale to drive deals with PBMs or other suppliers that are as favorable as those Aetna was able to obtain. Tr. 65:10–21 (Sood); *id.* at 149:23–150:8 (Moss). These criticisms fail to take into account that WellCare has been the fastest-growing Part D provider in the country. With the divested assets, WellCare will have over four million Part D members, giving it more scale than Aetna had. *Id.* at 342:4–21 (Swanson). And while academics like Prof. Sood and Dr. Moss may speculate about the effect of WellCare's lack of commercial business, those who participate in the industry know that Medicare regulations prevent insurers from using scale on the commercial side to enhance bargaining power on the government side, which means the lack of a commercial business does not impair WellCare's competitiveness in the Part D space. *See id.* at 346:1–16.

Brand recognition. Prof. Sood and Dr. Moss both claimed WellCare lacks Aetna's brand recognition, impairing WellCare's ability to compete with Aetna in the Part D space. Tr. 65:6–9, 69:7–12 (Sood); *id.* at 150:1–4, 155:1–156:12 (Moss). Again, these criticisms ignore WellCare's tremendous recent growth and the success of its low-premium plan—branded as WellCare—in the last enrollment cycle, which significantly outperformed other well-known brands such as AARP, Aetna, Cigna, Humana, and UnitedHealth. Brand is far less important to Part D customers than price. *Id.* at 346:17–347:20 (Swanson). And because customers have ready access to the online tools they need to compare and switch plans, they can be expected to choose those plans that deliver the best value, irrespective of brand strength. *Id.* at 343:16–344:14.

Dependence upon CVS Caremark.  Both Prof. Sood and Dr. Moss testified that WellCare would be dependent upon CVS Caremark for PBM services, which CVS could use to harm WellCare to benefit Aetna.  Tr. 29:5–31:8 (Sood); *id.* at 153:3–154:16 (Moss).  But as Ms. Swanson explained, both Aetna and WellCare have used CVS Caremark for PBM services for years while competing with CVS SilverScript in the Part D space, and both Aetna and WellCare have thrived.  *Id.* at 348:22–349:5, 360:17–361:7.  Part D plans using CVS Caremark as their PBM have grown faster, and obtained higher star ratings, than the market average—all while competing with CVS SilverScript.  *Id.* at 306:7–13 (Lotvin).  Because strict firewalls ensure competitively sensitive information is not shared between CVS's insurance and PBM businesses, the merger will have no effect on WellCare's ability to operate independently of CVS.  *Id.* at 361:8–19 (Swanson).  And because the PBM market is highly competitive, WellCare has many options (including its recently acquired PBM) should it choose to consider taking its business elsewhere.  *Id.* at 348:20–349:20 (Swanson); *id.* at 304:12–20 (Lotvin); *id.* at 266:4–7 (Wu).

Removal of a competitor.  Prof. Sood and Dr. Moss also argue the divestiture creates competitive concerns by reducing the number of PDP competitors, particularly in regions that post-merger Herfindahl–Hirschman Index ("HHI") levels supposedly render "highly" concentrated according to the Horizontal Merger Guidelines.  *E.g.*, *id.* at 43:20–44:3 (Sood); *id.* at 144:22, 146:9–10, 149:8 (Moss).  But as Amici's own data show, ECF No. 62, at 4 & n.23, these figures are not indicative of a "highly concentrated" industry, which requires an HHI of more than 2500.[6]  Tr. 273:10–24 (Wu).  Although a few regions "potentially" raise concerns under the Guidelines, none meets the threshold for a "highly concentrated" market in which

---

[6] Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* 19 (Aug. 19, 2010), https://www.justice.gov/sites/default/files/atr/legacy/2010/08/19/hmg-2010.pdf.

enhanced market power may be presumed.  ECF No. 56, at 22–23.  In fact, according to AMA,

the Medicare Part D HHI is 1,861[7]—much closer to "unconcentrated" (1,500) than "highly

concentrated" (2,500).  In any event, the HHI is just a starting point for the competitive analysis.

Tr. 273:10–12 (Wu).  Particularly given the strength of multiple competitors in all regions and

the limited market share of Aetna's and WellCare's combined individual PDP businesses, the

merger and divestiture are not likely to substantially lessen competition.  ECF No. 56, at 22–23.

