UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,    ) | |
|                    ) | |
|       Plaintiffs,    ) | |
|                    ) | |
|       v.    )     Civil Case No. 18-2340 (RJL) | |
|                    ) | |
| CVS HEALTH CORPORATION, *et al.*,    ) | |
|                    ) | |
|       Defendants.    ) | |

## MEMORANDUM OPINION
(September 4, 2019) [Dkt. # 57]

The United States of America ("the Government") filed this lawsuit to challenge CVS Health Corporation's ("CVS's") acquisition of Aetna Inc. ("Aetna") as a violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. It now moves to resolve the case through entry of a negotiated consent judgment. *See* U.S. Mot. & Memo. in Supp. of Entering Prop. Final J. ("Mot. for Prop. Final J.") [Dkt. # 57]. When the Government seeks to settle a civil antitrust suit through a consent judgment, a court must independently "determine that . . . entry of [the proposed] judgment is in the public interest" before granting the Government's request. 15 U.S.C. § 16(e)(1) ("the Tunney Act"[1]). As such, this Court must determine whether the proposed consent judgment here is in the public interest.

That determination in this particular case, however, is no small matter. Industry players, consumer groups, and state regulatory bodies have all raised concerns about

---

[1] The Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)–(h), is also known as the Tunney Act.

CVS's acquisition of Aetna. The merger combines two healthcare giants. Its effects, for better or worse, will be felt by millions of consumers. As I explained to the parties near the outset of this case, with so much at stake, the congressionally mandated public interest inquiry must be thorough. Indeed, if the Tunney Act is to mean anything, it surely must mean that no court should rubberstamp a consent decree approving the merger of "one of the largest companies in the United States" and "the nation's third-largest health-insurance company," Compl. ¶¶ 15–16 [Dkt. # 1], simply because the Government requests it !

My determination of whether the Government's proposed final judgment is in the public interest will, of course, be based on the existing record, which has been meaningfully supplemented by the briefs and testimony presented by the parties and *amici curiae* ("the *amici*").[2] Indeed, the *amici* raised substantial issues that deserved serious consideration. Unfortunately for the *amici*, however, the record did not persuasively undermine the parties' contention that the proposed final judgment is in the public interest. Accordingly, for the following reasons, I have concluded that the Government's Motion to Enter the Proposed Final Judgment must be GRANTED.

## BACKGROUND

On October 10, 2018, the Government, along with the States of California, Florida, Hawaii, Mississippi, and Washington, sued to enjoin CVS's sixty-nine-billion-dollar acquisition of Aetna. *See* Compl. ¶¶ 1, 41. According to the Government's

---

[2] Four *amici*—the AIDS Healthcare Foundation, the American Medical Association ("the AMA"), Consumer Action, and U.S. PIRG—submitted briefs and participated in the hearings in this matter. Two additional *amici*—Pharmacists United for Truth and Transparency and the Pharmacists Society of the State of New York—filed briefs but declined to participate in the hearings.

complaint, "CVS . . . is one of the largest companies in the United States." *Id.* ¶ 15. Indeed, it is currently listed as number eight in the Fortune 500 list, *see* Fortune.com, Fortune 500, CVS Health, https://fortune.com/fortune500/2019/cvs-health, and "operates the nation's largest retail pharmacy chain; owns a large pharmacy benefit manager called Caremark; and is the nation's second-largest provider of individual [Medical Part D prescription drug plans ("PDPs")], with over 4.8 million members," Compl. ¶ 15. By acquiring Aetna, CVS purchased "the nation's third-largest health-insurance company and fourth-largest individual PDP insurer." *Id.* ¶ 16. Both companies earn billions of dollars in annual revenue. *See id.* ¶¶ 15–16. The Government alleged in its complaint that their merger would "lessen competition substantially in the sale of individual PDPs" in sixteen of the geographic regions[3] established by the Centers for Medicare & Medicaid Services ("CMS"), the agency that administers Medicare Part D. *See id.* ¶¶ 1, 2, 39; *United States ex rel. Fox Rx, Inc. v. Omnicare, Inc.*, 38 F. Supp. 3d 398, 402 (S.D.N.Y. 2014) (explaining that CMS "administers the Government's Medicare and Medicaid programs").