### 3. The Data Show that the PBM Industry Is Intensely Competitive.

Amici's witnesses opined that the merger would enable CVS to raise prices for its PBM

services, and that the uncompetitive, opaque nature of the PBM market would prevent customers

from responding by taking their business elsewhere.  This is inaccurate in all respects.

First, the PBM industry is highly competitive.  In 2012, based on interviews with over

200 market participants, the review of millions of documents, and econometric analyses of sales,

cost, and bid data, the FTC cleared the merger of two large PBMs because its "investigation

revealed that competition for [employer] accounts is intense, has driven down prices, and

resulted in declining PBM profit margins[.]"[8]

PBMs face constant pressure to win and retain health plan business, both from other

PBMs and from plans that "insource" PBM services by expanding in-house PBM capabilities.

CVS Caremark bidding data show continued competition against other PBMs, including Express

---

[7] Richard M. Scheffler, *The Impact of Aetna's Proposed Medicare Part D Stand-Alone Prescription Drug Plan Divestiture to WellCare* 3 (May 31, 2019, revised June 17, 2019), http://petris.org/impact-aetnas.

[8] Fed. Trade Comm'n, *Statement Concerning the Proposed Acquisition of Medco Health Solutions by Express Scripts, Inc.* 2 (Apr. 2, 2012) [hereinafter *ESI/Medco FTC Stmt.*], https://www.ftc.gov/sites/default/files/documents/public_statements/statement-federal-trade-commission-concerning-proposed-acquisition-medco-health-solutions-express./120402expressscripts.pdf.  The FTC further found health plans have an even broader set of options because they "do not require the full array" of PBM services. *Id.* at 2 n.4.

Scripts, OptumRx, MedImpact, Prime Therapeutics, and Navitus, among others, *id.* at 222:15–224:1 (Wu)—and that CVS lost business to over ten different PBMs in 2017.[9]  Given this intense competition, historical market shares are poor predictors of market power as to future bids.[10]  For example, before they merged, Express Scripts and Medco together held 41% of the market,[11] but as of today that share has been cut nearly in half; UnitedHealth's OptumRx PBM was just entering the PBM space at that time, with an "infinitesimal" share,[12] but is now the third-largest PBM.[13]  And in the past two years alone, at least two Fortune 100 companies have expanded into the PBM marketplace:  Anthem, with over 40 million health plan members, launched IngenioRx; and Centene invested in and moved its large book of business to a small startup PBM, RxAdvance, to replace CVS Caremark.  Tr. 226:7–227:21, 263:3–266:1 (Wu).

Second, contrary to Prof. Sood's assertion that health plans lack the information to choose competitively priced PBM services, the PBM industry is not opaque to its customers: "[I]f [PBMs] want to bid on the business, they have to provide [pricing and other confidential] information."  *Id.* at 358:12–19 (Swanson).  PBM customers also typically have audit rights and

---

[9] AMA, Tunney Act Comments, TC-003, at 133 (Dec. 17, 2018), https://media.justice.gov/vod/atr/cvs-aetna-comments/tc-003.pdf (attaching CVS/Aetna Submission to California Department of Insurance (July 3, 2018)).

[10] *See ESI/Medco FTC Stmt.* at 2 ("[M]arket shares of the parties do not accurately reflect the current competitive environment and are not an accurate indicator of the likely effects of the merger . . . .").

[11] Adam J. Fein, *ESRX-MHS: Strategic and Market Analysis (1 of 3)* (July 25, 2011), https://www.drugchannels.net/2011/07/esrx-mhs-strategic-and-market-analysis.html.

[12] *Dissenting Statement of Commissioner Julie Brill Concerning the Proposed Acquisition of Medco Health Solutions Inc. by Express Scripts, Inc.* 7 (Apr. 2, 2012), https://www.ftc.gov/sites/default/files/documents/public_statements/dissenting-statement-commissioner-julie-brill/120402medcobrillstatement.pdf.