As soon as the complaint was filed, however, the Government submitted a notice attaching a proposed consent judgment that would settle the case. *See* U.S. Explanation of Consent Decree Procedures at 1 [Dkt. # 2]. To comply with the proposed judgment, Aetna would have to divest its individual PDP business to an independently owned competitor, WellCare Health Plans, Inc. ("WellCare"). The Government describes its

---

[3] The complaint alleges anticompetitive effects in "Arkansas, California, Florida, Georgia, Hawaii, Kansas, Louisiana, Mississippi, Missouri, New Mexico, North Carolina, Ohio, Oklahoma, South Carolina, Wisconsin, and the multistate region of Iowa, Minnesota, Montana, Nebraska, North Dakota, South Dakota, and Wyoming." Compl. ¶ 29.

proposed remedy as having five primary components:

> First, CVS must divest both of Aetna's individual PDP contracts with the Centers for Medicare and Medicaid Services. . . . Second, the proposed Final Judgment required CVS and Aetna to transfer all data relating to Aetna's individual PDP business to WellCare, including information regarding the amount that Aetna pays to retail pharmacies in exchange for filling prescriptions for Aetna members and any contracts with brokers that currently sell Aetna's individual PDPs. Third, during the 60-day period following the sale to WellCare, the proposed Final Judgment gave WellCare the opportunity to interview and hire Aetna's current employees with expertise related to the individual PDP business. Fourth, CVS must, at WellCare's option, enter into an administrative services agreement to provide WellCare with all of the services required to manage the divestiture assets through the 2019 plan year, which ends on December 31, 2019, including contracting with pharmacy networks, administering the plans' formularies, and providing back-office support and claims administration functions. Finally, CVS and Aetna must allow WellCare to use the Aetna brand for the divestiture assets through the 2019 plan year.

Mot. for Prop. Final J. at 2–3.

Because this is a civil antitrust suit brought by the Government, the proposed consent judgment is subject to the Tunney Act. *See* 15 U.S.C. § 16(b). That statute requires the Government to take several procedural steps before moving for entry of its proposed judgment.[4] *See id.* § 16(b)–(d). The Government must publish its proposed final judgment and a competitive impact statement[5] in the *Federal Register* at least sixty

---

[4] The Tunney Act also imposes, subject to a statutory exception, the procedural requirement that defendants "file with the district court a description of any and all written or oral communications" made by them or on their behalf "with any officer or employee of the United States concerning or relevant to" the proposed judgment. 15 U.S.C. § 16(g).

[5] The Tunney Act requires that a competitive impact statement recite:

> (1) the nature and purpose of the proceeding;
>
> (2) a description of the practices or events giving rise to the alleged violation of the antitrust laws;
>
> (3) an explanation of the proposal for a consent judgment, including an explanation of any unusual circumstances giving rise to such proposal or any provision contained therein, relief to be obtained thereby, and the anticipated effects on competition of such relief;

days before the effective date of the proposed judgment. *See id.* § 16(b). During the sixty-day period, the Government must receive and consider written comments about its proposed judgment. *See id.* § 16(b), (d). And at the close of the sixty-day period, it must publish a response to those comments in the *Federal Register* and file the same response with the Court. *See id.* The Government is also required to publish the proposed final judgment and competitive impact statement in a newspaper of general circulation in the district where the case is pending and to furnish the competitive impact statement to members of the public upon request. *See id.* § 16(b)–(c). When the Government moved for entry of final judgment in this case, it certified that it had completed all required procedural steps. *See* Cert. of Compliance with Provisions of the Antitrust Procedures and Penalties Act [Dkt. # 57-2].

In addition to these procedural steps, the Tunney Act "requires that before a proposed consent judgment" is "approved by the Court, the Court must determine that 'the entry of such judgment is in the public interest.'" *United States v. Airline Tariff Pub. Co.*, 836 F. Supp. 9, 11 (D.D.C. 1993) (quoting 15 U.S.C. § 16(e)). To establish that its proposed judgment meets this standard, the Government incorporated its response to the comments received during the sixty-day notice and comment period into its motion for entry of final judgment. *See* Mot. for Prop. Final J. at 4–5. To say the least, that response left much to be desired. It is rife with conclusory assertions that merely reiterate

---

(4) the remedies available to potential private plaintiffs damaged by the alleged violation in the event that such proposal for the consent judgment is entered in such proceeding;
(5) a description of the procedures available for modification of such proposal; and
(6) a description and evaluation of alternatives to such proposal actually considered by the United States.

15 U.S.C. § 16(b).

the Government's confidence in its proposed remedy, but shed little light on the reasons for that confidence. Indeed, the Government's perfunctory response to the public comments was particularly disappointing in light of the volume and quality of the comments to which it was responding![6]

For example, the AMA's comments criticized the Government's proposed divestiture remedy because the buyer—WellCare—relies on CVS for pharmacy benefit management[7] ("PBM") and retail pharmacy services. *See* Resp. to Comments at 26–27; *see also id.*, Ex. TC-003 at 9–12. The AMA contended that CVS has the ability to deny or restrict WellCare's access to those PBM and pharmacy services and, in so doing, threaten the success of the Government's proposed remedy. *See* Resp. to Comments at 26–27. In response, the Government merely asserted that "such foreclosure—whether directed at WellCare or any other insurer—is unlikely to occur." *Id.* at 27. This