[13] Adam J. Fein, *CVS, Express Scripts, and the Evolution of the PBM Business Model* (May 29, 2019), https://www.drugchannels.net/2019/05/cvs-express-scripts-and-evolution-of.html.

the ability to conduct regular "market checks" to ensure pricing remains competitive during the course an existing contract. *Id.* at 326:8–22 (Lotvin); *see also id.* at 358:20–359:5 (Swanson).[14]

Third, though Amici's academic witnesses repeatedly suggested CVS could manipulate its PBM services to disadvantage its health insurance rivals and reduce customer choice, *id.* at 22:1–24:10 (Sood), this is not how PBM services work. PBMs are hired by customers— including employers, health plans, government agencies, and unions—to administer pharmacy benefits for their customers' individual members. These customers decide the structure of their pharmacy benefit, including copay tiers (the amount a member pays for brand or generic drugs), the formulary (which medically equivalent brand drugs a member has access to, at what price), and the pharmacy network (*e.g.*, all 70,000 pharmacies or fewer at lower cost), *id.* at 300:16– 301:10 (Lotvin); *id.* at 354:8–355:14 (Swanson). The results are highly customized and tailored to customer needs. *See id.* at 301:4–10 (Lotvin); ECF No. 118-1, at 1 (Letter from Gary Loeber).

###        C.        The Merger Will Not Enable CVS To Engage in Vertical Foreclosure.

Amici's witnesses speculated the merger will encourage CVS to harm its insurance rivals by raising the cost or lowering the quality of services or products CVS supplies in the PBM and pharmacy markets, *e.g.*, Tr. 34:24–36:5, 38:8–22 (Sood); *id.* at 159:19–161:3 (Moss), and that CVS will cut off rival pharmacies' and PBMs' access to Aetna insureds, *id.* at 158:24–159:7 (Moss). But the evidence shows the government was correct to conclude the merger is unlikely to give CVS the ability or incentive to foreclose competition. *See* ECF No. 56, at 24–28.

---

[14] PBM customers also "routinely retain expert consultants to identify potential bidders, develop detailed solicitations, and evaluate the proposals before settling on a winner." *ESI/Medco FTC Stmt.* at 7. "Because of their repeated interactions with PBMs, industry consultants are particularly well-suited to identify and counteract any attempted coordination by suppliers." *Id.*

First, the merger does not enable CVS profitably to raise prices for its PBM services. The PBM market is highly competitive, and if subjected to higher prices for PBM services, customers like WellCare can be expected to take their business to one of CVS's many large- and medium-sized PBM rivals, or to insource PBM services.  Tr. 349:6–20 (Swanson).  Implicitly conceding this point, Prof. Sood testified that because PBM margins are low relative to health insurance margins, CVS might be willing to disadvantage and risk losing a PBM customer to gain a customer for its health insurance business.  *Id.* at 34:24–36:5 (Sood).

But the Court perfectly captured the problem with this conjecture:  Such a strategy would be "cutting off your nose to spite your face."  *Id.* at 261:23–24.  CVS's revenues from its entire individual Part D business are about $3 billion.  *Id.* at 258:24–25 (Wu).  Revenues from the non-Aetna health plan portion of its PBM business, by contrast, are $36 billion.  *Id.* at 260:19–261:2 (Wu).  It would be commercially nonsensical for CVS to risk losing customers that comprise "a huge part of the overall CVS PBM business," *id.* at 261:1–2, in hopes that it will possibly gain some members in its much smaller Part D business.  *Id.* at 304:8–305:15, 328:17–329:3 (Lotvin).

Similarly, only a fraction (fewer than 10 million) of the 90 million lives served by CVS Caremark are insured by Aetna.  *Id.* at 328:23–329:3 (Lotvin); ECF No. 118-1, at 2.  And to maximize firm-wide growth, CVS Caremark must continue to "work with as many health plans and employers as possible."  Tr. 328:20–21.  The alternative—disadvantaging the non-Aetna plans that make up the vast majority of CVS Caremark's revenue—would be "economic suicide."  *Id.* at 329:1–3.

Additional facts show that CVS Caremark's PBM is not a "must have" for insurers and that insurers use numerous alternatives.  For instance, more than 70% of pharmacy claims are processed by a PBM other than CVS Caremark.  *Id.* at 216:11–14 (Wu).  And CVS Caremark's

13

win/loss data show that it frequently loses bids to many other PBMs.  *Id.* at 222:18–223:7.

Second, the merger does not enable CVS profitably to raise prices for its pharmacy services.  Prof. Sood and Dr. Moss claimed that CVS's pharmacy business has less incentive to give price discounts to competing health plans relative to its own plan, and that competing plans will have no choice but to accept higher rates in those markets where CVS is a "must-have pharmacy."  *Id.* at 39:8–17 (Sood); *id.* at 140:4–13, 154:9–24 (Moss).  But neither provided any details to explain how CVS would exert the alleged pressure, particularly given that CVS owns less than 15% of U.S. retail pharmacies.  *Id.* at 230:15-18 (Wu); *id.* at 328:23–24 (Lotvin).[15] Any effort by CVS to raise prices on its customers would amount to self-sabotage.