---

[6] The Government received 173 comments, totaling over 1,800 pages, on its proposed judgment. *See* U.S. Resp. to Pub. Comments on Prop. Final J. ("Resp. to Comments") at 1 [Dkt. # 56]; *id.*, Exs. TC-001 to TC-085. The *amici* participating in this case each submitted comments raising plausible objections. The AMA's submission alone ran 224 pages, including multiple attachments authored by experts. *See id.*, Ex. TC-003. AIDS Healthcare Foundation submitted a letter from its Chief of Operations. *See id.*, Ex. TC-001. Consumer Action and U.S. PIRG submitted a letter on their own behalf and joined a second letter submitted with Consumer Reports and the Universal Health Care Foundation of Connecticut. *See id.*, TC-023 to TC-024. The Pharmacists Society of the State of New York and Pharmacists United for Truth and Transparency submitted the *amicus* brief they filed in this action as a comment on the proposed judgment. *See id.*, Ex. TC-060. In addition to *amici*'s comments, the Government received submissions from American Pharmacy Cooperative, Inc.; the Association of American Physicians and Surgeons, Inc.; the Massachusetts Independent Pharmacists Association; the Medical Society of the State of New York; the National Community Pharmacists Association; and the West Virginia Independent Pharmacy Association, among many others.

[7] Pharmacy benefit managers, or PBMs, "implement[] and administer[]" drug and pharmacy benefits on behalf of clients, such as health plans, employers, and unions. Ltr. to the Court from Gary A. Loeber of CVS ("Loeber Ltr.") at 1 (June 19, 2019) [Dkt. # 118-1]. This involves "contract[ing] with . . . retail pharmacies," "'adjudicat[ing]' . . . claims," and "negotiat[ing] discounts and rebates with pharmaceutical manufacturers." *Id.* at 1–2. To provide these services, PBMs build nationwide networks of retail pharmacies and design drug formularies, which list the drugs that will be covered by the PBM client. *See* Hr'g Tr. at 233:11–19 (June 5, 2019 A.M.) [Dkt. # 111]; Hr'g Tr. at 299:12–300:15, 322:21–323:14 (June 5, 2019 P.M.) [Dkt. # 112].

conclusion was apparently based on the Government's review of "evidence [that] showed . . . CVS is unlikely to be able to profitably raise its PBM or retail pharmacy costs post-merger." *Id.* at 26. But the Government did not describe the evidence it reviewed. Nor did it explain how that evidence supports its conclusion that CVS will not likely be able to profitably raise its prices. Without such a description and explanation, the Government's response to the AMA's criticism is little more than a bald assertion that it is right and the AMA is wrong.[8]

Rather than risk an uninformed public interest determination that relied too heavily on responses like these from the Government, I decided to hold hearings on the Motion to Enter the Proposed Final Judgment. The hearings were designed to assist the Court in evaluating the public record. The parties and the *amici* were given the opportunity to propose up to three witnesses who could be called to testify. The Court alone would decide which of those witnesses it believed would be most helpful to its analysis and how much time would be allotted to each witness. In the end, the *amici* were allowed to call a combined total of three witnesses who were permitted to testify for a total of four hours. CVS and the Government were allowed the same combined total of witnesses and the same combined total number of hours of testimony. To reinforce my repeated emphasis that the hearings were *not* a trial, cross-examination was not permitted. Only the Court was allowed to ask follow-up questions during the direct examination of each witness.

At the hearings, which lasted two days, the AMA examined Dr. Neeraj Sood, a

---

[8] *See supra* note 6.

7

college professor who is an expert on health policy. Consumer Action and U.S. PIRG jointly examined Dr. Diana Moss, an economist who is president of the American Antitrust Institute. And the AIDS Healthcare Foundation elicited factual testimony from the Foundation's Chief Medical Officer, Dr. Michael Wohlfeiler.

After *amici*'s testimony, the parties to the case were permitted a rebuttal presentation. I heard testimony from Dr. Alan Lotvin, CVS's Executive Vice President and Chief Transformation Officer, and from Dr. Lawrence Wu, an expert in economics offered by CVS. Thereafter, the Government and CVS jointly designated Terri Swanson, Vice President for Medicare Part D products at Aetna, to testify about the PDP assets Aetna sold to WellCare.[9]

The parties and *amici* then submitted supplemental briefing that addressed the evidence presented at the hearings. Finally, oral argument on the Government's Motion for Entry of Final Judgment was held on July 19, 2019.

## STANDARD OF REVIEW

The Tunney Act provides that, when making a public interest determination, "the court shall consider":

> (A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of

---

[9] The Government cross-designated Ms. Swanson as a hearing witness, *see* U.S. Witness List at 5 [Dkt. # 84], but, for reasons known only to the Government, declined to question her after CVS's examination was complete, even though I expressly reserved half of the witness's time for questioning by the Department of Justice, *see* Minute Order (May 31, 2019); Hr'g Tr. at 336:10–15, 363:2–5 (June 5, 2019 P.M.). Curiously, the Government, in subsequent pleadings, misrepresented that it was never permitted to call its own witnesses at the hearings. Such phantasmagorical claims are, of course, demeaning to the credibility of the Antitrust Division's litigation position. As I said when I corrected the record at our most recent hearing, "I hope and trust the Department of Justice will refrain from these misrepresentations going forward. Doing so reflects poorly on the important work that they are doing on a regular basis for the good of the American people." Hr'g Tr. at 10:14–17 (July 19, 2019) [Dkt. # 133].

relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

(B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint . . . .

15 U.S.C. § 16(e)(1).

The public interest inquiry is "not . . . 'a *de novo* determination of facts and issues.'" *United States v. Newpage Holdings Inc.*, No. 14-2216, 2015 WL 9982691, at *5 (D.D.C. Dec. 11, 2015) (quoting *United States v. Western Elec. Co.*, 993 F.2d 1572, 1577 (D.C. Cir. 1993)). The Court need "only . . . confirm that the . . . settlement is within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1460 (D.C. Cir. 1995) (quotation marks, citation, and italics omitted).

But neither is the inquiry a mere formality or judicial rubberstamp. If, for example, a proposed consent "decree is ambiguous, or the district judge can foresee difficulties in implementation," the decree should not be entered until the problems are fixed. *Microsoft*, 56 F.3d at 1462. "[I]f third parties contend that they would be positively injured by the decree, a district judge might well hesitate before assuming that the decree is appropriate." *Id.* And no "judge is . . . obliged to accept [a consent decree] that, on its face and even after government explanation, appears to make a mockery of judicial power." *Id.*

Throughout this case, the Government has repeatedly asked this Court to dismiss out of hand many of *amici*'s objections to its proposed final judgment. Relying for the

9

most part on *United States v. Microsoft Corporation*, 56 F.3d 1448 (D.C. Cir. 1995), the Government argues that consideration of harms that were not alleged in the complaint would "aggravate . . . 'constitutional difficulties that inhere'" in the Tunney Act. U.S. Resp. to Order to Show Cause at 2 [Dkt. # 32] (quoting *Microsoft*, 56 F.3d at 1459). To avoid this purported aggravation, the Government contends that the Court must ignore all evidence regarding "harm outside of the individual PDP market," "theor[ies] of harm that the United States did not allege," and "efficiencies" gained from the merger. U.S. Mot. to Limit the Scope of the Tunney Act Hr'g at 4–6 [Dkt. # 82].

To say the least, these arguments severely understate the permissible scope of a Tunney Act review. The "constitutional difficulties" our Circuit Court addressed in *Microsoft* were implicated because a court "reach[ed] beyond the complaint to evaluate *claims* that the government did *not* make." 56 F.3d at 1459 (first italics added). Courts cannot, of course, "force the government to make [a] claim." *Id.* at 1460. The Government, alone, chooses which causes of action to allege in its complaint.

But *Microsoft* never says that allegations in the complaint are the *only harms* courts may consider in a Tunney Act review.[10] Indeed, such a holding would have contradicted the Tunney Act itself. There, Congress directs courts to consider "the impact of entry of [a] judgment" on *both* "individuals alleging specific injury from the

---

[10] Curiously, this appears to be the Government's actual position. *See* Hr'g Tr. at 19:24–20:8 (July 19, 2019) ("THE COURT: So the government's position is even if the Court were to somehow identify harms that were not mentioned in the complaint and those harms would in some way undermine the public interest, the Court is to turn a blind eye to those and focus on just the harms that were alleged in the complaint? Is that essentially your position? [Counsel for the Government]: Yes, Your Honor. The public-interest determination here is measured in light of the allegations made in the United States' complaint.").

violations set forth in the complaint" *and* "the *public generally.*" 15 U.S.C. § 16(e)(1)(B) (emphasis added); *see also United States v. BNS Inc.*, 858 F.2d 456, 462–63 (9th Cir. 1988) ("[T]he [Tunney Act] does not authorize a district court to base its public interest determination on *antitrust concerns* in markets other than those alleged in the government's complaint. . . . Nevertheless, the statute clearly indicates that the court may consider the *impact of the consent judgment* on the public interest, *even though that effect may be on an unrelated sphere of economic activity.*" (emphasis added)). A Tunney Act review that ignores harms that will flow from the entry of a proposed judgment to the general public ignores the language Congress uses in the Act. *See Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1659 (2017) (Courts "presum[e] that each word Congress uses is there for a reason.").

The *Microsoft* Court recognized this very point. It explained that the Tunney Act reflects Congress's understanding that "a consent decree might well do unexpected harm to persons other than those 'alleging specific injury from the violations set forth in the complaint,'" so "district court[s] might ponder those sort of concerns in determining whether to enter [a proposed] judgment." *Microsoft*, 56 F.3d at 1459 (quoting 15 U.S.C. § 16(e)(2) (1988), now codified at 15 U.S.C. § 16(e)(1)(B)). The *Microsoft* Court went on to specifically identify three examples of when complaint allegations do not circumscribe a Tunney Act inquiry. Courts, it said, may review whether a "decree is ambiguous, or . . . difficult[] [to] implement[]," whether "third parties . . . w[ill] be positively injured by the decree," and whether entry of a decree would "make a mockery of judicial power." *Id.* at 1462. Adequately reviewing any of these potential harms to the

public interest could require a court to look beyond the four corners of the Government's complaint. But none constitute the "evaluat[ion of a] claim[] that the government did not make." *Id.* at 1459 (italics omitted). All, therefore, are fair game. *See id.* at 1462; *BNS Inc.*, 858 F.2d at 462–64.