Finally, the merger will not encourage CVS to harm rival pharmacies by steering Aetna members to CVS pharmacies.  Again, Dr. Moss's theory—which lacks any explanation as to its mechanics, *id.* at 158:24–159:7—ignores that PBM customers, not PBMs, define their networks, *supra* p. 12, and burdening members by restricting them to CVS pharmacies is not a plausible option, Tr. 334:12–335:3 (Lotvin); *id.* at 61:19–62:13 (Sood).  As the Court observed, CVS-owned pharmacies constitute a fraction of the 70,000 pharmacies nationwide.  *Id.* at 32:14–17.

## III.    Amici's Witnesses Lack Expertise and The Evidence Refutes Their Testimony.

All three of CVS's witnesses have decades of experience in health care and direct knowledge of CVS's and Aetna's operations.  In contrast, Amici's witnesses did not demonstrate

---

[15] CVS is not a must-have pharmacy.  Several large health care programs, such as the U.S. Military's 9.4 million member Tricare program, exclude CVS from their pharmacy networks. *E.g.* Shelby Livingston, *CVS Pushed Out of Tricare Pharmacy Network*, Modern Healthcare (Oct. 3, 2016), https://www.modernhealthcare.com/article/20161003/NEWS/161009986/cvs-pushed-out-of-tricare-pharmacy-network.  And CVS pharmacies are non-preferred in a majority of Medicare Part D plan networks. *E.g.*, Adam J. Fein, *Walgreens Plays to Win: Our Exclusive Analysis of 2017's Part D Preferred Pharmacy Networks* (Oct. 25, 2016), https://www.drugchannels.net/2016/10/walgreens-plays-to-win-our-exclusive.html.

knowledge of or expertise in the PBM, PDP, or pharmacy industries, nor did they indicate their testimony was informed by input from WellCare or customers allegedly harmed by the merger.

### A.    Dr. Moss Lacks Expertise and Provided Inaccurate Testimony.

Although counsel presented Diana Moss as having "experience in antitrust and healthcare," Tr. 136:23–24, Dr. Moss has never worked in the health care industry and has never previously testified in court as an expert witness on antitrust or health care matters.  ECF No. 75-1 (Moss CV).  Moss lacks credibility as a witness with personal knowledge or expertise on the major subjects covered in her testimony, including PBMs, Part D, and pharmacies.

Dr. Moss's vertical merger analysis and credibility are especially suspect.  Contrary to her representation that she "agree[d] with" this Court's reasoning in the *AT&T* opinion, Tr. 154:20, Moss publicly criticized that decision as a "poorly framed opinion," "very one-sided," and "riddled with all sorts of inconsistencies, errors, misunderstandings about antitrust."[16]  She also suggested that "the antitrust laws are about protecting competition and consumers [but] Judge Leon doesn't think that," and stated the Court had "refut[ed] the role and importance of economic modeling."[17]  The D.C. Circuit, however, unanimously affirmed this Court's opinion.[18]

Dr. Moss's testimony contained numerous inaccurate statements.  For example:

- Dr. Moss testified that Medicare Part D "average monthly premiums have escalated rapidly, especially since 2015." Tr. 141:18–19.  That is untrue.  CMS, the agency that administers the Part D program, announced that "for the second year in a row, the

---

[16] C-Span, *Communicators Roundtable on AT&T-Time Warner Merger*, at 00:18, 29:35 (June 13, 2018), https://www.c-span.org/video/?446966-1/communicators-roundtable-att-time-warner-merger; Technology Policy Inst. Panel, *The AT&T/Time Warner* Decision, at 12:58 (June 19, 2018), https://techpolicyinstitute.org/events/the-att-time-warner-decision-what-it-means-for-technology-and-media-mergers.

[17] Technology Policy Inst. Panel, *supra* note 16, at 12:25, 12:58, 1:29:30.  Dr. Moss also alleged this Court "dismiss[ed] the value of anecdotal evidence in a merger investigation" and engaged in a "wholesale, lovefest, embracement of the defendants' claims" while giving "stingy, uncharitable treatment" to the government.  *Id.* at 34:25, 35:20.