The Government's suggestion here—that by narrowly drafting a complaint it can effectively force the Court to shut its eyes to the real-world impact of a proposed judgment—thus misconstrues *Microsoft*.[11] It also strikes at the heart of the Tunney Act's very purpose. Congress passed the law to "ensure[] that the economic power and political influence of antitrust violators do not unduly influence the government into entering into consent decrees that do not effectively remedy antitrust violations." *Airline Tariff Pub. Co.*, 836 F. Supp. at 11. The Government's position here could actually facilitate such undue influence so long as unduly influenced attorneys strategically draft complaints to shield their indifference to the public interest from judicial review. Neither the statute, nor *Microsoft*, supports such a reading. Therefore, while the Government is certainly entitled to great deference—if not a presumption of accuracy—when it contends that a proposed final judgment is in the public interest, evidence by third parties that

---

[11] Reading *Microsoft* too narrowly, as the Government does, also ignores Congress's response to that very case. In 2004, Congress amended the Tunney Act and included in the amendments congressional findings that reject a narrow reading of *Microsoft*. *See* Antitrust Criminal Penalty Enhancement and Reform Act of 2004, Pub. L. 108-237, Title II, § 221(a)(1)(B), 118 Stat. 661, 668 (June 22, 2004) ("[I]t would misconstrue the meaning and Congressional intent in enacting the Tunney Act to limit the discretion of district courts to review antitrust consent judgments solely to determining whether entry of those consent judgments would make a 'mockery of the judicial function.'"); 150 Cong. Rec. S3617–18 (Apr. 2, 2004) (statement of Sen. Kohl) ("The language quoted paraphrases the D.C. Circuit decisions in *Massachusetts School of Law v. U.S.*, 118 F.3d 776, 783 (D.C. Cir. 1997) and *U.S. v. Microsoft*, 56 F.3d 1448, 1462 (D.C. Cir. 1995). To the extent that these precedents are contrary to section 221(a) of our bill regarding the standard of review a court should apply in reviewing consent decrees under the Tunney Act, these decisions are overruled by this legislation.").

persuasively demonstrates actual or likely harm to the public interest will overcome that presumption and the proposed final judgment will be denied.

Thus, based on a correct reading of *Microsoft* and the Tunney Act, the potential harms to the public interest raised by the *amici* in this case fall within the permissible scope of this Court's review. As such, notwithstanding the Antitrust Division's protestations to the contrary, a judicial evaluation of those alleged harms raises no constitutional issue.

## ANALYSIS

*Amici*'s testimony and briefs alleged a variety of harms to the public interest that the final judgment would cause if it were entered by the Court. While those concerns shed a healthy light on this merger, the *amici* did not substantially undermine the parties' public interest position by persuasively demonstrating that their concerns currently exist or are likely to develop. This was especially so in light of the rebuttal presentations by CVS and the Government. A review of the *amici*'s major concerns should be sufficient.[12]

Principal among *amici*'s concerns were the following three contentions: (i) Aetna's divestiture to WellCare will not effectively remedy the harm to the PDP market alleged in the complaint; (ii) the proposed final judgment's failure to address effects in markets adjacent to the PDP market—like the market for PBM services—will undercut the effectiveness of the divestiture remedy and harm the public; and (iii) entry of the proposed final judgment without modification will harm HIV and AIDS patients in

---

[12] *Amici* had a number of other concerns, but they address harms that, by comparison, are less likely than their principal concerns to undermine the parties' claim that the merger is in the public interest. As such, they do not warrant further discussion.

need of affordable, quality healthcare. I will discuss each in turn.

First, *amici* contend that the divestiture to WellCare mandated by the proposed judgment will *not* remedy the competitive harm to the PDP market alleged in the Government's complaint. *Amici* argue that, according to the Herfindahl-Hirschman Index ("HHI"),[13] the divestiture leaves the PDP market overly concentrated and anticompetitive and that WellCare—which is smaller than Aetna, has a less recognizable brand than Aetna, and simultaneously competes against and contracts with CVS—will not be as strong a competitor in the PDP market as Aetna was.