[18] *United States v. AT&T, Inc.*, 916 F.3d 1029 (D.C. Cir. 2019).

average basic premium for a Medicare Part D prescription drug plan in 2019 is projected to decline."[19]  The continuing fall in Part D premiums undercuts Dr. Moss's theory that the merger will lead to "significantly higher premiums." *Id.* at 171:1–6.

- Dr. Moss asserted that "nobody knows how big the [PBM] rebates are" and that rebates are not reported at the federal level. *Id.* at 164:17–165:1.  In fact, Part D plans must report details on their rebates from PBMs in their annual bids.[20]  She also ignores that CVS has publicly disclosed data on its rebates:  It passes on 100% of its rebates for Medicare and about 98% of its rebates for its other businesses.[21]  PBM customers also have access to detailed information on rebate volume as part of their PBM contracts. *Id.* at 325:8–326:22 (Lotvin); *id.* at 359:7–360:5 (Swanson).

- Dr. Moss repeatedly and inaccurately testified that the Medicare Part D and PBM markets are "highly concentrated," s*ee, e.g.*, *id.* at 142:9, 144:22, 146:9–10, 149:8, 151:17, 163:2-12, though Amici's own data show they are not, *see supra* p. 10.

**B.      Dr. Wohlfeiler's Testimony Reveals AHF's Competitor Biases.**

Dr. Wohlfeiler's testimony makes clear that AHF is participating in this proceeding to protect its own interests as a competitor.  AHF "competes in the pharmacy market with CVS," "compete[s] with Aetna as a health plan," and "participate[s] as a provider through [its] retail clinics" (totaling over 60 clinics in 15 states, most embedded with AHF pharmacies). *Id.* at 103:1–15, 113:22–114:5.

After asserting that vertical integration of CVS/Aetna's health plan, pharmacy, and clinic businesses will not generate patient benefits, Dr. Wohlfeiler touted the benefits AHF has brought to consumers through its own vertically aligned assets. *Id.* at 103:8–18, 106:25–112:10.  Even while emphasizing the benefits of the "model of care" that allows AHF to "coordinat[e] between

---

[19] CMS, *Medicare Part D Premiums Continue to Decline in 2019* (July 31, 2018), https:// www.cms.gov/newsroom/press-releases/medicare-part-d-premiums-continue-decline-2019.

[20] *See* CMS, *Instructions for Completing the Prescription Drug Plan Bid Pricing Tool for Contract Year 2020* (Apr. 5, 2019), https://www.cms.gov/Medicare/Health-Plans/ MedicareAdvtgSpecRateStats/Bid-Pricing-Tools-and-Instructions-Items/BPT2020.html.

[21] CVS Health Q2 2018 Earnings Call (Aug. 8, 2018), https://www.fool.com/earnings/call-transcripts/2018/08/10/cvs-health-cvs-q2-2018-earnings-conference-call-tr.aspx.

our providers, our clinics, our pharmacies," *id.* at 106:1–3, Dr. Wohlfeiler insisted on the need to block CVS from vertically integrating the same types of assets through the merger.

In *AT&T*, this Court expressed the concern that, when competitors oppose a merger, "there is a threat that [their] testimony reflects self-interest rather than genuine concerns about harm to competition." *AT&T*, 310 F. Supp. 3d at 211. Dr. Wohlfeiler's testimony is a case in point. For example, he criticized mail-order pharmacies on the ground that patients may be offered a "financial benefit" for using them: "[T]hey'll get three months' worth of medication but only pay two months' worth of co-pays." Tr. 116:17–20. But lower copays are a patient *benefit* set by a PBM's customers (e.g., employers) to incentivize patients to use lower-cost options. This design saves both patients and their employers money—an outcome that is good for the public but threatens AHF's revenues, currently almost $2 billion annually.[22]

Dr. Wohlfeiler made several claims about the PBM industry that are contradicted by AHF's own experience. For example, he agreed with AHF's counsel that AHF cannot "just decide to go to another PBM." *Id.* at 119:2–16. But AHF currently uses "another PBM" for its own health plans that it markets to customers: MedImpact,[23] which is not one of the so-called "top three" PBMs, *id.* at 31:18–21 (Sood), but rather one of many alternative PBMs that has won bids against CVS Caremark, *id.* at 223:2–7 (Wu). And like Prof. Sood, Dr. Wohlfeiler also inaccurately attributed pharmacy network and plan design to PBMs, rather than health plans and their customers. *Id.* at 122:18–123:13.