In response, CVS and the Government provided a more persuasive rebuttal. Terri Swanson, the Vice President in charge of Aetna's Medicare Part D products prior to the divestiture, was the hearing witness most familiar with the PDP market and the PDP assets that WellCare purchased. *See* Hr'g Tr. at 336:24–337:16, 338:10–16, 339:9–22 (June 5, 2019 P.M.). Her testimony focused on how the PDP market is already highly competitive. *See id.* at 342:22–344:5. She described CMS's Medicare Plan Finder tool, which allows PDP customers to compare plans in granular detail. *See id.* at 343:16–344:5. Using CMS's tool, customers can see "the price of a specific drug at a specific pharmacy for a specific plan" before purchasing a PDP plan. *Id.* CMS also makes it "very easy for [customers] to switch" PDP plans online or over the phone. *Id.* at 344:6–14. Ms. Swanson explained that, because PDP plans can be easily compared and swapped, variables like brand recognition are far less important to maintaining PDP

---

[13] "Market power or the lack of it is often measured by the HHI," which "is calculated by squaring the individual market shares of all firms in the market and adding up the squares." *FTC v. PPG Indus.*, 798 F.2d 1500, 1503 (D.C. Cir. 1986).

market share than simply offering the drug coverage customers want for a couple of dollars less than competitors. *See id*. at 346:17–348:11.

She also emphasized that WellCare has been a successful competitor in these very conditions. Prior to Aetna's divestiture, WellCare "added around half a million" new members—growing from "about 1.1 million members" to "about 1.6 million members"—by underselling Aetna "a dollar or two" on "similarly situated plans." Hr'g Tr. at 340:8–342:3, 346:17–347:20 (June 5, 2019 P.M.). WellCare did so despite being smaller than Aetna. *See id*. at 342:4–11. It also did so while both competing against CVS in the PDP market and contracting with CVS for PBM services. *See id*. at 360:17–361:7; Hr'g Tr. at 228:9–228:19; 251:10–19 (June 5, 2019 A.M.). WellCare thus showed, before the divestiture, that it could attract customers from larger competitors under conditions similar to those it faces now. It stands to reason that, notwithstanding *amici*'s concerns, WellCare can and will continue to compete post-merger, after its market share has been bolstered by the purchase of Aetna's assets.

With respect to *amici*'s other concern—PDP market concentration—CVS's expert, Dr. Lawrence Wu, emphasized that *amici*'s HHI analysis shows that the PDP market is "moderately," as opposed to "highly," concentrated under the Government's guidelines. *See* Hr'g Tr. at 272:23–273:24 (June 5, 2019 A.M.). According to the Government, the HHI scores at issue here merely indicate *potential* competitive concerns, *not* a presumption of market power.[14] *See* Resp. to Comments at 21–22. And while

---

[14] The AMA does argue that in one geographic market—Hawaii—the divestiture causes an increase in HHI score that is sufficient to raise a presumption of enhanced market power. *See* Hr'g Tr. at 40:7–14 (July 19, 2019). But even "where the HHI calculation . . . indicates a merger to be presumptively illegal,"

*amici* argue that studies have concluded that increased concentration in the PDP market causes premiums to rise, *see* Hr'g Tr. at 46:9–19 (July 19, 2019), CVS and the Government have pointed to evidence that shows the market has remained quite competitive. For example, CMS reported in July 2018 that, "for the second year in a row, the average basic premium for a Medicare Part D prescription drug plan . . . is projected to decline." CMS, *Medicare Part D Premiums Continue to Decline in 2019* (July 31, 2018), https://www.cms.gov/newsroom/press-releases/medicare-part-d-premiums-contin ue-decline-2019; *see also* Hr'g Tr. at 70:9–20 (July 19, 2019). Considering that the PDP market was already moderately concentrated when this announcement was made by CMS, *see* Hr'g Tr. at 43:16–44:3 (June 4, 2019 A.M.) [Dkt. # 109], *amici*'s concerns are not borne out by present circumstances.

In the final analysis, PDP customers do have numerous options when picking a plan, and many of the plans are offered by major healthcare players, including United Healthcare, Humana, Cigna, and Rite Aid. *See* Hr'g Tr. at 342:22–343:15 (June 5, 2019 P.M.). The moderate concentration in the PDP market has neither prevented WellCare from competing in the market, nor prevented price competition from driving premium prices down, in recent years.[15] Accordingly, *amici*'s warnings of similar conditions after

---

the calculation "establish[es] [only] a prima facie case of an anticompetitive merger," necessitating "a more comprehensive and holistic assessment of whether the proposed merger is likely to create or enhance market power or facilitate its exercise." *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 124 (D.D.C. 2004). For the reasons discussed throughout this Memorandum Opinion, the evidence showed that PDP markets remain competitive despite *amici*'s HHI calculation. This is true even in Hawaii, where the average PDP price fell in 2019. *See* Hr'g Tr. at 70:9–20 (July 19, 2019).

[15] *Amici* also argued that the WellCare divestiture will be ineffective because WellCare is unlikely to retain all of Aetna's former PDP customers. But because the evidence showed that the individual PDP market is competitive, with multiple plan options available to customers, concerns about WellCare's customer retention rate do not establish the divestiture is contrary to the public interest. Former Aetna

Aetna's divestiture do not persuasively establish that the proposed judgment is ineffective or will otherwise be contrary to the public interest.