Finally, Dr. Wohlfeiler's suggestion that the proposed Final Judgment be modified to

---

[22] *See* Christopher Glazek, *The C.E.O. of H.I.V.*, N.Y. Times (Apr. 26, 2017), https://www.nytimes.com/2017/04/26/magazine/the-ceo-of-hiv.html.

[23] AHF Positive Healthcare, *How to Get Prescription Drugs*, https://positivehealthcare.net/georgia/php/for-members/drug-benefit (last visited June 18, 2019).

impose a "guarantee[]" that AHF would be able to participate as a preferred provider for CVS's clients, *id.* at 132:1–6, would raise drug costs and eliminate a cost-saving choice for employers. If pharmacies do not have to compete on price to earn a preferred position in a network and are instead "guaranteed" a spot in the network, drug prices will go up.  That would elevate AHF's private interests above the public interest.[24]

### C.    Prof. Sood Lacks Antitrust Expertise and Relies on Flawed Assumptions.

Professor Sood is not qualified to testify on antitrust issues.  He holds a Ph.D in Policy Analysis from the RAND graduate school, but he has no expertise in antitrust law, competition, or industrial organization economics.  ECF No. 74-2 (Sood CV).  Sood's testimony also reflects AMA's biases as a competitor.[25]

Prof. Sood revealed his lack of relevant experience by repeatedly and inaccurately asserting that an HHI level between 1,500 and 2,500 raises "significant competitive concerns." *E.g.*, Tr. 42:1–2, 42:24–25, 51:24, 53:10–12, 55:1–3, 63:17–21, 69:1–6.  The Horizontal Merger Guidelines classify markets with such HHIs as "*potentially*" raising competitive concerns, and concentration alone is merely a starting point in the analysis.[26]

Prof. Sood uses similarly inaccurate assumptions to build a model that purports to show the divestiture will create competitive concerns.  To assess the effect on market concentration should WellCare fail to retain members, his model inexplicably assumes every PDP member WellCare loses would go to SilverScript, and not to UnitedHealth, Cigna/Express Scripts,

---

[24] Dr. Wohlfeiler also claimed, incorrectly, that as a nonprofit AHF lacks profit incentives. Tr. 101:18–20.  *See Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1390 (7th Cir. 1986) (Posner, J).

[25] AMA does not deny its members compete with CVS's retail clinics, HealthHUBs, specialty pharmacies, or home healthcare and infusion offerings—it instead urges the Court to pretend these financial interests do not exist when AMA opines on the merger.  *See* ECF No. 87.

[26] Prof. Sood also incorrectly calculated the HHIs with respect to low-income subsidy members in Arkansas and Hawaii.  ECF No. 116, at 8.

Humana, Anthem, Blue Cross plans, Rite Aid, or the dozens of other PDP competitors.  *See* Sood Demonstratives 18–19.  As Prof. Sood himself recognizes, there are 19 to 26 PDP options available to seniors in each region.  *Id.* at 7.

Other basic inaccuracies fundamentally undermine Prof. Sood's analysis of the PDP market.  Like Dr. Moss, he incorrectly claimed that premiums rise as concentration increases, Sood Demonstrative 8, even though CMS has stated Part D premiums have fallen two years in a row at the same time Prof. Sood claims HHIs have been increasing, *supra* p. 15.  He misrepresented the findings of three academic papers to support his claim that mergers have hurt the PDP market, Tr. 45:8–48:5, not only disregarding CMS data showing premium declines, but also ignoring statistical significances and omitted variables, and even one paper's finding that merger efficiencies more than offset any harm, *id.* at 274:18–276:25 (Wu).  He erroneously asserted that seniors must purchase a standalone PDP plan, *id.* at 15:7–11, when CMS enrollment data show that about 20 million seniors opt for Medicare Advantage plans containing pharmacy benefits.[27]  And he offered no facts to support his speculation that WellCare's purchase price reflects its likely inability to retain members; not only did he greatly overestimate Aetna's revenue and valuation, but his position was persuasively refuted by Dr. Wu, who explained that the price exceeded that of similar, prior PDP transactions, and that post-acquisition retention rates are typically around 95%.  *Id.* at 56:2–58:12 (Sood); *id.* at 252:22–258:15 (Wu).