*Amici* next argue that the proposed judgment's failure to address the merger's effects in PDP-adjacent markets—such as the market for PBM services—threaten the success of the Government's proposed remedy and potentially harm third parties and the general public. How so?

CVS is a major player in the PBM market. It accounts for close to a quarter of PBM market share, and with the two other top PBMs, CVS is part of "the big three" that control about 70% of the market. *See* Adam J. Fein, *The CVS-Aetna Deal: Five Industry and Drug Channel Implications*, Drug Channels (Dec. 5, 2017), https://www.drugchannels.net/2017/12/the-cvs-aetna-deal-five-industry-and.html.

*Amici* argue that CVS can leverage this power in the PBM market to disadvantage companies that compete against its newly expanded health insurance business. They theorize that CVS could, for example, raise the price of its PBM services when selling the services to health insurance competitors.[16] If the competitors cannot find cheaper PBM services elsewhere, CVS's rivals may then have to raise the price of their insurance products or accept reduced profits, leaving CVS with the more attractive insurance offerings or more profitable business. *Amici* argue that this would harm members of the general public, who could end up overpaying for pharmacy benefits. And it would

---

customers who choose to leave WellCare will likely find themselves in a competitive market and will not necessarily need to turn to CVS to purchase a new PDP plan.

[16] *Amici* also theorize that CVS could reduce access to certain formulary-listed drugs or PBM services post-merger. *See, e.g.*, Hr'g Tr. at 159:22–163:12 (June 4, 2019 P.M.) [Dkt. # 115]. Those theories raise the same issues as *amici*'s contention that CVS could raise the price of its PBM services, so they need not be analyzed separately.

threaten the success of the Government's proposed divestiture remedy because WellCare, which both competes against CVS in the PDP market and contracts with CVS for PBM services, would be vulnerable to such a tactic.

But again, CVS presented more persuasive evidence that substantially undermines *amici*'s theory. Notwithstanding CVS's significant market share, the evidence showed that CVS must compete vigorously to retain its PBM customers. Dr. Wu explained that CVS's PBM competes on two fronts. First, rival PBMs try to underbid CVS. *See* Hr'g Tr. at 222:15–224:1 (June 5, 2019 A.M.). Indeed, Dr. Wu concluded, based on a review of bid data, that CVS "lose[s] bids all the time." *Id.* In fact, it "lost business to more than ten different PBM competitors" in 2017. Resp. to Comments, Ex. TC-003 at 133. Second, CVS's PBM oftentimes competes against its own customers. *See* Hr'g Tr. at 263:3–264:9 (June 5, 2019 A.M.). After all, health insurance companies can move PBM services in house when and if they consider CVS's price for contract services too high. *See id.*; Hr'g Tr. at 324:20–326:7 (June 5, 2019 P.M.).

Moreover, PBM customers have ways of ensuring that they receive the best deal the market can offer. Clients, for example, "demand market checks, which means, even if you have a 3-year contract, . . . during the contract[,] . . . that PBM client will have the right to take the business back out for a market check." Hr'g Tr. at 326:8–22 (June 5, 2019 P.M.). PBM clients also negotiate directly with pharmaceutical manufacturers to confirm that their PBM is providing the lowest available price for the manufacturer's drugs. *See id.* at 325:2–7.

This evidence combined strongly suggests that, if CVS were to raise its PBM

18

prices, customers like WellCare could simply switch to a less expensive PBM or stop contracting for those PBM services altogether. Were CVS to raise PBM prices in this scenario, it would risk losing PBM market share without disadvantaging WellCare or other competing insurers at all. To say the least, that would be an enormous risk for CVS to take.

Indeed, Dr. Lotvin addressed that very problem when he testified that focusing CVS's business only on its health insurance customers "would be economic suicide." Hr'g Tr. at 328:15–329:3 (June 5, 2019 P.M.). CVS's PBM business covers about 90 million lives. *See id.* Its pharmacies[17] "probably see a third of the people in the country over the course of [a] year." *Id.* The health insurance business CVS acquired from Aetna, by contrast, covers about 22 million lives, and Aetna provided pharmacy benefits to fewer than 10 million of them.[18] *See id.*; Loeber Ltr. at 2. *Amici* may well be correct that CVS wants to grow its health insurance business. But that does not mean the company would risk jeopardizing its 90-million-life PBM business or 100-million-life