Prof. Sood also endorsed a vertical foreclosure theory that lacks basis in antitrust precedent, particularly *AT&T*.  He failed to explain how CVS Caremark is a "must have" PBM when more than 70% of the marketplace is served by one of the many PBMs that frequently win

---

[27] CMS, *Monthly Contract Summary Report—June 2019*, https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/MCRAdvPartDEnrolData/Monthly-Contract-and-Enrollment-Summary-Report-Items/Contract-Summary-2019-06.html.

business from CVS Caremark.  *Id.* at 216:11–228:8 (Wu).  But even if CVS Caremark were a must-have PBM, CVS has no incentive to risk its $36 billion PBM business in hopes of incrementally growing its $3 billion PDP business.  In reaching a contrary conclusion, Prof. Sood failed to analyze the necessary elements, including customer loss rate (i.e., the number of members WellCare loses to another PBM, if any), diversion rate from WellCare to SilverScript, the profitability of those diverted customers relative to the lost WellCare business, and offsetting consumer benefits, including a standard efficiency of vertical mergers: elimination of double marginalization.  *Id.* at 266:8–272:22 (Wu); Wu Demonstrative 6.

Perhaps Prof. Sood's most glaring error is his assertion that PBMs set plan design and CVS would thus be able to manipulate Aetna's plan designs to benefit its PBM business.  *Id.* at 22:1–24:10.  Aetna's clients choose their plan designs, and CVS Caremark offers tens of thousands of network, formulary, and copay designs at its clients' request.  *See supra* p. 12.

Finally, Prof. Sood incorrectly asserted that CVS Caremark now owns 22 million Aetna PBM customers and that these customers are no longer "available" to CVS's competitors, Tr. 28:19–29:2, 94:15–95:3.  But at the time of the transaction Aetna provided pharmacy benefits through CVS Caremark to under 10 million members (excluding divested PDP lives), and did so pursuant to short-term contracts between Aetna and the members' employers (or other payors).  ECF No. 118-1, at 2.  Far from owning these members, CVS Caremark and Aetna must continually compete to retain them for pharmacy and medical benefits services.  *Id.* at 3.

## CONCLUSION

For all the forgoing reasons, as well as those stated in CVS's and the government's other filings in this matter, the Court should find the proposed Final Judgment is in the public interest and should enter it as a consent decree.

Dated:       June 21, 2019                    Respectfully submitted,


                                              /s/ Enu A. Mainigi
                                              Enu A. Mainigi
                                                   D.C. Bar No. 454012
                                              Craig D. Singer
                                                   D.C. Bar No. 445362
                                              Jonathan B. Pitt
                                                   D.C. Bar No. 479765
                                              **WILLIAMS & CONNOLLY LLP**
                                              725 12th Street, N.W.
                                              Washington, D.C. 20005
                                              Telephone: (202) 434-5000
                                              Facsimile: (202) 434-5029
                                              E-Mail: emainigi@wc.com

                                              Michael G. Cowie
                                                   D.C. Bar No. 432338
                                              Rani A. Habash
                                                   D.C. Bar No. 981388
                                              Michael H. McGinley
                                                   D.C. Bar No. 1006943
                                              **DECHERT LLP**
                                              1900 K Street, N.W.
                                              Washington, DC 20006
                                              Telephone: (202) 261-3300
                                              Facsimile: (202) 261-3333
                                              E-Mail: mike.cowie@dechert.com

                                              *Counsel for CVS Health Corporation*

## CERTIFICATE OF SERVICE

I, Jane Y. Chong, hereby certify that on June 21, 2019, I caused a copy of the foregoing document to be filed with the Court using the CM/ECF system, to be served upon Plaintiffs United States of America, State of California, State of Florida, State of Hawaii and State of Washingon via the CM/ECF system, and to be served upon Plaintiff State of Mississippi by mailing the documents electronically to its duly authorized legal representative:

**Counsel for State of Mississipi:**
Crystal Utley Secoy
Consumer Protection Division
Mississippi Attorney General's Office
P.O. Box 22947
Jackson, Mississippi 39225
Phone: (601) 359-4213
cutle@ago.state.ms.us

/s/ Jane Y. Chong
Jane Y. Chong
WILLIAMS & CONNOLLY LLP
725 12th Street, N.W.
Washington, D.C. 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
E-Mail: jchong@wc.com