---

[17] *Amici* also raised concerns about CVS's retail pharmacies. But the arguments about pharmacies do not show harm to the public interest for the same reasons that *amici*'s concerns about CVS's PBM business do not. Again, the evidence showed that, if CVS were to raise prices for or reduce access to its retail pharmacies, health insurers could take their business to CVS's competitors. Dr. Lotvin testified that most national pharmacy networks include around 50,000 to 60,000 pharmacies. *See* Hr'g Tr. at 335:1–3 (June 5, 2019 P.M.). CVS owns less than 15% of the nation's approximately 70,000 retail pharmacies. *See* Hr'g Tr. at 32:9–33:2 (June 4, 2019 A.M.). So a network of more than 50,000 pharmacies can be constructed without including a single one owned by CVS. In fact, within the last three years, CVS's pharmacies have been excluded from a major pharmacy network. *See* Shelby Livingston, *CVS Pushed Out of Tricare Pharmacy Network*, Modern Healthcare (Oct. 3, 2016), https://www.modernhealthcare.com/article/20161003/NEWS/161009986/cvs-pushed-out-of-tricare-pharmacy-network ("In a blow to CVS Health Corp., pharmacy benefit manager Express Scripts Holding Co. announced it has ousted the provider from the pharmacy network it manages for Tricare, the U.S. Defense Department's health benefits program with 9.4 million beneficiaries."). Like with its PBM business, the evidence showed that CVS is likely to lose customers if it tries to disadvantage competitors by raising the price of, or reducing access to, its retail pharmacy services.

[18] In addition, CVS's individual PDP business covers almost 5 million lives. *See* Compl. ¶ 15.

pharmacy business to funnel customers toward its much, much smaller health insurance business. As I pointed out during the hearings, that would surely be a case of "cutting off your nose to spite your face"! Hr'g Tr. at 261:23–24 (June 5, 2019 A.M.).

As such, the record here did not persuasively establish *amici*'s contention that the proposed final judgment's failure to address the PBM market will likely result in harm to the public interest.

Finally, *amici* argue that the proposed final judgment will harm certain HIV and AIDS patients. Dr. Michael Wohlfeiler, of the AIDS Healthcare Foundation, testified about the importance of comprehensive, HIV-and-AIDS-specific treatment programs in addressing those conditions. *See* Hr'g Tr. at 107:9–113:17 (June 4, 2019 P.M.). Success in treating HIV and AIDS can often turn on patients' adherence to complicated medicinal regimens. *See id.* at 109:4–110:2. Those adherence rates increase when specialists remain in frequent contact with patients. *See id.* at 110:13–112:10. And even simple procedures, like flu shots, can be fraught with danger when a patient with HIV or AIDS receives treatment from someone who lacks specialized training. *See id.* at 127:9–24. Dr. Wohlfeiler's testimony demonstrated that, *if* the proposed final judgment were to cause patients to leave HIV-and-AIDS-specific treatment providers for providers that are unequipped to treat those conditions, the judgment could cause harm.

For the reasons already discussed, however, the record did *not* establish that the proposed final judgment will likely result in CVS gaining the ability to steer patients away from their current healthcare providers. Indeed, that reasoning applies with even more force to patients receiving healthcare from the AIDS Healthcare Foundation

because it embeds its own pharmacies in its clinics and contracts with MedImpact, one of CVS's competitors, for PBM services. *See* Hr'g Tr. at 103:8–15 (June 4, 2019 P.M.); Hr'g Tr. at 224:9–10 (June 5, 2019 A.M.). Put simply, if the record did not establish that CVS will be likely to steer customers away from WellCare, which relies on CVS for PBM services, it certainly did not establish that CVS will be likely to steer patients away from the AIDS Healthcare Foundation, which uses a different PBM and maintains its own pharmacies. As such, the potential harm to this segment of the public was not persuasively established on the record either.[19]

## CONCLUSION

Although *amici* raised substantial concerns that warranted serious consideration, CVS's and the Government's witnesses, when combined with the existing record, persuasively support why the markets at issue are not only very competitive today, but are likely to remain so post-merger. Consequently, the harms to the public interest the *amici* raised were not sufficiently established to undermine the Government's conclusion to the contrary.

As such, for all of the above reasons, I have concluded that the proposed settlement is well "within the reaches" of the public interest and the Government's Motion to Enter the Proposed Final Judgment [Dkt. # 57] should therefore be GRANTED. *See Microsoft*, 56 F.3d at 1460 (In the final analysis, "the court's function is not to determine whether the resulting array of rights and liabilities is the one that will

---

[19] The AIDS Healthcare Foundation requested several specific modifications to the Government's proposed final judgment. Since I have determined that the proposed judgment, as submitted, is in the public interest, it will be entered without the modifications proposed by the AIDS Healthcare Foundation.

*best* serve society, but only to confirm that the resulting settlement is within the *reaches* of the public interest." (quotation marks and citations omitted)). An Order consistent with this decision and an executed version[20] of the Final Judgment that was submitted with the Government's motion accompany this Memorandum Opinion.

RICHARD J. LEON
United States District Judge

---

[20] The executed version of the Final Judgment was modified slightly in the last paragraph of the preamble by deleting the words "before any testimony is taken," which, if left in, would obviously conflict with the two days of hearings held by the Court in June 2019.